Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATTI KLAIR, ROBERT MYERS, ROBERT BARNES, ERIC CARNRITE, ELIZABETH HILL-D'ALESSANDRO, ROBERT TANNEHILL, DITAS TANNEHILL, JOSE REMENTERIA, TEENA REMENTERIA, CHARLES BRAUER, LAURA BRAUER, KAREN MARION, KATHERINE MADERA, CARL MCQUEARY, LYNN MCQUEARY, DONALD PATTERSON, KURTIS TRENT MANNING, TONY SCHAKER, PATRICK WHITE, HILDEGARD WHITE, QUEST REALTY TRUST, SECURE STORAGE LLC, KURTIS TRENT MANNING LIVING TRUST, | **COMPLAINT** <br><br> **JURY DEMANDED** <br><br> Case No. <br><br> Judge |
| *Plaintiffs,* | |
| v. | |
| KEVIN LONG; MILLCREEK COMMERCIAL, LLC; COLLIERS INTERNATIONAL; ANDREW BELL; TREVOR WEBER; SPENCER TAYLOR; BLAKE MCDOUGAL, SCOTT | |

1

| RUTHERFORD; EQUITY SUMMIT GROUP; ELEVATED 1031, | |
|---|---|
| *Defendants.* | |

By and through undersigned counsel, Plaintiffs complaint of Defendants as follows:

## INTRODUCTION

When the scheme that is at the center of this case was first seized upon, and exactly by which person, is not yet known.  What is known is that at least by 2020, Kevin Long, Emanuel Butera, Josh Constantin, Justin Smith, and their related entities began to develop, market, and sell or facilitate the sale of investments in in commercial properties – Tenant in Common (or "TIC") investments.  These investments were designed to take advantage of so-called 1031 exchanges, whereby individuals wanted to exchange an investment in one business for another—"a like kind exchange"— to avoid paying capital gains tax at the time of the transaction.  1031 exchanges were named after Section 1031 of Internal Revenue 26 U.S. Code § 1031 which was created to allow taxes to be deferred until later – typically upon the death of the investor.  A 1031 exchange, thus, was attractive to a certain type of investor, namely retirees who wanted to maximize their income stream for themselves and their partners during their final years to pay mortgages and costs of everyday living without worry.  After all, many of these elderly folks had worked their entire lives to earn the income to invest.

2

They would be unable to go back to work should their investment fail.  It was this population that Long et al. publicly declared to be the target of their 1031 program.

Long, through his position as Senior Vice President and Executive Vice President at the Utah division of Colliers, and President and founder of Millcreek Commercial, marketed the TIC opportunities through word of mouth, publications, and by obtaining referrals from a network of real estate and 1031 exchange specialists.   Although Long, et al. pushed at least 8 of these properties during the period relevant here, this case centers on the three located in Kennesaw, Georgia; Naperville, Illinois; and Keller, Texas.

Long et al. marketed these properties to investors as ideal 1031 exchange properties.  According to Long and his affiliates, the properties were an excellent 1031 investment because the location and condition of the buildings made them very valuable in themselves; the properties had already been leased by a "tenant of your dreams"; those tenants had been thoroughly "vetted" by Collier's team of analysts; the leases were guaranteed by a publicly traded company with very strong financials; the leases had "extremely attractive terms"; the leases were long term – usually 20 years in duration; they were triple net leases ("NNN"), which meant the tenant would pay insurance, day-to-day maintenance, and property taxes; the leases were insured by Lloyds of London; that the investment was unquestionably "safe, secure, and stable"

with a capitalization rate of 6-9% over the term of the lease; and that the tenant was "such a good tenant" that they had even made pre-payments on rent.

In fact, these claims were false and replete with material omissions.  The tenant failed to tender even a single payment at the Keller location and defaulted quickly on all its leases.  Of course, the guarantor did not honor its obligation to cover the payments, nor was there ever a bond issued by Lloyds of London.   In fact, both the tenant and the guarantor, as well as the individual who controlled the development company that was purportedly making tenant improvements to the Keller Property and others had easily discovered histories of fraud.  The interior of the building at the Keller, Texas property had not been well maintained, had not possessed a certificate of occupancy—nor was one imminent.  TIC owners were further surprised to learn that certain payments, purportedly rent paid in advance, were not from the tenant, advertised as rent payments made in advance, were not from the tenant at all.  In fact, Millcreek had quietly been making payments to the TIC owners on the tenant's behalf in order to hide the tenant's insolvency.

Long and Colliers should have known this.  In fact, it is likely that they did.  Long had known the man behind ADP (Butera) for many years.  In fact, records indicate that they had been partners in Utah businesses that sold TIC investments years before.  Colliers knew or should have known of Butera's shady past, not the least because Long

was a broker, Senior Vice President, and Executive Vice President with the Utah division of Colliers.

Despite this knowledge, Millcreek-affiliated Millrock Investment Fund 1 paid these companies over 12 million dollars—all of which has disappeared, leaving the Plaintiffs, mostly elderly and retired, with title to properties that are some combination of unfinished, over-priced, subject to maintenance fees, insurance, management fees, taxes, and an investment many Plaintiffs fear will not be covered by the IRS 1031 exemption.  As one might expect, many of the Plaintiffs, particularly the elderly and vulnerable, have suffered very real and physical and emotional injury from these acts.

This Complaint arises from the omissions, misstatements, and outright lies that led to financial ruin and broken retirement dreams for the Plaintiffs.  Lead Defendant Kevin Long, acting on behalf of his company Millcreek Commercial and in concert with others, including the named Defendants, systematically targeted retirement investors with promises of nearly-risk-free investments in real property. He used lies and misdirection in conjunction with the strict timeline of the IRS 1031 exchange program to pressure his marks into investing in deals that were designed to fail and did in fact fail.

## PARTIES

### **Defendants**

1. Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting and investment services company.

2. There are 4 Colliers offices located in Utah.

3. Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek and directed towards transactions having a nexus in Utah.

4. Defendant Millcreek Commercial Properties, LLC ("Millcreek" or "Millcreek Commercial") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

5. Kevin G. Long ("Long") is an individual residing in Utah.

6. Long was Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

7. After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

8. In 2017 Long founded Millcreek Commercial and affiliated commercial real-estate investment funds, including non-party Millrock Investment Fund 1.

9. Long is "President of Millcreek with Colliers."

10. At all material times, Long was an employee and agent of Millcreek.

11. At all material times, Long was an employee and agent of Colliers.

12. Andrew Bell ("Bell") is an individual residing in Utah.

13. At all material times, Bell was an employee and agent of Millcreek.

14. At all material times, Bell was an employee and agent of Colliers.

6

15. Trevor Weber ("Weber") is an individual residing in Utah.

16. At all material times, Weber was an employee and agent of Millcreek.

17. At all material times, Weber was an employee and agent of Colliers.

18. Blake McDougal ("McDougal") is an individual residing in Utah.

19. At all material times, McDougal was an employee and agent of Millcreek.

20. At all material times, McDougal was an employee and agent of Colliers.

21. Spencer Taylor ("Taylor") is an individual residing in Utah.

22. At all material times, Taylor was an employee and agent of Millcreek.

23. Defendant Equity Summit Group ("Equity Summit") is a Utah personal corporation
    with its principal place of business in Saratoga Springs, Utah.

24. Defendant Elevated 1031 ("Elevated") is an unregistered business entity with its
    principal place of business in Pleasant Grove, Utah.

25. Scott Rutherford ("Rutherford") is an individual residing in Utah.

26. At all material times, Rutherford was an agent and representative of Millcreek.

27. At all material times, Rutherford was an agent and representative of Equity Summit.

28. At all material times, Rutherford was an agent and representative of Elevated 1031.

29. At all material times, Long, Rutherford, Bell, Weber, Taylor and McDougal acted as
    close business associates of one another, including through joint marketing,
    communications, social media, and transactional commission payments.

30. At all material times, Millcreek and Colliers acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

31. Collectively, Millcreek, Colliers, Long, Rutherford, Bell, Weber, Taylor and McDougal are referred to herein as the "Millcreek/Colliers Parties".

**Plaintiffs**

32. *Robert and Ditas Tannehill* are residents of California and were aged 67 and 68 respectively at the time they purchased TIC ownership in the Keller Property.

33. *Jose and Teena Rementeria* are residents of Oregon and own the Secure Self Storage, LLC entity, which has its principal place of business in Oregon.  The Rementerias were 69 and 62 years old respectively at the time their entity Secure Self Storage purchased TIC ownership in the Keller and Naperville Properties.

34. *Robert Myers* is a resident of Oregon. He was 75 years old at the time he purchased TIC ownership in the Keller Property.

35. *Charles and Laura Brauer* are residents of Massachusetts and are trustees of Quest Realty Trust. They were 70 and 64 years old respectively at the time they purchased TIC ownership in the Keller Property.

36. During all material times herein, Charles Brauer suffered from a disability associated with multiple sclerosis.

37. *Patti L. Klair* is a resident of Delaware.  She was 60 years old at the time she purchased TIC ownership in the Keller Property.

38. *Robert and Annabelle Barnes* are residents of New Jersey.  They were between the ages of 51-60 at the time they purchased TIC ownership in the Keller and Kennesaw Properties.

39. *Donald Patterson* is a resident of New Jersey.  He was 75 years old at the time he purchased TIC ownership in the Keller and Kennesaw Properties.

40. During all material times herein, Donald Patterson suffered from a disability associated with Parkinson's Disease.

41. With regard to circumstances specifically involving the Kennesaw Property, the Barnes' and Donald Patterson are herein referred to as the Kennesaw Plaintiffs.

42. *Patrick and Hildegard White* are residents of Pennsylvania.  They were both 55 years old at the time they purchased TIC ownership. in the Keller Property

43. *Eric Carnrite and Elizabeth Hill-D'Alessandro* are residents of Washington.  They were 51 and 53 years old respectively at the time they purchased TIC ownership in the Keller Property.

44. *Karen Marion* is a U.S citizen residing in the Netherlands.  She was 62 years old at the time she purchased TIC ownership in the Keller Property.

45. During all material times herein, Karen Marion suffered from a traumatic brain injury-related disability.

46. *Katherine Madera* is a resident of Montana.  She was 75 years old at the time she purchased TIC ownership in the Keller Property.

47. *Carl and Lynn McQueary* are residents of Montana.  They were 70 and 69 years old at the time they purchased TIC ownership in the Keller Property.

48. *Kurtis T. Manning* is a resident of California.  He was 55 years old at the time he purchased TIC ownership in the Keller Property.

49. *Tony Schaker* is a resident of California.  He was 63 years old at the time he purchased TIC ownership in the Keller Property.

50. All Plaintiffs invested in TIC interests in the Keller Property and, in cases specifically involving the Keller Property, are referred to herein as the Keller Plaintiffs.

## JURISDICTION AND VENUE

51. Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

52. The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims

arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

53. Venue is appropriate in this forum pursuant to 28 U.S.C § 1391 (b)(2) and 15 U.S.C. § 78aa.

54. In connection with the conduct alleged in this Complaint, Defendants directly and indirectly used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

## THE MILLCREEK/COLLIERS TIC PROGRAM

### Overview of the Millcreek/Colliers TIC Program

55. Over the last several years, Millcreek Commercial and its agents have conspired with third parties in a sophisticated scheme to fraudulently induce vulnerable, often elderly investors to purchase TIC investments in commercial properties located throughout the United States at grossly inflated prices (the "Millcreek/Colliers TIC Program").

56. Millcreek marketed TIC interests in real properties at multiple locations, including Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Blytheville, Arkansas; Alpharetta, Georgia; Kennesaw, Georgia; Draper, Utah, and Keller, Texas.

57. Millcreek Commercial's affiliate, non-party Millrock Investment Fund 1, contracted with developers to make renovations improvements, and construction on the buildings at the Keller Property, Kennesaw Property, and Naperville Property.

58. The Millcreek/Colliers Parties represented that they had already secured for each property a paying tenant with sufficient revenue to service their long-term lease.

59. This tenant was identified as Healthcare Solutions Holdings Inc. ("HSH").

60. HSH is a Delaware corporation with its principal place of business in Glen Cove, New York.

61. HSH is a wholly owned subsidiary of Healthcare Solutions Management Group.

62. Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware corporation with its principal place of business in Glen Cove, New York.

63. Joshua Constantin ("Constantin") is an individual residing in Louisiana.

64. Justin Smith ("Smith") is an individual residing in Ohio.

65. At all material times, Constantin acted as the Head of Commercial Real Estate for HSH.

66. At all material times, Smith acted as HSMG's Chief Executive Officer.

67. While not named as defendants in this lawsuit, collectively, HSH, HSMG, Constantin, and Smith are referred to herein as the "HSH Parties".

68. The HSH Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

69. Either the HSH Parties or their affiliates entered long-term leases to operate the Romeoville, Pine Bluff, Blytheville, Alpharetta, Kennesaw, and Naperville properties as urgent care centers or advanced care medical centers.

70. Either the HSH Parties or their affiliates entered long-term leases to operate the Keller Property as a surgical ambulatory regional center ("SARC").

71. Either the HSH Parties or their affiliates entered long-term leases to operate the Kennesaw Property and the Naperville Property as advanced medical care centers ("ACMs").

72. These leases were bundled with the sale of TIC interests in each property.

73. Millcreek represented this would result in investors receiving a return on their investment in the range of 6-9% over the term of each lease.

74. Millcreek represented that this would result in a steady stream of income along the way.

75. The Millcreek/Colliers Parties represented that the rent payments on the lease were backed by two failsafe mechanisms to protect investors from potential losses.

76. The first of these was a corporate guarantee backing the lease.

77. The corporate guarantor for the Keller, Kennesaw, and Naperville leases was HSH and/or HSMG.

78. The second of these was represented by Millcreek to be a bond issued by Lloyds of London, the world's leading insurance/reinsurance market.

13

79. To locate potential investors and induce their investments, Millcreek Commercial and its agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents to locate and refer potential investors to them.

80. While not named as defendants in this lawsuit, these referring parties are described collectively herein as "Advisors" and allegations regarding them are added to provide context to Plaintiffs' claims.

**The Millcreek/Colliers Parties Jointly Target Retirement Investors**

81. From 2013 to 2016, Kevin Long was the Principal Broker and COO of CBC Advisors, a real estate company.

82. Kevin Long worked with Brandon Fugal at CBC Advisors.

83. Long and Fugal, at CBC Advisors, worked with Lew Cramer at Colliers.

84. Lew Cramer went on to become Chief Executive Officer of the Utah division of Colliers.

85. In 2017, Colliers acquired Long's company, CBC Advisors.

86. Brandon Fugal went on to become Chairman of the Utah division of Colliers after the acquisition.

87. After the acquisition, Long worked as a broker for Colliers.

88. Long was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiffs below:

14

**Kevin G. Long**

Senior Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

89. Long was also Executive Vice President of the Utah division of Colliers, as shown in

his email signature from communications with Plaintiffs below:

**Kevin G. Long**

Executive Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

90. In 2017, Long founded Millcreek Commercial, LLC and affiliated commercial real

estate funds, including Millrock Investment Fund 1 of Utah ("Millrock").

91. Long was "President of Millcreek with Colliers", as shown in this excerpt from his

personal LinkedIn page:

 Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

## Experience

 **President of Millcreek Commercial with Colliers International | Utah**
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

92. Long represented that Millcreek and Colliers worked in partnership with each

other, as shown in this excerpt from the Millcreek/Colliers website:

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

93. At all material times, Defendants Kevin Long, Scott Rutherford, Andrew Bell,

Trevor Weber, Blake McDougal, Spencer Taylor, and other agents of Millcreek

Commercial and Colliers International were close business associates, including

through joint marketing, communications, social media, and transactional

commission payments.

94. In or about 2020, Millcreek Commercial and its agents Rutherford, Bell, Weber,

Taylor, and McDougal, under Long's leadership, began marketing and selling TIC

interests in real property including the Keller, Kennesaw, and Naperville Properties.

95. Defendants Long, Weber, McDougal, Taylor, Rutherford, and Bell are only registered to sell real estate in the state of Utah.

96. Defendants Long, Weber, McDougal, Taylor, Rutherford, and Bell are not registered with the state of Texas, Illinois, or Georgia to sell real estate.

97. Long, Weber, McDougal, Taylor, Rutherford, and Bell are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

98. The TIC interests sold by the Millcreek/Colliers TIC Program, including the Keller Property, Kennesaw Property, and Naperville Property, were not registered as securities by the filing of a registration statement.

99. The Millcreek/Colliers Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

100. A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"—i.e., property of the same nature or character as the sold property.

101. 1031 exchanges must take place over a constrained time frame, by law.

102. From the date the original property is sold, the purchase of the new property must be completed within 180 days.

103.    Millcreek "markets to middle class retirement investors", as shown in this

excerpt from the Frequently Asked Questions page of Millcreek's website:

**What is the exit strategy?**

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market, Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

104.    The tax-deferral advantages of a 1031 exchange are appealing to retirees,

particularly when such an exchange came with a promise of large monthly returns

on which they could rely during their final years.

105.    Millcreek marketed that "Millcreek Commercial generates passive income for

you."

106.    Typically, the Millcreek/Colliers Parties bundled long-term, triple net leases

with the sale of TIC interests.

107.    That is, they offered TIC interests in properties that already had leases in place

with tenants.

108.    The lease connected with each TIC property was designed to be the income

stream for the Millcreek/Colliers Parties' targeted investors.

109.   Millcreek marketed their properties as a way to "leave the headaches of being a landlord behind".

110.   Millcreek also coaxed possible investors by saying "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer", as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange":

# Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

111.   Typically, a tenant was identified and acquired by the Developer Parties.

112.   In or about 2020, the Millcreek/Colliers Parties, under Long's direction, began marketing the Keller, Kennesaw, and Naperville Properties.

113.   Millcreek represented that the Keller Property was a former urgent care center that was converted in 2021.

114.   Millcreek represented that the Kennesaw Property was a former bank that was converted in 2021.

115.   Millcreek represented that the Naperville Property was a newly constructed building completed in 2020.

116.   According to Millcreek's marketing, the Keller, Kennesaw, and Naperville Properties were each under long-term lease to a single tenant.

117.   Each of the Plaintiffs in this action purchased TIC interests for the desired purpose of deferring capital gains tax and to obtain an income-generating property.

118.   As part of each of Plaintiffs' purchases of TIC interests in the Keller, Kennesaw, and Naperville Properties, Colliers acted as the broker and received commission payments on each purchase.

**The Advisor Parties' Role in the Millcreek/Colliers TIC Program**

119.   Before learning of Millcreek's TIC offerings, few of the Plaintiffs knew much about the 1031 exchange process and so they sought guidance from investment and real estate advisors or 1031 exchange specialists (collectively, the "Advisor/s").

120.   The Advisors are not parties in this action but allegations regarding them are included as context for claims against Defendants.

121.   None of the Plaintiffs had ever heard of Millcreek beforehand.

122.   Advisors recommended a TIC investment through the Millcreek/Colliers TIC Program and assured the would-be owner that Millcreek had great TIC investment opportunities.

123.    Each of the Advisors pointed out that Millcreek had partnered with Colliers with respect to the TIC investments in the Millcreek/Colliers TIC Program.

124.    Each of the Advisors counseled the respective Plaintiff with whom they were dealing that a TIC investment through Millcreek partnered with Colliers would provide the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiffs were seeking.

125.    None of the Advisors mentioned that they would receive a commission or a similar type of compensation from the Millcreek/Colliers Parties for the referral.

**The Millcreek/Colliers TIC Program Sales Pitch**

126.    Plaintiffs communicated directly with representatives of Millcreek, including Long, Rutherford, Bell, Weber, Taylor, and McDougal.

127.    Additionally, Long, Bell, Weber, and McDougal were Colliers employees at the time they sold TIC investments to Plaintiffs.

128.    Each of the Millcreek representatives with whom Plaintiffs talked strongly recommended they invest in one of a portfolio of TIC properties sold by Millcreek.

129.    Each of the Plaintiffs was informed that a Millcreek TIC was a great investment because Millcreek always "hand-select[s] the best properties", as shown in this excerpt from Millcreek's promotional materials:

Removing Barriers to Investing in Commercial Real Estate
First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

130.    Each Plaintiff was told that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors", as shown in this excerpt from Millcreek's website:

### Choosing a bad investment

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

131.    Each Plaintiff was told that with every property, investors could "enjoy a quality property that has been identified and vetted by seasoned professionals", as stated in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure that the property meets three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased. In addition, Millcreek Commercial will travel to the property for a personalized inspection of the property, building, and the surrounding area. Millcreek Commercial's years of experience in identifying profitable properties allows investors to avoid having to fear getting stuck with a "bad investment". Their expertise can help investors enjoy a quality property that has been identified and vetted by seasoned professionals.

132.   Moreover, the Millcreek/Colliers Parties represented that they had already secured "the tenant of your dreams" for the Keller, Kennesaw, and Naperville Properties.

133.   According to the Millcreek/Colliers Parties, the tenant had already signed a 20-year lease with 2% annual increases and an average return on investment over that period of 6-9%.

134.   For some Plaintiffs, including Annabelle and Robert Barnes, Eric Carnrite, Charlie and Laura Brauer, Robert Myers, Karen Marion, Patti Klair, and Donald Patterson, Millcreek represented that the tenant was "such a good tenant" that they

prepaid 6-8 months of rent in advance when these Plaintiffs closed on their purchase in the Keller Property.

135.   For other Plaintiffs, including Teena and Jose Rementeria, Bob and Ditas Tannehill, Katherine Madera, Patrick and Hildegard White, and Kurtis Manning, Millcreek represented that, after closing, they were receiving monthly payments of "rent" paid by the tenant when closing for the Keller Property.

136.   Millcreek represented the lease on each of its TIC properties in Keller, Kennesaw, and Naperville was triple-net ("NNN") – meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

137.   Millcreek stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors.  Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather "benefit from a steady stream of passive income", as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

138.   Accordingly, the Millcreek/Colliers Parties stated the lease was "backed by strength" by Healthcare Solutions Management Group, the guarantor on the lease and a member of the HSH Parties.

139.   Millcreek represented that HSMG working "'in cooperation' with Millcreek" was developing a nationwide network of surgery centers.

140.   The Millcreek/Colliers Parties represented that HSMG was "a publicly traded medical service and device company", as shown in this excerpt from the Keller Property's Offering Memorandum:

### Backed By Strength

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

HSH not only helps physicians deliver better healthcare but also assists them in remaining compliant with industry best practices.

141.   The Millcreek/Colliers Parties represented that "Healthcare Solutions Holdings, Inc. (HSH), meets [their] pillars for success", as shown in this excerpt from the Keller Property's Offering Memorandum:

### The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

142.   The Millcreek/Colliers Parties represented that the lease was insured by the prestigious Lloyds of London insurance entity.

143.   The Millcreek/Colliers Parties thus assured Plaintiffs that, even if the tenant defaulted in the first two years of a lease, Lloyds of London would pay a year of rent payments.

144.    The Millcreek/Colliers Parties meant to imply, and Plaintiffs in fact inferred, that the involvement of Lloyds of London meant that reputable and reliable vetting and evaluation of the lease had been performed in connection with issuance of the bond.

145.    The Millcreek/Colliers Parties told Plaintiffs that they could rest assured that the investment would be "safe, stable, [and] secure", as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**

At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

146.    The Millcreek/Colliers Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction", as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

## How is a purchase executed?

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering

147.   According to Millcreek Commercial, the Keller, Kennesaw, and Naperville Properties passed its "relative test."

148.   The "relative test," as Millcreek explained in its marketing material, was whether "we would sell [the property] to our mother, grandmother, best friend, or son".

149.   Millcreek Commercial stated that "our acquisition team only purchases properties that our principals want to hold in our portfolios", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

150.   Millcreek stated that "we typically stay in our deals for the long term [...] This commitment provides our partners with added assurance that we believe in and are committed to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

151.   The Millcreek/Colliers Parties represented that they had done many such deals before.

152.   Plaintiffs were told by the Millcreek/Colliers Parties that Millcreek "utilizes Colliers International as [its] brokerage partner".

153.   The Millcreek/Colliers Parties represented to the Plaintiffs that the Millcreek/Colliers partnership extended internationally inasmuch as Colliers was Millcreek's "global partner", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

154.   The Millcreek/Colliers TIC Program's representatives communicated with Plaintiffs using their official Colliers email addresses.

155.   Colliers' logo was prominently placed right next to Millcreek's logo on every page of the Keller, Kennesaw, and Naperville Property Offering Memoranda.

156. Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Millcreek Commercial agents.

157. Below is the front page of the Millcreek/Colliers' parties Offering Memorandum for TIC investments in the Keller Property.



158.    Below is the heading of the second page of the Offering Memorandum for the

Keller Property, again prominently featuring the logos of both Millcreek and its

partner, Colliers International.



159.    On the front page of the Offering Memorandum, Millcreek and Colliers further

state:

> The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

160.    Plaintiffs relied on each of these representations when each eventually

purchased a TIC interest in the Keller, Kennesaw, and/or Naperville Properties.

**The Developer Parties' Role**

161.    American Development Partners ("ADP") is a Tennessee company with its

principal place of business in Franklin, Tennessee.

162.    Emanuel Butera ("Butera") is an individual residing in Tennessee.

163.    At all material times, Butera acted as the owner and operator of ADP.

164.    SARC USA, Inc. is a Missouri limited liability company with its principal place of

business in Dexter, Missouri.

165.    Steve Caton ("Caton") is an individual residing in Illinois.

166.    At all material times, Caton acted as the president of SARC USA, Inc.

167.    While not named as defendants in this lawsuit, collectively, ADP, Butera, SARC USA, Inc., and Caton, are referred to herein as the "Developer Parties."

168.    The Developer Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

169.    Millcreek or its affiliates entered a series of contracts with one or more of the Developer Parties wherein the Developer Parties would develop and make renovations, improvements and construction on the Keller, Kennesaw, and Naperville Properties.

170.    In approximately 2018, "Millcreek Commercial Properties [partnered] with American Development Partners to develop $50 million in single-tenant triple-net lease assets throughout the US."

171.    "Millcreek [served] as the capital partner for American Development, which [would] build multiple single-tenant properties, including two facilities for Healthcare Solutions Holdings."

172.    Long stated: "They [ADP] have an extensive background in single tenant net lease product across the US.  We spent months exploring a venture together.  We have come together and are excited about the synergy that these two companies bring together for the American public."

173.    Two of these single-tenant properties that Millcreek contracted ADP to develop were the Keller Property and the Naperville Property.

174.    One of these single-tenant properties that Millcreek contracted SARC USA, Inc. to develop was the Kennesaw Property.

**Background of Defendants' Previous Schemes, Frauds, and Investigations**

175.    Although Plaintiffs did not know it at the time, Plaintiffs have since discovered that many of Defendants, as well as several of the Advisor parties, have previously been involved in similar TIC investment schemes, fraudulent activity, and SEC investigations.

176.    Scott Rutherford was identified as a member of a principal party that operated a similar TIC investment scheme in Case No. 2:19-cv-277 in the United States District Court for the District of Utah, and he was named as an individual defendant in another fraud case alleging a similar TIC investment scheme in Case No. 2:20-cv-00004 in the United States District Court for the District of Utah.

177.    Plaintiffs allege that the Millcreek/Colliers Parties knew or should have known that Scott Rutherford was named as a defendant in two similar TIC investment schemes.

178.    As of November 27, 2013, Joshua Constantin was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment adviser, or from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court Southern District of New York.

179.   The Millcreek Colliers parties knew or should have known that Joshua Constantin was indefinitely barred by the SEC.

180.   In or about October of 2006, Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee Nashville Division, a breach of lease agreement case.

181.   The Millcreek/Colliers Parties knew or should have known that Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee.

182.   In or about July 2022, Butera and his associated entity Redstone, LLC were named as defendants in a similar real estate investment scheme in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

183.   The Millcreek/Colliers Parties knew or should have known that Butera was named as a defendant in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

184.   In or about April 2020, Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside, a breach of contract and fraud real estate investment scheme.

185.   With respect to this information, Plaintiffs allege that Millcreek/Colliers Parties knew or should have known that Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside.

34

186.    Justin Smith is the sole member of Landes Capital Management, LLC. He also has "voting and dispositive control" of the HSH shares held by Landes and Compagnie Trust Prive KB.

187.    On information and belief, Justin Smith used Landes Capital Management, LLC and Landes and Compagnie Trust Prive KB as a façade for his personal operations, to siphon funds to himself, and/or promote fraud or injustice by siphoning funds away from HSMG to avoid its obligations under leases and contracts.

188.    With respect to this information, Plaintiffs allege that the Millcreek Colliers parties knew or should have known that Justin Smith was alleged to have used Landes entities for fraudulent purposes.

## MISREPRESENTATIONS AND OMISSIONS

**Misrepresentations and Omissions to All Plaintiffs**

189.    Long, Rutherford, Bell, Weber, Taylor, and McDougal provided written marketing materials, including materials in electronic form, to all of the Plaintiffs.

190.    This included Offering Memoranda for each of the Keller, Kennesaw, and Naperville Properties, and property descriptions on their website.

191.    Together, these materials are referred to herein as the "Marketing Materials."

192.    The Millcreek/Colliers Parties developed the Marketing Materials with input from the Developer Parties and the HSH Parties, and the Developer Parties and

HSH Parties were aware of and approved, either expressly or tacitly, all of the content of the Marketing Materials.

193.    Rutherford, Taylor, Bell, Weber, and McDougal reviewed and were made aware of the information contained in the Marketing Materials.

194.    Rutherford, Taylor, Bell, Weber, and McDougal distributed the Marketing Materials to each Plaintiff with whom they had contact by means including but not limited to:

      a.    Emailing the Marketing Materials.

      b.    Directing Plaintiffs to the Marketing Materials through the Millcreek website.

*Misrepresentations in Marketing Materials to All Plaintiffs*

195.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that tenant (HSH) was a publicly traded medical company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools, as shown in this excerpt from the Keller Offering Memorandum:

**Backed By Strength**

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

196.    With respect to this misrepresentation, Plaintiffs allege as follows:

197.    The representation is false, because HSH is a shell company with little or no revenue, business operations, or assets.

198.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial solvency of the tenant company.

199.    The Millcreek/Colliers Parties knew or should have known that HSH Parties did not have the capital or the cashflow to service rent payments on leases at the Keller, Kennesaw, or Naperville Properties.

200.    The Marketing Materials provided by Millcreek/Colliers represented that HSH "will capture revenue and margins that have historically been 'lost'", resulting in "significantly enhanced operating margins."

201.    With respect to this misrepresentation, Plaintiffs allege as follows:

202.    This representation is false, because HSH is a shell company without the genuine business operations necessary to capture any meaningful revenue or margins at all.

203.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company.

204.   Millcreek/Colliers Parties knew or should have known that HSH was patently unable to make good on this representation.

205.   The Marketing Materials provided by Millcreek/Colliers represented that "ACM, in cooperation with HSH will sign a 20-year NNN lease with 2% rent escalations annually", as shown in this excerpt from the Keller Offering Memorandum:

## The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

206.    With respect to this misrepresentation, Plaintiffs allege as follows:

207.   This representation is false, because HSH did not have the financial ability to commit to a 20-year NNN lease with 2% rent escalations annually.

208.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of the investment and the viability of the tenant.

209.   Millcreek/Colliers Parties knew or should have known that HSH did not have the financial ability to commit to and service 20-year NNN leases with 2% annual rent escalations.

38

210. The Marketing Materials provided by Millcreek/Colliers represented that the Keller, Kennesaw, and Naperville Leases were "all backed by an HSH corporate guarantee."

211. With respect to this misrepresentation, Plaintiffs allege as follows:

212. This representation was false, because neither HSH nor any of the HSH Parties had the financial capability to fulfill this obligation.

213. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial viability of the tenant and the risk profile of the investment.

214. Millcreek/Colliers Parties knew or should have known that HSH was incapable of providing a reliable corporate guarantee.

215. The Marketing Materials provided by Millcreek/Colliers represented that the leases bundled with the Keller, Kennesaw, and Naperville Properties were "insured by Lloyds of London."

216. With respect to this representation, Plaintiffs allege as follows:

217. This representation was false, because Lloyds of London never insured the leases bundled with the Keller, Kennesaw, or Naperville Properties.

218.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

219.   The Millcreek/Colliers Parties knew or should have known that HSH did not secure this bond from Lloyds of London.

*Omissions of Material Fact to all Plaintiffs*

220.   Millcreek made the following omissions of material fact:

221.   Millcreek omitted to disclose their sale of their TIC ownership in the Keller, Kennesaw, and Naperville Properties, even though they represented to Plaintiffs that they would always retain 5% to 20% ownership.

222.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the profile of Millcreek/Colliers risk in the Keller, Kennesaw, and Naperville Properties.

223.   Millcreek omitted to disclose that public SEC filings stated that HSH underwent a reverse merger in order to go public.

224.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

40

225.   Millcreek omitted to disclose that public SEC filings stated that HSH's supposed assets disclosed as part of their reverse merger appear to be merely loans.

226.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

227.   Millcreek omitted to disclose that the tenant was late to pay rent as early as December 2021.

228.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

229.   The Millcreek/Colliers Parties omitted to disclose that the tenant was late on rent and continued to represent to potential buyers that the tenant was a "tenant of your dreams".

230.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

231.   Millcreek omitted to timely disclose that its affiliate entity Millrock Investment Fund 1, LLC, or other undisclosed and unknown entities and individuals, not Millcreek Commercial itself, held TIC interests in the Keller Property and would sell their TIC interests to Plaintiffs.

232.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, Millcreek's risk profile in its own TIC investments.

233.    Millcreek omitted to include financial reports about HSH in the due diligence materials for Keller, Kennesaw, and Naperville.

234.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, HSH's financial viability. It also encouraged Plaintiffs to rely on Millcreek's other false representations about the financial strength of HSH.

235.    Upon information and belief, the Millcreek/Colliers Parties made other misrepresentations and omissions regarding material facts in order to induce Plaintiffs' investment, which will be further uncovered and alleged as a result of the discovery process in this action.

**Misrepresentations and Omissions Regarding the Keller Property**

*Misrepresentations and Omissions to All Keller Plaintiffs*

236.    The Marketing Materials given to all Plaintiffs made a series of untrue and misleading misrepresentations to induce investments into the Keller Property.

237.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the TIC interests sold as part of the Millcreek/Colliers TIC Program were not

securities under federal law, as shown in this excerpt from the Offering

Memorandum for the Keller Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com

Millcreek Commercial  |  2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

238.    With respect to this misrepresentation, Plaintiffs allege as follows:

239.    The representation is false, because the TIC interests are securities under

federal law and under the applicable laws of several states.

240.    The representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including specifically, information concerning Defendants' trustworthiness, the

legal status of the investment, and the regulatory environment concerning the

investment.

241.    The Marketing Materials provided by the Millcreek/Colliers Parties represented

that HSH was poised to create the most extensive branded system in the country, as

shown in this excerpt from the Offering Memorandum:

43

**Surgical Ambulatory Regional Centers (SARC)**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

242.   With respect to this misrepresentation, Plaintiffs allege as follows:

243.   This representation is false, because HSH was a shell company unable to occupy and conduct business at even the Keller Property, much less extend its "operations" across the country.

244.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial strength and business aptitude of the Keller tenant.

245.   Millcreek/Colliers Parties knew or should have known that HSH Parties were not financially stable enough to "create the most extensive branded system in the country."

246.   The Marketing Materials provided by the Millcreek/Colliers Parties represented that the Keller Property's fair market value was as much as $21MM, but always

more than $4MM, depending on the version of the Offering Memorandum given to each Plaintiff.

## Property Information

| | |
|---|---|
| **Tenant** | Surgical Ambulatory Regional Centers |
| **Location** | 1220 Keller Parkway, Keller, TX |
| **Property Type** | Freestanding, Medical |
| **Building Size** | 10,260 SF |
| **Purchase Price** | $21,336,982 |
| **Cap Rate** | 6.00% |

247. With respect to this misrepresentation, Plaintiffs allege as follows:

248. This representation was false, because the Keller Property is likely worth only approximately $4MM, but in any case much less than $21MM.

249. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the Keller Property.

250. The Millcreek/Colliers Parties knew or should have known that the actual value of the Keller Property was substantially lower than $21MM.

251. Millcreek represented that the renovations on the building on the Keller Property would be minimal because "[t]he facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model", as shown in this excerpt from the Offering Memorandum:

45

**The Property History**

This 10,250 SF facility was originally constructed as a freestanding Emergency Room facility five years ago. Due to reductions in reimbursement rates and other business decisions the tenant mothballed the facility after only six months of use. They have continued to pay rent. The facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model.

252.    With respect to this misrepresentation, Plaintiffs allege as follows:

253.    This representation was false, because required renovations were so extensive that, left uncompleted, the building would be unfit for occupation by any tenant.

254.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment.

255.    The Millcreek/Colliers Parties knew or should have known that the building on the Keller Property was not in "as new conditions" and would require extensive renovations.

256.    The Millcreek/Collies parties represented that the Keller Property was a "state of the art" SARC.

257.    With respect to this misrepresentation, Plaintiffs allege as follows:

258.    This representation was false, because required renovations had not been completed on the Keller Property, so it could not be a "state of the art" SARC.

259.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment.

260.   The Millcreek/Colliers Parties knew or should have known that the building on the Keller Property was not a "state of the art" SARC.

261.   The Millcreek/Colliers Parties omitted to timely disclose that Millcreek was the party paying the "rent" payments that Plaintiffs received, rather than the tenant.

262.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

*Misrepresentations to Robert and Ditas Tannehill*

263.   In or about May 2021, Robert and Ditas Tannehill began considering a 1031 exchange property for an apartment complex they owned as a way for them to simplify their life and begin the process of retirement.

264.   In June 2021, the Tannehills put their apartment complex on the market and began looking for a suitable 1031 exchange property.

265.   The Tannehills were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

266.   From approximately May to December 2021, through emails, phone calls, and other communications, Scott Rutherford made many representations to the Tannehills to induce their investment in the Keller Property. Specifically, Rutherford stated to the Tannehills:

 a.   That the Keller Property was already occupied by its tenant.

47

b. That the Keller Property was in operation as a "state of the art" SARC facility.

c. That the tenant was "solid" and that their 6% return would be guaranteed for 20 years.

d. That their TIC investment in the Keller Property would be "turnkey"—that is, the Tannehills would not have to do anything (or very little) to manage their TIC investment.

e. That due to Colliers' involvement and the safe, secure nature of Millcreek's investment strategy, it would be easy for the Tannehills to sell their TIC interest if they desired to do so at a later point.

f. That there was "always a buyer for the property" and that when they sold their share, they would get their cash "within 24 hours of close".

g. That the Keller Property was "going fast" and that they would have to move quickly to purchase a TIC ownership in the same, per an email correspondence in or about July 2021.

267.   Scott Rutherford omitted material facts in discussing the Keller Property with the Tannehills:

a. Rutherford failed to provide the Tannehills with a link to the online portal containing due diligence information.

b.   Rutherford failed to provide the Tannehills with the tenant lease
   agreement until after the tenant defaulted.

c.   Rutherford failed to provide the Tannehills with the final recorded deed.

d.   Rutherford failed to disclose that the building was still undergoing
   renovations.

e.   Rutherford failed to disclose that the certain disbursed payments
   represented as "rent" would not be rent payments from the tenant, but
   from the Millcreek/Colliers Parties.

*Misrepresentations to Jose and Teena Rementeria*

268.   In approximately May 2021, Jose and Teena Rementeria and Secure Self Storage,
LLC were referred to Andrew Bell to help them find a suitable 1031 exchange
property.

269.   From May to July 2021, through emails, phone calls, and other communications,
Andrew Bell made at least the following representations to the Rementerias in
order to induce their investment in the Keller Property:

a.   That they would "never have to worry" about this investment since the
   tenant was on a 20-year lease with a guaranteed 6% return.

b.   That a TIC investment in the Keller Property would provide a cashflow
   with a "good company".

c.   That the purchase price of the building was about $15 MM.

49

    d.   That payments distributed to the Rementerias were rent from the tenant.

    e.   That the tenant for the Keller Property had been vetted by Millcreek in collaboration with Colliers.

270.   Andrew Bell made at least the following omissions of material fact to the Rementerias as he induced their investment in the Keller Property:

    a.   Bell failed to disclose that the Keller building was undergoing significant renovations.

    b.   Bell failed to provide the Rementerias with an Assignment of Lease.

    c.   Bell failed to provide the Rementerias with due diligence materials regarding the Keller Property TIC investment.

    d.   Bell failed to disclose that the Rementerias would not be buying their share from Millcreek Commercial, but rather from a previously unknown entity, Millrock Investment Fund 1.

    e.   Bell failed to disclose the commissions paid to Advisor parties, Millcreek Commercial, and Colliers International as a part of the sale transaction.

*Misrepresentations to Robert Myers*

271.   On February 25, 2022, Robert Myers was referred to Andrew Bell to help him find a suitable 1031 exchange property.

272. From approximately February to April 2022, through emails, phone calls, and other communications, Andrew Bell made at least the following representations to Robert Myers in order to induce his investment in the Keller Property:

  a. That Colliers was a Millcreek partner on the Keller Property deal, and that this was a "Collier's Deal".

  b. That Colliers did the due diligence for the Keller Property deal, and that the investment opportunity was therefore especially trustworthy.

  c. That the Keller Property was debt-free with a cash flow of 6% annually.

  d. That the tenant was a "solid" public company with corporate guarantees and "totally vetted by Millcreek/Colliers".

  e. That there was a bond to guarantee the lease and ensure rent payments.

  f. That the Keller Property was a newly remodeled, state of the art surgery center almost equivalent to a hospital.

  g. That all of the surgery center equipment would be in place and renovations completed in July 2022.

  h. That the tenant was ready to occupy the Keller Property in July 2022.

  i. That TIC ownership was "liquid" and Millcreek would buy Myers' TIC interest in the future if Myers decided to sell it.

  j. That Millcreek would retain 5% to 20% ownership in the Keller Property.

273.   Andrew Bell made at least the following omissions of material fact to Robert Myers as he induced his investment in the Keller Property:

    a.   Bell failed to disclose that Robert Myers was buying his TIC share from third-party sellers instead of from Millcreek Commercial.

*Misrepresentations to Charles and Laura Brauer*

274.   In approximately March 2022 Charles and Laura Brauer decided to look to retire and were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

275.   From approximately March to May 2022, through emails, phone calls, and other communications, Scott Rutherford made at least the following representations to the Brauers in order to induce their investment in the Keller Property:

    a.   That Millcreek's properties were highly sought after and presented on a "first come, first served" basis, per an email correspondence in or about March 2022.

    b.   That Millcreek's properties had "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about March 2022.

    c.   That Millcreek was "backed by Colliers" and therefore the Keller Property deal was very secure.

d. That the Keller Property tenant was "rock solid" and a "reputable health care company" with several instances of their business model already up and running.

e. That there was a Lloyds of London bond to guarantee the lease and ensure rent payments.

f. That Millcreek had done $10MM in renovations to the Keller Property and that a certificate of occupancy was coming soon.

g. That the building was equipped with state-of-the-art medical equipment.

h. That due to the NNN lease, 6% cap rate, and property manager, all the Brauers would have to do is collect their check every month.

i. That the Keller Property would give the Brauers a "hands-off revenue stream".

j. That "construction is mostly complete" and the equipment just needed to be "set up", per an email correspondence in or about April 2022.

k. That "even if they were to vacate the property, that would not release the parent company from the responsibility of paying the monthly rent and fulfilling the terms of the lease", per an email correspondence in or about April 2022.

l. That Charles Brauer would receive an individual deed filed with Tarrant County, per an email correspondence in or about April 2022.

    m. That the Millcreek-estimated $21MM value of the Keller Property was based on comparable medical-purpose properties, per an email correspondence in or about April 2022.

    n. That Millcreek would purchase the Brauer's TIC interest at a premium if the Brauers decided to sell it.

    o. That the tenant had had other ventures that had been "up and running for a while", per an email correspondence in or about April 2022.

*Misrepresentations to Patti L. Klair*

276.    In approximately August 2021, Patti L. Klair was referred to Scott Rutherford to help her find a suitable 1031 exchange property.

277.    From approximately August 2021 to May 2022, through emails, phone calls, and other communications, Scott Rutherford represented to Patti L. Klair at least the following in order to induce her investment in the Keller Property:

    a. That Millcreek's properties had "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about August 2021.

    b. That Millcreek's properties were "in very high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about August 2021.

c. That an investment in a Millcreek property would "provide great asset value and cash flow", per an email correspondence in or about August 2021.

d. That the tenant would not default and was "a very strong tenant", per phone call.

e. That even if the tenant defaulted, rent would be paid through a bond securing the lease, per a phone call.

f. That if the bond was exhausted, "surgery centers are typically associated with larger entities such as hospitals who would then be obligated to pay the rent and have insurance for these types of situations", per a phone call.

g. That even if anything went wrong, Klair would have plenty of warning of any potential problem and easily be able to sell her shares, per a phone call.

h. That Klair was "lucky" to have an opportunity to invest in the Keller Property as it was "coveted" and shares were going fast.

i. That the tenant would occupy the building and be operating in June 2022.

j. That the additional month's rent would be added bonus to Klair if "new lease was signed in June and not delayed".

k. That "Phase 1 of this property sold out in less than 2 weeks", per an email correspondence in or about January 2022.

278. Scott Rutherford made at least the following omissions of material fact to Patti Klair as he induced her investment in the Keller Property:

a. Rutherford failed to disclose that the building was not finished.

b. Rutherford failed to provide the due diligence materials to Klair before she closed her Keller Property TIC purchase.

c. Rutherford failed to provide Patti L. Klair with the final recorded deed.

*Misrepresentations to Robert and Annabelle Barnes*

279. In or about February 2022, Robert Barnes was referred to Scott Rutherford to help find a suitable 1031 exchange property.

280. In or about February 2022 to April 2022, through phone calls, email, and other communications, Scott Rutherford made at least the following representations in order to induce the Barnes' investment in the Keller Property:

a. That an investment with Millcreek is "safe, secure, stable, and simple".

b. That "someone is always looking for investments like this".

c. That there would be "no landlord hassles, just a check".

d. That there would be "passive income".

e. That Millcreek had chosen a "solid tenant" for the Keller Property.

    f.  That Millcreek would purchase the Barnes' TIC share back if the Barnes decided to sell.

    g.  That the investment would be passive and hands off.

    h.  That Millcreek owns a percentage of all of their properties.

281.    Scott Rutherford made at least the following omissions of material fact to the Barnes as he induced their investment in the Keller Property:

    a.  Rutherford failed to provide Robert Barnes with due diligence materials.

    b.  Rutherford failed to disclose that the building was under construction, the terms of that construction, the significance of the construction, and the state of the construction or any related risks.

    c.  Rutherford failed to disclose that the building did not have a certificate of occupancy.

    d.  Rutherford failed to disclose that the tenant had not yet taken possession of the building.

    e.  Rutherford failed to disclose that Millcreek no longer owned any percentage of the property.

282.    When the Barnes' began to consider closing with Millcreek Commercial, Kevin Long began communicating by email with the Barnes' using the email address "kevin.long@colliers.com".

*Misrepresentations to Patrick and Hildegard White*

283.    In approximately January 2022 Patrick & Hildegard White were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

284.    Patrick and Hildegard White were told by their Advisor that investment in a Millcreek property would be a safe, suitable investment, "no hassle investment" and were directed to Scott Rutherford in January 2022.

285.    From January to April 2022, through phone calls, emails, and other communication, Scott Rutherford represented to Patrick and Hildegard White at least the following to induce their investment in the Keller Property:

a.    That because Millcreek "operates under the umbrella of Colliers International, the fifth largest commercial real estate brokerage in the country" it would be easy to sell their TIC ownership if they ever desired to, per an email correspondence in or about January 2022.

b.    That "Millcreek's core properties provide cash flow immediately upon closing", per an email correspondence in or about January 2022.

c.    That Millcreek's commercial properties were "under corporate-guaranteed lease terms."

d.    That the Keller Property was new and fully renovated and ready for use as a medical facility.

e.    That the tenant was a "publicly traded medical service".

    f.   That TIC ownership opportunities in the Keller Property were "in VERY high demand and are presented on a 'first come, first served' basis" and that their "most recent properties had sold out in 2-3 weeks", per an email correspondence in or about January 2022.

    g.   That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades" and "provide great asset value and cash flow", per an email correspondence in or about January 2022.

    h.   That the tenant was "under corporate-guaranteed lease terms" and were "insured by Lloyds of London", per email correspondence.

    i.   That if a tenant defaulted the building could be re-rented for the value that was sold and there was room for the building to appreciate as part of the natural market, per email correspondence in or about January 2022.

    j.   That the rent commencement date was May 2022.

    k.   That they would receive eight months of "rent paid by the tenant" in advance at the time the Whites closed on their purchase.

286.    Scott Rutherford made at least the following omissions of material fact to the Whites as he induced their investment in the Keller Property:

a. Rutherford failed to disclose that the building was under construction, the terms of that construction, the significance of the construction, the state of the construction or any related risks.

b. Rutherford failed to disclose that the TIC ownership they were purchasing was not from Millcreek Commercial, but rather from two previously unknown and undisclosed sellers.

*Misrepresentations to Eric Carnrite and Elizabeth Hill-D'Alessandro*

287.   In approximately March 2022 Eric Carnrite was referred to Trevor Weber to help find a suitable 1031 exchange property.

288.   In or about March to May 2022, through phone calls, emails, or other communications, Trevor Weber made at least the following representations in order to induce the Carnrite's and Hill-D'Alessandro's investment in the Keller Property:

a. That Millcreek's buildings were purchased debt free and had "corporate guarantees to protect you financially", per an email correspondence in or about March 2022.

a. That the Keller Property had a "double corporate guarantee", per an email correspondence in or about March 2022.

b. That due to the triple-net nature of the lease, there would be no regular or ongoing expenses to the TIC owners.

60

c. That Millcreek properties were "first come first serve due to high demand", per an email correspondence in or about March 2022.

d. That "you can sell out of your property share at any time", per an email correspondence in or about April 2022.

e. That if the tenant could not pay rent there was a corporate guarantee whereby other corporations "have both agreed to pay rents for remainder of the lease", per an email correspondence in or about April 2022.

f. That Carnrite and Hill-D'Alessandro's risk on investing through Millcreek was "minimal, almost completely mitigated."

g. That there was a "long-term, vetted tenant in place" for the Keller Property.

h. That the tenant, HSH, was "The Tenant of Your Dreams" and met Millcreek's "pillars for success", per an email correspondence in or about May 2022.

i. That Millcreek maintains at least 5% ownership in all their properties.

j. That the tenant's rent payments on the lease had been insured by Lloyds of London.

k. That if anything went wrong, the corporate guarantees would financially protect the TIC investors.

l. That renovations to the Keller Property would be complete in June and that they were only waiting on "one building item," and a certificate of occupancy would follow a month later, per an email correspondence in or about May 2022.

m. That Kevin Long of Millcreek takes "a lot of time to personally vet all our properties, do on-site visits, review financials, etc.", per an email correspondence in or about May 2022.

n. That they were buying into the Keller Property at a fair price.

289. Trevor Weber made at least the following omissions of material fact to Eric Carnrite as he induced their investment in the Keller Property:

a. Weber failed to provide a link to the due diligence materials for the Keller Property.

b. Weber failed to disclose that the occupancy permit was not only waiting on final inspections, but also waiting on the completion of the renovations.

c. Weber failed to disclose that no bond had been secured.

d. Weber failed to disclose that Millcreek intended to fully sell out of the property and not maintain ownership.

e. Weber failed to disclose that there were commissions paid as part of the sales process.

    f.   Weber failed to disclose that the Millcreek parties had been paying HSH's 'rent' for other TIC owners since December 2021 due to HSH's cash flow problems.

*Misrepresentations to Karen Marion*

290.    In or about March 2022, Karen Marion was referred to Scott Rutherford to help her find a suitable 1031 exchange property.

291.    In or about March 2022, through emails, Zoom calls, and other communications, Scott Rutherford represented to Karen Marion at least the following to induce her investment in the Keller Property:

    a.   That Millcreek's "high-grade" commercial properties are under "corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about March 2022.

    b.   That Millcreek's properties "provide cash flow immediately upon closing", per an email correspondence in or about March 2022.

    c.   That Millcreek's properties are in "VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about March 2022.

    d.   That Millcreek's properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about March 2022.

e.  That working with Millcreek would "simplify your search process and provide great asset value and cash flow", per an email correspondence in or about March 2022.

f.  That Millcreek's commercial properties (including the Keller Property) were under corporate-guaranteed lease terms to protect tenant's investment, per an email correspondence in or about March 2022.

g.  That investment in a Keller Property TIC interest would perfectly suit Karen Marion's goal of providing a reliable income stream, per a Zoom call in or about March 2022.

h.  That if Marion desired to sell her TIC interest at a later point it would "not be a problem", per a Zoom call in or about March 2022.

i.  That Marion would receive 8 months of prepaid rent from the tenant at the time of closing and that the tenant would start paying regular rent in October 2022, per a Zoom call in or about March 2022.

*Misrepresentations to Katherine Madera*

292.  In or about August 2021, Katherine Madera was referred to Blake McDougal to help her find a suitable 1031 exchange property.

293.  When Blake McDougal communicated with Madera regarding the Keller Property and TIC investments with Millcreek, he sometimes did so from his Colliers email address.

64

294.   From approximately August to October 2021, through emails, phone calls, and other communications, Blake McDougal represented to Madera at least the following to induce her investment in the Keller Property:

    a.   That TIC ownership opportunities in the Keller Property were going fast and that Madera should make her decision soon if she wanted to take advantage of the opportunity.

    b.   That the Keller Property was a "surgical center".

    c.   That the deal was "backed by Colliers".

    d.   That HSH was evaluated by Colliers as part of their "process".

    e.   That the tenant was already in the building.

    f.   That the Keller Property was fully renovated and ready for use as a medical facility.

295.   Blake McDougal made at least the following omissions of material fact to Katherine Madera as he induced their investment in the Keller Property:

    a.   McDougal failed to disclose that the building on the Keller Property was undergoing significant renovations.

    b.   McDougal failed to disclose that HSH was late making rent payments at other properties in December of 2021.

*Misrepresentations to Carl and Lynn McQueary*

296.   In approximately December of 2021 Carl and Lynn McQueary were referred to Spencer Taylor to help them find a suitable 1031 exchange property.

297.   From approximately December 2021 to January 2022, through emails, phone calls, and other communications, Spencer Taylor made at least the following representations to Carl and Lynn McQueary to induce their investment in the Keller Property:

   a.   That the tenant had signed the lease and had begun paying rent payments.

   b.   That the building would complete construction and renovations in September 2022.

   c.   That there would be no problem selling or exchanging his TIC investment ownership.

*Misrepresentations to Donald Patterson*

298.   In approximately February 2022, Donald Patterson was referred to Scott Rutherford to help him find a suitable 1031 exchange property.

299.   From approximately February to May 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Donald Patterson at least the following in order to induce his investment in the Keller Property:

   a.   That triple net leases were Millcreek's specialty "hands off investment", per a meeting in or about February 2022.

b.   That Millcreek properties were in high demand and that their inventory
     continues to be "depleted quickly", and that a Millcreek property being
     available was a "limited opportunity that you need to jump on", per a
     meeting in or about February 2022.

c.   That there was a "team" of individuals that vetted properties to ensure
     they were the "right property in the right location at the right price" per a
     meeting in or about February 2022.

d.   That "he had never had an investor get out of a [Millcreek] property and
     lose money", per a meeting in or about February 2022.

e.   That the "Millcreek properties appreciate and there hasn't been tenant
     issues", per a meeting in or about February 2022.

f.   That the tenant for the Keller Property was a renowned surgical center,
     per a phone call in or about February 2022.

g.   That the tenant for the Keller Property had been fully vetted.

h.   That in the case of selling, Millcreek would always purchase your share,
     per a meeting in or about February 2022.

i.   That he would never have to worry about this investment since the tenant
     was on a 20-year lease with a guaranteed 6% return, per meeting in or
     about February 2022.

j.  That the Keller properties "were going fast" and he needed to proceed

with a sense of "urgency".

*Misrepresentations to Tony Schaker*

300.   In or about November 2021 Tony Schaker was referred to Millcreek Commercial

to help him find a suitable 1031 exchange property.

301.   Schaker was told that investment in a Millcreek property would be a safe,

suitable investment, and was directed to Scott Rutherford.

302.   When discussing some of the details of the Keller Property, Scott Rutherford

introduced Tony Schaker to Kevin Long.

303.   In email correspondence with Long, Rutherford, and other individuals at

Millcreek, Long used the email "kevin.long@colliers.com".

304.   From approximately November 2021 to January 2022, through phone calls,

emails, and other communications, Scott Rutherford represented to Tony Schaker

at least the following to induce the plaintiff's investment in the Keller Property:

a.  That Millcreek provides "high-quality, passive commercial properties", as

per an email correspondence in or about November 2021.

b.  That "Millcreek Commercial to rank among the finest real estate

experiences you will ever have", per an email correspondence in or about

November 2021.

68

c.  That Millcreek's "properties are in very high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about November 2021.

d.  That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about November 2021.

e.  That investing in a Millcreek property would "simplify your search process and provide great asset value and cash flow", per an email correspondence in or about November 2021.

f.  That the Keller Property would have a 6% capitalization rate and 2% annual increase in rent payments.

g.  That the lease on the Keller Property was backed by a bond issued by Lloyds of London.

*Misrepresentations to Kurtis Trent Manning*

305.  In or about March 2021, Kurtis Trent Manning began looking for options to take advantage of the 1031 exchange process and was referred to Trevor Weber to help him find a suitable 1031 exchange property.

306.  Manning went to Millcreek's website and was impressed by what was represented as their partnership with Colliers International.

307.   From approximately May 2021 to November 2021, through phone calls, emails, and other communications, Trevor Weber represented to Manning at least the following to induce Manning's investment in the Keller Property:

    a.   That each year, the property would yield a 6% return on investment.

    b.   That the property had a tenant ready with a "20-year lease".

    c.   That the tenant at the Keller Property was already paying rent.

    d.   That the building was complete and ready for tenant's business operations to begin.

    e.   That Millcreek had been working with the Keller tenant, HSH, and its associated entities for a long time.

    f.   That the Keller Property had a bond that was backed by Lloyds of London.

    g.   That certain monthly payments disbursed to Manning were rent payments from the tenant.

**Misrepresentations and Omissions Regarding the Kennesaw Property**

*Misrepresentations and Omissions to All Kennesaw Plaintiffs*

308.   The Marketing Materials given to the Kennesaw Plaintiffs made untrue and misleading misrepresentations to induce their investment into the Kennesaw Property.

309.    The Kennesaw Offering Memorandum provided by the Millcreek/Colliers Parties had Colliers' logo prominently placed right next to Millcreek's logo on every page, as shown in this excerpt:



310.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant was a "large[] network" and a "[d]evelopment of 350 Comprehensive Care Centers [which] will create the most extensive branded system in the country", as shown in this excerpt:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

Building a Brand: A key element to their strategy is to acquire reputable family practice to establish themselves in each community they target. Clusters of facilities will provide better access and more consistent care to patients in their system.

New Technologies: They intend to use new technologies and more comprehensive diagnostic capabilities to improve patient care and access and to give their medical teams more tools to provide superior care.

311.    With respect to this misrepresentation, Plaintiffs allege as follows:

312.    This representation is false, because neither the tenant on the lease nor any of the HSH Parties realistically had the ability to operate any care centers at all.

313.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the reliability and financial stability of the tenant and its affiliated entities.

314.    The Millcreek/Colliers Parties knew or should have known that none of the entities among the HSH Parties could realistically operate any care centers.

315.    The Marketing Materials provided by Millcreek/Colliers represented that the tenant would generate "significant margins" and that "[b]y vertically integrating, they will capture revenue and margins that have historically been 'lost' in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins".

316.    With respect to this misrepresentation, Plaintiffs allege as follows:

317.    This representation is false, because the tenant and its associated entities did not have any significant revenue or normal business operations and therefore no ability to generate significant margins of any kind.

318.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial viability of the tenant.

319.    The Millcreek/Colliers Parties knew or should have known that neither the tenant nor any of its affiliate entities had sufficient business operations or revenue.

72

320.    The Millcreek/Colliers parties failed to disclose that the tenant listed on the

Marketing Materials, Advance Care Medical, differed from the tenant listed on the

lease, Advance Care Medical Kennesaw GA-1.

321.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding their ability to do the necessary due

diligence on the tenant.

322.    The Millcreek/Colliers parties failed to disclose that the tenant, Advance Care

Medical Kennesaw GA-1, was not a legitimate business entity.

323.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the viability of the tenant.

324.    The Millcreek/Colliers parties failed to disclose that the guarantor for the

Kennesaw Property's lease, Heathcare Solutions Holdings, Inc., was not financially

capable of providing a corporate guarantee.

325.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding the security of their investment.

326.    The Millcreek/Colliers parties failed to disclose that the HSH parties had yet to

install the $500K worth of equipment necessary for the tenant to generate revenue.

73

327.  This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the state of the building and its ability to generate revenue.

328.  The Millcreek/Colliers parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying taxes, maintenance fees, insurance, and fees related to re-tenanting.

329.  This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the cost of their investment.

*Misrepresentations and Omissions to Robert and Annabelle Barnes Regarding the Kennesaw Property*

330.  In or about February 2022 to April 2022, through phone calls, email, and other communications, Scott Rutherford made at least the following representations in order to induce the Barnes' investment in the Kennesaw Property:

a.  That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about January 2022.

b.  That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors, as well

74

as whole properties or a combination of both whole and percentage-based ownership", per an email correspondence in or about January 2022.

c. That investing in Millcreek's properties would be "perfect solutions for [the Barnes']", per an email correspondence in or about January 2022.

d. That Millcreek's properties were "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about January 2022.

e. That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about January 2022.

f. That "Millcreek's mantra of "safety, security, and stability" (and I [Rutherford] would add "simplicity") is the priority with each property", per an email correspondence in or about January 2022.

g. That Millcreek's properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about January 2022.

h. That Millcreek's properties had a "[p]roven track record", per an email correspondence in or about January 2022.

i.  That "properties available from Millcreek to rank among the finest real estate experiences you will ever have", per an email correspondence in or about January 2022.

j.  That "Millcreek's core properties provide cash flow immediately upon closing, so you [the Barnes] are able to put your funds to work as quickly as possible", per an email correspondence in or about January 2022.

k.  That "the [Kennesaw] building was built in 2021", per an email correspondence in or about February 2022.

l.  That there was a "default bond which included a years' worth of payments if the tenant defaulted in the first 48 months", per an email correspondence in or about February 2022.

m.  That the "Lease was Absolute NNN and bonded – an absolute NNN bonded lease places significant financial responsibilities on the tenant while minimizing the landlord's obligations, providing a stable and predictable rental income for the landlord", per an email correspondence in or about February 2022.

*Misrepresentations and Omissions to Donald Patterson Regarding the Kennesaw Property*

331.   From approximately February to May 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Donald Patterson at least the following in order to induce his investment in the Kennesaw Property:

a. That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about February 2022.

b. That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors", per an email correspondence in or about February 2022.

c. That "you [Patterson] will find the properties available from Millcreek to rank among the finest real estate experiences you will ever have", per an email correspondence in or about February 2022.

d. That Millcreek's properties are "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about February 2022.

e. That Millcreek's properties have a "[p]roven track record", per an email correspondence in or about February 2022.

f. That "Millcreek's core properties provide cash flow immediately upon closing, so you [Patterson] are able to put your funds to work as quickly as possible", per an email correspondence in or about February 2022.

g. That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about February 2022.

h. That "Millcreek's mantra of 'safety, security, and stability' (and I would add 'simplicity') is the priority with each property", per an email correspondence in or about February 2022.

i. That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about February 2022.

j. That Rutherford's "goal is to provide you with solutions which simultaneously simplify your search process and provide great asset value and cash flow", per an email correspondence in or about February 2022.

**Misrepresentations and Omissions Regarding the Naperville Property**

332.   The Marketing Materials given to the Rementerias made a series of untrue and misleading misrepresentations to induce investments into the Naperville Property.

333.   The Marketing Materials provided by Millcreek/Colliers represented that the TIC interests sold as part of the Millcreek/Colliers TIC Program were not securities under federal law, as shown in this excerpt from the Offering Memorandum from the Naperville Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.**MILLCREEKCOMMERCIAL**.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

334.    With respect to this misrepresentation, Plaintiffs allege as follows:

335.    The representation is false, because the TIC interests are securities under federal law and under applicable state laws.

336.    The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Defendants' qualifications, trustworthiness, and the legal nature of their investment.

337.    The Millcreek/Colliers Parties knew or should have known that under federal law and applicable state laws, the TIC investments they sold were securities.

338.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant's business strategy is to" vertically integrate urgent care facilities with ancillary services and new technologies" with the outcome of "providing a broader continuum of patient care at a lower cost and generate significantly higher

operating margins", as shown in this excerpt from the Offering Memorandum from the Naperville Property:

## Property Information

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

339. With respect to this misrepresentation, Plaintiffs allege as follows:

340. This representation is false, because the tenant named on the lease is not a registered entity at all, and neither HSH nor HSMG have the revenue or business operations necessary to service a 20-year lease on the Naperville Property.

341. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the reliability and financial viability of the tenant.

80

342.     The Millcreek/Colliers Parties knew or should have known that the tenant did

not have the capital or the cashflow to sign a 20-year lease for the Naperville

Property.

343.     The Marketing Materials provided by the Millcreek/Colliers Parties represented

that the tenant's development of 350 Comprehensive Care Centers will create "the

most extensive branded system in the country", as shown in this excerpt from the

Naperville Property Offering Memorandum:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

344.     With respect to this misrepresentation, Plaintiffs allege as follows:

345.     This representation is false, because the tenant had no realistic ability to

develop 350 care centers or "the most extensive branded system in the country."

346.     This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the reliability and financial viability

of the tenant.

347.     The Millcreek/Colliers Parties knew or should have known that the tenant had

no realistic ability to develop 350 care centers or "the most extensive branded

system in the country."

348.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the Naperville Property's fair market value was as much as $5MM.

349.    With respect to this misrepresentation, Plaintiffs allege as follows:

350.    This representation was false, because the realistic value of the property is likely about $700,000, but in any case substantially less than $5MM.

    a.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the property they were investing in.

351.    The Millcreek/Colliers Parties knew or should have known that the value of the actual value of the Naperville property was substantially lower than $5MM.

352.    The Marketing Materials provided by Millcreek/Colliers represented that the Naperville Property Lease Guarantor is Healthcare Solutions Holdings Inc, as shown in this excerpt from the Naperville Property Offering Memorandum:



## Lease Information

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

353.    This representation was misleading, because HSH is a shell company with insufficient revenue and business operations and was incapable of acting as a lease guarantor with the financial burden of repayment responsibility in case the tenant defaults.

354.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

355.    The Marketing Materials provided by Millcreek/Colliers represented that the Naperville property lessee was Advance Care Medical, Inc. which would operate a surgical ambulatory regional center. With respect to this misrepresentation, Plaintiffs allege as follows:

356.   This representation was false, because Advance Care Medical, Inc. - Naperville, LLC is the lessee entity named in the lease.

357.   This representation concerned an issue of material fact, because it limited the investors' ability to do due diligence on the tenant.

358.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including information about the lessee and more specifically, the likelihood of the lessee's ability to occupy the Naperville Property and service the lease.

359.   The Millcreek/Colliers Parties knew or should have known that the entity named in the lease was not a registered business entity.

360.   The Millcreek/Colliers Parties failed to disclose that the corporate guarantor for the Naperville Property lease was not financially capable of providing a corporate guarantee.

361.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

362.   The Millcreek/Colliers parties failed to disclose that the tenant on the Naperville Property Lease was not a legitimate business entity.

363.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the viability of the tenant.

364.   The Millcreek/Colliers parties failed to disclose that the bond included in their due diligence folder was incomplete and therefore invalid.

365.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

366.   The Millcreek/Colliers parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying taxes, maintenance fees, insurance, and fees related to retenanting.

367.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the cost of their investment.

368.   In or about July 2021 to August 2021, through phone calls, emails, and other communications, Andrew Bell made at least the following representations in order to induce the Rementerias' investment in the Naperville Property:

    a.   That "[y]ou will receive rental income via direct deposit each month as you experience our motto of 'Exchanging Hassle for Happiness'", per an email correspondence from July 2021.

b. That Millcreek and the Rementerias would be "co-owners" as they would each share a percentage of Naperville, per an email correspondence in or about July 2021.

c. That the Naperville building was "built in 2020".

369.   Andrew Bell made at least the following omissions of material fact to Teena and Jose Rementeria as he induced their investment in the Naperville Property:

a. Bell failed to provide the Rementerias with digital access to the due diligence materials for the Naperville Property.

b. Bell failed to disclose to the Rementerias the significant commissions he would receive for their purchase into the Naperville Property.

c. Bell failed to disclose that the market value lease per square foot of the Naperville Property was less than $92.53.

d. Bell failed to disclose that the represented value of the Naperville Property fluctuated several times.

e. Bell failed to provide access to the due diligence materials until the day that the Rementerias were closing on the Naperville Property.

f. Bell failed to provide financial statements or reports for the tenant in Naperville's due diligence materials.

**PLAINTIFFS INVEST IN THE MILLCREEK TIC PROGRAM**

370.   Relying on the misrepresentations, omissions, and general deception of the Millcreek/Colliers Parties, their Advisors, the HSH Parties, the Developer Parties, and their principals, the Plaintiffs invested into the Keller Property, the Kennesaw Property, and the Naperville Property.

371.   The Plaintiffs invested a total of approximately $8MM in the Keller, Kennesaw, and Naperville Properties.

**Commissions**

372.   In connection with each of Plaintiffs' purchases in the Keller, Kennesaw, and Naperville Properties, commissions and similar compensation payments were made to third parties in each transaction.

373.   Plaintiffs did not know about these commissions and similar compensation payments until they saw settlement statements for their respective transactions.

374.   Some of the Plaintiffs, including at least Donald Patterson, Tony Schaker, and Robert Barnes, have not been given one or more settlement statements from the title company involved in their respective transactions.

375.   All of the Plaintiffs' settlement statements listed commissions to Colliers.

376.   Colliers' commissions varied from approximately 1% to 4% of the total purchase amount of the TIC interest.

377.   Most of the Plaintiff's Settlement Statements stated that commissions were paid to a broker party.

378. These broker parties were either Equity Summit Group or non-party Merit Commercial Real Estate.

379. Brokers' commissions varied anywhere from 3% to 6% of total purchase amount.

380. All settlement statements state that Millcreek received a "marketing fee" from the seller as part of the transaction.

381. The marketing fees paid to Millcreek's varied from approximately 1% to 3% of the total purchase amount of the TIC interest.

382. The Barnes had at least the following commissions or other payments made in their settlement statement:

  a. Colliers received at least $2,663.85 in total in commissions.

  b. Millcreek received at least $7,992.00 in total in marketing fees.

  c. Equity Summit Group received at least $7,992.00 in total in commissions.

383. The Brauers had the following commissions or other payments made in their settlement statement:

  a. Colliers received $6,608.99 in total in commissions.

  b. Millcreek received $19,826.97 in total in marketing fees.

  c. Equity Summit Group received $19,826.97 in total in commissions.

384. The Carnrite/Hill-D'Alessandro's had the following commissions or other payments made in their settlement statement:

88

    a.  Colliers received $25,617.20 in total in commissions.

    b.  Millcreek received $19,219.90 in total in commissions.

    c.  There were no broker's commissions listed.

385.   Patti Klair had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $8,369.58 in total in commissions.

    b.  Millcreek received $8,369.58 in total in marketing fees.

    c.  Equity Summit Group received $25,108.73 in total in commissions.

386.   Katherine Madera had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $19,106.40 in total in commissions.

    b.  Millcreek received $9,553.20 in total in marketing fees.

    c.  There were no broker's commissions listed.

387.   Kurtis Manning had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $9,650.79 in total in commissions.

    b.  Millcreek received $14,885.11 in total in marketing fees.

    c.  There were no broker's commissions listed.

388.   Karen Marion had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $3,000.00 in total in commissions.

    b.  Millcreek received $9,000.00 in total in marketing fees.

    c.  Equity Summit Group received $9,000.00 in total in commissions.

389.  The McQuearys' had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $8,000.00 in total in commissions.

    b.  Millcreek received $4,000.00 in total in marketing fees.

    c.  There were no broker's commissions listed.

390.  Donald Patterson was not provided with his settlement statements.

391.  As such, the commissions and marketing fees paid to Colliers, Millcreek, and any broker parties are unknown.

392.  Robert Myers had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $4,705.88 in total in commissions.

    b.  Millcreek received $11,294.42 in total in marketing fees.

    c.  Merit Commercial Real Estate received $12,792.28 in total in commissions.

393.  The Rementerias had at least the following commissions or other payments made in their settlement statement:

    a.  Colliers received at least $6,678.80 in total in commissions.

90

  b. Millcreek received at least $10,301.201 in total in commissions.

  c. Merit Commercial Real Estate received at least $16,980.00.

394. Tony Schaker had at least the following commissions or other payments made in their settlement statement:

  a. Colliers received at least $3,061.14 in total in commissions.

  b. Millcreek received at least $3,061.14 in total in marketing fees.

  c. Equity Summit Group received at least $9,183.42 in total in commissions.

395. The Tannehills had the following commissions or other payments made in their settlement statement:

  a. Colliers received $4,493.18 in total in commissions.

  b. Millcreek received $4,493.18 in total in marketing fees.

  c. Equity Summit Group received $26,959.06 in total in commissions.

396. The Whites had the following commissions or other payments made in their settlement statement:

  a. Colliers received $1,976.80 in total in commissions.

  b. Millcreek received $5,930.40 in total in marketing fees.

  c. Equity Summit Group received $5,930.40 in total in commissions.

397. Neither the Millcreek/Colliers Parties nor any Advisor parties disclosed these commissions in advance.

398.   Colliers International received a total of at least $103,932.61 in commissions from Plaintiffs' TIC purchases.

399.   Millcreek Commercial received a total of at least $127,920.10 in commissions from Plaintiffs' TIC purchases.

400.   Equity Summit Group received a total of at least $104,000.58 in commission from Plaintiffs' TIC purchases.

401.   Merit Commercial Real Estate received a total of at least $29,772.28 in commission from Plaintiffs' TIC purchases.

**Plaintiffs' Final Ownership Percentages and Total Investments**

402.   According to their respective closing documents, Plaintiffs have the following ownership percentages and total investments in the Keller Property:

     a.   Robert and Annabelle Barnes have 2.3531% ownership of the Keller Property with an investment of approximately $502,128.14.

     b.   Eric Carnrite and Elizabeth Hill-D'Alessandro have 3.0015% ownership of the Keller Property with an investment of approximately $640,430.

     c.   Charles and Laura Brauer have 3.0974% ownership of the Keller Property with an investment of approximately $660,899.13.

     d.   Teena and Jose Rementeria have 2.6527% ownership of the Keller Property with an investment of approximately $566,000.

e. Patti Klair has 3.9226% ownership of the Keller Property with an investment of approximately $836,957.35.

f. Robert Myers has 1.8747% ownership of the Keller Property with an investment of approximately $400,000.

g. Karen Marion has 1.4060% ownership of the Keller Property with an investment of approximately $300,000.

h. Robert and Ditas Tannehill have 2.1058% ownership of the Keller Property with an investment of approximately $449,318.19.

i. Katherine Madera has 2.2368% ownership of the Keller Property with an investment of approximately $477,000.

j. Patrick and Hildegard White have 0.9265% ownership of the Keller Property with an investment of approximately $194,679.89.

k. Tony Schaker has 3.7698% ownership of the Keller Property, with an investment of approximately $804,354.

l. Carl and Lynn McQueary have 0.9373% ownership of the Keller Property with an investment of approximately $200,000.

m. Donald Patterson has 2.8803% ownership of the Keller Property with an investment of approximately $614,581.21.

n. Kurtis Trent Manning has 3.8331% ownership of the Keller Property with an investment of approximately $817,463.46.

403.    Robert and Annabelle Barnes invested approximately $232,800 and received 4.1928% ownership in the Kennesaw Property.

404.    Donald Patterson invested approximately $300,800 and received 5.4218% ownership share in the Kennesaw Property.

405.    Jose and Teena Rementeria's entity Secure Self Storage LLC invested approximately $160,800 and received 3.0249% ownership share in the Naperville Property.

**FAILURE OF KELLER, KENNESAW, AND NAPERVILLE INVESTMENTS**

**HSH Parties are Late Paying Rent**

406.    In or about December 2021, "HSMG failed to pay its portion of the rent obligations under the Keller Lease".

407.    "Millrock had paid HSMG's portion of the rent obligations starting around December 2021."

408.    In or about August 2022, HSMG disclosed to Millcreek that they needed "cash flow relief". These problems with cash flow caused HSMG to be late with rent payments and they "incurred certain late fees."

409.    On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement and Promissory Note, called the "Millrock/HSMG Agreement".

410.    "The Millrock/HSMG Agreement contemplated that through the Agreement, Millrock would provide HSMG with cash flow relief and assist HSMG with its obligations under the Leases."

411.    "Pursuant to the Millrock/HSMG Agreement, Millrock loaned HSMG the principal amount of $350,000."

412.    "Pursuant to the Millrock/HSMG Agreement, HSMG's also agreed that within ten days of August 5, 2022, it would cause the Leases to be secured by the Bonds."

413.    "The parties also agreed in the Millrock/HSMG Agreement that HSMG would be solely responsible for any payments due under the Keller Lease as of October 1, 2022."

414.    "Under the Millrock/HSMG Agreement, Millrock and HSMG agreed that if any obligation under the Agreement were not timely met, the remaining unpaid principal balance and interest would become due immediately at Millrock's option."

**The Tenant Defaults and the Guarantee and Bond Fail**

415.    For months after their purchase, Plaintiffs did not suspect anything had gone wrong with their TIC investments.

416.    They received payments that they were told were rent payments and they believed that the tenant either had or imminently would occupy the buildings in Keller, Kennesaw, and Naperville.

417.    In or about early October 2022 the TIC owners of the Keller Property, the Kennesaw Property, and the Naperville Property, including Plaintiffs, were informed by the lease administrator (Mary Street of CAMS Realty) that the tenant at all three properties had defaulted.

418.    The tenant had defaulted on all seven of the properties in the Millcreek/Colliers TIC Program that involved the tenant.

419.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that the HSH-affiliated tenant named on each lease agreement was an unregistered entity.

420.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that the HSH Parties were shell companies with insufficient revenue or business operations and were unable to service their rent obligations under the lease.

421.    What Millcreek had billed as the "tenant of your dreams" became the tenant of the Plaintiffs' nightmares.

422.    The Millcreek/Colliers Parties represented to some of the Plaintiffs that the "rent payments" they were receiving after closing on the Keller Property were either a lump sum of prepaid rent from the tenant or a monthly rent payment from the tenant.

423.    Mary Street, however, told Plaintiffs that none of these purported rent payments were from the tenant.

424.    The tenant has never produced any revenue at the Keller or Kennesaw Properties.

425.    The payments purporting to be rent from the Keller Property were paid by Millcreek Commercial.

426.    Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and Naperville Properties that HSH and HSMG—the corporations that purportedly had backed the tenant with a guarantee on the lease—was unable or unwilling to make good on that guarantee.

427.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that HSMG was a shell company with insufficient revenue or business activities and was unable to fulfill its obligations on the guarantee.

428.    Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and Naperville Properties that there was no bond from Lloyd's of London guaranteeing the leases at those properties.

429.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or should have known that no bond from Lloyd's of London had been issued backing the leases at the Keller, Kennesaw, and Naperville Properties.

430.   Long informed the Keller owners, including Plaintiffs, that Millrock had filed a lawsuit (the "Millrock-HSH Lawsuit") against several of the HSH Parties for misusing the Equipment Allowance Funds.

431.   The Millrock-HSH Lawsuit is ongoing.

432.   Long told the Keller owners, including Plaintiffs, that the Millrock-HSH Lawsuit was for their benefit and was filed on their behalf.

433.   Millrock is only seeking damages in the amount of $4,642,000 for the "Equipment Allowance Funds".

434.   None of the Keller owners, including Plaintiffs, are parties or beneficiaries in that lawsuit.

435.   Millrock does not retain any ownership of the Keller or Naperville Properties, and so is not similarly situated to the Keller or Naperville owners, including Plaintiffs.

436.   Under a triple-net lease like the ones bundled with the Keller, Kennesaw, and Naperville Properties, the tenant pays for taxes, maintenance costs, and insurance.

437.   After the tenant defaulted, Plaintiffs at the Kennesaw and Naperville Properties were burdened with the need to pay for taxes, maintenance, and insurance.

438.   The Keller Property may also have to pay for taxes, maintenance, and insurance in the future.

**Plaintiffs Discover Keller and Kennesaw Renovations and Construction Are Incomplete**

439.    As alleged previously, the Millcreek/Colliers Parties represented that the Keller Property was in a finished or nearly finished state following renovations.

440.    In the Offering Memorandum, it was represented to the investors that the building would be in "'as new' condition" after a period of renovation.

441.    In at least one version of an Offering Memorandum given to Plaintiffs as part of the sales process, the period of renovation was stated to be "2019 - 2020".

442.    A visit to the property in March 2023 revealed that the Keller building's renovations are nowhere near completion.

443.    As of at least March 2023, the Keller building is not able to function as a surgical center because of its incomplete renovations. For instance:

    a. Ceilings are not in a finished state.

    b. Walls have not been sheet rocked.

    c. Walls have not been painted.

    d. Flooring is not in place.

    e. Furniture has not been installed.

    f. Surgical equipment has not been installed.

    g. Electrical work has not been completed.

    h. Construction materials have not been removed.





444.    The Millcreek/Colliers Parties promised Plaintiffs a completed building ready to

be occupied at the Keller Property in their sales pitch.

445.    Indeed, the Millcreek/Colliers Parties induced Robert and Ditas Tannehill,

Teena and Jose Rementeria, Charles and Laura Brauer, Patti Klair, Robert and

Annabelle Barnes, Patrick and Hildegard White, Katherine Madera, Kurtis

Manning, and Tony Schaker to invest by stating that Keller renovations were

already complete.

446.    The Millcreek/Colliers Parties also induced Robert and Ditas Tannehill, Robert

and Annabelle Barnes, and Katherine Madera to invest by stating that the tenant

had already occupied the building.

447.    Instead, the funds for the renovation were diverted by the Developer Parties and

        HSH Parties.

448.    Millcreek's affiliate Millrock Investment Fund 1 authorized the disbursement of

        these funds without verifying that the renovations had been completed or that

        significant progress was being made.

449.    The Keller Property in its current state is unusable for any tenant.

450.    The Kennesaw Property, while renovated, is also not usable for any tenant in its

        current state.

451.    Upon information and belief, no surgical equipment has yet been installed at the

        Kennesaw Property.

**Plaintiffs Discover the Keller, Kennesaw, and Naperville Property Values are**

**Overinflated**

452.    Plaintiffs were further distraught to discover that the Keller, Kennesaw, and

        Naperville Properties were worth a fraction of what Defendants had represented.

453.    In the Offering Memorandum the Millcreek/Colliers Parties gave to Plaintiffs

        during the sales process, the value of the Keller Property was represented to be

        $21MM.

454.    But according to the City of Keller Tax Assessment, the value of the Keller

        Property is approximately $4MM, which Long and others have since confirmed.

455.   Millcreek-affiliated Millrock Investment Fund 1, along with a number of other individuals and entities, purchased the Keller Property in November of 2020 for approximately $4MM.

456.   Millrock has confirmed that $4MM, not $21MM, is the real market value of the property.

457.   The Kennesaw Property was marketed by Millcreek's representatives as being worth over $5.5MM.

458.   The realistic market value of the Kennesaw Property is substantially less than $5.5MM.

459.   The Naperville Property was marketed by Millcreek's representatives as being worth as much as $5MM.

460.   The realistic market value of the Naperville Property is approximately $700,000.

**Plaintiffs Discover the Keller, Kennesaw, and Naperville Lease Rates Are Overinflated**

461.   Long assured the Keller, Kennesaw, and Naperville owners, including Plaintiffs, that they could simply find a new tenant.

462.   However, Plaintiffs discovered that the lease terms that the HSH Parties agreed to pay under the Keller, Kennesaw, and Naperville leases were wildly overvalued compared to accurate market rates.

463.    Depending on the specific representations made by the Millcreek/Colliers
Parties, the rent per square foot in the lease bundled with the sale of the Keller
Property was between $100-$125 per square foot.

464.    However, accurate market rates for medical facilities in the area are typically
between $26-30 per square foot.

465.    The rent per square foot in the lease bundled with the Kennesaw Property was
approximately $140 per square foot.

466.    Realistic market rates for leasing the Kennesaw Property are approximately $30
per square foot.

467.    The rent per square foot in the lease bundled with the Naperville Property was
approximately $90 per square foot.

468.    Realistic market rates for leasing the Naperville Property are approximately $30
per square foot.

469.    Long knew or should have known that re-tenanting the Properties with the same
lease rate that the HSH parties had agreed to would be impossible.

470.    Not only were Plaintiffs stuck without a tenant and with endless empty promises
from the Millcreek/Colliers Parties, but due to the overinflated rent rate and
property value, finding a new tenant to occupy the Keller, Kennesaw, or Naperville
Properties or selling their TIC ownerships was simply not feasible.

471.   Plaintiffs lost the expected value of their investment—a reliable tenant, a 20-year lease backed by a guarantee and a bond, a monthly stream of income, the value of the property itself, the scheduled rent increases over the term of the lease, the 6-9% capitalization rate over the term of the lease, and the "safe, secure, and stable" investment they were repeatedly promised.

**<u>Harms to Plaintiffs' Health</u>**

472.   Many Plaintiffs suffer from disabilities, illnesses or chronic illnesses, and other debilitating and painful medical conditions.

473.   Plaintiff Karen Marion suffers from a disability stemming from a traumatic brain injury.

474.   Plaintiff Charles Brauer suffers from multiple sclerosis.

475.   Plaintiff Donald Patterson suffers from Parkinson's Disease.

476.   After being defrauded by Defendants, many symptoms of Plaintiffs' previously existing illnesses and conditions have intensified.

477.   After being defrauded by Defendants, Plaintiffs began to suffer new physical, mental, and emotional symptoms of distress and illness.

478.   Plaintiffs have suffered extreme stress and anxiety, feelings of guilt, depression, sleeplessness, social isolation, and excessive worry.

479.   Many Plaintiffs have suffered excessive strain on and harm to their familial relationships.

480.    In some cases, Plaintiffs' emotional and psychological suffering has been so

acute as to drive them to seek and obtain professional treatment and medication.

481.    Plaintiffs have suffered physical manifestations of their emotional and

psychological distress, including elevated blood pressure, head and muscle aches,

loss of appetite, unhealthy weight loss, low energy, listlessness, insomnia,

increased danger of heart attack or stroke, digestive distress, and more.

482.    In many cases, Plaintiffs' physical suffering has been so acute as to drive them to

seek professional treatment and medication.

483.    All of Plaintiffs have suffered severe physical, emotional, and/or psychological

injury and distress stemming from Defendants' wrongful actions.

## FIRST CAUSE OF ACTION

### *(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against All Defendants)*

484.    Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties

was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment

in a common enterprise with the success of the venture dependent primarily upon

the efforts of others, namely, the HSH Parties as tenants, guarantor, and affiliated

entities.

485.    Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

486.    The material misrepresentations and omissions were made in connection with the offer to sell a security.

487.    Such material misrepresentation and omissions include:

    a.  The risk analysis of the Keller, Kennesaw, and Naperville Properties,

    b.  The average capitalization rate of 6-9%% over the initial 20-year lease term,

    c.  That Millcreek Commercial retained, and would continue to retain, an ownership interest in the Keller, Kennesaw, and Naperville Properties,

    d.  That the tenant was a "dream tenant",

    e.  That the guarantor was a solvent company,

    f.  That there was a bond in place in case of tenant and guarantor default,

    g.  That the Keller Property was finished or nearly finished and would be operational by July of 2022, and

    h.  That Millcreek's TIC offerings did not constitute securities and federal and state laws regulating the sale of securities did not apply.

488.    Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with the Plaintiffs, or through the marketing materials.

489.    Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

490.    Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

491.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase interests in the Keller, Kennesaw, and Naperville Properties. The Plaintiffs would not have invested had they known the true facts.

492.    Plaintiffs justifiably relied on the foregoing misrepresentations.

493.    The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to this action because no meaningful cautionary statements were made regarding material risks and facts known by Defendants.

494.    The foregoing misrepresentations and omissions caused the owners to suffer

extensive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### *(Sale of Unregistered Securities Against All Defendants)*

495. Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties was

a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a

common enterprise with the success of the venture dependent primarily upon the

efforts of others, namely, the HSH Parties.

496. The TIC interests in the Keller, Kennesaw, and Naperville Properties which are the

subject of this Complaint were not registered by the filing of a registration

statement.

497. During the time in which the Millcreek/Colliers Parties marketed TIC interests in

the Keller, Kennesaw, and Naperville Properties, they made use of means or

instruments of communication in interstate commerce or the mails—including

telephone lines, the internet, email transmissions over the internet, and the United

States Postal Service—for the purpose of offering, selling, and delivering interests in

the Keller, Kennesaw, and Naperville Properties, in violation of Section 5 (a) and 5

(c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

498. Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason

of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to

the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security.  For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in the Keller, Kennesaw, and Naperville Properties to Defendants upon receipt of the amount specified in this paragraph, as may be proven at trial.

499. In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

500. In either case, Plaintiffs are further entitled to an award of pre and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

### THIRD CAUSE OF ACTION

*(Control Person Liability Under the Securities Exchange Act Against Long/Rutherford/Bell/McDougal/Taylor/Weber)*

501.    Millcreek Commercial and Colliers International, named as Defendants in Plaintiffs' First and Second Causes of Action, are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

502.    At all times relevant to this Complaint, the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

503.   Defendants were officers, directors, agents, or other control people of entities that are Liable Persons.

504.   Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

505.   Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

506.   Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

507.   Defendants participated in the business operations of the Liable Persons generally.

508.   Defendants had power over the specific transactions and activities at issue in this Complaint.

509.   With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the First Cause of Action.

510.   Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable

Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's First Cause of Action.

511.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FOURTH CAUSE OF ACTION

### *(State Law Securities Fraud  Against All Defendants)*

512.    The investments in Millcreek TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law

513.    Under applicable provisions of state securities laws[1], Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

---

[1] Applicable state law regarding securities fraud includes at least the following statutes: California, § 25401; Georgia, Ga. Code § 10-5-50; Massachusetts, Mass. Gen. Laws Ch. 110A § 101; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-401; Illinois, 815 ILCS 5/12; Delaware, DE Code § 73-201; New Jersey, N.J. Stat. § 49:3-71; Montana, MT Code 20-10-301; Washington, RCW § 21.20.010.

514.    In connection with the Defendants' sale and the Plaintiffs' purchase of investments in the Keller, Kennesaw, and Naperville Properties, Defendants made untrue statements of material fact; omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of state law.

515.    The defendants engaged in the conduct violating the applicable laws with knowledge of their failure to make a full and fair disclosure to Plaintiffs.

516.    Plaintiffs did not know that Defendants' misrepresentations were false and were not aware of the material facts that Defendants omitted to disclose in connection with their purchase of securities.

517.    By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

518.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

**FIFTH CAUSE OF ACTION**

*(State Law Securities Violation/Sale by Unlicensed Broker or Investment Adviser Against All Defendants)*

519.    The investments in Millcreek TIC Properties which are the subject of this

Complaint are within the definition of securities under applicable provisions of

state law.

520.    Defendants functioned as securities agents in selling the investment in Millcreek

TIC Properties to the Plaintiffs.

521.    Defendants' conduct violates provisions of applicable state law2 which requires

securities agents to be licensed.

522.    By reason of Defendants' unlicensed participation in the sale of securities to the

Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory

remedies, which may be measured by the total amount of Plaintiffs' investment

plus interest at applicable rates, less the value of what Plaintiffs received from the

investment.

_____

[2]   Applicable state law regarding the licensing of securities agents includes at least the following statutes: California, § 25210; Georgia, Ga. Code § 10-5-31; Oregon, OR Rev. Stat. § 59.165; Pennsylvania, 70 Pa. Stat. § 1-301; New Jersey, NJ Stat. § 49:3-56; Illinois, 815 ILCS 5/12; Massachusetts, Mass. Gen. Laws. Ch. 110A § 201; Washington, RCW § 21.20.040; Delaware, 6 DE Code § 73-202; Montana, Mt. Code 30-10-201.

523.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

### SIXTH CAUSE OF ACTION

### *(Materially Aiding State-Law Securities Fraud Against Long/Rutherford/Bell/McDougal/Taylor/Weber)*

524.    The Defendants identified in Plaintiffs' Fourth and Fifth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

525.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

   a.  Defendants were officers, directors, agents, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

   b.  As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

c.  Defendants otherwise engaged in conduct materially aiding the Liable

Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

526.  Defendants did not act in good faith, and Defendants knew or acted in reckless

disregard of the facts in carrying out their conduct relating to the sale of securities

to the Defendants.

527.  Pursuant to applicable state law relating to those who materially aid securities

violations,[3] Defendants are jointly and severally liable with and to the same extent

as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against

Defendants awarding damages in an amount to be proven at trial, but which is the

equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of

Action.

528.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract, at law, or

as consequential damages, and such further relief as the Court may deem

appropriate under the circumstances.

**SEVENTH CAUSE OF ACTION**

---

[3]  Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following: California, § 25403; Georgia, Ga. Code § 10-5-58; Massachusetts, Mass. Gen. Laws. Ch. 110A § 410; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-503; Washington, RCW 21.20.430; Illinois, Il. Code 815 ILCS 5/14; Delaware, 6 DE Code § 73-201; Montana, MT. Code 30-10-105; New Jersey, NJ Stat. § 49:3-71.

*(Fraud Against All Defendants)*

529.    Defendants made false statements about vital facts regarding the Keller, Kennesaw, and Naperville Properties, including the representations within the Marketing Materials and the representations made to each individual Plaintiff.

530.    Defendants made the statements knowing that they were false.

531.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

532.    Defendants intended that the Plaintiffs would rely on the statements.

533.    Plaintiffs reasonably relied on the statements by investing in the Keller, Kennesaw, and Naperville Properties.

534.    As a result of Defendants' conduct, Plaintiffs suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

*(Negligent Misrepresentation Against All Defendants)*

535.    Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affected or related to the condition of the Keller, Kennesaw, and Naperville Properties, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

536.    Defendants made false representations to Plaintiffs as detailed above.

117

537.   Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

538.   Defendants knew such representations were false or were negligent in making such representations.

539.   Defendants were negligent in investigating the tenant and the corporate guarantor.

540.   Defendants knew or should have known the misrepresentations were false.

541.   The Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing the Keller, Kennesaw, and Naperville Properties for a grossly inflated price.

542.   The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase the Keller, Kennesaw, and Naperville Properties.

543.   Plaintiffs would not have invested in the Keller, Kennesaw, and Naperville Properties had they known the true facts.

544.   Plaintiffs justifiably relied on the foregoing misrepresentations.

545.   As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### *(Breach of Fiduciary Duty Against All Defendants)*

118

546.   Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the Keller, Kennesaw, and Naperville Properties.

547.   Defendants expected that Plaintiffs would put particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the Keller, Kennesaw, and Naperville Properties.

548.   The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, *inter alia*, Plaintiffs' age, experience, abilities, disabilities as applicable, and the fact that that Plaintiffs were prohibited from actively managing their investments.

549.   Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

550.   Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

551.   Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

552.   Defendants accepted that trust and confidence from Plaintiffs.

553.   Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

554.   Defendants were also Plaintiffs' agents.

555.   Defendants also had access to superior and exclusive knowledge about the Keller investment opportunity, such as information about the financial performance of the tenants, HSH, HSMG, their affiliate entities, and the flow of funds to and from those entities.

556.   Defendants breached their fiduciary duties to Plaintiffs by, *inter alia*, failing to do any investigation into the legitimacy of the tenant and guarantor or else concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

557.   Defendants' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

558.   As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### *(Intentional Infliction of Emotional Distress Against All Defendants)*

559.   In performing the acts described in this Complaint, including specifically inducing Plaintiffs' investment, in making false representations and material

omissions to induce their investment, in failing to properly vet or investigate the HSH Parties, in misappropriating Plaintiffs' funds, in conspiring to defraud Plaintiffs, and other acts described herein, Defendants acted intentionally or recklessly.

560.   In performing the acts described in this Complaint, including specifically inducing investment from vulnerable and often elderly adults upon the basis of false representations and material concealments and omissions and thereby defrauding them, Defendants' conduct was extreme or outrageous.

561.   Defendants' conduct described in this Complaint has resulted in emotional distress to Plaintiffs so severe that it has caused physical and behavioral symptoms as more fully alleged in this Complaint.

562.   By reason of Defendants' intentional infliction of emotional distress upon Plaintiffs, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but not less than the total of Plaintiffs' tangible or economic damages.

563.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**ELEVENTH CAUSE OF ACTION**

*(Negligent Infliction of Emotional Distress Against All Defendants)*

564.   Defendants owed Plaintiffs a duty to refrain from conduct that would reasonably and foreseeably result in inflicting severe emotional distress upon Plaintiffs.

565.   In performing the acts described in this Complaint, including specifically inducing investment from vulnerable and often elderly adults upon the basis of false representations and material concealments and omissions and thereby defrauding them, Defendants breached their duty.

566.   Defendants' conduct described in this Complaint has resulted in emotional distress to Plaintiffs so severe that it has caused physical and behavioral symptoms and manifestations as more fully alleged in this Complaint.

567.   By reason of Defendants' negligent infliction of emotional distress upon Plaintiffs, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but not less than the total of Plaintiffs' tangible or economic damages.

568.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### TWELFTH CAUSE OF ACTION

*(Elder Abuse/Abuse of Vulnerable Adults By Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, Donald Patterson, and Karen Marion Against All Defendants)*

569.    Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Katherine Madera, Carl McQueary, Donald Patterson, Charles Brauer and Lynn McQueary were 65 or older at the time their investments were induced.

570.    Plaintiff Karen Marion suffers from a disability stemming from a traumatic brain injury.

571.    Plaintiff Charles Brauer suffers from a disability stemming from multiple sclerosis and is older than 65 years old.

572.    Plaintiff Donald Patterson suffers from a disability stemming from Parkinson's disease and is older than 65 years old.

573.    At all relevant times herein, Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, Donald Patterson, and Karen Marion were "vulnerable adults" as that term is defined in Utah Code § 76-5-111 and is therefore entitled to the protections provided under Utah Law.

574.    Defendants were in a position of trust and confidence or had a business relationship with these vulnerable adults, who put substantial trust and confidence in Defendants.

575.   Defendants knowingly, by deception, obtained or used these vulnerable adult's
funds, credit, assets, or other property.

576.   Defendants intended to temporarily or permanently deprive the vulnerable
adults of the use, benefit, or possession of the Plaintiffs' property, for their own
benefit.

577.   Defendants were aware of and exploited Plaintiffs' dependency upon
Defendants' purported knowledge, skills, and expertise.

578.   To sell the TIC investments to Plaintiffs, Defendants made misrepresentations of
material facts as alleged herein. Defendants were motivated by greed and intended
to generate fees and commissions for themselves by causing Plaintiffs to invest
while exposing Plaintiffs to an unreasonable risk of harm.

579.   Defendants received commissions, fees, and other benefits on the sale of the
TICs to Plaintiffs.

580.   Oftentimes, these commissions were not disclosed to Plaintiffs.

581.   Defendants have made written and oral misrepresentations of material facts in
connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs
to invest.

582.   In engaging in such conduct, Defendants were motivated by purposes other
than the well-being and interest of the Plaintiffs but acted with improper motives
including at least greed and self-interest.

583.   In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

584.   Under applicable state statutes and related tort principles, including the doctrine of *prima facie* tort or negligence *per se,* Defendants' conduct constitutes abuse of vulnerable persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable under other claims asserted herein, together with additional general damages as may be determined at trial.

585.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## THIRTEENTH CAUSE OF ACTION

### *(Conspiracy to Engage in Tortious Conduct Against All Defendants)*

586.   With respect to the tortious conduct alleged herein, the Millcreek/Colliers Parties entered into a combination with the HSH Parties and Developer Parties to accomplish the object of the tortious behavior, namely fraudulently inducing Plaintiffs' investment in the Keller, Kennesaw, and Naperville Properties.

587.   Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the Causes of Action above, and was reached expressly

in communications between the parties regarding the Millcreek TIC Program, or was tacit or implied in the parties' intent as evidenced by their conduct.

588.    In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful acts, including the acts described in the Causes of Action above.

589.    By reason of Defendants' participation in the civil conspiracy, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of property that Plaintiffs actually received.

590.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FOURTEENTH CAUSE OF ACTION

### *(Aiding and Abetting Tortious Conduct Against All Defendants)*

591.    As set forth in the Seventh through Seventeenth Causes of Action above, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

592.    The Millcreek/Colliers Parties knowingly aided and abetted the underlying

tortious conduct by distributing sales materials concerning the Millcreek TIC

properties, recommending investment in Millcreek TIC properties, selling and

closing sales of investment transactions, causing a substantial portion of Plaintiffs'

investment funds to be diverted to the payment of excessive commissions or other

compensation to the Millcreek/Colliers Parties and the referring Advisor parties,

and making the remaining proceeds of Plaintiffs' investments freely available to the

Developer Parties and/or the HSH Parties without restriction as to use.

593.    The Millcreek/Colliers Parties engaged in such conduct with knowledge of the

underlying tortious conduct in that they were intimately familiar with the HSH

Parties, their operations, their financial weakness, their failures to pay property

taxes, and their failing business based on frequent and on- going communication

with the HSH Parties and their principals, negotiations of loans and other inter-

party transactions, and receipt of financial information.

594.    The HSH Parties knowingly aided and abetted the underlying tortious conduct

by participating in the creation of the Marketing Materials containing material

misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs'

investment, as well as by diverting funds intended for Plaintiffs' benefit in

connection with renovations at the Keller Property.

595.   The HSH Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

596.   The Developer Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the Keller Property.

597.   The Developer Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

598.   By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among

other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the property that Plaintiffs actually received.

599.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTEENTH CAUSE OF ACTION

### (Unjust Enrichment of Defendants – All Defendants)

600.    Plaintiffs conferred a benefit on the Defendants by making their investment in Millcreek TIC Properties.

601.    Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

602.    Defendants appreciated, acknowledged, or had knowledge of the benefits incurred upon them as they directly received money from the proceeds of the Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Millcreek TIC Program, obtain, and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiffs.

603.    Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

604.    By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

605.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

1.  An award of actual damages, damages for pain and suffering, treble damages under applicable statutes, and punitive damages, attorney fees and costs in an amount to be proven at trial, plus interest as set forth by applicable statutes.

2.  Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

3.  If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

4.  Such other relief as may be just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

RESPECTFULLY SUBMITTED this 21st day of June 2023

DEISS LAW, P.C.

_/s/ Andrew G. Deiss_
Andrew G. Deiss
Corey Riley
_Attorneys for Plaintiffs_