Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
Andrew D. Miller (Utah Bar # 19625)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com
amiller@deisslaw.com
*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| PATTI KLAIR, ROBERT MYERS, ROBERT BARNES, ERIC CARNRITE, ELIZABETH HILL-D'ALESSANDRO, ROBERT TANNEHILL, DITAS TANNEHILL, JOSE REMENTERIA, TEENA REMENTERIA, CHARLES BRAUER, LAURA BRAUER, KAREN MARION, KATHERINE MADERA, CARL MCQUEARY, LYNN MCQUEARY, DONALD PATTERSON, KURTIS TRENT MANNING, TONY SCHAKER, PATRICK WHITE, HILDEGARD WHITE, QUEST REALTY TRUST, SECURE STORAGE LLC, KURTIS TRENT MANNING LIVING TRUST, | **FIRST AMENDED COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case No. 2:23-cv-00407<br><br>Judge Ann Marie McIff Allen<br><br>Magistrate Judge Cecilia M. Romero |
| *Plaintiffs,* | |
| v. | |
| KEVIN LONG; MILLCREEK COMMERCIAL PROPERTIES, LLC; COLLIERS INTERNATIONAL; ANDREW BELL; TREVOR WEBER; SPENCER TAYLOR; BLAKE MCDOUGAL, SCOTT RUTHERFORD; EQUITY SUMMIT | |

GROUP; ELEVATED 1031; MILLROCK
INVESTMENT FUND 1, LLC; MILLROCK
INVESTMENT FUND 1 MANAGEMENT,
LLC; KGL REAL ESTATE DEVELOPMENT
PLLC; BRENT SMITH; TOM SMITH;
MARY STREET, CAMS REALTY, LLC;
MOUNTAIN WEST COMMERCIAL
REALTY, LLC; STEVE CATON; SARC US,
INC.; CONSTANCE L. GREENAWALT;
EASTERN 1031 STARKER EXCHANGE
LLC; EASTERN 1031 STARKER
EXCHANGE LLP; INVESTMENT
PROPERTY EXCHANGE SERVICES, INC.;
KYLE WILLIAMS; MAX HANSEN;
ACCRUIT LLC; ROB RETTINHOUSE;
GRANITE EXCHANGE SERVICES LLC;
MARK ADAMS; BEUTLER EXCHANGE
GROUP LLC; SCOTT KING; MERIT
COMMERCIAL REAL ESTATE, LLC;
MARK MACHLIS; LADY MIRA BLUE
MACHLIS; HELLO BELLO, LLC; SAMUEL
DUKE; KGL ADVISORS, LLC;

*Defendants.*

By and through undersigned counsel, Plaintiffs complaint of Defendants as
follows:

## INTRODUCTION

At least by 2020, Kevin Long, Emanuel Butera, Josh Constantin, Justin Smith, and
their related entities began to develop, market, and sell or facilitate the sale of
investments in in commercial properties—Tenant in Common (or "TIC") investments.
These investments were designed to take advantage of so-called 1031 exchanges,

2

whereby individuals wanted to exchange an investment in one business for another—
"a like kind exchange"— to avoid paying capital gains tax at the time of the transaction.
1031 exchanges were named after Section 1031 of Internal Revenue 26 U.S. Code § 1031
which was created to allow taxes to be deferred until later—typically upon the death of
the investor. A 1031 exchange, thus, was attractive to a certain type of investor, namely
retirees who wanted to maximize their income stream for themselves and their
partners during their final years to pay mortgages and costs of everyday living without
worry. After all, many of these elderly folks had worked their entire lives to earn the
income to invest. They would be unable to go back to work should their investment
fail. It was this population that Long et al. publicly declared to be the target of their
1031 program.

Long, through his position as Senior Vice President and Executive Vice President at
the Utah division of Colliers, and President and founder of Millcreek Commercial
Properties, marketed the TIC opportunities through word of mouth, publications, and
by obtaining referrals from a network of real estate and 1031 exchange specialists.
Although Long, et al., pushed at least 14 of these properties during the period relevant
here, this case centers on the three located in Kennesaw, Georgia; Naperville, Illinois;
and Keller, Texas.

Long conspired with others to market these properties to investors as ideal 1031
exchange properties. According to Long and his affiliates, the properties were an

3

excellent 1031 investment because the location and condition of the buildings made them very valuable in themselves; the properties had already been leased by a "tenant of your dreams"; those tenants had been thoroughly "vetted" by Collier's team of analysts; the leases were guaranteed by a publicly traded company with very strong financials; the leases had "extremely attractive terms"; the leases were long term – usually 20 years in duration; they were triple net leases ("NNN"), which meant the tenant would pay insurance, day-to-day maintenance, and property taxes; the leases were insured by Lloyds of London; that the investment was unquestionably "safe, secure, and stable" with a capitalization rate of 6-9% over the term of the lease; and that the tenant was "such a good tenant" that they had even made pre-payments on rent.

In fact, these claims were false and replete with material omissions. The tenant failed to tender even a single payment at the Keller location and defaulted quickly on all its leases. Of course, the guarantor did not honor its obligation to cover the payments, nor was there ever a bond issued by Lloyds of London. In fact, both the tenant and the guarantor, as well as the individual who controlled the development company that was purportedly making tenant improvements to the Keller Property and others had easily discovered histories of fraud. The interior of the building at the Keller, Texas property had not been well maintained, had not possessed a certificate of occupancy—nor was one imminent. TIC owners were further surprised to learn that

4

certain payments, purportedly rent paid in advance, were not from the tenant at all. In fact, Millcreek had quietly been making payments to the TIC owners on the tenant's behalf in order to hide the tenant's insolvency.

Long and Colliers should have known this. In fact, it is likely that they did. Long had known the man behind American Development Partners (ADP)- one of the developer parties responsible for renovations, improvement and construction on the Keller, Kennesaw, and Naperville properties- for many years. In fact, records indicate that Long and Emanuel Butera (the owner and operator of ADP) had been partners in Utah businesses that sold TIC investments years before. Colliers knew or should have known of Butera's shady past, not the least because Long was a broker, Senior Vice President, and Executive Vice President with the Utah division of Colliers.

Despite this knowledge, Millcreek-affiliated Millrock Investment Fund 1 paid these companies over 10 million dollars—most of which has disappeared, leaving the Plaintiffs, mostly elderly and retired, with title to properties that are some combination of unfinished, over-priced, subject to maintenance fees, insurance, management fees, taxes, and an investment many Plaintiffs fear will not be covered by the IRS 1031 exemption. As one might expect, many of the Plaintiffs, particularly the elderly and vulnerable, have suffered very real and physical and emotional injury from these acts.

This Complaint arises from the omissions, misstatements, and outright lies that led to financial ruin and broken retirement dreams for the Plaintiffs. Lead Defendant

Kevin Long, acting on behalf of his company Millcreek Commercial Properties and in concert with others, including the named Defendants, systematically targeted retirement investors with promises of nearly-risk-free investments in real property. He used lies and misdirection in conjunction with the strict timeline of the IRS 1031 exchange program to pressure his marks into investing in deals that were designed to fail and did in fact fail.

**PARTIES**

**Defendants**

1. Defendant Colliers International ("Colliers") is an international real estate, valuation, consulting and investment services company.

2. There are 4 Colliers offices located in Utah.

3. Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek and directed towards transactions having a nexus in Utah.

4. Defendant Millcreek Commercial Properties, LLC ("Millcreek" or "Millcreek Commercial") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

5. Millcreek Commercial is managed by KGL Real Estate Development, PLLC, which at all material times directed, permitted, and was aware of Millcreek's conduct alleged herein.

6

6. KGL Real Estate Development, PLLC is a Utah professional limited liability company.  On information and belief Kevin Long is its sole member and manager.

7. Kevin G. Long ("Long") is an individual residing in Utah.

8. Long was Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

9. After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

10. In 2017 Long founded Millcreek Commercial Properties and affiliated commercial real-estate investment funds, including Millrock Investment Fund 1, LLC.

11. Long is "President of Millcreek with Colliers."

12. At all material times, Long was an employee and agent of Millcreek.

13. At all material times, Long was an employee and agent of Colliers.

14. Millrock Investment Fund 1, LLC ("Millrock") is a Utah limited liability corporation with its principal place of business in Lehi, Utah.

15. Millrock Investment Fund 1 Management, LLC is a Utah limited liability corporation.  Kevin Long is the manager of Millrock Investment Fund 1 Management, LLC.

16. At all material times Millrock Investment Fund 1 Management, LLC directed, permitted, and was aware of Millrock Investment Fund 1's conduct alleged herein.

17. Andrew Bell ("Bell") is an individual residing in Utah.

18. At all material times, Bell was an employee and agent of Millcreek.

7

19. At all material times, Bell was an employee and agent of Colliers.

20. Trevor Weber ("Weber") is an individual residing in Utah.

21. At all material times, Weber was an employee and agent of Millcreek.

22. At all material times, Weber was an employee and agent of Colliers.

23. Blake McDougal ("McDougal") is an individual residing in Utah.

24. At all material times, McDougal was an employee and agent of Millcreek.

25. At all material times, McDougal was an employee and agent of Colliers.

26. Spencer Taylor ("Taylor") is an individual residing in Utah.

27. At all material times, Taylor was an employee and agent of Millcreek.

28. At all material times, Taylor was a representative and agent of Millrock Investment Fund 1 LLC.

29. Defendant Equity Summit Group ("Equity Summit") is a Utah professional corporation with its principal place of business in Saratoga Springs, Utah.

30. Defendant Elevated 1031 ("Elevated") is an unregistered business entity with its principal place of business in Pleasant Grove, Utah. Upon information and belief, Elevated is managed by Scott Rutherford.

31. Scott Rutherford ("Rutherford") is an individual residing in Utah.

32. At all material times, Rutherford was an agent and representative of Millcreek.

33. At all material times, Rutherford was an agent and representative of Equity Summit.

34. At all material times, Rutherford was an agent and representative of Elevated 1031.

35. Brent Smith is an individual residing in Utah.

36. At all material times, Brent Smith was an agent and representative of Millcreek Commercial.

37. At all material times, Brent Smith was an agent and representative of Millrock Investment Fund 1.

38. At all material times, Brent Smith was an agent and representative of Millrock Investment Fund 1 Management.

39. Tom Smith is an individual residing in Utah.

40. At all material times, Tom Smith was an agent and representative of Millcreek Commercial.

41. At all material times, Tom Smith was an agent and representative of Millrock Investment Fund 1 LLC.

42. At all material times, Long, Rutherford, Bell, Weber, Taylor, McDougal, Brent Smith, Tom Smith, Samuel Duke, and Mary Street acted as close business associates of one another, including through development of the Millcreek/Colliers TIC Program, joint marketing, communications, social media, and transactional commission payments.

43. At all material times, Millrock, Millcreek, Colliers, CAMS Realty, Mountain West Realty, SARC US Inc., Elevated 1031, Equity Summit Group, Millrock Investment Fund 1 LLC, Millrock Investment Fund 1 Management, and KGL Real Estate

Development PLLC, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Granite Exchange Services LLC, IPX1031, Merit Commercial Real Estate LLC, Accruit LLC, Beutler Exchange Group, and Hello Bello, acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

44. Collectively, Millcreek, Colliers, Long, Rutherford, Bell, Weber, Taylor, McDougal, Brent Smith, Tom Smith, Elevated 1031, Equity Summit Group, Millrock Investment Fund 1 LLC, Millrock Investment Fund 1 Management, and KGL Real Estate Development PLLC are referred to herein as the "Millcreek/Colliers Parties."

45. Mary Street is an individual residing in Utah. She acted as lease administrator and property manager of the Keller, Kennesaw, and Naperville Properties, among other properties in the Millcreek/Colliers TIC Program.

46. CAMS Realty, LLC is a Utah limited liability company. It is a division of Mountain West Commercial Realty. Mary Street is its managing member and was its representative and agent at all material times.

47. Mountain West Commercial Realty, LLC is a Utah limited liability company with its primary place of business in Salt Lake City, Utah. At all material times CAMS Realty and Mary Street were its representatives and agents.

48. Hello Bello, LLC is a Utah domestic limited liability company with its principal place of business in South Jordan, Utah.

10

49. Samuel Duke is an individual residing in Utah. He is the manager and president of Hello Bello.

50. At all material times, Samuel Duke was the Head of Marketing for Millcreek Commercial Properties.

51. Constance L. Greenawalt ("Connie Greenawalt") is an individual residing in Pennsylvania. At all material times she was a representative and agent of Eastern 1031 Starker Exchange LLC and Eastern 1031 Starker Exchange LLP.

52. Eastern 1031 Starker Exchange LLC, is a Pennsylvania limited liability partnership with its principal place of business in Lewisberry, Pennsylvania.

53. Eastern 1031 Starker Exchange LLP is a Pennsylvania limited liability partnership with its principal place of business in Lewisberry, Pennsylvania.

54. Investment Property Exchange Services, Inc. ("IPX1031") is a California corporation with its principal place of business in Jacksonville, Florida.

55. Kyle Williams is an individual residing in Washington. At all material times he was a representative and agent of IPX1031.

56. Max Hansen is an individual residing in Montana. At all material times, he was a representative and agent of Accruit LLC.

57. Accruit LLC is a Delaware limited liability company with its principal place of business in Denver, Colorado.

58. Rob Rettinhouse is an individual residing in California.  At all material times he was a representative and agent of Granite Exchange Services LLC.

59. Granite Exchange Services LLC is a California limited liability company with its principal place of business in Granite Bay, California.

60. Mark Adams is an individual residing in Oregon.  At all material times he was a representative and agent of Beutler Exchange Group.

61. Beutler Exchange Group LLC is an Oregon domestic limited liability company with its principal place of business in Lake Oswego, Oregon.

62. Collectively, Greenawalt, Eastern 1031 Starker Exchanges LLC & LLP, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Rob Rettinhouse, Granite Exchange Services LLC, Mark Adams, and Beutler Exchange Group are referred to as the "Qualified Intermediaries."

63. Scott King is an individual residing in Oregon.  At all material times he was an agent and representative of Merit Commercial Real Estate.

64. Merit Commercial Real Estate, LLC is a limited liability company, on information and belief organized in Oregon.

65. Collectively, Scott King and Merit Commercial Real Estate are referred to as the "Referrers" for certain Plaintiffs.

66. Mark Machlis is an individual residing in Utah.

67. Lady Mira Blue Machlis is an individual residing in Utah.

68. At all material times the Machlises were close business associates of the Millcreek/Colliers Parties as development and investment partners, previous owners of TIC interests in the Keller Property, the marketing and sale of TIC Properties in the Millcreek/Colliers TIC Program, and on information and belief, the negotiation of the lease terms at one or more HSH-tenanted properties in the Millcreek/Colliers TIC Program.

69. Steve Caton is an individual residing in Illinois. At all material times, he was an agent and representative of SARC US, Inc.

70. SARC US, Inc. is a Missouri limited liability company with its principal place of business in Dexter, Missouri.

71. Defendant KGL Advisors, LLC is a Utah domestic limited liability corporation with its principal place of business in Lindon, Utah. On information and belief, KGL Advisors, LLC is managed by Defendant Kevin Long.

72. On information and belief, and based on the fact that in about late 2024 Millcreek Commercial indicated that it was closing but that KGL Advisors would assist Millcreek Commercial's former clients and that KGL Advisor's website adopted and incorporated large portions of Millcreek Commercial's website, KGL Advisors is an alter ego of Millcreek Commercial, continuing substantially similar operations and activities with substantially similar personnel, and should be held jointly and severally liable for any judgment against Millcreek Commercial in this case.

13

**Plaintiffs**

73. *Robert and Ditas Tannehill* are residents of California and were aged 67 and 68 respectively at the time they purchased TIC ownership in the Keller Property.

74. *Jose and Teena Rementeria* are residents of Oregon and own the Secure Self Storage, LLC entity, which has its principal place of business in Oregon. The Rementerias were 69 and 62 years old respectively at the time their entity Secure Self Storage purchased TIC ownership in the Keller and Naperville Properties.

75. *Robert Myers* is a resident of Oregon. He was 75 years old at the time he purchased TIC ownership in the Keller Property.

76. *Charles and Laura Brauer* are residents of Massachusetts and are trustees of Quest Realty Trust. They were 70 and 64 years old respectively at the time they purchased TIC ownership in the Keller Property.

77. During all material times herein, Charles Brauer suffered from a disability associated with multiple sclerosis.

78. *Patti L. Klair* is a resident of Delaware. She was 60 years old at the time she purchased TIC ownership in the Keller Property.

79. *Robert and Annabelle Barnes* are residents of New Jersey. They were 55 and 54 years old respectively at the time they purchased TIC ownership in the Keller and Kennesaw Properties.

80. *Donald Patterson* is a resident of New Jersey.  He was 75 years old at the time he purchased TIC ownership in the Keller and Kennesaw Properties.

81. During all material times herein, Donald Patterson suffered from a disability associated with Parkinson's Disease.

82. With regard to circumstances specifically involving the Kennesaw Property, the Barnes' and Donald Patterson are herein referred to as the Kennesaw Plaintiffs.

83. *Patrick and Hildegard White* are residents of Pennsylvania.  They were both 55 years old at the time they purchased TIC ownership in the Keller Property.

84. *Eric Carnrite and Elizabeth Hill-D'Alessandro* are residents of Washington.  They were 51 and 53 years old respectively at the time they purchased TIC ownership in the Keller Property.

85. *Karen Marion* is a U.S citizen residing in the Netherlands.  She was 62 years old at the time she purchased TIC ownership in the Keller Property.

86. During all material times herein, Karen Marion suffered from a traumatic brain injury-related disability.

87. *Katherine Madera* is a resident of Montana.  She was 75 years old at the time she purchased TIC ownership in the Keller Property.

88. *Carl and Lynn McQueary* are residents of Montana.  They were 70 and 69 years old at the time they purchased TIC ownership in the Keller Property.

89. *Kurtis T. Manning* is a resident of California.  He was 55 years old at the time he purchased TIC ownership in the Keller Property.

90. *The Kurtis T. Manning Living Trust* is a California trust and Kurtis T. Manning is its representative.

91. *Tony Schaker* is a resident of California.  He was 63 years old at the time he purchased TIC ownership in the Keller Property.

92. All Plaintiffs invested in TIC interests in the Keller Property and, in cases specifically involving the Keller Property, are referred to herein as the Keller Plaintiffs.

## JURISDICTION AND VENUE

93. Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

94. The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

95. Venue is appropriate in this forum pursuant to 28 U.S.C § 1391 (b)(2) and 15 U.S.C. § 78aa.

96. In connection with the conduct alleged in this Complaint, Defendants directly and indirectly used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

### THE MILLCREEK/COLLIERS TIC PROGRAM

**Overview of the Millcreek/Colliers TIC Program**

97. Over the last several years, Millcreek Commercial Properties and its agents have conspired with third parties in a sophisticated scheme to fraudulently induce vulnerable, often elderly investors to purchase TIC investments in commercial properties located throughout the United States at grossly inflated prices (the "Millcreek/Colliers TIC Program").

98. Millcreek marketed TIC interests in real properties at multiple locations, including Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Blytheville, Arkansas; Alpharetta, Georgia; Kennesaw, Georgia; Draper, Utah; Keller, Texas; Lehi, Utah; Bluffdale, Utah; South Jordan, Utah; Crockett, Texas; Tomball, Texas; and Katy, Texas.

99. Millcreek Commercial Properties' affiliate, Millrock Investment Fund 1, contracted with developers to purchase equipment and make renovations, improvements, and

construction on the buildings at the Keller Property, Kennesaw Property, and
Naperville Property.

100.    The Millcreek/Colliers Parties represented that they had already secured for
each property a paying tenant with sufficient revenue to service their long-term
lease.

101.    This tenant was identified as Healthcare Solutions Holdings Inc. ("HSH").

102.    HSH is a Delaware corporation with its principal place of business in Glen Cove,
New York.

103.    HSH is a wholly owned subsidiary of Healthcare Solutions Management Group.

104.    Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware
corporation with its principal place of business in Glen Cove, New York.

105.    Joshua Constantin ("Constantin") is an individual residing in Louisiana.

106.    Justin Smith ("Smith") is an individual residing in Ohio.

107.    At all material times, Constantin acted as the Head of Commercial Real Estate
for HSH.

108.    At all material times, Smith acted as HSMG's Chief Executive Officer.

109.    While not named as defendants in this lawsuit, collectively, HSH, HSMG,
Constantin, Smith, and their affiliates and subsidiaries are referred to herein as the
"HSH Parties."

18

110.    The HSH Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

111.    Either the HSH Parties or their affiliates entered long-term leases to operate the Romeoville, Pine Bluff, Blytheville, Alpharetta, Kennesaw, and Naperville properties as urgent care centers or advanced care medical centers.

112.    Either the HSH Parties or their affiliates entered long-term leases to operate the Keller Property as a surgical ambulatory regional center ("SARC").

113.    Either the HSH Parties or their affiliates entered long-term leases to operate the Kennesaw Property and the Naperville Property as advanced medical care centers ("ACMs").

114.    These leases were bundled with the sale of TIC interests in each property.

115.    Millcreek represented this would result in investors receiving a return on their investment in the range of 6-9% over the term of each lease.

116.    Millcreek represented that this would result in a steady stream of income along the way.

117.    The Millcreek/Colliers Parties represented that the rent payments on the lease were backed by two failsafe mechanisms to protect investors from potential losses.

118.    The first of these was a corporate guarantee backing the lease.

119.    The corporate guarantor for the Keller, Kennesaw, and Naperville leases was HSH and/or HSMG.

120. The second of these was represented by the Millcreek/Colliers Parties to be a bond issued by Lloyds of London, the world's leading insurance/reinsurance market.

121. To locate potential investors and induce their investments, Millcreek Commercial Properties, Colliers, and their agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified intermediaries, and 1031 exchange agents to locate and refer potential investors to them, some of whom are named as Defendants in this action.

**The Millcreek/Colliers Parties Jointly Target Retirement Investors**

122. From 2013 to 2016, Kevin Long was the Principal Broker and COO of CBC Advisors, a real estate company.

123. Kevin Long worked with Brandon Fugal at CBC Advisors.

124. Long and Fugal, at CBC Advisors, worked with Lew Cramer at Colliers.

125. Mary Street was an Associate Broker and Senior Vice President of Land and Investments at CBC Advisors.

126. All of the above-mentioned individuals can be seen in the following picture, published in a newsletter celebrating CBC Advisors accomplishments:

## CBC Advisors: Redefining Commercial Real Estate

 Meg Walter • Jul 14, 2016 • 2 min read



127.    Lew Cramer went on to become Chief Executive Officer of the Utah division of Colliers.

128.    In 2017, Colliers acquired Long's company, CBC Advisors.

129.    Brandon Fugal went on to become Chairman of the Utah division of Colliers after the acquisition.

130.    After the acquisition, Long worked as a broker for Colliers.

131.    Long represented he was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiffs below:

21

**Kevin G. Long**

Senior Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

132.    Long represented he was also Executive Vice President of the Utah division of Colliers, as shown in his email signature from communications with Plaintiffs below:

**Kevin G. Long**

Executive Vice President
**Direct +1 801 947-8324** | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

22

133.    On or about April 27, 2017, Kevin Long founded Millrock Investment Fund 1, LLC and Millrock Investment Fund 1 Management, LLC.

134.    In or about September 26, 2019, Kevin Long also founded Millcreek Commercial Properties, LLC.

135.    Long was "President of Millcreek Commercial with Colliers International", as shown in this excerpt from his personal LinkedIn page:



Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

## Experience



President of Millcreek Commercial with Colliers International | Utah
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

136.    Long represented that Millcreek and Colliers worked in partnership with each other, as shown in this excerpt from the Millcreek/Colliers website:

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

137.    At all material times, Millcreek Commercial used headers on their marketing materials, announcements, and other relevant documents that highlight their partnership with Colliers, as shown in the excerpt below:





138.    On information and belief, Brent Smith performed an instrumental role in developing the Millcreek/Colliers TIC Program including the development, marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in this case, including by identifying potential tenants and properties and calculating and arranging the terms and details of leases, corporate guarantees, bonds, and other aspects of each TIC offering in order to package and sell a final TIC offering to potential investors.

139.    Kevin Long described Brent Smith as the "numbers guy" for the Millcreek/Colliers TIC Program.

140.    In a call with Keller Property owners including Plaintiffs in about December 2022, Brent Smith described his own role as playing "part of the development process with ADP and making sure that the numbers work."

24

141.    Tom Smith provided "Oversight & Leadership" for the Millcreek/Colliers TIC

Program and was a financial partner for it, as shown in this slide from a

presentation given by Scott Rutherford in about July 2020:



142.    Tom Smith's responsibilities with regard to the Millcreek/Colliers TIC Program

included "Accountability oversight," as shown in this slide from a presentation

given by Scott Rutherford in about July 2020:



143.    In a presentation given on about July 20, 2020, Scott Rutherford stated that Tom Smith was "the main financial partner" for Millcreek and provided training to sales agents under Millcreek and Colliers' umbrella.

144.    "Every person at Millcreek," Rutherford stated, goes through "mandatory ... training with Tom Smith. ... show[ing] the level of oversight and integrity at Millcreek, that he is involved in overseeing everything."

145.    In about October 2020, Kevin Long described Tom Smith as "my financial partner" in the Millcreek/Colliers TIC Program.

146.    On information and belief, Tom Smith performed an instrumental role in developing and executing the Millcreek/Colliers TIC Program including the development, marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in this case, including by providing necessary funding for the

Millcreek/Colliers TIC Program, including the Keller, Kennesaw, and Naperville

Properties at issue in this case, and providing oversight and management of the

Millcreek/Colliers TIC Program and its sales agents including the development,

marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in

this case, including by identifying potential tenants and properties and calculating

and arranging the terms and details of leases, corporate guarantees, bonds, and

other aspects of each TIC offering in order to package and sell a final TIC offering to

potential investors.

147.    From about 2018-2020, Mary Street represented that she was an Executive Vice

President of Colliers International.

148.    On or about April 6, 2020, Mary Street registered CAMS Realty, LLC in Utah, dba

Colliers Asset Management Services.

149.    On or about April 7, 2020, Mary Street registered Colliers Asset Management

Services in Utah.

150.    Mary Street also registered the business name Commercial Asset Management

Services.

151.    In or about 2020, Mary Street represented that she was the Principal Broker of

Colliers Asset Management Services.

152.    Mary Street identifies herself as an Associate Broker with Mountain West

Commercial Real Estate and manager of CAMS Realty, LLC.

153.    At all material times, Defendants Kevin Long, Scott Rutherford, Andrew Bell,

Trevor Weber, Blake McDougal, Spencer Taylor, Mary Street, Brent Smith, Tom

Smith, and other agents of Millcreek Commercial Properties and Colliers

International were close business associates, including through joint marketing,

communications, social media, and transactional commission payments.

154.    In about 2020, Millcreek Commercial Properties and its agents Rutherford, Bell,

Weber, Taylor, and McDougal, under Long's leadership, began marketing and

selling TIC interests in real property including the Keller, Kennesaw, and

Naperville Properties.

155.    Defendants Colliers International, Millcreek Commercial, Long, Weber,

McDougal, Taylor, Rutherford, and Bell are not registered with FINRA (the

Financial Industry Regulatory Authority) to sell securities.

156.    Defendants Long, Weber, McDougal, Taylor, Rutherford, and Bell are not

licensed with the states of Texas, Illinois, or Georgia to sell real estate.

157.    The TIC interests sold by the Millcreek/Colliers TIC Program, including the

Keller Property, Kennesaw Property, and Naperville Property, were not registered

as securities by the filing of a registration statement, nor were they exempt under

the 1933 Securities Act.

158.    The Millcreek/Colliers Parties marketed TIC interests to potential buyers who

wished to take advantage of the IRS Section 1031 exchange program.

159.    A 1031 exchange permits those who sell business or investment property to

postpone paying tax on the gain if the funds are reinvested in a "like-kind

exchange"—i.e., property of the same nature or character as the sold property.

160.    1031 exchanges must take place over a constrained time frame, by law.

161.    From the date the original property is sold, the purchase of the new property

must be completed within 180 days.

162.    Millcreek "markets to middle class retirement investors," as shown in this

excerpt from the Frequently Asked Questions page of Millcreek's website:

**What is the exit strategy?**

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market. Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

163.    The tax-deferral advantages of a 1031 exchange are appealing to retirees,

particularly when such an exchange came with a promise of large monthly returns

on which they could rely during their final years.

164.    Millcreek marketed that "Millcreek Commercial generates passive income for

you."

165.   Typically, the Millcreek/Colliers Parties bundled long-term, triple net leases
with the sale of TIC interests.

166.   That is, they offered TIC interests in properties that already had leases in place
with tenants.

167.   The lease connected with each TIC property was designed to be the income
stream for the Millcreek/Colliers Parties' targeted investors.

168.   Millcreek marketed their properties as a way to "leave the headaches of being a
landlord behind."

169.   Millcreek also coaxed possible investors by saying "[r]est assured that our
portfolio is rock solid. We rigorously vet every property that we offer," as shown in
this excerpt from Millcreek's website, on a page called "1031 Exchange":

# Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever
considered owning quality commercial real estate? With our passive lease
structure, you can leave the headaches of being a landlord behind. We deliver
fully managed properties with better returns than your current real estate
investment, giving you more time to do the things you love. Our co-ownership
model makes it possible for any investor to utilize and 1031 exchange to buy
into high quality commercial real estate. Rest assured that our portfolio is rock
solid. We rigorously vet every property that we offer.

170.   Typically, a tenant was identified and acquired by the Developer Parties.

30

171.    In or about 2020, the Millcreek/Colliers Parties, under Long's direction, began marketing the Keller and Naperville Properties.

172.    In or about 2021, the Millcreek/Colliers Parties, under Long's direction, began marketing the Kennesaw Property.

173.    The Millcreek/Colliers Parties represented that the Keller Property was a former urgent care center that was renovated from 2019 to 2020.

174.    The Millcreek/Colliers Parties represented on the Keller Property's Offering Memorandum that rent commencement would be May 2021.

175.    The Millcreek/Colliers Parties represented that the Kennesaw Property was a former bank that was converted in 2021.

176.    The Millcreek/Colliers Parties represented on the Kennesaw Property's Offering Memorandum that rent commencement would be in 2021.

177.    The Millcreek/Colliers Parties represented that the Naperville Property was a newly constructed building completed in 2020.

178.    The Millcreek/Colliers Parties represented on the Naperville Property's Offering Memorandum that rent commencement would be in 2020.

179.    According to the Millcreek/Collier Parties' marketing, the Keller, Kennesaw, and Naperville Properties were each under long-term lease to a single tenant.

180.    According to the Millcreek/Colliers Parties' marketing, the Keller, Kennesaw, and Naperville Properties were backed by a corporate guarantor.

181.    Each of the Plaintiffs in this action purchased TIC interests for the desired

purpose of deferring capital gains tax and to obtain an income-generating property.

182.    As part of each of Plaintiffs' purchases of TIC interests in the Keller, Kennesaw,

and Naperville Properties, Colliers acted as the broker and received commission

payments on each purchase.

**The Qualified Intermediaries/Referrers' Role in the Millcreek/Colliers TIC**

**Program**

183.    As part of their eventual investment in the Millcreek/Colliers TIC Program,

Plaintiffs were referred by, consulted with, and engaged the services of those

qualified intermediaries named as Defendants (herein, "Qualified Intermediaries").

184.    Qualified intermediaries help exchangers such as Plaintiffs follow and comply

with the complex legal rules governing 1031 exchanges, including special

requirements for 1031 exchanges of TIC properties.

185.    In some cases, Plaintiffs were referred to the Millcreek/Colliers TIC program by

an individual and/or business entity that was not a qualified intermediary and did

not perform that Plaintiff's 1031 exchange, but referred Plaintiffs to the

Millcreek/Colliers TIC Program and endorsed, encouraged, and induced their

investments (herein, "Referrers").  In most cases, Plaintiffs' respective Qualified

Intermediaries referred Plaintiffs to the Millcreek/Colliers TIC Program and

endorsed, encouraged, and induced their investments.

186.    Plaintiffs did not know at the time, and did not discover until much later, that
some, and on information and belief all, of the Qualified Intermediaries and
Referrers were being paid by the Millcreek/Colliers Parties or their affiliates to refer
them to the Millcreek/Colliers TIC Program and conduct their exchanges.

187.    As alleged more specifically herein, the Qualified Intermediaries and Referrers,
spoke of the Millcreek/Colliers TIC Program in glowing terms and made specific
misrepresentations of material facts and omitted to disclose key facts about the
Millcreek/Colliers TIC Program and the investments through it that they
recommended to Plaintiffs.

188.    The Qualified Intermediaries also represented to Plaintiffs that, due to their
expertise and professional qualifications, they could and would ensure that
Plaintiffs' investments were 1031-compliant and advise Plaintiffs with respect to
their investments' 1031-compliance.

189.    Additionally, to qualify as a 1031 exchange, purchases of TIC interests must also
comply with requirements set forth in Revenue Procedure 2002-22. Some of these
requirements include but are not limited to: co-owners holding a title to the
Property, number of co-owners, no treatment of co-ownership as an entity,
restrictions on alienation, that securities are non-eligible, and others.

190.    In reality, the Qualified Intermediaries did little or nothing to ensure that the
investments they helped induce were 1031-compliant, and in at least some

33

instances took deliberate steps that threatened the investments' 1031-compliant status. Numerous aspects of the investment were likely not compliant with IRS regulations, potentially exposing Plaintiffs to enormous tax liability that they specifically sought to avoid through the help of the Qualified Intermediaries and their investments through the Millcreek/Colliers TIC Program.

191.    The IRS also identifies what qualifies as a "like-kind exchange," pertinent time limits to identify and complete an exchange, restrictions on "deferred and reverse exchanges", and how to report like-kind exchanges to the IRS in IRC Section 1031.

192.    A qualified intermediary should aid exchangers in identifying like-kind properties, complying with the timeline imposed by the IRS, and protecting exchangers from potential tax liabilities incurred by not adhering to §1031, Revenue Procedure 2002-22, and other applicable regulations.

193.    Upon information and belief, none of the defendants identified as qualified intermediaries in this suit ensured or verified that their clients, Plaintiffs, were compliant with the different regulations of Revenue Procedure 2002-22 and §1031.

194.    None of the Plaintiffs had ever heard of tenant-in-common properties.

195.    Many Plaintiffs had never done a 1031 Exchange before.

196.    None of the Plaintiffs had ever heard of Millcreek Commercial Properties beforehand.

197. As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers recommended a TIC investment through the Millcreek/Colliers TIC Program and assured the would-be owner that Millcreek had great TIC investment opportunities that would be 1031 exchange compliant.

198. As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers pointed out that Millcreek had partnered with Colliers with respect to the TIC investments in the Millcreek/Colliers TIC Program.

199. As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers counseled the respective Plaintiff with whom they were dealing that a TIC investment through Millcreek partnered with Colliers would provide a 1031 compliant property that featured the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiffs were seeking.

200. Upon information and belief, most or all of the Qualified Intermediaries and Referrers engaged in a referral agreement, referred to as an "Ambassador Agreement," with Millcreek Commercial and were paid a commission for successful referrals.

201. The amount of commission each Qualified Intermediary or Referrer would receive was based on three tiers of sales, as pictured from a Millcreek Ambassador Agreement excerpt attached below.

| Calendar Year Sales Volume | |
|---|---|
| Up to $1,000,000 | 3.0% Commission |
| $1,000,000 to $2,000,000 | 3.5% Commission |
| Greater than $2,000,000 | 4.0% Commission |
| MCP may, at their discretion, from time to time, offer additional cash, merchandise, or travel as incentives based on transaction or deal volume. | |

202.    None of the Qualified Intermediaries or Referrers mentioned to Plaintiffs that they would receive a commission or a similar type of compensation from the Millcreek/Colliers Parties for the referral.

203.    On documents sent to the title companies used in each of Plaintiffs' TIC investments in this case, on information and belief, Millcreek instructed that the Qualified Intermediaries' commissions should be reflected on the closing statement as a "Millcreek Commercial Cooperative Marketing Fee.".

204.    None of the Qualified Intermediaries or Referrers disclosed to Plaintiffs whether they had already engaged in the Ambassador Agreement, or even that it existed, with the Millcreek/Colliers parties before referring Plaintiffs to Millcreek/Colliers.

**The Millcreek/Colliers TIC Program Sales Pitch**

205.    Plaintiffs communicated directly with representatives of Millcreek, including Long, Rutherford, Bell, Weber, Taylor, and McDougal.

206.    In addition, Colliers acted as the broker holding real estate agent licenses for

Bell, McDougal, and on information and belief, other Millcreek representatives,

agents, and employees.

207.    Each of the Millcreek representatives with whom Plaintiffs talked strongly

recommended they invest in one of a portfolio of TIC properties sold by Millcreek.

208.    Each of the Plaintiffs was informed that a Millcreek TIC was a great investment

because Millcreek always "hand-select[s] the best properties", as shown in this

excerpt from Millcreek's promotional materials:



**Removing Barriers to Investing in Commercial Real Estate**
First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

We help each of our investors enjoy monthly passive income by co-owning premium commercial real estate that is both recession-resilient and fully managed.  How do we achieve this?

Removing Barriers to Investing in Commercial Real Estate
First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

- Single tenant (avoids complexity)
- Long-term lease (15+ years reduces tenant shuffling)
- Triple net lease (tenants are responsible for improvements, taxes, maintenance, etc.)
- Backed by a corporate guarantee (a larger company guarantees the lease)

209.    Plaintiffs were told that "[i]n terms of commercial real estate, a 'bad investment'

could equal a property that goes under, an unreliable tenant, or a property that

37

requires extensive responsibility on part of the investor. Millcreek Commercial

brings experience to the table by identifying and purchasing profitable properties

that will benefit the portfolios of investors,", as shown in this excerpt from

Millcreek's website:

### Choosing a bad investment

Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

210.    Each Plaintiff was told that with every property, investors could "enjoy a quality

property that has been identified and vetted by seasoned professionals,", as stated

in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure
> that the property meets three of four requirements:
> single tenant, long-term lease, investment grade, and
> triple-net leased. In addition, Millcreek Commercial
> will travel to the property for a personalized
> inspection of the property, building, and the
> surrounding area. Millcreek Commercial's years of
> experience in identifying profitable properties allows
> investors to avoid having to fear getting stuck with a
> "bad investment". Their expertise can help investors
> enjoy a quality property that has been identified and
> vetted by seasoned professionals.

211.    Moreover, the Millcreek/Colliers Parties represented that they had already
secured "the tenant of your dreams" for the Keller, Kennesaw, and Naperville
Properties.

212.    According to the Millcreek/Colliers Parties, the tenant had already signed a 20-
year lease with 2% annual increases and an average return on investment over that
period of 6-9%.

213.    For some Plaintiffs, including Annabelle and Robert Barnes, Eric Carnrite,
Charlie and Laura Brauer, Robert Myers, Karen Marion, Patti Klair, and Donald
Patterson, Millcreek represented that the tenant was "such a good tenant" that they

prepaid 6-8 months of rent in advance when these Plaintiffs closed on their purchase in the Keller Property.

214.    For other Plaintiffs, including Teena and Jose Rementeria, Bob and Ditas Tannehill, Katherine Madera, Patrick and Hildegard White, and Kurtis Manning, Millcreek represented that, after closing, they were receiving monthly payments of "rent" paid by the tenant when closing for the Keller Property.

215.    Millcreek represented the lease on each of its TIC properties in Keller, Kennesaw, and Naperville was triple-net ("NNN") – meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

216.    Millcreek stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather "benefit from a steady stream of passive income", as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

> Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

217.    Accordingly, the Millcreek/Colliers Parties stated the lease was "backed by strength" by Healthcare Solutions Management Group, the guarantor on the lease and a member of the HSH Parties.

218.    Millcreek represented that HSMG working "'in cooperation' with Millcreek" was

developing a nationwide network of surgery centers.

219.    The Millcreek/Colliers Parties represented that HSMG was "a publicly traded

medical service and device company", as shown in this excerpt from the Keller

Property's Offering Memorandum:

**Backed By Strength**

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

HSH not only helps physicians deliver better healthcare but also assists them in remaining compliant with industry best practices.

220.    The Millcreek/Colliers Parties represented that "Healthcare Solutions Holdings,

Inc. (HSH), meets [their] pillars for success", as shown in this excerpt from the

Keller Property's Offering Memorandum:

**The Tenant of Your Dreams**

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

221.    The Millcreek/Colliers Parties represented that the lease was insured by the

prestigious Lloyds of London insurance entity.

222.    The Millcreek/Colliers Parties thus assured Plaintiffs that, even if the tenant

defaulted in the first two years of a lease, Lloyds of London would pay a year of rent

payments.

41

| | |
|---|---|
| Lease Type | Absolute NNN bonded |
| Landlord Responsibilities | Zero |
| Insurance/Taxes/CAM/Utilities | Tenant |
| ROFO | No |
| Estoppel | On file |
| Default Bond | 1 year of rent payments if in the first 48 months |
| Ownership Interest | Fee simple estate |

223.    The Millcreek/Colliers Parties meant to imply, and Plaintiffs in fact inferred, that the involvement of Lloyds of London meant that reputable and reliable vetting and evaluation of the lease had been performed in connection with issuance of the bond.

224.    The Millcreek/Colliers Parties told Plaintiffs that they could rest assured that the investment would be "safe, stable, [and] secure", as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**
At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

225.    The Millcreek/Colliers Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction", as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

## How is a purchase executed?

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering

226.    According to Millcreek Commercial, the Keller, Kennesaw, and Naperville Properties passed its "relative test."

227.    The "relative test," as Millcreek explained in its marketing material, was whether "we would sell [the property] to our mother, grandmother, best friend, or son".

228.    Millcreek Commercial stated that "our acquisition team only purchases properties that our principals want to hold in our portfolios", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

229.    Millcreek stated that "we typically stay in our deals for the long term [...] This commitment provides our partners with added assurance that we believe in and are

committed to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

230.    The Millcreek/Colliers Parties represented that they had done many such deals before.

231.    Plaintiffs were told by the Millcreek/Colliers Parties that Millcreek "utilizes Colliers International as [its] brokerage partner".

232.    The Millcreek/Colliers Parties represented to the Plaintiffs that the Millcreek/Colliers partnership extended internationally inasmuch as Colliers was Millcreek's "global partner", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**2. A National Platform**

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

233.    The Millcreek/Colliers TIC Program's representatives communicated with Plaintiffs using their official Colliers email addresses.

234.    Colliers' logo was prominently placed right next to Millcreek's logo on every

page of the Keller, Kennesaw, and Naperville Property Offering Memoranda.

235.    Colliers' logo was also prominently displayed on emails and marketing materials

used by Long and other Millcreek Commercial Properties agents.

236.    Below is the front page of the Millcreek/Colliers' parties Offering Memorandum

for TIC investments in the Keller Property.



Surgical Ambulatory Regional Centers | Keller, TX

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.



Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com
Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

237.    Below is the heading of the second page of the Offering Memorandum for the

Keller Property, again prominently featuring the logos of both Millcreek and its

partner, Colliers International.

MILLCREEK COMMERCIAL | Colliers                    SARC | Keller, TX

238.    On the front page of the Offering Memorandum, Millcreek and Colliers further

state:

> The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in
> real property. They do not constitute securities. Consequently, federal and state laws regulating the sale
> of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not
> be entitled to the protection afforded to purchasers of securities under federal and state
> securities laws. Nothing in the attached offering documents should be construed as an offer or a
> solicitation of an offer to buy or sell securities.

239.    Plaintiffs relied on each of these representations when each eventually

purchased a TIC interest in the Keller, Kennesaw, and/or Naperville Properties.

**The Developer Parties' Role in the Millcreek/Colliers TIC Program**

240.    American Development Partners ("ADP") is a Tennessee company with its

principal place of business in Franklin, Tennessee.

241.    Emanuel Butera is an individual residing in Tennessee.

242.    Jamie Butera is an individual residing in Tennessee.

243.    At all material times, the Buteras acted as the owners and operators of ADP.

244.    SARC USA, Inc. is a Missouri limited liability company with its principal place of

business in Dexter, Missouri.

245.    Steve Caton ("Caton") is an individual residing in Illinois.

246.    At all material times, Caton acted as the president of SARC USA, Inc. and SARC

US, Inc.

247.    At all material times, Caton was a representative and agent of Caton

Commercial.

248.    Caton, SARC US, Inc., and Caton Commercial are not registered with FINRA (the

Financial Industry Regulatory Authority) to sell securities.

249.    While not all are named as defendants in this lawsuit, collectively, ADP, Butera,

SARC USA, Inc., SARC US, Inc., and Caton, are referred to herein as the "Developer

Parties."

250.    While not all the Developer Parties are parties in this action, allegations

regarding them are included as context for claims against Defendants.

251.    Millcreek or its affiliates entered a series of contracts with one or more of the

Developer Parties wherein the Developer Parties would develop and make

renovations, improvements and construction on the Keller, Kennesaw, and

Naperville Properties.

252.    In approximately 2018, "Millcreek Commercial Properties [partnered] with

American Development Partners to develop $50 million in single-tenant triple-net

lease assets throughout the US."

48

253.    "Millcreek [served] as the capital partner for American Development, which [would] build multiple single-tenant properties, including two facilities for Healthcare Solutions Holdings."

254.    Long stated: "They [ADP] have an extensive background in single tenant net lease product across the US.  We spent months exploring a venture together.  We have come together and are excited about the synergy that these two companies bring together for the American public."

255.    Two of these single-tenant properties that Millcreek contracted ADP to develop were the Keller Property and the Naperville Property.

256.    One of these single-tenant properties that Millcreek contracted SARC US, Inc. to develop was the Kennesaw Property.

**Mary Street and CAMS Realty's Role in the Millcreek/Colliers TIC Program**

257.    When Plaintiffs ultimately purchased the TIC interests in this case, they were introduced for the first time to Mary Street of CAMS Realty, whom the Millcreek/Colliers Parties had enlisted as the lease administrator at the Keller, Kennesaw, and Naperville Properties.

258.    To Plaintiffs, it initially appeared (and the other Millcreek/Colliers Parties represented) that Mary Street was a neutral, professional, trustworthy third-party who would act in the new TIC owners' best interests as lease administrator.

259.    In reality, and as Plaintiffs did not fully discover until after the start of this

litigation, Mary Street had a long history of professional collaboration with the

Millcreek/Colliers Parties in developing and implementing the Millcreek/Colliers

TIC Program.

260.    While purporting to represent Plaintiffs' best interests as owners of the ill-fated

TIC investments offered by the Millcreek/Colliers Parties, Mary Street collaborated

with the Millcreek/Colliers Parties to keep Plaintiffs and other investors in the dark

and string them further along the disastrous path that was the Millcreek/Colliers

TIC Program.

261.    Specifically, and as alleged more fully herein, Mary Street and CAMS Realty

concealed and obfuscated the financial realities of Plaintiffs' investment, concealed

the fact that there was no certificate of occupancy at the Keller Property and

affirmatively misrepresented that there was a certificate of occupancy, and then

after the failure of the HSH tenants, aided the Millcreek/Colliers Parties in

attempting to induce Plaintiffs to put up additional cash or sacrifice ownership

interest to fund equipment purchases and renovations for a new, equally un-vetted

tenant at the Keller and Naperville Properties.

262.    At the Keller Property, Plaintiffs and other owners rejected the proposed new

tenant; at Naperville, owners voted to lease the property to the new tenant, which,

predictably and in the same basic pattern as the HSH tenants, promptly defaulted in its turn at Naperville and other Millcreek/Colliers properties where it was tenanted.

### The Previous TIC Owners' Roles in the Millcreek/Colliers TIC Program

263.    While the TIC interests ultimately purchased by Plaintiffs were marketed and sold to them by the Millcreek/Colliers Parties, none of the TIC interests were owned by Millcreek or Colliers themselves.

264.    Instead, the TIC interests Plaintiffs purchased through the Millcreek/Colliers TIC Program were owned by Defendant Millrock Investment Fund 1, LLC, or a variety of other individuals or entities.

265.    The Millcreek/Colliers Parties did not disclose to Plaintiffs who really owned the TIC interests during the investment process, and Plaintiffs did not know that the TIC interests they were being induced to purchase were owned by other individuals and entities, not Millcreek or Colliers, until the final stages of the sale.

266.    Some of the previous owners, such as Millrock Investment Fund 1, Mark Machlis, Lady Mira Blue Machlis, and Hello Bello, were affiliates of Millcreek Commercial and intentionally aided the development and execution of the Millcreek/Colliers TIC Program, including through the development, marketing, and/or sale of Millcreek/Colliers TIC offerings, including those in this case.

267.    Additionally, because each purchased TIC interests in either the Keller, Kennesaw, or Naperville Properties, and then sold them to Plaintiffs at a drastically

inflated rate, each received a direct financial benefit for their participation in the

Millcreek/Colliers TIC Program.

**Background of Defendants' Previous Schemes, Frauds, and Investigations**

268.    Although Plaintiffs did not know it at the time, Plaintiffs have since discovered

that many of Defendants, as well as several of the Qualified Intermediary and

Developer parties, have previously been involved in similar TIC investment

schemes, fraudulent activity, and SEC investigations.

269.    Scott Rutherford was identified as a member of a principal party that operated a

nearly identical TIC investment scheme in Case No. 2:19-cv-277 in the United States

District Court for the District of Utah, filed April 23, 2019, and in Case No. 2:20-cv-

00004 in the United States District Court for the District of Utah, filed January 3,

2020.

270.    The conspirators entered a consent decree with the Securities and Exchange

Commission on December 30, 2020. Case No. 2:20-cv-918, Dkt. 7.

271.    Plaintiffs allege that the Millcreek/Colliers Parties knew or should have known

that Scott Rutherford was named as a participant in a nearly identical fraudulent

investment scheme.

272.    Connie Greenawalt and Eastern 1031 Starker Exchange were named as

defendants in federal complaint 2:20-cv-004 for her involvement in referring

potential investors to Rutherford.

273.    Plaintiffs allege that the Millcreek/Colliers Parties knew or should have known that Connie Greenawalt and Eastern 1031 Starker Exchange were named as participants in a nearly identical fraudulent investment scheme.

274.    On April 25, 2013, a federal court in New York found Joshua Constantin and his related brokerage firm jointly and severally liable for $2.49 million, and Constantin and his related holding company jointly and severally liable for over $760,000. The court issued an opinion finding Constantin liable for fraud; noted that Constantin and his colleague had made a "litany of misrepresentations" to clients; found that Constantin had "diverted" investor funds "to his own purposes"; and found that Constantin had "provided clients with misleading documents to cover up the fraudulent nature of [his] investment scheme."

275.    The Millcreek Colliers Parties knew or should have known that Joshua Constantin was found liable for fraud in his past investment scheme.

276.    As of November 27, 2013, Joshua Constantin was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment adviser, or from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court Southern District of New York.

277.    The Millcreek Colliers parties knew or should have known that Joshua Constantin was indefinitely barred by the SEC.

278.    Long justified this apparent oversight in a meeting on or about December 8, 2022, by admitting that "we're not in a practice of Googling individual executives of publicly traded companies".

279.    The HSH parties have defaulted on every operating lease in its portfolio—at least fourteen properties.

280.    Landes Capital was named as a defendant in a lawsuit styled Commodity Futures Trading Commission v. Financial Tree et al., case no. 2:20-cv-01184 in the United States District Court for the Eastern District of California. In this action, Financial Tree was found liable on claims of Commodity Option Fraud in Violation of 7 U.S.C. § 6c(b), Forex Fraud in violation of 7 U.S.C. § 6(b)(2)(A)-(C), among other claims. In this same action, Landes Capital was found liable on a claim of disgorgement for having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim.

281.    The Millcreek/Colliers Parties knew or should have known that Landes Capital was found liable for having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim.

282.    In or about October of 2006, Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee Nashville Division, a breach of lease agreement case.

54

283. The Millcreek/Colliers Parties knew or should have known that Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee.

284. In or about July 2022, Emanuel Butera and his associated entity Redstone, LLC were named as defendants in a similar real estate investment scheme in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

285. The Millcreek/Colliers Parties knew or should have known that Emanuel Butera was named as a defendant in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

286. In or about April 2020, Emanuel Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside, a breach of contract and fraud real estate investment scheme.

287. With respect to this information, Plaintiffs allege that Millcreek/Colliers Parties knew or should have known that Emanuel Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside.

288. Justin Smith is the sole member of Landes Capital Management, LLC. He also has "voting and dispositive control" of the HSH shares held by Landes and Compagnie Trust Prive KB.

289.    On information and belief, Justin Smith used Landes Capital Management, LLC

and Landes and Compagnie Trust Prive KB as a façade for his personal operations,

to siphon funds to himself, and/or promote fraud or injustice by siphoning funds

away from HSMG to avoid its obligations under leases and contracts.

290.    With respect to this information, Plaintiffs allege that the Millcreek/Colliers

Parties knew or should have known that Justin Smith was alleged to have used

Landes entities for fraudulent purposes.

## MISREPRESENTATIONS AND OMISSIONS – QUALIFIED INTERMEDIARIES/REFERRERS

### Misrepresentations and Omissions to All Plaintiffs

291.    The Qualified Intermediaries held themselves out to Plaintiffs as competent

professionals with the experience and expertise necessary to ensure that their

clients' property exchanges through the Millcreek/Colliers TIC Program would

comply with applicable IRS regulations including section 1031 and Revenue

Procedure 2002-22.

292.    The Qualified Intermediaries' purported expertise and reliability was

instrumental to Plaintiffs' decisions to invest in the Millcreek/Colliers TIC Program

and to employ the services of the Qualified Intermediaries, not least because of the

stringent timing requirements of 1031 exchanges and the complexity of navigating

numerous IRS regulations.

293.    As Plaintiffs ultimately discovered and as described further herein, their investments in the Millcreek/Colliers TIC Program suffered from numerous deficiencies that may render their investments noncompliant with IRS regulations.

294.    The Qualified Intermediaries and Referrers also made affirmative representations and omissions of material fact to Plaintiffs about the quality, safety, security, and stability of the Millcreek/Colliers TIC Program and urged Plaintiffs to invest in it.

295.    The Qualified Intermediaries and Referrers made at least the following misrepresentations and omissions of material facts to individual Plaintiffs:

_Misrepresentations and Omissions to Robert and Annabelle Barnes_

296.    In about January and February of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange referred Robert and Annabelle Barnes to the Millcreek/Colliers TIC Program.

297.    Shortly before January 30, 2022, on a phone call, Connie Greenawalt described Millcreek/Colliers' TIC offerings to Robert and recommended them to him.

298.    She stated, among other things, that she had "upwards of $4M invested" herself, and just "gets a check every month."

299.    Greenawalt's statement was false, in that she had not herself invested in any of the Millcreek/Colliers properties that she induced Robert and Annabelle Barnes to invest in.

300.    Greenawalt represented to Robert Barnes that there had not been a single complaint filed against them.

301.    This statement was false, in that she and Scott Rutherford, to whom she referred the Barnes, were previously co-defendants in another civil suit alleging TIC fraud in a nearly identical scheme.

302.    When Greenawalt referred the Barnes to Rutherford by email on or about January 30, 2022, she told Robert Barnes that "Millcreek offers commercial investment properties structured as tenants-in-common ownership in real properties which also pay a great rate of return."

303.    This statement was false, in that the HSH parties never paid any returns at all in either the Kennesaw or Keller Properties that the Barnes were induced to purchase, and in that third parties unknown to the Barnes, not Millcreek, were the previous owners from whom the Barnes were induced to purchase.

304.    Greenawalt told Robert Barnes that his investment was particularly safe with her, as she was an IRS agent and would probably be the one assigned if there was any audit of his purchase.

305.    This statement was false and misleading, as Greenawalt was not an IRS agent and had done little or nothing to vet the Barnes' investment for IRS compliance.

306.    Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

58

307.    Greenawalt omitted to mention the financial benefits she anticipated receiving,

and ultimately did receive, by referring the Barnes to the Millcreek/Colliers Parties.

308.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC

Program, in that she failed to disclose that the HSH parties were insolvent and

utterly incapable of fulfilling their lease obligations, that their corporate guarantor

was equally insolvent and unreliable, that no bond from Lloyds of London had been

issued, that equipment and renovations were lacking, that the Millcreek/Colliers

Parties were grossly overvaluing their properties and the leases on them, and that

she had done little or nothing to verify or ensure that the Barnes' investment would

comply with applicable IRS regulations.

309.    Greenawalt's false and misleading statements and her omissions of facts were

material in that they altered the mix of information available to the Barnes as they

considered and ultimately chose to invest.

310.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew

or should have known that her statements were false or misleading or made them

with reckless disregard to their truth or falsity, and as to Greenawalt's omissions

alleged herein, Greenawalt either knew or should have known that her omissions

were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Karen Marion*

59

311.   In about March and April of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange referred Karen Marion to the Millcreek/Colliers TIC Program.

312.   By email on about March 15, 2022, Greenawalt told Karen Marion that the Millcreek/Colliers' TIC offerings were "maintenance free to the owners and be[s]t of all – [paid] a great rate of return."

313.   This statement was false and misleading, as none of the Millcreek/Colliers TIC offerings at issue in this case paid any return at all from the HSH tenants, and when the HSH tenants immediately defaulted, Karen Marion and other owners were immediately burdened with significant management and maintenance work.

314.   Greenawalt omitted to disclose key facts about purchase contracts for the properties in that she failed to disclose in a timely matter that there would be two contracts needing Karen Marion's signature.

315.   Greenawalt omitted to disclose that she had done little or nothing to verify whether Karen Marion's investments were compliant with applicable IRS regulations governing 1031 exchanges.

316.   Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

317.   Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring Karen Marion to the Millcreek/Colliers Parties.

60

318.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC
Program, in that she failed to disclose that the HSH parties were insolvent and
utterly incapable of fulfilling their lease obligations, that their corporate guarantor
was equally insolvent and unreliable, that no bond from Lloyds of London had
issued, that equipment and renovations were lacking, and that the
Millcreek/Colliers Parties were grossly overvaluing their properties and the leases
on them.

319.    Greenawalt's false and misleading statements and her omissions of facts were
material in that they altered the mix of information available to Karen Marion as
she considered and ultimately chose to invest.

320.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew
or should have known that her statements were false or misleading or made them
with reckless disregard to their truth or falsity, and as to Greenawalt's omissions
alleged herein, Greenawalt either knew or should have known that her omissions
were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Charles and Laura Brauer*

321.    In about March of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange
referred Charles and Laura Brauer to the Millcreek/Colliers TIC Program.

322.    By email on about March 21, 2022, Greenawalt touted her reliability as a 1031
exchange company, with "never one single complaint ever filed against us" and

61

having "never ever had one single client ever audited from their exchanges through Eastern 1031."

323.    These statements were false and misleading, as Greenawalt had previously been a co-defendant with Scott Rutherford, to whom she referred the Brauers, in a civil suit alleging TIC-related fraud in a nearly identical scheme.

324.    These statements were also false and misleading in that they assured the Brauers that their transactions through her would comply with IRS 1031 exchange requirements when there was a substantial likelihood they did not, and Greenawalt had done little or nothing to verify or ensure that they would.

325.    On about March 22, 2022, Greenawalt introduced the Brauers to Scott Rutherford by email.  She represented that Millcreek/Colliers TIC offerings would be "a wonderful fit for their retirement," in particular because of the "monthly income."

326.    This statement was false and misleading, in that the Brauers were looking for a tax-deferred investment and Greenawalt had done little or nothing to verify or ensure that the Millcreek/Colliers TIC offerings satisfied IRS tax deferral rules for TIC properties, and in that the tenant did not fulfill nor was able to fulfill its 20-year lease with attendant monthly income.

327.    Greenawalt omitted to disclose that to qualify for tax deferral, the Brauers would need to hold the property for two years.

328.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Brauers to the Millcreek/Colliers Parties.

329.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

330.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Brauers as they considered and ultimately chose to invest.

331.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

_Misrepresentations and Omissions to Eric Carnrite and Elizabeth D'Alessandro_

332.    In about March of 2022, Kyle Williams of IPX1031 referred Eric Carnrite and Elizabeth D'Alessandro to the Millcreek/Colliers TIC Program.

333.    On about March 2, 2022, Williams told Eric Carnrite that his firm's "protections we implement for our clients" were "the highest level in this industry," in an "unregulated market where billions of dollars have been lost by other companies due to fraud, cyber theft, and everything in between."

334.    This statement was false and misleading, as Williams had done little or nothing to investigate or verify the quality of the Millcreek/Colliers TIC Program and ensure that the TIC investments through it would be 1031-compliant, and completely failed to protect Eric Carnrite and Elizabeth D'Alessandro, his clients, from the fraud or negligence of the Millcreek/Colliers Parties to whom he recommended them.

335.    On about March 30, 2022, Williams told Eric Carnrite that he was "a disinterested party."

336.    This statement was false and misleading, as, on information and belief, Williams expected to and actually did receive a financial benefit for referring Eric Carnrite and Elizabeth D'Alessandro to the Millcreek/Colliers Parties.

337.    Williams further told Eric Carnrite that "Millcreek is owned by Colliers" and that Trevor Weber, to whom Carnrite and D'Alessandro were referred by him, was "a Licensed Commercial Real Estate Agent with Colliers International," upon which

Carnrite and D'Alessandro relied for Colliers' reputation as they made their decision to invest.

338.   This statement was false and misleading in that it assured Eric Carnrite that rigorous due diligence had been done by the Millcreek/Colliers Parties on all material aspects of the investment.

339.   Carnrite and D'Alessandro had initially contacted Williams to inquire about another kind of investment called a DST.  Williams spontaneously suggested and recommended that they invest in a TIC offering through the Millcreek/Colliers TIC Program.

340.   Williams omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

341.   Williams' false and misleading statements and his omissions of facts were material in that they altered the mix of information available to Eric Carnrite and Elizabeth D'Alessandro as they considered and ultimately chose to invest.

342.   As to Williams' misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with

reckless disregard to their truth or falsity, and as to his omissions alleged herein, he
either knew or should have known that his omissions were material and that he had
a duty to disclose the truth of them.

*Misrepresentations and Omissions to Patti Klair*

343.    In about August through December of 2021, Connie Greenawalt of Eastern 1031
Starker Exchange referred Patti Klair to the Millcreek/Colliers TIC Program.

344.    On about August 20, 2021, by email, Greenawalt told Patti Klair that the
Millcreek/Colliers TIC Program would provide her with a TIC investment "pay[ing]
a great rate of return – and the best part – maintenance free to you."

345.    This statement was false and misleading, as the Keller Property that Patti Klair
was induced to purchase into never paid any returns at all, nor did it ever have a
tenant remotely capable of servicing the advertised lease.  When the HSH tenants
defaulted at the Keller Property, Patti Klair was immediately saddled with onerous
maintenance and management responsibilities along with the other owners.

346.    Greenawalt told Patti that she had recommended several clients to the
Millcreek/Colliers TIC Program and that this type of investment was "common
practice" in 1031 exchanges.

347.    This statement was false and misleading, as it implied that her other
representations and the Millcreek/Colliers Parties representations about the
Millcreek/Colliers TIC Program were true, and that Greenawalt had sufficient

66

knowledge to attest to the quality of the proposed investment and its compliance

with applicable IRS regulations, when in fact she had done little or nothing to verify

the compliance of the investment with applicable IRS regulations.

348.    Greenawalt omitted to mention the financial benefits she anticipated receiving,

and ultimately did receive, by referring Patti Klair to the Millcreek/Colliers Parties.

349.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC

Program, in that she failed to disclose that the HSH parties were insolvent and

utterly incapable of fulfilling their lease obligations, that their corporate guarantor

was equally insolvent and unreliable, that no bond from Lloyds of London had

issued, that equipment and renovations were lacking, and that the

Millcreek/Colliers Parties were grossly overvaluing their properties and the leases

on them.

350.    Greenawalt's false and misleading statements and her omissions of facts were

material in that they altered the mix of information available to Patti Klair as she

considered and ultimately chose to invest.

351.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew

or should have known that her statements were false or misleading or made them

with reckless disregard to their truth or falsity, and as to Greenawalt's omissions

alleged herein, Greenawalt either knew or should have known that her omissions

were material and that she had a duty to disclose the truth of them.

67

*Misrepresentations and Omissions to Katherine Madera*

352.    In about August and September of 2021, Max Hansen of Accruit referred Katherine Madera to the Millcreek/Colliers TIC Program.

353.    On about August 30, 2021, Hansen represented to Katherine Madera that there was $5.1MM available in the Keller Property, with a 20-year lease.

354.    This statement was false and misleading, as it was based on an exorbitant overvaluing of the Keller Property completely unmoored from fair market rates, and the HSH tenant at the Keller Property was insolvent and wholly unable to service a 20-year lease.

355.    Hansen urged Katherina Madera to invest in the Keller Property, highlighting the annual rent increases, the triple-net nature of the lease, and the absence of landowner responsibilities.

356.    Hansen omitted to mention the financial benefits that, on information and belief, he anticipated receiving and ultimately did receive, by referring Katherine Madera to the Millcreek/Colliers Parties.

357.    Hansen omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued,

that equipment and renovations were lacking, and that the Millcreek/Colliers

Parties were grossly overvaluing their properties and the leases on them.

358.    Hansen omitted to disclose that he had done little or nothing to verify or ensure

that Katherine Madera's investment would comply with applicable IRS regulations

governing 1031 exchanges.

359.    Hansen's false and misleading statements and his omissions of facts were

material in that they altered the mix of information available to Katherine Madera

as she considered and ultimately chose to invest.

360.    As to Hansen's misrepresentations alleged herein, he either knew or should

have known that his statements were false or misleading or made them with

reckless disregard to their truth or falsity, and as to his omissions alleged herein, he

either knew or should have known that his omissions were material and that he had

a duty to disclose the truth of them.

_Misrepresentations and Omissions to Kurtis Trent Manning_

361.    On or about October 5, 2021, Rob Rettinhouse referred Kurtis Trent Manning to

the Millcreek/Colliers TIC Program and sent him links to Millcreek/Colliers'

marketing materials.

362.    In his initial conversation with Kurtis Trent Manning, Rettinhouse said that his

grandfather had invested in Millcreek's properties a few years prior and they had

done very well for him.

69

363.   After an initial meeting with Trevor Weber and Rettinhouse, Kurtis Trent

Manning emailed them on or about October 8, 2021, and asked about the seemingly

overinflated lease price per square foot at the Keller Property.

364.   Rettinhouse omitted to disclose that the proposed lease rates were far above the

market standard for commercial properties.

365.   On or about October 18, 2021, Rettinhouse instructed Kurtis Trent Manning in

how to fill out his closing documents, specifically saying that "The date you [Trent]

need to fill in is 7/6/2021."

366.   Rettinhouse omitted to disclose possible tax liabilities that Kurtis Trent Manning

may incur from backdating documents, including by potentially making his

exchange 1031-inelegible.

367.   On or about October 25, 2021, while advising as to different properties that

Kurtis Trent Manning could invest in, Rettinhouse said that he had reviewed the

Millcreek investment opportunities.

368.   This statement was false and misleading, as Williams had done little or nothing

to investigate or verify the quality of the Millcreek/Colliers TIC Program, and

completely failed to protect Kurtis Trent Manning, his client, from the fraud or

negligence of the Millcreek/Colliers Parties to whom he recommended him.

369.    Rettinhouse failed to disclose the financial benefits he anticipated receiving, and

ultimately did receive, by referring Kurtis Trent Manning to the Millcreek/Colliers

Parties.

370.    Rettinhouse omitted to disclose key facts about the Millcreek/Colliers TIC

Program, in that he failed to disclose that the HSH parties were insolvent and

utterly incapable of fulfilling their lease obligations, that their corporate guarantor

was equally insolvent and unreliable, that no bond from Lloyds of London had

issued, that equipment and renovations were lacking, and that the

Millcreek/Colliers Parties were grossly overvaluing their properties and the leases

on them.

371.    Rettinhouse omitted to disclose that he had done little or nothing to verify

whether Kurtis Trent Manning's investment would comply with applicable IRS

regulations governing 1031 exchanges.

372.    Rettinhouse's false and misleading statements and his omissions of facts were

material in that they altered the mix of information available to Kurtis Trent

Manning as he considered and ultimately chose to invest.

373.    As to Rettinhouse's misrepresentations alleged herein, he either knew or should

have known that his statements were false or misleading or made them with

reckless disregard to their truth or falsity, and as to his omissions alleged herein, he

either knew or should have known that his omissions were material and that he had

a duty to disclose the truth of them.

*Misrepresentations and Omissions to Carl and Lynn McQueary*

374.    In about September of 2021 through January of 2022, Max Hansen of Accruit

referred Carl and Lynn McQueary to the Millcreek/Colliers TIC Program.

375.    On about September 3, 2021, Hansen suggested that, instead of alternative

investments the McQuearys were considering, they should invest in the Keller

Property.  He represented to the McQuearys that the Keller Property was worth

$20MM with a triple net lease, no owner responsibility, and annual rent increases,

adding that "[it] looks good."

376.    These statements were false and misleading, as it exorbitantly overvalued the

Keller Property, the HSH tenant promptly defaulted with no payments on the lease

at all (let alone increases), the owners including the McQuearys were promptly

burdened with owner responsibilities.

377.    Starting on or about September 14, 2021, and continuing at least until December

9, 2021, Max Hansen and his representatives represented to the McQuearys that

they would be purchasing a 2.5% interest in the Keller Property.

378.    This statement was false and misleading, as it overinflated the projected share

the McQuearys were going to have in the Keller Property, including their influence

in making ownership decisions.

379.    Further, this misled the McQuearys to identify the Keller Property in a particular way on their IRS filings, putting their 1031 exchange at risk of not being compliant with applicable regulations.

380.    Despite regarding the McQuearys as "old family friends," Hansen omitted to mention the financial benefits that on information and belief he anticipated receiving, and ultimately did receive, by referring the McQuearys to the Millcreek/Colliers Parties.

381.    Hansen omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had been issued, that equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

382.    Hansen omitted to disclose that he had done little or nothing to verify whether the McQuearys' investment would comply with applicable IRS regulations governing 1031 exchanges.

383.    Hansen's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to the McQuearys as they considered and ultimately chose to invest.

384.    As to Hansen's misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Robert Myers*

385.    In about January of 2022, Scott King referred Robert Myers to the Millcreek/Colliers Parties and encouraged him to invest in one or more Millcreek/Colliers TIC offerings.

386.    After initially referring him to Millcreek agent Andrew Bell, Scott King made contact with Robert Myers again to encourage him to invest, and was present on all or nearly all the phone calls and cc'd on all or nearly all emails that Robert Myers had with Andrew Bell, and tacitly endorsed Andrew Bell's representations of material fact alleged herein.

387.    Through phone and email communications he told Robert Myers that Millcreek's TIC offerings were fully backed by Colliers and that Robert Myers didn't need to worry about it and could trust it without reservation.

388.    Scott King told Robert Myers that the Millcreek/Colliers TIC Program would be a far better investment than another alternative that Robert Myers had been considering.

389.    Scott King told Robert Myers that the Keller Property he ultimately invested in
was backed by a bond and that construction would finish in July for the tenant to
occupy the building.

390.    Robert Myers asked Scott King if he had experience with prior clients investing
with Millcreek.  Scott King replied that he did and that his prior clients had a very
successful experience with the Millcreek/Colliers Parties.  He assured Robert Myers
that he was familiar with Millcreek and its employees and leadership.

391.    These statements were false and misleading in that there was little or no vetting
done on the tenant and other key aspects of the investment by the
Millcreek/Colliers Parties, there was no bond at the Keller Property, that Scott
King's prior clients referred to had not had a successful investment through the
Millcreek/Colliers TIC Program, and Scott King did not have a reasonable basis to
make the affirmative representations he made.

392.    Scott King omitted to mention the financial benefits he anticipated receiving,
and ultimately did receive, by referring Robert Myers to the Millcreek/Colliers
Parties.

393.    Scott King omitted to disclose key facts about the Millcreek/Colliers TIC
Program, in that he failed to disclose that the HSH parties were insolvent and
utterly incapable of fulfilling their lease obligations, that their corporate guarantor
was equally insolvent and unreliable, that no bond from Lloyds of London had been

issued, that equipment and renovations were lacking, and that the

Millcreek/Colliers Parties were grossly overvaluing their properties and the leases

on them.

394.    Scott King omitted to disclose that he had done little or nothing to verify whether

Robert Myers' investment was compliant with applicable IRS regulations governing

1031 exchanges.

395.    Scott King's false and misleading statements and his omissions of facts were

material in that they altered the mix of information available to the Robert Myers as

they considered and ultimately chose to invest.

396.    As to Scott King's misrepresentations alleged herein, he either knew or should

have known that his statements were false or misleading or made them with

reckless disregard to their truth or falsity, and as to his omissions alleged herein, he

either knew or should have known that his omissions were material and that he had

a duty to disclose the truth of them.

397.    In about January of 2022, Kyle Williams of IPX1031 began to communicate and

work with Robert Myers with respect to his investment in the Millcreek/Colliers TIC

Program.

398.    On about January 6, 2022, Williams told Robert Myers that his firm's

"protections we implement for our clients" were "the highest level in this industry,"

in an "unregulated market where billions of dollars have been lost by other companies due to fraud, cyber theft, and everything in between."

399.    Williams additionally stated that his firm's "nationwide staff" included "industry experts" and "veteran attorneys."

400.    These statements were false and misleading, as Williams had done little or nothing to investigate or verify the quality of the Millcreek/Colliers TIC Program, and completely failed to protect Robert Myers, his client, from the fraud or negligence of the Millcreek/Colliers Parties to whom he recommended them.

401.    Williams omitted to disclose the financial benefit that, on information and belief, he received for referring Robert Myers to the Millcreek/Colliers Parties.

402.    Williams omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

403.    Williams omitted to disclose that he had done little or nothing to ensure or verify that Robert Myers' investment would comply with applicable IRS regulations governing 1031 exchanges.

404.    Williams' false and misleading statements and his omissions of facts were
material in that they altered the mix of information available to Robert Myers as
they considered and ultimately chose to invest.

405.    As to Williams' misrepresentations alleged herein, he either knew or should
have known that his statements were false or misleading or made them with
reckless disregard to their truth or falsity, and as to his omissions alleged herein, he
either knew or should have known that his omissions were material and that he had
a duty to disclose the truth of them.

*Misrepresentations and Omissions to Donald Patterson*

406.    By email on about November 9, 2021, Greenawalt touted her reliability as a 1031
exchange company, with "never one single complaint ever filed against us" and
having "never ever had one single client ever audited from their exchanges through
Eastern 1031."

407.    These statements were false and misleading, as Greenawalt had previously been
a co-defendant with Scott Rutherford, to whom she referred to Donald Patterson, in
a civil suit alleging TIC-related fraud.

408.    These statements were also false and misleading in that they assured Donald
Patterson that his transactions through her would comply with IRS 1031 exchange
requirements when there was a substantial likelihood they did not.

409.    Greenawalt told Patterson that her previous clients had invested through
Millcreek with great success.

410.    This statement was false and misleading in that it assured Donald Patterson that
the Millcreek/Colliers TIC Program had a reliable track record of success and that
his investment would likely be successful.  On information and belief few or none
of Greenawalt's previous clients' investments through Millcreek were financially
successful.

411.    Greenawalt omitted to mention the financial benefits she anticipated receiving,
and ultimately did receive, by referring Donald Patterson to the Millcreek/Colliers
Parties.

412.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC
Program, in that she failed to disclose that the HSH parties were insolvent and
utterly incapable of fulfilling their lease obligations, that their corporate guarantor
was equally insolvent and unreliable, that no bond from Lloyds of London had
issued, that equipment and renovations were lacking, and that the
Millcreek/Colliers Parties were grossly overvaluing their properties and the leases
on them.

413.    Greenawalt omitted to disclose that she had done little or nothing to verify
whether Donald Patterson's investment was compliant with applicable IRS
regulations governing 1031 exchanges.

414.    Greenawalt's false and misleading statements and her omissions of facts were
material in that they altered the mix of information available to Donald Patterson as
he considered and ultimately chose to invest.

415.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew
or should have known that her statements were false or misleading or made them
with reckless disregard to their truth or falsity, and as to Greenawalt's omissions
alleged herein, Greenawalt either knew or should have known that her omissions
were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Teena and Jose Rementeria*

416.    In about July 2021, Scott King referred the Rementerias to the Millcreek/Colliers
TIC Program, urged them to purchase a TIC through the Millcreek/Colliers Parties,
and sent them Marketing Materials.

417.    Scott King omitted to disclose the financial benefit that he expected to receive,
and ultimately did receive, for referring the Rementerias to the Millcreek/Colliers
TIC Program.

418.    King omitted to disclose key facts about the Millcreek/Colliers TIC Program, in
that he failed to disclose that the HSH parties were insolvent and utterly incapable
of fulfilling their lease obligations, that their corporate guarantor was equally
insolvent and unreliable, that no bond from Lloyds of London had issued, that

equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

419. King omitted to disclose that he had done little or nothing to verify whether the Rementerias' investment was compliant with applicable IRS regulations governing 1031 exchanges.

420. King's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to the Rementerias as they considered and ultimately chose to invest.

421. As to King's misrepresentations alleged herein, King either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to King's omissions alleged herein, King either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

422. By about July 29, 2021, Mark Adams of Beutler Exchange began working with the Rementerias to conduct their 1031 exchange in connection with their investment in the Millcreek/Colliers TIC Program.

423. Mark Adams omitted to disclose that he had done little or nothing to verify or ensure that the Rementerias' investment was compliant with applicable IRS regulations, including Section 1031 and Revenue Procedure 2002-22.

424.   Mark Adams omitted to provide substantive consultation or ensure that the replacement property selected by Jose and Kathy Rementeria complied with IRS 1031 exchange requirements, including TIC-specific rules.

425.   Mark Adams' omissions were material in that they altered the mix of information available to Jose and Kathy Rementeria as they considered and ultimately completed their 1031 exchange.

426.   As to Adams' omissions alleged herein, Adams either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Tony Schaker*

427.   In about November 2021, Connie Greenawalt introduced Tony Schaker to Scott Rutherford and the Millcreek/Colliers TIC Program by email.

428.   When Greenawalt referred Tony Schaker to Rutherford by email on or about November 2, 2021, she told him that "Millcreek offers commercial investment properties structured as tenants-in-common ownership in real property ... Can you please show Tony some of the properties Millcreek has to offer?"

429.   Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

430.   Greenawalt told Tony Schaker that she used to audit exchanges such as the one she would help him conduct in the course of his investment.

431.    This statement was false and misleading as it implied that Greenawalt had taken

due care to ensure and verify that Tony Schaker's investment would comply with

applicable IRS regulations governing 1031 exchanges.

432.    Greenawalt omitted to mention the financial benefits she anticipated receiving,

and ultimately did receive, by referring Tony Schaker to the Millcreek/Colliers

Parties.

433.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC

Program, in that she failed to disclose that the HSH parties were insolvent and

utterly incapable of fulfilling their lease obligations, that their corporate guarantor

was equally insolvent and unreliable, that no bond from Lloyds of London had

issued, that equipment and renovations were lacking, and that the

Millcreek/Colliers Parties were grossly overvaluing their properties and the leases

on them.

434.    Greenawalt's false and misleading statements and her omissions of facts were

material in that they altered the mix of information available to Tony Schaker as he

considered and ultimately chose to invest.

435.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew

or should have known that her statements were false or misleading, and as to

Greenawalt's omissions alleged herein, Greenawalt either knew or should have

83

known that her omissions were material and that she had a duty to disclose the

truth of them.

*Misrepresentations and Omissions to Robert and Ditas Tannehill*

436.    In about August 2022, Connie Greenawalt referred Robert and Ditas Tannehill to

the Millcreek/Colliers TIC Program.

437.    Connie Greenawalt told Robert and Ditas Tannehill that she and Eastern 1031

Starker Exchange had "never ever had one single client ever audited for their

exchanges" and "never one single complaint ever filed against us."

438.    These statements were false and misleading, in that she and Scott Rutherford, to

whom she referred the Tannehills, were previously co-defendants in another civil

suit alleging TIC fraud in a nearly identical scheme.

439.    Greenawalt told the Tannehills that she was an IRS agent and one of their go-to

experts for 1031 exchange questions.

440.    This statement was false and misleading in that it assured the Tannehills that

Greenawalt had taken and would take reasonable steps to verify and ensure their

investment's compliance with applicable IRS regulations governing 1031

exchanges.

441.    Greenawalt omitted to mention the financial benefits she anticipated receiving,

and ultimately did receive, by referring the Tannehills to the Millcreek/Colliers

Parties.

84

442.    Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC

Program, in that she failed to disclose that the HSH parties were insolvent and

utterly incapable of fulfilling their lease obligations, that their corporate guarantor

was equally insolvent and unreliable, that no bond from Lloyds of London had

issued, that equipment and renovations were lacking, and that the

Millcreek/Colliers Parties were grossly overvaluing their properties and the leases

on them.

443.    Greenawalt's false and misleading statements and her omissions of facts were

material in that they altered the mix of information available to the Tannehills as

they considered and ultimately chose to invest.

444.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew

or should have known that her statements were false or misleading or made them

with reckless disregard to their truth or falsity, and as to Greenawalt's omissions

alleged herein, Greenawalt either knew or should have known that her omissions

were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Patrick & Hildegard White*

445.    In about January 2022, Connie Greenawalt introduced Patrick and Hildegard

White to Scott Rutherford by email.

446.    When Greenawalt referred the Whites to Rutherford by email on or about

January 20, 2022, she told Patrick White that "Millcreek offers commercial

85

investment properties structured as tenants-in-common ownership in real properties which also pay a great rate of return."

447.   Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

448.   Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Whites to the Millcreek/Colliers Parties.

449.   Greenawalt omitted to disclose key facts about the Millcreek/Colliers TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Millcreek/Colliers Parties were grossly overvaluing their properties and the leases on them.

450.   Greenawalt omitted to disclose that she had done little or nothing to verify whether the Whites' investment was compliant with applicable IRS regulations governing 1031 exchanges.

451.   Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Whites as they considered and ultimately chose to invest.

452.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew
or should have known that her statements were false or misleading or made them
with reckless disregard to their truth or falsity, and as to Greenawalt's omissions
alleged herein, Greenawalt either knew or should have known that her omissions
were material and that she had a duty to disclose the truth of them.

**MISREPRESENTATIONS AND OMISSIONS – MILLCREEK/COLLIERS PARTIES**

**Misrepresentations and Omissions to All Plaintiffs**

453.    Long, Rutherford, Bell, Weber, Taylor, and McDougal provided written
marketing materials, including materials in electronic form, to all of the Plaintiffs.

454.    This included Offering Memoranda for each of the Keller, Kennesaw, and
Naperville Properties, and property descriptions on their website.

455.    Together, these materials are referred to herein as the "Marketing Materials."

456.    The Millcreek/Colliers Parties developed the Marketing Materials with input
from the Developer Parties and the HSH Parties, and the Developer Parties and
HSH Parties were aware of and approved, either expressly or tacitly, all of the
content of the Marketing Materials.

457.    Rutherford, Taylor, Bell, Weber, and McDougal reviewed and were made aware
of the information contained in the Marketing Materials.

458.    Rutherford, Taylor, Bell, Weber, and McDougal distributed the Marketing Materials to each Plaintiff with whom they had contact by means including but not limited to:

    a.    Emailing the Marketing Materials.

    b.    Directing Plaintiffs to the Marketing Materials through the Millcreek website.

*Misrepresentations in Marketing Materials to All Plaintiffs*

459.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that tenant (HSH) was a publicly traded medical company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools, as shown in this excerpt from the Keller Offering Memorandum:

**Backed By Strength**

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

460.    With respect to this misrepresentation, Plaintiffs allege as follows:

461.    The representation is false, because HSH is a shell company with little or no revenue, business operations, or assets.

462.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the financial solvency of the tenant

company.

463.    The Millcreek/Colliers Parties knew or should have known that HSH Parties did

not have the capital or the cashflow to service rent payments on leases at the Keller,

Kennesaw, or Naperville Properties.

464.    The Marketing Materials provided by Millcreek/Colliers represented that HSH

"will capture revenue and margins that have historically been 'lost,'" resulting in

"significantly enhanced operating margins."

465.    With respect to this misrepresentation, Plaintiffs allege as follows:

466.    This representation is false, because HSH is a shell company without the

genuine business operations necessary to capture any meaningful revenue or

margins at all.

467.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, the financial status of the tenant company.

468.    Millcreek/Colliers Parties knew or should have known that HSH was patently

unable to make good on this representation.

469.    The Marketing Materials provided by Millcreek/Colliers represented that "ACM,

in cooperation with HSH will sign a 20-year NNN lease with 2% rent escalations

annually," as shown in this excerpt from the Keller Offering Memorandum:

## The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

470.    With respect to this misrepresentation, Plaintiffs allege as follows:

471.    This representation is false, because HSH did not have the financial ability to commit to a 20-year NNN lease with 2% rent escalations annually.

472.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of the investment and the viability of the tenant.

473.    Millcreek/Colliers Parties knew or should have known that HSH did not have the financial ability to commit to and service 20-year NNN leases with 2% annual rent escalations.

474.    The Marketing Materials provided by Millcreek/Colliers represented that the Keller, Kennesaw, and Naperville Leases were "all backed by an HSH corporate guarantee."

475.    With respect to this misrepresentation, Plaintiffs allege as follows:

476.    This representation was false, because neither HSH nor any of the HSH Parties had the financial capability to fulfill this obligation.

90

477.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial viability of the tenant and the risk profile of the investment.

478.   Millcreek/Colliers Parties knew or should have known that HSH was incapable of providing a reliable corporate guarantee.

479.   The Marketing Materials provided by Millcreek/Colliers represented that the leases bundled with the Keller, Kennesaw, and Naperville Properties were "insured by Lloyds of London."

480.   With respect to this representation, Plaintiffs allege as follows:

481.   This representation was false, because Lloyds of London never insured the leases bundled with the Keller, Kennesaw, or Naperville Properties.

482.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

483.   The Millcreek/Colliers Parties knew or should have known that HSH did not secure this bond from Lloyds of London.

*Omissions of Material Fact to all Plaintiffs*

484.   Millcreek made the following omissions of material fact:

485.    Millcreek omitted to disclose their sale of their TIC ownership in the Keller, Kennesaw, and Naperville Properties, even though they represented to Plaintiffs that they would always retain 5% to 20% ownership.

486.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the profile of Millcreek/Collier's risk in the Keller, Kennesaw, and Naperville Properties.

487.    Millcreek omitted to disclose that public SEC filings stated that HSH underwent a reverse merger in order to go public.

488.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

489.    Millcreek omitted to disclose that public SEC filings stated that HSH's supposed assets disclosed as part of their reverse merger appear to be merely loans.

490.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

491.    Millcreek omitted to fully and fairly disclose that the tenant was late to pay rent as early as December 2021.

492.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

493.   The Millcreek/Colliers Parties omitted to disclose that the tenant was late on rent and continued to represent to potential buyers that the tenant was a "tenant of your dreams".

494.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

495.   Millcreek omitted to timely disclose that its affiliate entity Millrock Investment Fund 1, LLC, or other undisclosed and unknown entities and individuals, not Millcreek Commercial itself, held TIC interests in the Keller Property and would sell their TIC interests to Plaintiffs.

496.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, Millcreek's risk profile in its own TIC investments.

497.   Millcreek omitted to include financial reports about HSH in the due diligence materials for Keller, Kennesaw, and Naperville.

498.   This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including,

specifically, HSH's financial viability. It also encouraged Plaintiffs to rely on

Millcreek's other false representations about the financial strength of HSH.

499.    Upon information and belief, the Millcreek/Colliers Parties made other

misrepresentations and omissions regarding material facts in order to induce

Plaintiffs' investment, which will be further uncovered and alleged as a result of the

discovery process in this action.

**Misrepresentations and Omissions Regarding the Keller Property**

*Misrepresentations and Omissions to All Keller Plaintiffs*

500.    The Marketing Materials given to all Plaintiffs made a series of untrue and

misleading misrepresentations to induce investments into the Keller Property.

501.    The Marketing Materials provided by the Millcreek/Colliers Parties represented

that the TIC interests sold as part of the Millcreek/Colliers TIC Program were not

securities under federal law, as shown in this excerpt from the Offering

Memorandum for the Keller Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.**MILLCREEKCOMMERCIAL**.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

502.  With respect to this misrepresentation, Plaintiffs allege as follows:

503.  The representation is false, because the TIC interests are securities under federal law and under the applicable laws of several states.

504.  The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Defendants' trustworthiness, the legal status of the investment, and the regulatory environment concerning the investment.

505.  The Marketing Materials provided by the Millcreek/Colliers Parties represented that HSH was poised to create the most extensive branded system in the country, as shown in this excerpt from the Offering Memorandum:

**Surgical Ambulatory Regional Centers (SARC)**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

506.    With respect to this misrepresentation, Plaintiffs allege as follows:

507.    This representation is false, because HSH was a shell company unable to occupy

and conduct business at even the Keller Property, much less extend its "operations"

across the country.

508.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the financial strength and business

aptitude of the Keller tenant.

509.    Millcreek/Colliers Parties knew or should have known that HSH Parties were not

financially stable enough to "create the most extensive branded system in the

country."

510.    The Marketing Materials provided by the Millcreek/Colliers Parties represented

that the Keller Property's fair market value was as much as $21MM, but always

more than $4MM, depending on the version of the Offering Memorandum given to each Plaintiff.

## Property Information

| | |
|---|---|
| **Tenant** | Surgical Ambulatory Regional Centers |
| **Location** | 1220 Keller Parkway, Keller, TX |
| **Property Type** | Freestanding, Medical |
| **Building Size** | 10,260 SF |
| **Purchase Price** | $21,336,982 |
| **Cap Rate** | 6.00% |

511.    With respect to this misrepresentation, Plaintiffs allege as follows:

512.    This representation was false, because the Keller Property is likely worth only approximately $4MM, but in any case much less than $21MM.

513.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the Keller Property.

514.    The Millcreek/Colliers Parties knew or should have known that the actual value of the Keller Property was substantially lower than $21MM.

515.    Millcreek represented that the renovations on the building on the Keller Property would be minimal because "[t]he facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model", as shown in this excerpt from the Offering Memorandum:

97

**The Property History**

This 10,250 SF facility was originally constructed as a freestanding Emergency Room facility five years ago. Due to reductions in reimbursement rates and other business decisions the tenant mothballed the facility after only six months of use. They have continued to pay rent. The facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model.

516.    With respect to this misrepresentation, Plaintiffs allege as follows:

517.    This representation was false, because required renovations were so extensive

that, left uncompleted, the building would be unfit for occupation by any tenant.

518.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, the risk profile and value of their investment.

519.    The Millcreek/Colliers Parties knew or should have known that the building on

the Keller Property was not in "as new conditions" and would require extensive

renovations.

520.    The Millcreek/Collies parties represented that the Keller Property was a "state of

the art" SARC.

521.    With respect to this misrepresentation, Plaintiffs allege as follows:

522.    This representation was false, because required renovations had not been

completed on the Keller Property, so it could not be a "state of the art" SARC.

523.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, the risk profile and value of their investment.

98

524.    The Millcreek/Colliers Parties knew or should have known that the building on
the Keller Property was not a "state of the art" SARC.

525.    The Millcreek/Colliers Parties omitted to timely disclose that Millcreek was the
party paying the "rent" payments that Plaintiffs received, rather than the tenant.

526.    This omission concerned an issue of material fact, in that it altered the mix of
information available to Plaintiffs in making their investment decisions, including,
specifically, the reliability and financial viability of the tenant.

*Misrepresentations to Robert and Ditas Tannehill*

527.    In or about May 2021, Robert and Ditas Tannehill began considering a 1031
exchange property for an apartment complex they owned as a way for them to
simplify their life and begin the process of retirement.

528.    In June 2021, the Tannehills put their apartment complex on the market and
began looking for a suitable 1031 exchange property.

529.    The Tannehills were referred to Scott Rutherford to help them find a suitable
1031 exchange property.

530.    From approximately May to December 2021, through emails, phone calls, and
other communications, Scott Rutherford made many representations to the
Tannehills to induce their investment in the Keller Property. Specifically,
Rutherford stated to the Tannehills:

   a.  That the Keller Property was already occupied by its tenant.

99

b. That the Keller Property was in operation as a "state of the art" SARC facility.

c. That the tenant was "solid" and that their 6% return would be guaranteed for 20 years.

d. That their TIC investment in the Keller Property would be "turnkey"—that is, the Tannehills would not have to do anything (or very little) to manage their TIC investment.

e. That due to Colliers' involvement and the safe, secure nature of Millcreek's investment strategy, it would be easy for the Tannehills to sell their TIC interest if they desired to do so at a later point.

f. That there was "always a buyer for the property" and that when they sold their share, they would get their cash "within 24 hours of close".

g. That the Keller Property was "going fast" and that they would have to move quickly to purchase a TIC ownership in the same, per an email correspondence in or about July 2021.

531.    Scott Rutherford omitted material facts in discussing the Keller Property with the Tannehills:

a. Rutherford failed to provide the Tannehills with a link to the online portal containing due diligence information.

     b.  Rutherford failed to provide the Tannehills with the tenant lease agreement until after the tenant defaulted.

     c.  Rutherford failed to provide the Tannehills with the final recorded deed.

     d.  Rutherford failed to disclose that the building was still undergoing renovations.

     e.  Rutherford failed to disclose that the certain disbursed payments represented as "rent" would not be rent payments from the tenant, but from the Millcreek/Colliers Parties.

*Misrepresentations to Jose and Teena Rementeria*

532.    In approximately May 2021, Jose and Teena Rementeria and Secure Self Storage, LLC were referred to Andrew Bell to help them find a suitable 1031 exchange property.

533.    From May to July 2021, through emails, phone calls, and other communications, Andrew Bell made at least the following representations to the Rementerias in order to induce their investment in the Keller Property:

     a.  That they would "never have to worry" about this investment since the tenant was on a 20-year lease with a guaranteed 6% return.

     b.  That a TIC investment in the Keller Property would provide a cashflow with a "good company".

     c.  That the purchase price of the building was about $15 MM.

    d. That payments distributed to the Rementerias were rent from the tenant.

    e. That the tenant for the Keller Property had been vetted by Millcreek in collaboration with Colliers.

534. Andrew Bell made at least the following omissions of material fact to the Rementerias as he induced their investment in the Keller Property:

    a. Bell failed to disclose that the Keller building was undergoing significant renovations.

    b. Bell failed to provide the Rementerias with an Assignment of Lease.

    c. Bell failed to disclose that the Rementerias would not be buying their share from Millcreek Commercial, but rather from a previously unknown entity, Millrock Investment Fund 1.

    d. Bell failed to disclose the commissions paid to Qualified Intermediary and Referrer parties, Millcreek Commercial, and Colliers International as a part of the sale transaction.

*Misrepresentations to Robert Myers*

535. On February 25, 2022, Robert Myers was referred to Andrew Bell to help him find a suitable 1031 exchange property.

536. From approximately February to April 2022, through emails, phone calls, and other communications, Andrew Bell made at least the following representations to Robert Myers in order to induce his investment in the Keller Property:

    a.    That Colliers was a Millcreek partner on the Keller Property deal, and that this was a "Collier's Deal".

    b.    That Colliers did the due diligence for the Keller Property deal, and that the investment opportunity was therefore especially trustworthy.

    c.    That the Keller Property was debt-free with a cash flow of 6% annually.

    d.    That the tenant was a "solid" public company with corporate guarantees and "totally vetted by Millcreek/Colliers".

    e.    That there was a bond to guarantee the lease and ensure rent payments.

    f.    That the Keller Property was a newly remodeled, state of the art surgery center almost equivalent to a hospital.

    g.    That all of the surgery center equipment would be in place and renovations completed in July 2022.

    h.    That the tenant was ready to occupy the Keller Property in July 2022.

    i.    That TIC ownership was "liquid" and Millcreek would buy Myers' TIC interest in the future if Myers decided to sell it.

    j.    That Millcreek would retain 5% to 20% ownership in the Keller Property.

537.    Andrew Bell made at least the following omissions of material fact to Robert Myers as he induced his investment in the Keller Property:

    a.    Bell failed to disclose that Robert Myers was buying his TIC share from third-party sellers instead of from Millcreek Commercial.

*Misrepresentations to Charles and Laura Brauer*

538.    In approximately March 2022 Charles and Laura Brauer decided to look to retire
and were referred to Scott Rutherford to help them find a suitable 1031 exchange
property.

539.    From approximately March to May 2022, through emails, phone calls, and other
communications, Scott Rutherford made at least the following representations to
the Brauers in order to induce their investment in the Keller Property:

    a.  That Millcreek's properties were highly sought after and presented on a
"first come, first served" basis, per an email correspondence in or about
March 2022.

    b.  That Millcreek's properties had "strong returns and some of the most
attractive lease terms we've seen in decades", per an email
correspondence in or about March 2022.

    c.  That Millcreek was "backed by Colliers" and therefore the Keller Property
deal was very secure.

    d.  That the Keller Property tenant was "rock solid" and a "reputable health
care company" with several instances of their business model already up
and running.

    e.  That there was a Lloyds of London bond to guarantee the lease and
ensure rent payments.

104

f.  That Millcreek had done $10MM in renovations to the Keller Property and that a certificate of occupancy was coming soon.

g.  That the building was equipped with state-of-the-art medical equipment.

h.  That due to the NNN lease, 6% cap rate, and property manager, all the Brauers would have to do is collect their check every month.

i.  That the Keller Property would give the Brauers a "hands-off revenue stream."

j.  That "construction is mostly complete" and the equipment just needed to be "set up," per an email correspondence in or about April 2022.

k.  That "even if they were to vacate the property, that would not release the parent company from the responsibility of paying the monthly rent and fulfilling the terms of the lease," per an email correspondence in or about April 2022.

l.  That Charles Brauer would receive an individual deed filed with Tarrant County, per an email correspondence in or about April 2022.

m.  That the Millcreek-estimated $21MM value of the Keller Property was based on comparable medical-purpose properties, per an email correspondence in or about April 2022.

n.  That Millcreek would purchase the Brauer's TIC interest at a premium if the Brauers decided to sell it.

105

o. That the tenant had had other ventures that had been "up and running for

a while," per an email correspondence in or about April 2022.

*Misrepresentations to Patti L. Klair*

540.  In approximately August 2021, Patti L. Klair was referred to Scott Rutherford to

help her find a suitable 1031 exchange property.

541.  From approximately August 2021 to May 2022, through emails, phone calls, and

other communications, Scott Rutherford represented to Patti L. Klair at least the

following in order to induce her investment in the Keller Property:

a. That Millcreek's properties had "strong returns and some of the most

attractive lease terms we've seen in decades," per an email

correspondence in or about August 2021.

b. That Millcreek's properties were "in very high demand and are presented

on a 'first come, first served' basis," per an email correspondence in or

about August 2021.

c. That an investment in a Millcreek property would "provide great asset

value and cash flow," per an email correspondence in or about August

2021.

d. That the tenant would not default and was "a very strong tenant," per

phone call.

e. That even if the tenant defaulted, rent would be paid through a bond securing the lease, per a phone call.

f. That if the bond was exhausted, "surgery centers are typically associated with larger entities such as hospitals who would then be obligated to pay the rent and have insurance for these types of situations," per a phone call.

g. That even if anything went wrong, Klair would have plenty of warning of any potential problem and easily be able to sell her shares, per a phone call.

h. That Klair was "lucky" to have an opportunity to invest in the Keller Property as it was "coveted" and shares were going fast.

i. That the tenant would occupy the building and be operating in June 2022.

j. That the additional month's rent would be added bonus to Klair if "new lease was signed in June and not delayed."

k. That "Phase 1 of this property sold out in less than 2 weeks," per an email correspondence in or about January 2022.

l. That the tenant was paying eight months of rent upfront as a good faith bonus.

542.    Scott Rutherford made at least the following omissions of material fact to Patti Klair as he induced her investment in the Keller Property:

    a.  Rutherford failed to disclose that the building was not finished.

    b.  Rutherford failed to provide the due diligence materials to Klair before
she closed her Keller Property TIC purchase.

    c.  Rutherford failed to provide Patti L. Klair with the final recorded deed.

*Misrepresentations to Robert and Annabelle Barnes*

543.    In or about February 2022, Robert Barnes was referred to Scott Rutherford to
help find a suitable 1031 exchange property.

544.    In or about February 2022 to April 2022, through phone calls, email, and other
communications, Scott Rutherford made at least the following representations in
order to induce the Barnes' investment in the Keller Property:

    a.  That an investment with Millcreek is "safe, secure, stable, and simple."

    b.  That "someone is always looking for investments like this."

    c.  That there would be "no landlord hassles, just a check."

    d.  That there would be "passive income."

    e.  That Millcreek had chosen a "solid tenant" for the Keller Property.

    f.  That Millcreek would purchase the Barnes' TIC share back if the Barnes
decided to sell.

    g.  That the investment would be passive and hands off.

    h.  That Millcreek owns a percentage of all of their properties.

545.    Scott Rutherford made at least the following omissions of material fact to the

Barnes as he induced their investment in the Keller Property:

    a.  Rutherford failed to provide Robert Barnes with due diligence materials.

    b.  Rutherford failed to disclose that the building was under construction,

       the terms of that construction, the significance of the construction, and

       the state of the construction or any related risks.

    c.  Rutherford failed to disclose that the building did not have a certificate of

       occupancy.

    d.  Rutherford failed to disclose that the tenant had not yet taken possession

       of the building.

    e.  Rutherford failed to disclose that Millcreek no longer owned any

       percentage of the property.

546.    When the Barnes' began to consider closing with Millcreek Commercial, Kevin

Long began communicating by email with the Barnes' using the email address

"kevin.long@colliers.com."

*Misrepresentations to Patrick and Hildegard White*

547.    In approximately January 2022 Patrick & Hildegard White were referred to Scott

Rutherford to help them find a suitable 1031 exchange property.

548.   Patrick and Hildegard White were told by their Qualified Intermediary that

investment in a Millcreek property would be a safe, suitable investment, "no hassle

investment" and were directed to Scott Rutherford in January 2022.

549.   From January to April 2022, through phone calls, emails, and other

communication, Scott Rutherford represented to Patrick and Hildegard White at

least the following to induce their investment in the Keller Property:

   a. That because Millcreek "operates under the umbrella of Colliers

      International, the fifth largest commercial real estate brokerage in the

      country" it would be easy to sell their TIC ownership if they ever desired

      to, per an email correspondence in or about January 2022.

   b. That "Millcreek's core properties provide cash flow immediately upon

      closing," per an email correspondence in or about January 2022.

   c. That Millcreek's commercial properties were "under corporate-

      guaranteed lease terms."

   d. That the Keller Property was new and fully renovated and ready for use as

      a medical facility.

   e. That the tenant was a "publicly traded medical service."

   f. That TIC ownership opportunities in the Keller Property were "in VERY

      high demand and are presented on a 'first come, first served' basis" and

that their "most recent properties had sold out in 2-3 weeks," per an email correspondence in or about January 2022.

g.  That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades" and "provide great asset value and cash flow," per an email correspondence in or about January 2022.

h.  That the tenant was "under corporate-guaranteed lease terms" and were "insured by Lloyds of London," per email correspondence.

i.  That if a tenant defaulted the building could be re-rented for the value that was sold and there was room for the building to appreciate as part of the natural market, per email correspondence in or about January 2022.

j.  That the rent commencement date was May 2022.

k.  That they would receive eight months of "rent paid by the tenant" in advance at the time the Whites closed on their purchase.

550.  Scott Rutherford made at least the following omissions of material fact to the Whites as he induced their investment in the Keller Property:

a.  Rutherford failed to disclose that the building was under construction, the terms of that construction, the significance of the construction, the state of the construction or any related risks.

   b. Rutherford failed to disclose that the TIC ownership they were

      purchasing was not from Millcreek Commercial, but rather from two

      previously unknown and undisclosed sellers.

*Misrepresentations to Eric Carnrite and Elizabeth Hill-D'Alessandro*

551.   In approximately March 2022 Eric Carnrite was referred to Trevor Weber to help

   find a suitable 1031 exchange property.

552.   In or about March to May 2022, through phone calls, emails, or other

   communications, Trevor Weber made at least the following representations in

   order to induce the Carnrite's and Hill-D'Alessandro's investment in the Keller

   Property:

   a. That Millcreek's buildings were purchased debt free and had "corporate

      guarantees to protect you financially," per an email correspondence in or

      about March 2022.

   a. That the Keller Property had a "double corporate guarantee", per an

      email correspondence in or about March 2022.

   b. That due to the triple-net nature of the lease, there would be no regular or

      ongoing expenses to the TIC owners.

   c. That Millcreek properties were "first come first serve due to high

      demand," per an email correspondence in or about March 2022.

d.  That "you can sell out of your property share at any time", per an email
correspondence in or about April 2022.

e.  That if the tenant could not pay rent there was a corporate guarantee
whereby other corporations "have both agreed to pay rents for remainder
of the lease," per an email correspondence in or about April 2022.

f.  That Carnrite and Hill-D'Alessandro's risk on investing through Millcreek
was "minimal, almost completely mitigated."

g.  That there was a "long-term, vetted tenant in place" for the Keller
Property.

h.  That the tenant, HSH, was "The Tenant of Your Dreams" and met
Millcreek's "pillars for success," per an email correspondence in or about
May 2022.

i.  That Millcreek maintains at least 5% ownership in all their properties.

j.  That the tenant's rent payments on the lease had been insured by Lloyds
of London.

k.  That if anything went wrong, the corporate guarantees would financially
protect the TIC investors.

l.  That renovations to the Keller Property would be complete in June and
that they were only waiting on "one building item," and a certificate of

occupancy would follow a month later, per an email correspondence in or about May 2022.

m. That Kevin Long of Millcreek takes "a lot of time to personally vet all our properties, do on-site visits, review financials, etc.," per an email correspondence in or about May 2022.

n. That they were buying into the Keller Property at a fair price.

553. Trevor Weber made at least the following omissions of material fact to Eric Carnrite as he induced their investment in the Keller Property:

a. Weber failed to provide a link to the due diligence materials for the Keller Property.

b. Weber failed to disclose that the occupancy permit was not only waiting on final inspections, but also waiting on the completion of the renovations.

c. Weber failed to disclose that no bond had been secured.

d. Weber failed to disclose that Millcreek intended to fully sell out of the property and not maintain ownership.

e. Weber failed to disclose that there were commissions paid as part of the sales process.

f.  Weber failed to disclose that the Millcreek parties had been paying HSH's
'rent' for other TIC owners since December 2021 due to HSH's cash flow
problems.

*Misrepresentations to Karen Marion*

554.    In or about March 2022, Karen Marion was referred to Scott Rutherford to help
her find a suitable 1031 exchange property.

555.    In or about March 2022, through emails, Zoom calls, and other communications,
Scott Rutherford represented to Karen Marion at least the following to induce her
investment in the Keller Property:

a.  That Millcreek's "high-grade" commercial properties are under
"corporate-guaranteed lease terms for steady monthly cash flow," per an
email correspondence in or about March 2022.

b.  That Millcreek's properties "provide cash flow immediately upon
closing," per an email correspondence in or about March 2022.

c.  That Millcreek's properties are in "VERY high demand and are presented
on a 'first come, first served' basis," per an email correspondence in or
about March 2022.

d.  That Millcreek's properties have "strong returns and some of the most
attractive lease terms we've seen in decades," per an email
correspondence in or about March 2022.

e. That working with Millcreek would "simplify your search process and provide great asset value and cash flow," per an email correspondence in or about March 2022.

f. That Millcreek's commercial properties (including the Keller Property) were under corporate-guaranteed lease terms to protect tenant's investment, per an email correspondence in or about March 2022.

g. That investment in a Keller Property TIC interest would perfectly suit Karen Marion's goal of providing a reliable income stream, per a Zoom call in or about March 2022.

h. That if Marion desired to sell her TIC interest at a later point it would "not be a problem," per a Zoom call in or about March 2022.

i. That Marion would receive 8 months of prepaid rent from the tenant at the time of closing and that the tenant would start paying regular rent in October 2022, per a Zoom call in or about March 2022.

*Misrepresentations to Katherine Madera*

556.   In or about August 2021, Katherine Madera was referred to Blake McDougal to help her find a suitable 1031 exchange property.

557.   When Blake McDougal communicated with Madera regarding the Keller Property and TIC investments with Millcreek, he sometimes did so from his Colliers email address.

116

558. From approximately August to October 2021, through emails, phone calls, and other communications, Blake McDougal represented to Madera at least the following to induce her investment in the Keller Property:

    a. That TIC ownership opportunities in the Keller Property were going fast and that Madera should make her decision soon if she wanted to take advantage of the opportunity.

    b. That the Keller Property was a "surgical center."

    c. That the deal was "backed by Colliers."

    d. That HSH was evaluated by Colliers as part of their "process."

    e. That the tenant was already in the building.

    f. That the Keller Property was fully renovated and ready for use as a medical facility.

559. Blake McDougal made at least the following omissions of material fact to Katherine Madera as he induced their investment in the Keller Property:

    a. McDougal failed to disclose that the building on the Keller Property was undergoing significant renovations.

    b. McDougal failed to disclose that HSH was late making rent payments at other properties in December of 2021.

*Misrepresentations to Carl and Lynn McQueary*

560.    In approximately December of 2021 Carl and Lynn McQueary were referred to
Spencer Taylor to help them find a suitable 1031 exchange property.

561.    From approximately December 2021 to January 2022, through emails, phone
calls, and other communications, Spencer Taylor made at least the following
representations to Carl and Lynn McQueary to induce their investment in the Keller
Property:

    a.  That the tenant had signed the lease and had begun paying rent
payments.

    b.  That the building would complete construction and renovations in
September 2022.

    c.  That there would be no problem selling or exchanging his TIC investment
ownership.

*Misrepresentations to Donald Patterson*

562.    In approximately February 2022, Donald Patterson was referred to Scott
Rutherford to help him find a suitable 1031 exchange property.

563.    From approximately February to May 2022, through phone calls, emails, and
other communications, Scott Rutherford represented to Donald Patterson at least
the following in order to induce his investment in the Keller Property:

a. That "Millcreek Commercial properties are uniquely structured to
perfectly meet your needs", per an email correspondence in or about
February 2022.

b. That "Millcreek Commercial provides properties where you can purchase
a deeded ownership percentage of high-quality, passive commercial
properties that would otherwise be unavailable for most investors", per
an email correspondence in or about February 2022.

c. That Millcreek's properties are "[h]igh-grade commercial properties
under corporate-guaranteed lease terms for steady monthly cash flow",
per an email correspondence in or about February 2022.

d. That Millcreek's properties have a "[p]roven track record", per an email
correspondence in or about February 2022.

e. That "Millcreek's core properties provide cash flow immediately upon
closing, so you [Patterson] are able to put your funds to work as quickly as
possible", per an email correspondence in or about February 2022.

f. That "Millcreek's properties are in VERY high demand and are presented
on a 'first come, first served' basis", per an email correspondence in or
about February 2022.

119

g.  That "Millcreek's mantra of 'safety, security, and stability' (and I would add 'simplicity') is the priority with each property", per an email correspondence in or about February 2022.

h.  That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about February 2022.

i.  That Rutherford's "goal is to provide you with solutions which simultaneously simplify your search process and provide great asset value and cash flow", per an email correspondence in or about February 2022.

j.  That triple net leases were Millcreek's specialty "hands off investment," per a meeting in or about February 2022.

k.  That Millcreek properties were in high demand and that their inventory continues to be "depleted quickly," and that a Millcreek property being available was a "limited opportunity that you need to jump on," per a meeting in or about February 2022.

l.  That there was a "team" of individuals that vetted properties to ensure they were the "right property in the right location at the right price" per a meeting in or about February 2022.

120

    m. That "he had never had an investor get out of a [Millcreek] property and

       lose money," per a meeting in or about February 2022.

    n. That the "Millcreek properties appreciate and there hasn't been tenant

       issues," per a meeting in or about February 2022.

    o. That the tenant for the Keller Property was a renowned surgical center,

       per a phone call in or about February 2022.

    p. That the tenant for the Keller Property had been fully vetted.

    q. That in the case of selling, Millcreek would always purchase your share,

       per a meeting in or about February 2022.

    r. That he would never have to worry about this investment since the tenant

       was on a 20-year lease with a guaranteed 6% return, per meeting in or

       about February 2022.

    s. That the Keller properties "were going fast" and he needed to proceed

       with a sense of "urgency."

### _Misrepresentations to Tony Schaker_

564.    In or about November 2021 Tony Schaker was referred to Millcreek Commercial

to help him find a suitable 1031 exchange property.

565.    Schaker was told that investment in a Millcreek property would be a safe,

suitable investment, and was directed to Scott Rutherford.

566.    When discussing some of the details of the Keller Property, Scott Rutherford

introduced Tony Schaker to Kevin Long.

567.    In email correspondence with Long, Rutherford, and other individuals at

Millcreek, Long used the email "kevin.long@colliers.com."

568.    From approximately November 2021 to January 2022, through phone calls,

emails, and other communications, Scott Rutherford represented to Tony Schaker

at least the following to induce the plaintiff's investment in the Keller Property:

   a.    That Millcreek provides "high-quality, passive commercial properties," as

         per an email correspondence in or about November 2021.

   b.    That "Millcreek Commercial to rank among the finest real estate

         experiences you will ever have", per an email correspondence in or about

         November 2021.

   c.    That Millcreek's "properties are in very high demand and are presented

         on a 'first come, first served' basis," per an email correspondence in or

         about November 2021.

   d.    That Millcreek properties have "strong returns and some of the most

         attractive lease terms we've seen in decades," per an email

         correspondence in or about November 2021.

    e.   That investing in a Millcreek property would "simplify your search process and provide great asset value and cash flow," per an email correspondence in or about November 2021.

    f.   That the Keller Property would have a 6% capitalization rate and 2% annual increase in rent payments.

    g.   That the lease on the Keller Property was backed by a bond issued by Lloyds of London.

*Misrepresentations to Kurtis Trent Manning*

569.   In or about March 2021, Kurtis Trent Manning began looking for options to take advantage of the 1031 exchange process and was referred to Trevor Weber to help him find a suitable 1031 exchange property.

570.   Manning went to Millcreek's website and was impressed by what was represented as their partnership with Colliers International.

571.   From approximately May 2021 to November 2021, through phone calls, emails, and other communications, Trevor Weber represented to Manning at least the following to induce Manning's investment in the Keller Property:

    a.   That each year, the property would yield a 6% return on investment.

    b.   That the property had a tenant ready with a "20-year lease."

    c.   That the tenant at the Keller Property was already paying rent.

d. That the building was complete and ready for tenant's business operations to begin.

e. That Millcreek had been working with the Keller tenant, HSH, and its associated entities for a long time.

f. That the Keller Property had a bond that was backed by Lloyds of London.

g. That certain monthly payments disbursed to Manning were rent payments from the tenant.

**Misrepresentations and Omissions Regarding the Kennesaw Property**

*Misrepresentations and Omissions to All Kennesaw Plaintiffs*

572. The Marketing Materials given to the Kennesaw Plaintiffs made untrue and misleading misrepresentations to induce their investment into the Kennesaw Property.

573. The Kennesaw Offering Memorandum provided by the Millcreek/Colliers Parties had Colliers' logo prominently placed right next to Millcreek's logo on every page, as shown in this excerpt:



574.   The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant was a "large[] network" and a "[d]evelopment of 350 Comprehensive Care Centers [which] will create the most extensive branded system in the country", as shown in this excerpt:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

Building a Brand: A key element to their strategy is to acquire reputable family practice to establish themselves in each community they target. Clusters of facilities will provide better access and more consistent care to patients in their system.

New Technologies: They intend to use new technologies and more comprehensive diagnostic capabilities to improve patient care and access and to give their medical teams more tools to provide superior care.

575.   With respect to this misrepresentation, Plaintiffs allege as follows:

576.   This representation is false, because neither the tenant on the lease nor any of the HSH Parties realistically had the ability to operate any care centers at all.

577.   This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the reliability and financial stability of the tenant and its affiliated entities.

578.   The Millcreek/Colliers Parties knew or should have known that none of the entities among the HSH Parties could realistically operate any care centers.

125

579.    The Marketing Materials provided by Millcreek/Colliers represented that the tenant would generate "significant margins" and that "[b]y vertically integrating, they will capture revenue and margins that have historically been 'lost' in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins."

580.    With respect to this misrepresentation, Plaintiffs allege as follows:

581.    This representation is false, because the tenant and its associated entities did not have any significant revenue or normal business operations and therefore no ability to generate significant margins of any kind.

582.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial viability of the tenant.

583.    The Millcreek/Colliers Parties knew or should have known that neither the tenant nor any of its affiliate entities had sufficient business operations or revenue.

584.    The Millcreek/Colliers parties failed to disclose that the tenant listed on the Marketing Materials, Advance Care Medical, differed from the tenant listed on the lease, Advance Care Medical Kennesaw GA-1.

585.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding their ability to do the necessary due

diligence on the tenant.

586.    The Millcreek/Colliers parties failed to disclose that the tenant, Advance Care

Medical Kennesaw GA-1, was not a legitimate business entity.

587.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the viability of the tenant.

588.    The Millcreek/Colliers parties failed to disclose that the guarantor for the

Kennesaw Property's lease, Heathcare Solutions Holdings, Inc., was not financially

capable of providing a corporate guarantee.

589.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding the security of their investment.

590.    The Millcreek/Colliers parties failed to disclose that the HSH parties had yet to

install the $500K worth of equipment necessary for the tenant to generate revenue.

591.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, the state of the building and its ability to generate revenue.

127

592.    The Millcreek/Colliers parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying taxes, maintenance fees, insurance, and fees related to re-tenanting.

593.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the cost of their investment.

*Misrepresentations and Omissions to Robert and Annabelle Barnes Regarding the Kennesaw Property*

594.    In or about February 2022 to April 2022, through phone calls, email, and other communications, Scott Rutherford made at least the following representations in order to induce the Barnes' investment in the Kennesaw Property:

 a.    That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about January 2022.

 b.    That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors, as well as whole properties or a combination of both whole and percentage-based ownership", per an email correspondence in or about January 2022.

c.  That investing in Millcreek's properties would be "perfect solutions for
[the Barnes']", per an email correspondence in or about January 2022.

d.  That Millcreek's properties were "[h]igh-grade commercial properties
under corporate-guaranteed lease terms for steady monthly cash flow",
per an email correspondence in or about January 2022.

e.  That "Millcreek's properties are in VERY high demand and are presented
on a 'first come, first served' basis", per an email correspondence in or
about January 2022.

f.  That "Millcreek's mantra of "safety, security, and stability" (and I
[Rutherford] would add "simplicity") is the priority with each property",
per an email correspondence in or about January 2022.

g.  That Millcreek's properties have "strong returns and some of the most
attractive lease terms we've seen in decades", per an email
correspondence in or about January 2022.

h.  That Millcreek's properties had a "[p]roven track record", per an email
correspondence in or about January 2022.

i.  That "properties available from Millcreek to rank among the finest real
estate experiences you will ever have", per an email correspondence in or
about January 2022.

129

j. That "Millcreek's core properties provide cash flow immediately upon closing, so you [the Barnes] are able to put your funds to work as quickly as possible", per an email correspondence in or about January 2022.

k. That "the [Kennesaw] building was built in 2021", per an email correspondence in or about February 2022.

l. That there was a "default bond which included a years' worth of payments if the tenant defaulted in the first 48 months", per an email correspondence in or about February 2022.

m. That the "Lease was Absolute NNN and bonded – an absolute NNN bonded lease places significant financial responsibilities on the tenant while minimizing the landlord's obligations, providing a stable and predictable rental income for the landlord", per an email correspondence in or about February 2022.

*Misrepresentations and Omissions to Donald Patterson Regarding the Kennesaw Property*

595.    From approximately February to May 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Donald Patterson at least the following in order to induce his investment in the Kennesaw Property:

a. That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about February 2022.

130

b. That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors", per an email correspondence in or about February 2022.

c. That "you [Patterson] will find the properties available from Millcreek to rank among the finest real estate experiences you will ever have", per an email correspondence in or about February 2022.

d. That Millcreek's properties are "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about February 2022.

e. That Millcreek's properties have a "[p]roven track record", per an email correspondence in or about February 2022.

f. That "Millcreek's core properties provide cash flow immediately upon closing, so you [Patterson] are able to put your funds to work as quickly as possible", per an email correspondence in or about February 2022.

g. That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about February 2022.

131

h.  That "Millcreek's mantra of 'safety, security, and stability' (and I would
add 'simplicity') is the priority with each property", per an email
correspondence in or about February 2022.

i.  That Millcreek properties have "strong returns and some of the most
attractive lease terms we've seen in decades", per an email
correspondence in or about February 2022.

j.  That Rutherford's "goal is to provide you with solutions which
simultaneously simplify your search process and provide great asset
value and cash flow", per an email correspondence in or about February
2022.

k.  That the tenant for the Kennesaw Property was a renowned surgical
center, per a phone call in or about February 2022.

**Misrepresentations and Omissions Regarding the Naperville Property**

596.  The Marketing Materials given to the Rementerias made a series of untrue and
misleading misrepresentations to induce investments into the Naperville Property.

597.  The Marketing Materials provided by Millcreek/Colliers represented that the TIC
interests sold as part of the Millcreek/Colliers TIC Program were not securities
under federal law, as shown in this excerpt from the Offering Memorandum from
the Naperville Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

598.    With respect to this misrepresentation, Plaintiffs allege as follows:

599.    The representation is false, because the TIC interests are securities under federal law and under applicable state laws.

600.    The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Defendants' qualifications, trustworthiness, and the legal nature of their investment.

601.    The Millcreek/Colliers Parties knew or should have known that under federal law and applicable state laws, the TIC investments they sold were securities.

602.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the tenant's business strategy is to" vertically integrate urgent care facilities with ancillary services and new technologies" with the outcome of "providing a broader continuum of patient care at a lower cost and generate significantly higher

133

operating margins", as shown in this excerpt from the Offering Memorandum from the Naperville Property:

## Property Information

| | |
|---|---|
| Tenant | Advance Care Medical |
| Location | 2975 Showplace Dr., Naperville, IL 60564 |
| Property Type | Freestanding, Medical |
| Building Size | 3,500 Square Feet |
| Purchase Price | $5,078,231.42 |
| Cap Rate | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

603.    With respect to this misrepresentation, Plaintiffs allege as follows:

604.    This representation is false, because the tenant named on the lease is not a registered entity at all, and neither HSH nor HSMG have the revenue or business operations necessary to service a 20-year lease on the Naperville Property.

605.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the reliability and financial viability of the tenant.

134

606.    The Millcreek/Colliers Parties knew or should have known that the tenant did

not have the capital or the cashflow to sign a 20-year lease for the Naperville

Property.

607.    The Marketing Materials provided by the Millcreek/Colliers Parties represented

that the tenant's development of 350 Comprehensive Care Centers will create "the

most extensive branded system in the country", as shown in this excerpt from the

Naperville Property Offering Memorandum:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

608.    With respect to this misrepresentation, Plaintiffs allege as follows:

609.    This representation is false, because the tenant had no realistic ability to

develop 350 care centers or "the most extensive branded system in the country."

610.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information concerning the reliability and financial viability

of the tenant.

611.    The Millcreek/Colliers Parties knew or should have known that the tenant had

no realistic ability to develop 350 care centers or "the most extensive branded

system in the country."

135

612.    The Marketing Materials provided by the Millcreek/Colliers Parties represented that the Naperville Property's fair market value was as much as $5MM.

613.    With respect to this misrepresentation, Plaintiffs allege as follows:

614.    This representation was false, because the realistic value of the property is likely about $700,000, but in any case substantially less than $5MM.

    a.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the property they were investing in.

615.    The Millcreek/Colliers Parties knew or should have known that the value of the actual value of the Naperville property was substantially lower than $5MM.

616.    The Marketing Materials provided by Millcreek/Colliers represented that the Naperville Property Lease Guarantor is Healthcare Solutions Holdings Inc, as shown in this excerpt from the Naperville Property Offering Memorandum:



## Lease Information

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

617. This representation was misleading, because HSH is a shell company with insufficient revenue and business operations and was incapable of acting as a lease guarantor with the financial burden of repayment responsibility in case the tenant defaults.

618. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

619. The Marketing Materials provided by Millcreek/Colliers represented that the Naperville property lessee was Advance Care Medical, Inc. which would operate a surgical ambulatory regional center. With respect to this misrepresentation, Plaintiffs allege as follows:

620.    This representation was false, because Advance Care Medical, Inc. - Naperville, LLC is the lessee entity named in the lease.

621.    This representation concerned an issue of material fact, because it limited the investors' ability to do due diligence on the tenant.

622.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including information about the lessee and more specifically, the likelihood of the lessee's ability to occupy the Naperville Property and service the lease.

623.    The Millcreek/Colliers Parties knew or should have known that the entity named in the lease was not a registered business entity.

624.    The Millcreek/Colliers Parties failed to disclose that the corporate guarantor for the Naperville Property lease was not financially capable of providing a corporate guarantee.

625.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

626.    The Millcreek/Colliers parties failed to disclose that the tenant on the Naperville Property Lease was not a legitimate business entity.

627.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding the viability of the tenant.

628.    The Millcreek/Colliers parties failed to disclose that the bond included in their

due diligence folder was incomplete and therefore invalid.

629.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding the security of their investment.

630.    The Millcreek/Colliers parties failed to disclose that if the tenant defaulted after

a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying

taxes, maintenance fees, insurance, and fees related to retenanting.

631.    This representation concerned an issue of material fact, in that it altered the mix

of information available to Plaintiffs in making their investment decisions,

including, specifically, information regarding the cost of their investment.

632.    In or about July 2021 to August 2021, through phone calls, emails, and other

communications, Andrew Bell made at least the following representations in order

to induce the Rementerias' investment in the Naperville Property:

a.    That "[y]ou will receive rental income via direct deposit each month as

you experience our motto of 'Exchanging Hassle for Happiness'", per an

email correspondence from July 2021.

b. That Millcreek and the Rementerias would be "co-owners" as they would each share a percentage of Naperville, per an email correspondence in or about July 2021.

c. That the Naperville building was "built in 2020".

633.   Andrew Bell made at least the following omissions of material fact to Teena and Jose Rementeria as he induced their investment in the Naperville Property:

a. Bell failed to disclose to the Rementerias the significant commissions he would receive for their purchase into the Naperville Property.

b. Bell failed to disclose that the market value lease per square foot of the Naperville Property was less than $85.06.

c. Bell failed to disclose that the represented value of the Naperville Property fluctuated several times.

d. Bell failed to provide access to the due diligence materials until the day that the Rementerias were closing on the Naperville Property.

e. Bell failed to provide financial statements or reports for the tenant in Naperville's due diligence materials.

**PLAINTIFFS INVEST IN THE MILLCREEK TIC PROGRAM**

634.   Relying on the misrepresentations, omissions, and general deception of the Millcreek/Colliers Parties, their Qualified Intermediaries and Referrers, the HSH

Parties, the Developer Parties, and their principals, the Plaintiffs invested into the

Keller Property, the Kennesaw Property, and the Naperville Property.

635.    The Plaintiffs invested a total of approximately $8MM in the Keller, Kennesaw,

and Naperville Properties.

636.    All Plaintiffs' purchases of the Keller and Naperville Properties, through their

respective Qualified Intermediaries, were conducted through either Forest Anthony

at Old Republic Title or through Jay Thompson or Felicia Saez at First American

Title Company.

**Commissions**

637.    In connection with each of Plaintiffs' purchases in the Keller, Kennesaw, and

Naperville Properties, commissions and similar compensation payments were

made to third parties in each transaction.

638.    Plaintiffs did not know about these commissions and similar compensation

payments until they saw settlement statements for their respective transactions.

639.    Some of the Plaintiffs, including at least Donald Patterson, Tony Schaker, and

Robert Barnes, have not been given one or more settlement statements from the

title company involved in their respective transactions.

640.    All of the Plaintiffs' settlement statements listed commissions to Colliers.

641.    Colliers' commissions varied from approximately 1% to 4% of the total purchase

amount of the TIC interest.

642.    Most of the Plaintiff's Settlement Statements stated that commissions were paid

to a broker party.

643.    These broker parties were either Equity Summit Group or Merit Commercial

Real Estate.

644.    Brokers' commissions varied anywhere from 3% to 6% of total purchase

amount.

645.    All settlement statements state that Millcreek received a "marketing fee" from

the seller as part of the transaction.

646.    The marketing fees paid to Millcreek varied from approximately 1% to 3% of the

total purchase amount of the TIC interest.

647.    The Barnes had at least the following commissions or other payments made in

their settlement statement:

a.    Colliers received at least $2,663.85 in total in commissions.

b.    Millcreek received at least $7,992.00 in total in marketing fees.

c.    Equity Summit Group received at least $7,992.00 in total in commissions.

648.    The Brauers had the following commissions or other payments made in their

settlement statement:

a.    Colliers received $6,608.99 in total in commissions.

b.    Millcreek received $19,826.97 in total in marketing fees.

c.    Equity Summit Group received $19,826.97 in total in commissions.

649.    The Carnrite/Hill-D'Alessandro's had the following commissions or other

payments made in their settlement statement:

    a.  Colliers received $25,617.20 in total in commissions.

    b.  Millcreek received $19,219.90 in total in commissions.

    c.  There were no broker's commissions listed.

650.    Patti Klair had the following commissions or other payments made in their

settlement statement:

    a.  Colliers received $8,369.58 in total in commissions.

    b.  Millcreek received $8,369.58 in total in marketing fees.

    c.  Equity Summit Group received $25,108.73 in total in commissions.

651.    Katherine Madera had the following commissions or other payments made in

their settlement statement:

    a.  Colliers received $19,106.40 in total in commissions.

    b.  Millcreek received $9,553.20 in total in marketing fees.

    c.  There were no broker's commissions listed.

652.    Kurtis Manning had the following commissions or other payments made in their

settlement statement:

    a.  Colliers received $9,650.79 in total in commissions.

    b.  Millcreek received $14,885.11 in total in marketing fees.

    c.  There were no broker's commissions listed.

653. Karen Marion had the following commissions or other payments made in their settlement statement:

    a. Colliers received $3,000.00 in total in commissions.

    b. Millcreek received $9,000.00 in total in marketing fees.

    c. Equity Summit Group received $9,000.00 in total in commissions.

654. The McQuearys' had the following commissions or other payments made in their settlement statement:

    a. Colliers received $8,000.00 in total in commissions.

    b. Millcreek received $4,000.00 in total in marketing fees.

    c. There were no broker's commissions listed.

655. Donald Patterson was not provided with his settlement statements.

656. As such, the commissions and marketing fees paid to Colliers, Millcreek, and any broker parties are unknown.

657. Robert Myers had the following commissions or other payments made in their settlement statement:

    a. Colliers received $4,705.88 in total in commissions.

    b. Millcreek received $11,294.42 in total in marketing fees.

658. Merit Commercial Real Estate received $12,792.28 in total in commissions.

659. The Rementerias had at least the following commissions or other payments made in their settlement statement:

     a.  Colliers received at least $6,678.80 in total in commissions.

     b.  Millcreek received at least $10,301.201 in total in commissions.

     c.  Merit Commercial Real Estate received at least $16,980.00.

660.    Tony Schaker had at least the following commissions or other payments made in their settlement statement:

     a.  Colliers received at least $3,061.14 in total in commissions.

     b.  Millcreek received at least $3,061.14 in total in marketing fees.

     c.  Equity Summit Group received at least $9,183.42 in total in commissions.

661.    The Tannehills had the following commissions or other payments made in their settlement statement:

     a.  Colliers received $4,493.18 in total in commissions.

     b.  Millcreek received $4,493.18 in total in marketing fees.

     c.  Equity Summit Group received $26,959.06 in total in commissions.

662.    The Whites had the following commissions or other payments made in their settlement statement:

     a.  Colliers received $1,976.80 in total in commissions.

     b.  Millcreek received $5,930.40 in total in marketing fees.

     c.  Equity Summit Group received $5,930.40 in total in commissions.

663.    Neither the Millcreek/Colliers Parties nor any Qualified Intermediary or Referrer Parties disclosed these commissions in advance.

664.    Colliers International received a total of at least $103,932.61 in commissions

from Plaintiffs' TIC purchases.

665.    Millcreek Commercial Properties received a total of at least $127,920.10 in

commissions from Plaintiffs' TIC purchases.

666.    Equity Summit Group received a total of at least $104,000.58 in commission from

Plaintiffs' TIC purchases.

667.    Merit Commercial Real Estate received a total of at least $29,772.28 in

commission from Plaintiffs' TIC purchases.

**Plaintiffs' Final Ownership Percentages and Total Investments**

668.    According to their respective closing documents, Plaintiffs have the following

ownership percentages and total investments in the Keller Property:

a.    Robert and Annabelle Barnes have 1.2485% ownership of the Keller

Property with an investment of approximately $266,392.

b.    Eric Carnrite and Elizabeth Hill-D'Alessandro have 3.0015% ownership of

the Keller Property with an investment of approximately $640,430.

c.    Charles and Laura Brauer have 3.0974% ownership of the Keller Property

with an investment of approximately $660,899.13.

d.    Teena and Jose Rementeria have 2.6527% ownership of the Keller

Property with an investment of approximately $566,000.

e.  Patti Klair has 3.9226% ownership of the Keller Property with an
investment of approximately $836,957.35.

f.  Robert Myers has 1.8747% ownership of the Keller Property with an
investment of approximately $400,000.

g.  Karen Marion has 1.4060% ownership of the Keller Property with an
investment of approximately $300,000.

h.  Robert and Ditas Tannehill have 2.1058% ownership of the Keller
Property with an investment of approximately $449,318.19.

i.  Katherine Madera has 2.2368% ownership of the Keller Property with an
investment of approximately $477,000.

j.  Patrick and Hildegard White have 0.9265% ownership of the Keller
Property with an investment of approximately $194,679.89.

k.  Tony Schaker has 3.7698% ownership of the Keller Property, with an
investment of approximately $804,354.

l.  Carl and Lynn McQueary have 0.9373% ownership of the Keller Property
with an investment of approximately $200,000.

m.  Donald Patterson has 2.8803% ownership of the Keller Property with an
investment of approximately $614,581.21.

n.  Kurtis Trent Manning has 3.8331% ownership of the Keller Property with
an investment of approximately $817,463.46.

147

669.    Robert and Annabelle Barnes invested approximately $232,800 and received
4.1928% ownership in the Kennesaw Property.

670.    Donald Patterson invested approximately $300,800 and received 5.4218%
ownership share in the Kennesaw Property.

671.    Jose and Teena Rementeria's entity Secure Self Storage LLC invested
approximately $160,800 and received 3.0249% ownership share in the Naperville
Property.

### FAILURE OF KELLER, KENNESAW, AND NAPERVILLE INVESTMENTS

### HSH Parties are Late Paying Rent

672.    In or about December 2021, "HSMG failed to pay its portion of the rent
obligations under the Keller Lease".

673.    "Millrock had paid HSMG's portion of the rent obligations starting around
December 2021."

674.    In or about August 2022, HSMG disclosed to Millcreek that they needed "cash
flow relief". These problems with cash flow caused HSMG to be late with rent
payments and they "incurred certain late fees."

675.    On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement
and Promissory Note, called the "Millrock/HSMG Agreement".

676.    The existence of this agreement was not revealed to Plaintiffs until much later,
after the tenant's default alleged below.

148

677.    "The Millrock/HSMG Agreement contemplated that through the Agreement, Millrock would provide HSMG with cash flow relief and assist HSMG with its obligations under the Leases."

678.    "Pursuant to the Millrock/HSMG Agreement, Millrock loaned HSMG the principal amount of $350,000."

679.    On information and belief, the total amount that Millrock paid HSMG or its affiliates was in fact much larger, but at least this sum.

680.    "Pursuant to the Millrock/HSMG Agreement, HSMG's also agreed that within ten days of August 5, 2022, it would cause the Leases to be secured by the Bonds."

681.    "The parties also agreed in the Millrock/HSMG Agreement that HSMG would be solely responsible for any payments due under the Keller Lease as of October 1, 2022."

682.    "Under the Millrock/HSMG Agreement, Millrock and HSMG agreed that if any obligation under the Agreement were not timely met, the remaining unpaid principal balance and interest would become due immediately at Millrock's option."

**The Tenant Defaults and the Guarantee and Bond Fail**

683.    For months after their purchase, Plaintiffs did not suspect anything had gone wrong with their TIC investments.

684.    They received payments that they were told were rent payments and they

believed that the tenant either had or imminently would occupy the buildings in

Keller, Kennesaw, and Naperville.

685.    Some of the payments some Plaintiffs received were lump sums identified as

rent on the seller's settlement statements for their transactions.

686.    In or about early October 2022 the TIC owners of the Keller Property, the

Kennesaw Property, and the Naperville Property, including Plaintiffs, were

informed by the lease administrator (Mary Street of CAMS Realty) that the tenant at

all three properties had defaulted.

687.    The tenant had defaulted on all seven of the properties in the Millcreek/Colliers

TIC Program that involved the tenant.

688.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or

should have known that the HSH-affiliated tenant named on each lease agreement

was an unregistered entity.

689.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or

should have known that the HSH Parties were shell companies with insufficient

revenue or business operations and were unable to service their rent obligations

under the lease.

690.    What Millcreek had billed as the "tenant of your dreams" became the tenant of

the Plaintiffs' nightmares.

150

691.   The Millcreek/Colliers Parties represented to some of the Plaintiffs that the "rent
payments" they were receiving after closing on the Keller Property were either a
lump sum of prepaid rent from the tenant or a monthly rent payment from the
tenant.

692.   Mary Street, however, told Plaintiffs that none of these purported rent payments
were from the tenant.

693.   The tenant has never produced any revenue at the Keller or Kennesaw
Properties.

694.   The payments purporting to be rent from the Keller Property were paid by
Millcreek Commercial.

695.   Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and
Naperville Properties that HSH and HSMG—the corporations that purportedly had
backed the tenant with a guarantee on the lease—was unable or unwilling to make
good on that guarantee.

696.   Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or
should have known that HSMG was a shell company with insufficient revenue or
business activities and was unable to fulfill its obligations on the guarantee.

697.   Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and
Naperville Properties that there was no bond from Lloyd's of London guaranteeing
the leases at those properties.

698.    Long, Millcreek, Colliers, and the other Millcreek/Colliers Parties knew or

should have known that no bond from Lloyd's of London had been issued backing

the leases at the Keller, Kennesaw, and Naperville Properties.

699.    Long informed the Keller owners, including Plaintiffs, that Millrock had filed a

lawsuit (the "Millrock-HSH Lawsuit") against several of the HSH Parties for

misusing the Equipment Allowance Funds.

700.    The Millrock-HSH Lawsuit is ongoing.

701.    Long told the Keller owners, including Plaintiffs, that the Millrock-HSH Lawsuit

was for their benefit and was filed on their behalf.

702.    Millrock is only seeking damages in the amount of $4,642,000 for the

"Equipment Allowance Funds," and only for equipment at the Keller and Draper

Properties.  None of the Plaintiffs in this action own an interest in the Draper

Property.

703.    None of the Keller owners, including Plaintiffs, are parties or beneficiaries in

that lawsuit.

704.    Millrock does not retain any ownership of the Keller or Naperville Properties,

and so is not similarly situated to the Keller or Naperville owners, including

Plaintiffs.

705.    Under a triple-net lease like the ones bundled with the Keller, Kennesaw, and

Naperville Properties, the tenant pays for taxes, maintenance costs, and insurance.

706.    After the tenant defaulted, Plaintiffs at the Keller, Kennesaw, and Naperville Properties were burdened with the need to pay for taxes, maintenance, and insurance.

**Plaintiffs Discover Keller and Kennesaw Renovations and Construction Are Incomplete**

707.    As alleged previously, the Millcreek/Colliers Parties represented that the Keller Property was in a finished or nearly finished state following renovations.

708.    In the Offering Memorandum, it was represented to the investors that the building would be in "'as new' condition" after a period of renovation.

709.    In at least one version of an Offering Memorandum given to Plaintiffs as part of the sales process, the period of renovation was stated to be "2019 - 2020".

710.    A visit to the property in March 2023 revealed that the Keller building's renovations are nowhere near completion.

711.    As of at least March 2023, the Keller building is not able to function as a surgical center because of its incomplete renovations. For instance:

    a.  Ceilings are not in a finished state.

    b.  Walls have not been sheet rocked.

    c.  Walls have not been painted.

    d.  Flooring is not in place.

    e.  Furniture has not been installed.

153

f.   Surgical equipment has not been installed.

g.   Electrical work has not been completed.

h.   Construction materials have not been removed.





712.    The Millcreek/Colliers Parties promised Plaintiffs a completed building ready to be occupied at the Keller Property in their sales pitch.

713.    Indeed, the Millcreek/Colliers Parties induced Robert and Ditas Tannehill, Teena and Jose Rementeria, Charles and Laura Brauer, Patti Klair, Robert and Annabelle Barnes, Patrick and Hildegard White, Katherine Madera, Kurtis Manning, and Tony Schaker to invest by stating that Keller renovations were already complete.

714.    The Millcreek/Colliers Parties also induced Robert and Ditas Tannehill, Robert and Annabelle Barnes, and Katherine Madera to invest by stating that the tenant had already occupied the building.

715.    Instead, the funds for the renovation were diverted by the Developer Parties and HSH Parties.

716.    Millcreek's affiliate Millrock Investment Fund 1 authorized the disbursement of these funds without verifying that the renovations had been completed or that significant progress was being made.

717.    The Keller Property in its current state is unusable for any tenant.

718.    The Kennesaw Property, while renovated, is also not usable for any tenant in its current state and was ultimately sold at a significant discount from the inflated price that Plaintiffs paid.

719.    Upon information and belief, no surgical equipment has yet been installed at the Kennesaw Property.

**Plaintiffs Discover the Keller, Kennesaw, and Naperville Property Values are Overinflated**

720.    Plaintiffs were further distraught to discover that the Keller, Kennesaw, and Naperville Properties were worth a fraction of what Defendants had represented.

721.    In the Offering Memorandum the Millcreek/Colliers Parties gave to Plaintiffs during the sales process, the value of the Keller Property was represented to be $21MM.

722.    But according to the City of Keller Tax Assessment, the value of the Keller Property is approximately $4MM, which Long and others have since confirmed.

723.    Millcreek-affiliated Millrock Investment Fund 1, along with a number of other individuals and entities, purchased the Keller Property in November of 2020 for approximately $4MM.

724.    Millrock has confirmed that $4MM, not $21MM, is the real market value of the property.

725.    The Kennesaw Property was marketed by Millcreek's representatives as being worth over $5.5MM.

726.    The realistic market value of the Kennesaw Property is substantially less than $5.5MM and sold for about $1.35MM in about July 2024.

727.    The Naperville Property was marketed by Millcreek's representatives as being worth as much as $5MM.

728.    The realistic market value of the Naperville Property is approximately $700,000.

729.    At Kennesaw, $500,000 in equipment purchase funds had been allotted to developer Steve Caton and his company SARC US, Inc.

157

730.    The $500,000 in equipment funds for the Kennesaw Property have been unaccounted for and on information and belief, Caton and SARC US, Inc. have retained those funds or conveyed them to a third-party, and Plaintiffs have still not received the benefit from them they expected and were entitled to.

**Plaintiffs Discover the Keller, Kennesaw, and Naperville Lease Rates Are Overinflated**

731.    Long assured the Keller, Kennesaw, and Naperville owners, including Plaintiffs, that they could simply find a new tenant.

732.    However, Plaintiffs discovered that the lease terms that the HSH Parties agreed to pay under the Keller, Kennesaw, and Naperville leases, signed by Mary Street as Millrock's agent, were wildly overvalued compared to accurate market rates.

733.    Depending on the specific representations made by the Millcreek/Colliers Parties, the rent per square foot in the lease bundled with the sale of the Keller Property was between $100-$125 per square foot.

734.    However, accurate market rates for medical facilities in the area are typically between $26-30 per square foot.

735.    The rent per square foot in the lease bundled with the Kennesaw Property was approximately $104 per square foot.

736.    Realistic market rates for leasing the Kennesaw Property are approximately $30 per square foot.

737.   The rent per square foot in the lease bundled with the Naperville Property was approximately $90 per square foot.

738.   Realistic market rates for leasing the Naperville Property are approximately $30 per square foot.

739.   Long knew or should have known that re-tenanting the Properties with the same lease rate that the HSH parties had agreed to through the lease negotiated by Millrock would be impossible.

740.   Not only were Plaintiffs stuck without a tenant and with endless empty promises from the Millcreek/Colliers Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the Keller, Kennesaw, or Naperville Properties or selling their TIC ownerships was simply not feasible.

741.   Plaintiffs lost the expected value of their investment—a reliable tenant, a 20-year lease backed by a guarantee and a bond, a monthly stream of income, the value of the property itself, the scheduled rent increases over the term of the lease, the 6-9% capitalization rate over the term of the lease, and the "safe, secure, and stable" investment they were repeatedly promised.

**THE QUALIFIED INTERMEDIARIES' PROFESSIONAL FAILURES REGARDING 1031 REQUIREMENTS**

742.   Plaintiffs had engaged the Qualified Intermediaries as professionals to help them navigate the complex, legally fraught requirements of a 1031 exchange.

743.    These requirements include both IRC Section 1031, which imposes conditions on 1031 exchanges generally, and IRS Revenue Procedure 2002-22, which imposes additional conditions on 1031 exchanges involving TIC interests.

744.    The Qualified Intermediaries held and transacted substantial funds belonging to Plaintiffs in the course of their responsibilities performing 1031 exchanges for Plaintiffs.

745.    The Qualified Intermediaries held themselves out as having superior knowledge and experience related to 1031 exchanges, and Plaintiffs engaged them and relied on them as such.  Plaintiffs' reliance was reasonable and essential, given the stringent requirements and timeline with which their investments needed to comply to qualify as 1031 exchanges.

746.    It has become apparent that Plaintiffs' investments were plagued by numerous factors and conditions which may render their investments non-compliant in the eyes of the IRS and impose unknown and potentially enormous tax burdens and other legal consequences upon them.

747.    These factors and conditions include, among others, the following:

    a.  That construction and renovation during the exchange period may have subjected Plaintiffs' exchanges to additional requirements that were not met;

160

b.  That the leases at the Keller, Kennesaw, and Naperville Properties were not fair market value leases;

c.  That the TIC interests Plaintiffs purchased in the Keller, Kennesaw, and Naperville Properties were not sold at fair market rates;

d.  That the owners of the Keller, Kennesaw, and Naperville Properties were required by the TIC Agreements to participate in all management decisions;

e.  That equipment purchases were bundled with the sale of the Keller and Kennesaw Properties;

f.  That Mary Street's compensation was based upon profits generated by the Keller, Kennesaw, and Naperville Properties; and

g.  That the TIC interests sold to Plaintiffs are securities.

748.  These factors and conditions, and others with a substantial likelihood of compromising the 1031-compliant status of Plaintiffs' investments, either existed at the time the Qualified Intermediaries advised Plaintiffs and conducted their 1031 exchanges, or else were reasonably foreseeable by a competent and diligent 1031 professional at the time the Qualified Intermediaries rendered services to Plaintiffs.

749.  The Qualified Intermediaries either knew or reasonably should have known of the many factors and conditions which may render Plaintiffs' investments non-compliant in the eyes of the IRS and thereby impose liabilities upon them.

161

750.   Because of the Qualified Intermediaries' failures to verify or ensure that Plaintiffs' investments would be 1031-compliant, Plaintiffs have also been compelled to independently investigate and verify whether and attempt to ensure that their investments are 1031-compliant.

**THE PREVIOUS OWNERS' PARTICIPATION IN THE OVERALL SCHEME**

751.   As part of their purchase in Millcreek/Colliers TIC interests, Plaintiffs signed Purchase and Sale Agreements with the previous owners of TIC interests in the Keller, Kennesaw, and Naperville Properties.  For applicable Plaintiffs, these previous owners included Defendants Millrock Investment Fund 1, Hello Bello, and Mark and Lady Mira Blue Machlis.

752.   Each Purchase and Sale Agreement conveyed a percentage interest in each respective property.

753.   In selling TIC interests to Plaintiffs, Defendants Millrock Investment Fund 1, Hello Bello, Samuel Duke, and Mark and Lady Mira Blue Machlis intended to and actually did participate in and further the objectives of the Millcreek/Colliers TIC Program.

754.   Samuel Duke, the principal of Hello Bello, was the Head of Marketing for Millcreek during the period relevant to this litigation.

755.   He described himself as being "[r]esponsible for all marketing programs and campaigns", having "[b]uilt and maintained the website", having "[s]upported all

partners with marketing materials and leading gen programs", having "[r]aised

capital for commercial development projects", and having "[d]elivered over 1,000

marketing qualified leads per month."

756.    Millrock Investment Fund 1 played an instrumental role in the development of

the Millcreek/Colliers TIC Program, including through entering development and

lease agreements that were material to Plaintiffs' decisions to invest.

757.    Kevin Long described Millrock Investment Fund 1, Hello Bello, and Mark and

Lady Mira Blue Machlis as his "development partners" or "investment partners."

758.    Through their close association and partnership with the other

Millcreek/Colliers Parties, Defendants Millrock Investment Fund 1, Hello Bello,

Samuel Duke, and Mark and Lady Mira Blue Machlis knew or should have known

about the misrepresentations, omissions, and general deceptions practiced in the

course of the Millcreek/Colliers TIC Program.

759.    Despite their knowledge of the material defects of the investments sold to

Plaintiffs through the Millcreek/Colliers TIC Program, set forth herein, Defendants

Millrock Investment Fund 1, Hello Bello, Samuel Duke, and Mark and Lady Mira

Blue Machlis did not disclose these material defects to the Plaintiffs they sold to.

**MARY STREET'S ROLE IN THE FRAUDULENT ENTERPRISE**

760.    After purchasing their TIC interests through the Millcreek/Colliers' TIC

Program, Plaintiffs and other owners were introduced to Mary Street and CAMS

163

Realty, the property manager for upwards of 32 properties offered by the Millcreek/Colliers Parties.

761.    All properties in the Millcreek/Commercial TIC Program were marketed as being managed by a property manager "with extensive experience in property management" that would work to "provide the safety, security, and stability that is expected by each Millcreek Commercial Owner."

762.    Managing commercial property is time-consuming and complicated.  A commercial property manager's responsibilities often include overseeing the operations, maintenance, and profitability of the property, understanding and navigating lease agreements, coordinating tenant move-ins, enforcing the lease according to local law, handling rent collection and disbursement, tracking expenses, and keeping owners informed.  In a property with TIC ownership such as those offered by the Millcreek/Colliers Parties, the property manager is the *de facto* representative of the owners and their interests, and an instrumental part of the promise of the Millcreek/Colliers Program that Plaintiffs' investments would be hands-off.

763.    After their purchases, Mary Street and CAMS Realty were presented to Plaintiffs as a property manager who could be trusted to deliver on the promises of the Millcreek/Colliers TIC Program and defend the interests of the new property

owners. She was in a position of superior knowledge, experience, and authority

relative to Plaintiffs and their investments in the Millcreek/Colliers TIC Program.

764.    In reality, as Plaintiffs later discovered, Mary Street had a long history of

association with Kevin Long, Millcreek Commercial, Colliers International, and the

other Millcreek/Colliers Parties and had an integral role in the planning,

development and execution of the Millcreek/Colliers TIC Program.

765.    In fact, the Lease Agreements for the Keller Property listed Mary Street as the

contact for the "Landlord," Millrock Investment Fund 1, LLC.

766.    Plaintiffs were compelled to rely on and did in fact rely on Mary Street due to

her superior knowledge, expertise, and her position of authority and responsibility

as the lease manager at the Keller, Kennesaw, and Naperville Properties.

767.    Mary Street dispensed advice to Plaintiffs and other owners from her position of

superior knowledge, expertise, authority, and responsibility. She deliberately gave

the impression that she was acting in their best interests in managing the leases and

properties for them.

768.    In reality, in her position as lease manager and through her prior planning and

development of the Millcreek/Colliers TIC Program with the other

Millcreek/Colliers TIC Parties, she served the interests of the Millcreek/Colliers

Parties through concealment of material information, faulty advice, failure to

perform her duties in the best interests of the new owners, posturing as a third-

165

party acting in the interest of Plaintiffs and other owners, and a general pattern of manipulation designed to maneuver Plaintiffs and other owners into decisions favorable to the Millcreek/Colliers Parties.

### Mary Street's Failure to Manage the Keller, Kennesaw, and Naperville Properties

769.    Mary Street failed to timely provide bank statements to Plaintiffs and other owners, and in fact did not provide any at all until at least March 23, 2023, depriving them of essential financial information in order to keep them in the dark.

770.    In her position managing and administering Plaintiffs' investments, Mary Street and CAMS Realty had responsibility to enforce the terms of the leases and collect rents, including late rent fees, from the HSH Parties.

771.    After HSH's late rent payment in December 2021, HSH owed additional rent fees under their lease.

772.    Mary Street and CAMS Realty did not collect all additional rent fees due from HSH and disburse them to Plaintiffs and other owners, nor did she take reasonable steps to do so.  Instead, she approved an alternative form of payment from Millcreek or its affiliates that concealed the real financial state of Plaintiffs investment from them and deceived them into believing that the tenant was still paying rent.

166

773.   She did, however, begin charging her elevated "crisis rate" under the Lease Administration Agreement after the October 2022 default, and did not inform Plaintiffs of this fact until months later.

774.   At the same time, prior to the October 2022 default, she did not inform Plaintiffs and other owners that supposed "rent" payments were not coming from the tenant at all, and she failed to make serious efforts to collect on late fees due.

775.   For example, by email on about July 14, 2022, Mary Street told Plaintiffs and other owners that "I received rent for the following HSH-leased properties today: ACM Kennesaw, SARC Pine Bluff, ACM Romeoville, and ACM Naperville. I did not, however, receive the late fees. I sent a message to HSH thanking them for the rent, but reminding them that late fees are assessed for rent that is not received by the due date per their Lease Agreement. For July, late fees are due for Pine Bluff, Romeoville, and Naperville."

776.   At Kennesaw, a Rent Funds Agreement was entered into by CAMS Realty, Millrock, and SARC US, Inc., obligating Mary Street to hold in trust funds until October 2022 from Millrock and SARC US, Inc., that would be paid to the Kennesaw Plaintiffs and other owners as ostensible "rent" payments.

777.   As in other instances, Mary Street concealed the fact that these funds were not coming from the tenant at all.

778.   Mary Street failed to collect the amounts due from Millrock under that
agreement, against the best interests of the Kennesaw Plaintiffs.

779.   Mary Street, at SARC US, Inc.'s request and without the permission of the
Kennesaw Plaintiffs or other owners or authorization from the Kennesaw Rent
Funds Agreement, refunded a portion of SARC US, Inc.'s funds.

780.   Mary Street sent owners 1099 forms identifying monies Plaintiffs and other
owners received as "rent."

781.   As Mary Street knew, however, no actual rent had ever been paid at the Keller
Property; the "rent" they received was paid by Millcreek Commercial or its
affiliates, not HSH.

782.   Additionally, for Plaintiffs owning TIC interests in more than one of the Keller,
Kennesaw, and Naperville Properties, Mary Street sent 1099 forms improperly
combining payments from multiple properties on a single form.

783.   Under their leases at the Kennesaw and Naperville Properties, the HSH Parties
were obligated to provide a security deposit (the Keller lease had a similar
provision, but never obtained the prerequisite certificate of occupancy).  The HSH
parties never did so, and Mary Street did not attempt to compel them to comply
with their lease obligations to do so.

784.   The cities of Keller and Kennesaw cited owners of each respective property
multiple times for code violations.

785.    The Millcreek/Colliers Parties represented to Plaintiffs that the properties would be fully managed.

786.    Mary Street did not take reasonable steps to prevent or resolve the cities of Keller and Kennesaw from citing Plaintiffs and other owners.

787.    In October 2022, Mary Street told Plaintiffs and other owners that the Keller Property had received a certificate of occupancy.  This was not true, as the Keller Property had never received a certificate of occupancy and still has not to this day.

788.    Mary Street concealed or downplayed key details of HSH's trouble paying rent until the default in October 2022, lulling Plaintiffs and other owners into a false sense of security and preventing them from taking earlier action to remedy or attempt to salvage the value of their investment.

789.    Mary Street held herself out as a competent real estate professional.  She knew or should have known the truth about the manifold deficiencies of Plaintiffs' investments in the Millcreek/Colliers TIC Program—the absence of a bond, the unreliability of the tenant and guarantor, the state of renovations at the Keller Property, and other key misrepresentations and omissions alleged herein.  Yet, she did nothing to alert Plaintiffs or other owners.

790.    Mary Street knew that Plaintiffs and other owners had invested in the Millcreek/Colliers TIC Program reasonably expecting and based on the

Millcreek/Colliers Parties' representations to that effect that their investments would be 1031-eligible, and that this was material to their decision to invest.

791.    Mary Street failed to take reasonable precautions to ensure that their investments would remain 1031-eligible, including by accepting a compensation model that appears to be inconsistent with IRS guidelines and failing to warn Plaintiffs about other ways the 1031-eligible status of their investments were at risk.

792.    Mary Street held no real-estate related licenses in Texas, Georgia, or Illinois, where the Keller, Kennesaw, and Naperville Properties are located.

793.    Mary Street permitted the previous owners of TIC interests in the Keller, Kennesaw, and Naperville Properties to sell their interests to Plaintiffs without the right of first refusal for other Plaintiffs, thereby concealing from each Plaintiff information about the overall operation of the Millcreek/Colliers TIC Program.

794.    Mary Street additionally concealed information from Plaintiffs and other owners about the ownership of each property by blind cc'ing each owner on emails prior to the October 2022 default.

**Mary Street's and Other Defendants' Efforts to Convince Plaintiffs to Re-Tenant with Neuragenex**

795.    After the HSH Parties defaulted on their leases at Keller, Kennesaw, Naperville, and other Millcreek/Colliers TIC locations in October 2022, Mary Street, Kevin

Long, and other Millcreek/Colliers Parties attempted to induced Plaintiffs and other owners to re-tenant with a new company, Neuragenex.

796.    According to Mary Street, Kevin Long, and their associates, Neuragenex (like HSH) was willing to pay a high lease rate, $139 per square foot at the Naperville Property.  According to two independent brokers, market rates for a lease at the Naperville Property would likely be $30-35 per square foot.

797.    Mary Street held herself out as a professional, reliable realtor, and she knew or should have known that the lease rates for Neuragenex (like HSH before it) were far above market rates, and with no justifiable basis for being overvalued.

798.    Plaintiffs were told Neuragenex would require renovations and equipment purchases at the Naperville Property, to be funded by a $1.15MM capital call on Plaintiffs and other Naperville owners.  Cash payments would be made to Slope Construction, a company managed by Millcreek affiliate Brent Smith.

799.    Owners not able to fund the capital call in cash would have the option to sign over the percentage interests in Naperville to Millcreek-affiliated Millrock Investment Fund 1.

800.    Mary Street endorsed the plan to re-tenant with Neuragenex and encouraged Plaintiffs and other owners to accept the proposal.

801.    Steve Caton, the developer of the Kennesaw Property, also endorsed to Plaintiffs and other owners the plan to re-tenant with Neuragenex.

802.  The reality was that Neuragenex was as thin and flimsy a tenant as HSH was.

803.  Neuragenex "financials" eventually provided to owners were unaudited.

804.  At the Keller Property, the owners refused to re-tenant with Neuragenex.

805.  At Naperville, despite the fact that agreements between TIC owners must make leasing decisions unanimous in order to comply with IRS regulations, the TIC Agreement had been drafted in such a way that, according to Kevin Long, a unanimous vote was not required.  By majority vote, the Naperville owners decided to re-tenant with Neuragenex at Mary Street's and Kevin Long's urging.

806.  Delays in renovations, equipment purchases, and rent commencement plagued the re-tenanting process with Neuragenex.  By October 2023, the first month Neuragenex was due to pay rent, it defaulted.

807.  Owners who had been manipulated into accepting Neuragenex as a tenant suffered the further loss of additional cash outlay or reduction in TIC ownership, paid to Millrock Investment Fund 1.

808.  Neuragenex also failed to pay rent at two other locations in the Millcreek/Colliers TIC Program in Bluffdale and Lehi, Utah.

809.  In January 2024, Neuragenex filed for bankruptcy.

810.  In short, despite Kevin Long's statement that "[w]e have, of course, been lobbying for your interests," the Millcreek/Colliers Parties' deployment of tenant

Neuragenex was as ill-conceived and ill-fated as the rest of the Millcreek/Colliers TIC Program.

811.    On information and belief, the Millcreek/Colliers Parties' efforts to induce Plaintiffs to re-tenant with Neuragenex are part of a "rinse and repeat" plan operating at dozens of Millcreek/Colliers TIC properties nationwide whereby vulnerable, retirement-age investors are defrauded of their life savings in fatally flawed TIC investments.

### FIRST CAUSE OF ACTION

*(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Steve Caton, SARC US, Inc., Mark Machlis, Lady Mira Blue Machlis, Hello Bello, Samuel Duke, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Scott King, and Merit Commercial Real Estate)*

812.    Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties as tenants, guarantor, and affiliated entities, and the Millcreek/Colliers Parties as those who developed and coordinated the TIC offerings.

813.    Defendants made untrue statements of material fact and omitted material facts

necessary to make the statements not misleading, as alleged above, in violation of

Rule 10b-5.

814.    The material misrepresentations and omissions were made in connection with

the offer to sell a security.

815.    Such material misrepresentation and omissions include, as alleged more fully

and specifically herein:

    a.    That the Millcreek/Collier Parties had conducted due diligence on the

    tenants for the Millcreek Properties;

    b.    That the investments sold to Plaintiffs would comply with applicable IRS

    regulations to be 1031-compliant, and that applicable Defendants would

    verify and ensure that Plaintiffs investments were compliant.

    c.    The risk analysis of the Keller, Kennesaw, and Naperville Properties;

    d.    The average capitalization rate of 6-9%% over the initial 20-year lease

    term;

    e.    That Millcreek Commercial retained, and would continue to retain, an

    ownership interest in the Keller, Kennesaw, and Naperville Properties;

    f.    That the tenants for the Millcreek Properties were "dream tenants";

    g.    That the guarantor was a solvent company;

    h.    That there was a bond in place in case of tenant and guarantor default,

     i.   That the Keller Property was finished or nearly finished and would be operational by July of 2022; and

     j.   That Millcreek's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

816.   Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with the Plaintiffs, or through the marketing materials.

817.   Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

818.   Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

819.   The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase interests in the Keller, Kennesaw, and Naperville Properties. The Plaintiffs would not have invested had they known the true facts.

820.   Plaintiffs justifiably relied on the foregoing misrepresentations.

821.    The statutory safe harbor and bespeaks caution doctrine that apply to forward

looking statements under certain circumstances do not apply to this action because

no meaningful cautionary statements were made regarding material risks and facts

known by Defendants.

822.    The Millcreek/Colliers TIC Program, including the development, marketing, and

sale of the Keller, Kennesaw, and Naperville Properties to Plaintiffs in this case, was

a device, scheme, or artifice to defraud Plaintiffs, and a series of acts, practices, and

a course of business that operated as a fraud or deceit upon Plaintiffs under the

meaning of the Securities Exchange Act.

823.    Defendants participated in, planned, furthered, and executed the

Millcreek/Colliers TIC Program as alleged more fully and specifically herein,

including by:

    a.  The development of the Millcreek/Colliers TIC Program;

    b.  Oversight of each component part of the Millcreek/Colliers TIC Program;

    c.  The selection of and negotiation with tenants;

    d.  The development of each TIC offering including lease terms, guarantees,

        bonds, projections, forecasts, and other aspects of each TIC offering as

        constituted and marketed;

    e.  Planning, negotiations and oversight of equipment purchases,

        renovations, and construction;

f.  The creation of marketing materials and their dissemination to Plaintiffs;

g.  Referring Plaintiffs to the Millcreek/Colliers TIC Program and endorsing their investment in the same;

h.  The execution of each of Plaintiffs' 1031 exchange and related transactions;

i.  The investment of funds necessary to purchase TIC interests and otherwise operate the Millcreek/Colliers TIC Program; and

j.  The concealment of financial information, communications, and other material facts regarding Plaintiffs investment to prevent Plaintiffs' discovery of said facts and information.

824.   The foregoing misrepresentations, omissions, schemes and artifices to defraud, and actions and course of business on the part of Defendants caused Plaintiffs to suffer extensive damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION

***(Sale of Unregistered Securities Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Scott King, Merit Commercial Real Estate LLC, Max Hansen, Accruit LLC, Steve Caton, SARC US Inc., Mark Machlis, Lady Mira Blue Machlis, Hello Bello, and Samuel Duke)***

825. Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a

common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties as tenants, guarantor, and affiliated entities, and the Millcreek/Colliers Parties as those who developed and coordinated the TIC offerings..

826. The TIC interests in the Keller, Kennesaw, and Naperville Properties which are the subject of this Complaint were not registered by the filing of a registration statement.

827. During the time in which the Millcreek/Colliers Parties, applicable Qualified Intermediaries, and other Defendants marketed and sold TIC interests in the Keller, Kennesaw, and Naperville Properties, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in the Keller, Kennesaw, and Naperville Properties, in violation of Section 5 (a) and 5 (c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

828. Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security.  For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in the

Keller, Kennesaw, and Naperville Properties to Defendants upon receipt of the

amount specified in this paragraph, as may be proven at trial.

829. In the alternative, Plaintiffs are entitled to an award of damages in an amount to be

proven at trial.

830. In either case, Plaintiffs are further entitled to an award of pre and post-judgment

interest, attorney's fees as provided by contract or law, costs, and such further relief

as the Court may deem appropriate under the circumstances.

### THIRD CAUSE OF ACTION

*(Control Person Liability Under the Securities Exchange Act Against the
Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Steve
Caton, SARC US, Inc., Mark Machlis, Lady Mira Blue Machlis, Hello Bello, Samuel
Duke, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031
Starker Exchange LLP, Rob Rettinhouse, Granite Exchange Services LLC, Kyle
Williams, IPX1031, Max Hansen, Accruit LLC, Scott King, and Merit Commercial
Real Estate)*

831.   Defendants named in Plaintiffs' First and Second Causes of Action are liable

under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act

of 1934, and are referred to in this Cause of Action as the "Liable Persons."

832.   At all times relevant to this Complaint, and as alleged specifically herein the

Defendants identified in this Third Cause of Action controlled the Liable Persons, as

follows:

833.   Defendants were officers, directors, agents, or other control people of entities

that are Liable Persons.

179

834.    Defendants had authority over the Liable Persons as employers, supervisors, or

persons with the ability to affect the terms of the Liable Person's employment or

livelihood.

835.    Defendants exercised actual control over the Liable Persons through authority,

economic influence, contractual rights, or the use of dominant bargaining power or

position.

836.    Liable Persons willingly submitted to and complied with the instruction,

direction, or authority of Defendants.

837.    Defendants participated in the business operations of the Liable Persons

generally.

838.    Defendants had power over the specific transactions and activities at issue in

this Complaint.

839.    With respect to their conduct and control of the Liable Persons relating to the

matters addressed in the First Cause of Action, Defendants did not act in good faith

and the acts of Defendants did directly or indirectly induce the acts of the Liable

Persons which is the basis for the First Cause of Action.

840.    Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)),

Defendants are jointly and severally liable with and to the same extent as the Liable

Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants

awarding damages in an amount to be proven at trial, but which is the equivalent of

any award determined under Plaintiff's First Cause of Action.

841.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract, at law, or

as consequential damages, and such further relief as the Court may deem

appropriate under the circumstances.

## FOURTH CAUSE OF ACTION

***(State Law Securities Fraud Against the Millcreek/Colliers Parties, Mary Street,
CAMS Realty, Mountain West Realty, Steve Caton, SARC US, Inc., Mark Machlis,
Lady Mira Blue Machlis, Hello Bello, Samuel Duke, Connie Greenawalt, Eastern
1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Rob Rettinhouse,
Granite Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit
LLC, Scott King, and Merit Commercial Real Estate)***

842.    The investments in Millcreek TIC Properties which are the subject of this

Complaint are within the definition of securities under applicable provisions of

state law[1].

---

[1] Applicable state law regarding securities fraud includes at least the following statutes:
California, § 25401; Georgia, Ga. Code § 10-5-50; Massachusetts, Mass. Gen. Laws Ch.
110A § 101; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-401; Illinois, 815
ILCS 5/12; Delaware, DE Code § 73-201; New Jersey, N.J. Stat. § 49:3-71; Montana, MT
Code 30-10-301; Washington, RCW § 21.20.010; Utah Code §61-1-1.

843.   Section 61-1-1(2) of the Utah Uniform Securities Act (UUSA) makes it unlawful

"for any person, in connection with the offer, sale, or purchase of any security,

directly or indirectly to ... make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they are made, not misleading.

844.   As described herein, in connection with the Defendants' offer and sale of

investments in the Keller, Kennesaw, and Naperville Properties, Defendants made

untrue statements of material fact to the Plaintiffs; omitted to state material facts

necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; or otherwise engaged in conduct that

worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of

the UUSA and other applicable provisions of state law.

845.   The Defendants engaged in the conduct violating the applicable laws with

knowledge of their failure to make a full and fair disclosure to Plaintiffs.

846.   Plaintiffs did not know that Defendants' misrepresentations were false and were

not aware of the material facts that Defendants omitted to disclose in connection

with their purchase of securities.

847.   Each untrue statement of a material fact or omission of a material fact,

including but not limited to those specifically alleged herein, is alleged as a separate

violation of Section 61-1-1(2) of the UUSA and other applicable provisions of state

law.

848.    Section 61-1-7 of the UUSA makes it unlawful "for any person to offer or sell any

security in this state unless it is registered under this chapter, the security for which

a notice filing has been made pursuant to the provisions of Section 61-1-15.5."

849.    As described herein, Defendants have violated and continue to violate Section

61-1-7 of the UUSA by offering and selling securities in Utah that are not federal

covered securities for which a notice filing has been made.

850.    By reason of Defendants' violations of applicable state statutes governing

securities fraud, Plaintiffs are entitled to a judgment awarding the applicable

statutory remedies, which may be measured by the total amount of Plaintiffs

investment plus interest at applicable rates, less the value of what Plaintiffs

received from the investment.

851.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees as provided in the applicable statutes, and

such further relief as the Court may deem appropriate under the circumstances.

### FIFTH CAUSE OF ACTION

*(State Law Securities Violation/Sale by Unlicensed Broker or Investment Adviser
Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West
Realty, Mark Machlis, Lady Mira Blue Machlis, Hello Bello, Samuel Duke, Connie
Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange
LLP, Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams, IPX1031,*

***Max Hansen, Accruit LLC, Scott King, and Merit Commercial Real Estate)***

852.    The investments in Millcreek TIC Properties which are the subject of this

Complaint are within the definition of securities under applicable provisions of

state law, including Section 61-1-3(1) of the UUSA[2].

853.    Section 61-1-3(1) of the UUSA makes it unlawful "to transact business in this

state as a broker-dealer or agent unless the person is licensed under this chapter."

854.    As described herein, Defendants have violated and continue to violate Section

61-1-3(1) of the UUSA by, among other things, offering and selling securities in and

from the State of Utah, in return for compensation, without a license.

855.    Defendants functioned as securities agents in selling the investment in Millcreek

TIC Properties to the Plaintiffs.

856.    Defendants' conduct violates provisions of applicable state law[2] which requires

securities agents to be licensed.

857.    By reason of Defendants' unlicensed participation in the sale of securities to the

Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory

---

[2]  Applicable state law regarding the licensing of securities agents includes at least the
following statutes: California, § 25210; Georgia, Ga. Code § 10-5-31; Oregon, OR Rev.
Stat. § 59.165; Pennsylvania, 70 Pa. Stat. § 1-301; New Jersey, NJ Stat. § 49:3-56; Illinois,
815 ILCS 5/12; Massachusetts, Mass. Gen. Laws. Ch. 110A § 201; Washington, RCW §
21.20.040; Delaware, 6 DE Code § 73-202; Montana, Mt. Code 30-10-201; Utah Code §61-
1-3.

remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

858.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CAUSE OF ACTION

### *(Materially Aiding State-Law Securities Fraud Against All Defendants)*

859.    The Defendants identified in Plaintiffs' Fourth and Fifth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

860.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

  a.  Defendants were officers, directors, agents, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

  b.  As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided

185

information, services, labor or funds that significantly advanced the

Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

c.  Defendants otherwise engaged in conduct materially aiding the Liable

Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

861.    Defendants did not act in good faith, and Defendants knew or acted in reckless

disregard of the facts in carrying out their conduct relating to the sale of securities

to the Defendants.

862.    Pursuant to applicable state law relating to those who materially aid securities

violations[3]Defendants are jointly and severally liable with and to the same extent as

the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against

Defendants awarding damages in an amount to be proven at trial, but which is the

equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of

Action.

863.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract, at law, or

---

[3] Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following: California, § 25403; Georgia, Ga. Code § 10-5-58; Massachusetts, Mass. Gen. Laws. Ch. 110A § 410; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-503; Washington, RCW 21.20.430; Illinois, Il. Code 815 ILCS 5/14; Delaware, 6 DE Code § 73-201; Montana, MT. Code 30-10-105; New Jersey, NJ Stat. § 49:3-71; Utah Code §61-1-22

as consequential damages, and such further relief as the Court may deem

appropriate under the circumstances.

## SEVENTH CAUSE OF ACTION

***(Common Law Fraud Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Scott King, and Merit Commercial Real Estate)***

864.    Defendants made false statements about vital facts regarding Plaintiffs'

investments in the Keller, Kennesaw, and Naperville Properties, including the

representations within the Marketing Materials and the representations made to

each individual Plaintiff, as well as false statements to Plaintiffs following their

investments in the Millcreek/Colliers TIC Program.

865.    Defendants made the statements knowing that they were false.

866.     Alternatively, Defendants made the statements recklessly and without regard

for their truth.

867.    Defendants intended that the Plaintiffs would rely on the statements.

868.    Plaintiffs reasonably relied on the statements by investing in the Keller,

Kennesaw, and Naperville Properties and in continuing to rely on the

Millcreek/Colliers Parties and Mary Street to guide and manage their investment.

869.    As a result of Defendants' conduct, Plaintiffs suffered damages in an amount to

be proven at trial.

## EIGHTH CAUSE OF ACTION

*(Negligent Misrepresentation Against the Millcreek/Colliers Parties, Mary Street,
CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern 1031 Starker
Exchange LLC, Eastern 1031 Starker Exchange LLP, Rob Rettinhouse, Granite
Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Scott King,
and Merit Commercial Real Estate)*

870.    Defendants had a duty to inspect and to disclose fully and fairly all facts that

materially affected or related to the condition of the Keller, Kennesaw, and

Naperville Properties, the viability of the investment, the legitimacy of the tenant

and corporate guarantor, and compliance with applicable IRS regulations including

Section 1031 and Revenue Procedure 2002-22.

871.    Defendants made false representations to Plaintiffs as detailed above.

872.    Defendants owed a duty of reasonable care to Plaintiffs independent of any

contractual obligation.

873.    Defendants knew such representations were false or were negligent in making

such representations.

874.    Defendants were negligent in investigating the tenant and the corporate

guarantor.

875.    Defendants were negligent in ensuring and/or verifying that the investments

complied with applicable IRS regulations for 1031 exchanges, including Revenue

Procedure 2002-22.

876.    Defendants knew or should have known the misrepresentations were false.

877.    The Defendants made the misrepresentations in an effort to induce the Plaintiffs

into purchasing the Keller, Kennesaw, and Naperville Properties for a grossly

inflated price.

878.    The foregoing misrepresentations and omissions were not only material, but the

information was critical to the Plaintiffs' evaluation of whether to purchase the

Keller, Kennesaw, and Naperville Properties and their continued reliance on Mary

Street and the Millcreek/Colliers Parties thereafter.

879.    Plaintiffs would not have invested in the Keller, Kennesaw, and Naperville

Properties, nor continued to rely on Mary Street and the Millcreek/Colliers Parties

to manage their investments, had they known the true facts.

880.    Plaintiffs justifiably relied on the foregoing misrepresentations.

881.    As a result of Defendants' negligence, Plaintiffs have been damaged in an

amount to be proven at trial.

## NINTH CAUSE OF ACTION

***(Breach of Fiduciary Duty Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Steve Caton, SARC US, Inc., Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Mark Adams, Beutler Exchange, Scott King, and Merit Commercial Real Estate)***

882.    Defendants had or held themselves out as having superior skill, knowledge,

training, and experience concerning all aspects of the transactions by which

Plaintiffs invested in the Keller, Kennesaw, and Naperville Properties.

883.    Defendants expected that Plaintiffs would put particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the Keller, Kennesaw, and Naperville Properties.

884.    The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, *inter alia*, Plaintiffs' age, experience, abilities, disabilities as applicable, and the fact that that Plaintiffs were prohibited from actively managing their investments.

885.    Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

886.    Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

887.    Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

888.    Defendants accepted that trust and confidence from Plaintiffs.

889.    Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

890.    Defendants were also Plaintiffs' agents.

891.    Defendants also had access to superior and exclusive knowledge about the Keller, Kennesaw, and Naperville investment opportunities, such as information

about the financial performance of the tenants, HSH, HSMG, their affiliate entities,
the flow of funds to and from those entities, the status of promised renovations and
equipment purchases, and the investments' degree of likely compliance with
applicable IRS regulations for 1031 exchanges.

892.    Defendants breached their fiduciary duties to Plaintiffs by, *inter alia*, failing to
do any investigation into the legitimacy of the tenant and guarantor or else
concealing their knowledge regarding the same, by making the materially false or
misleading representations or omissions alleged above, by actively concealing
information concerning Plaintiffs' investments from them, and otherwise acting in
the best interests of parties other than Plaintiffs.

893.    Defendants' breach of their fiduciary duties directly and proximately caused
injury and damages to Plaintiffs.

894.    As a result of Defendants' conduct, Plaintiffs have been damaged in an amount
to be proven at trial.

### TENTH CAUSE OF ACTION

***(Concealment/Fraudulent Nondisclosure Against the Millcreek/Colliers Parties,
Mary Street, CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern
1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Steve Caton,
SARC US, Inc., Rob Rettinhouse, Granite Exchange Services LLC, Kyle Williams,
IPX1031, Max Hansen, Accruit LLC, Mark Adams, Beutler Exchange, Scott King,
and Merit Commercial Real Estate)***

895.    As alleged more fully herein, a special relationship existed between Plaintiffs

and the Millcreek/Colliers Parties, in that the Millcreek/Colliers Parties had and

held themselves out as having superior knowledge, expertise, and access to

information concerning all aspects of the TIC investments they developed,

marketed, and sold to Plaintiffs, and Plaintiffs were in a uniquely vulnerable

position due to their lack of relative experience, knowledge, and access to

information, including due to IRS regulations governing the timing, management,

and other conditions of 1031 exchanges.

896.    The Millcreek/Colliers Parties knew the truth of their numerous

misrepresentations and omissions alleged herein, including concerning the

absence of the advertised bond, the financial and operational state of the tenant and

guarantor; the reliability and trustworthiness of the Developer Parties, HSH Parties,

and others with whom they partnered in the Millcreek/Colliers TIC Program; the

status of renovations and equipment acquisitions; the many factors giving rise to a

substantial likelihood that Plaintiffs' investments were not 1031-compliant; and

others, but failed to disclose these facts to Plaintiffs.

897.    As alleged more fully herein, special relationship existed between Plaintiffs and

Mary Street and CAMS Realty, in that Mary Street and CAMS Realty had agreed to

act in Plaintiffs' best interests, had and held themselves out as having superior

knowledge and experience concerning all aspects of their role as lease

administrator and/or property manager, and held Plaintiffs' funds in the course of

their administration of the Keller, Kennesaw, and Naperville Investments.

898.    Mary Street and CAMS Realty knew that the HSH Parties were not paying rent, that Millcreek or its affiliates were actually paying rent, that there was no certificate of occupancy at the Keller Property nor was one imminent, that there was no bond from Lloyds of London, and that they had done little or nothing to vet Plaintiffs investment or act in their best interests with respect to their investments in the Millcreek/Colliers TIC Program, but failed to disclose these facts to Plaintiffs, as alleged more fully herein.

899.    As alleged more fully herein, special relationship existed between Plaintiffs and each of their respective Qualified Intermediaries or Referrers, in that the Qualified Intermediaries had and held themselves out as having superior knowledge and experience concerning all material aspects of the transactions they conducted on Plaintiffs behalf and held Plaintiffs' funds to conduct their respective 1031 exchanges, and Plaintiffs were in a uniquely vulnerable position due to their lack of relative experience, knowledge, and access to information regarding, *inter alia*, the Millcreek/Colliers TIC Program and IRS regulations governing the timing and other conditions of 1031 exchanges.

900.    The Qualified Intermediaries and Referrers knew that they had done little or nothing to verify or ensure that Plaintiffs potential investments through the Millcreek/Colliers TIC Programs were 1031-compliant or to verify the truth of the

Millcreek/Colliers Parties representations about their TIC investments, and knew

the truth of their other misrepresentations about the Millcreek/Colliers TIC

Program and their own credentials, experience, reliability, and services, but failed

to disclose these facts to the respective Plaintiffs with whom they interacted, as

alleged more fully herein.

901.    As alleged more fully herein, a special relationship existed between Plaintiffs

and Steve Caton and SARC US, Inc., in that Caton and his company were entrusted

with substantial funds on behalf of Plaintiffs with respect to their investments, and

in that Caton and his company integrated themselves into the development and

execution of the Millcreek/Colliers TIC Program into which Plaintiffs invested and

had superior knowledge, expertise, and access to information concerning all

aspects of Plaintiffs' investment, and Plaintiffs were in a uniquely vulnerable

position due to their lack of relative experience, knowledge, and access to

information, including due to IRS regulations governing the timing, management,

and other conditions of 1031 exchanges.

902.    Caton and SARC US, Inc. knew the truth about substantial aspects of

Millcreek/Colliers TIC Program, including the absence of the advertised bond, the

financial and operational state of the tenant and guarantor; the reliability and

trustworthiness of the HSH Parties, the deceptive marketing of the

Millcreek/Colliers Parties, the status of renovations and equipment acquisitions,

194

and others, but failed to disclose these facts to Plaintiffs.

903.    Plaintiffs did not know the facts described above, including the lack of vetting for either the tenant or the investment as a whole, the investments' 1031-compliant status, the absence of a bond, the unreliability of the corporate guarantor, and other material facts described more fully herein.

904.    Each of Defendants' failures to disclose the above-identified facts were a substantial factor in causing Plaintiffs' damages, the amount of which will be determined at trial.

## ELEVENTH CAUSE OF ACTION

*(Elder Abuse/Abuse of Vulnerable Adults By Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, and Donald Patterson, Against the Millcreek/Colliers Parties, Mary Street, CAMS Realty, Mountain West Realty, Connie Greenawalt, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Steve Caton, SARC US, Inc., Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Scott King, and Merit Commercial Real Estate)*

905.    Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Katherine Madera, Carl McQueary, Donald Patterson, Charles Brauer and Lynn McQueary were 65 or older at the time their investments were induced.

906.    Plaintiff Charles Brauer suffers from a disability stemming from multiple sclerosis and is older than 65 years old.

195

907.   Plaintiff Donald Patterson suffers from a disability stemming from Parkinson's disease and is older than 65 years old.

908.   At all relevant times herein, Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, and Donald Patterson were "vulnerable adults" as that term is defined in Utah Code § 76-5-111 and is therefore entitled to the protections provided under Utah Law.

909.   Defendants were in a position of trust and confidence or had a business relationship with these vulnerable adults, who put substantial trust and confidence in Defendants.

910.   Defendants knowingly, by deception, obtained or used these vulnerable adult's funds, credit, assets, or other property.

911.   Defendants intended to temporarily or permanently deprive the vulnerable adults of the use, benefit, or possession of the Plaintiffs' property, for their own benefit.

912.   Defendants were aware of and exploited Plaintiffs' dependency upon Defendants' purported knowledge, skills, and expertise.

913.   To sell the TIC investments to Plaintiffs, Defendants made misrepresentations of material facts and committed other wrongful acts as alleged herein.  Defendants were motivated by greed and intended to generate fees ,commissions, and other

benefits for themselves by causing Plaintiffs to invest while exposing Plaintiffs to an unreasonable risk of harm.

914.   Defendants received commissions, fees, and other benefits on the sale of the TICs to Plaintiffs and their management.

915.   Oftentimes, these commissions were not disclosed to Plaintiffs.

916.   Defendants have made written and oral misrepresentations and misleading statements of material facts in connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs to invest.

917.   In engaging in such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest.

918.   In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

919.   Under applicable state statutes and related tort principles, including the doctrine of *prima facie* tort or negligence *per se,* Defendants' conduct constitutes abuse of vulnerable persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable under other claims asserted herein, together with additional general damages as may be determined at trial.

920.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable, and such further relief as

the Court may deem appropriate under the circumstances.

**TWELFTH CAUSE OF ACTION**

*(Conspiracy to Engage in Tortious Conduct Against All Defendants)*

921.    With respect to the tortious conduct alleged herein, the Millcreek/Colliers

Parties and other Defendants entered into a combination with each other and with

the HSH Parties and Developer Parties to accomplish the object of the tortious

behavior, namely fraudulently inducing Plaintiffs' investment in the Keller,

Kennesaw, and Naperville Properties.

922.    Defendants' agreement to participate in the conspiracy is evident from the acts

of each party, as outlined in the Causes of Action and other facts above, and was

reached expressly in communications between the parties regarding the

Millcreek/Colliers TIC Program, or was tacit or implied in the parties' intent as

evidenced by their conduct.

923.    In carrying out the conspiracy, participants in the conspiracy committed one or

more unlawful acts, including the acts described in the Causes of Action above.

924.    By reason of Defendants' participation in the civil conspiracy, Plaintiffs have

suffered injury for which Defendants are jointly and severally liable and for which

Plaintiffs are entitled to a judgment against Defendants awarding damages in an

amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of property that Plaintiffs actually received.

925.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## THIRTEENTH CAUSE OF ACTION

### (Aiding and Abetting Tortious Conduct Against All Defendants)

926.    As set forth in the allegations above, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

927.    The Millcreek/Colliers Parties knowingly aided and abetted the underlying tortious conduct by developing and marketing the Millcreek/Colliers TIC Program, distributing sales materials concerning the Millcreek TIC properties, recommending investment in Millcreek TIC properties, selling and closing sales of investment transactions, causing a substantial portion of Plaintiffs' investment funds to be diverted to the payment of excessive commissions or other compensation to the Millcreek/Colliers Parties and the referring Qualified Intermediaries, and making the remaining proceeds of Plaintiffs' investments

freely available to the Developer Parties and/or the HSH Parties without restriction as to use.

928.    The Millcreek/Colliers Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were intimately familiar with the HSH Parties, their operations, their financial weakness, their failures to pay property taxes, and their failing business based on frequent and on- going communication with the HSH Parties and their principals, negotiations of loans and other inter-party transactions, and receipt of financial information.

929.    The HSH Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the Keller Property.

930.    The HSH Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

931.    The Developer Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing

200

material misrepresentations that enabled the Millcreek/Colliers Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the Keller and Kennesaw Properties.

932.    The Developer Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Millcreek/Colliers Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

933.    The Qualified Intermediaries knowingly aided and abetted the underlying tortious conduct by entering referral agreements with the Millcreek/Colliers Parties and receiving fees for their referrals, referring Plaintiffs to the Millcreek/Colliers TIC Program and endorsing it to Plaintiffs, and neglecting to verify or ensure the investments' compliance with applicable IRS regulations.

934.    The Qualified Intermediaries engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that they had done little or nothing to verify the truth of the Millcreek/Colliers Parties' and their own representations with respect to the investments marketed and sold, that they had done little or nothing to verify or ensure that Plaintiffs' investments were compliant with applicable IRS regulations, and in that they received undisclosed referral fees for inducing Plaintiffs' investments.

201

935.    Mary Street, CAMS Realty, and Mountain West Realty knowingly aided and abetted the underlying tortious conduct by aiding in the development and planning of the Millcreek/Colliers TIC Program, in their concealment, misrepresentation, and manipulation of crucial information regarding Plaintiffs' investments, and by acting against Plaintiffs' best interests with respect to their investments.

936.    Mary Street, CAMS Realty, and Mountain West Realty engaged in such conduct with knowledge of the underlying tortious conduct, in that they aided the Millcreek/Colliers Parties in the development and planning of the Millcreek/Colliers TIC Program and had knowledge of the deceptive and exploitative nature of its design and operation, knew the truth of material issues regarding Plaintiffs investment including "rent" from the tenant and the status of a certificate of occupancy at the Keller Property but concealed and misrepresented the truth, and knew Plaintiffs' best interests but acted against them.

937.    By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the property that Plaintiffs actually received.

938.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment

interest, costs of court, attorneys' fees where recoverable under contract or as

consequential damages, and such further relief as the Court may deem appropriate

under the circumstances.

## FOURTEENTH CAUSE OF ACTION

### *(Unjust Enrichment of Defendants – All Defendants)*

939.    Plaintiffs conferred benefits on the Defendants by making their investment in

Millcreek TIC Properties.

940.    Defendants each received a benefit from Plaintiffs in the form of commissions

or other compensation paid from the proceeds of the sale transaction; access to and

direct use of the identifiable proceeds of the investment; and perpetuation of the

overall scheme.

941.    Defendants appreciated, acknowledged, or had knowledge of the benefits

incurred upon them as they directly received money from the proceeds of the

Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Millcreek

TIC Program, obtain, and use funds from TIC investors, and divert invested money

to purposes not benefiting Plaintiffs.

942.    Under the circumstances, equity and justice demand that Defendants not be

permitted to retain the benefits conferred upon them by Plaintiffs without

compensating Plaintiffs therefor.

943.    By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

944.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

1. An award of actual damages, damages for pain and suffering, treble damages under applicable statutes, and punitive damages, attorney fees and costs in an amount to be proven at trial, plus interest as set forth by applicable statutes.

2. Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

3. If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

4. Such other relief as may be just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

RESPECTFULLY SUBMITTED this 26th of March, 2025.

DEISS LAW, P.C.


_/s/ Andrew G. Deiss_
Andrew G. Deiss
Corey Riley
Andrew D. Miller
*Attorneys for Plaintiffs*