Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
DEISS LAW PC
10 West 100 South, Suite 700
Salt Lake City, UT 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com
*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| PATTI KLAIR, ROBERT MYERS, ROBERT BARNES, ERIC CARNRITE, ELIZABETH HILL-D'ALESSANDRO, ROBERT TANNEHILL, DITAS TANNEHILL, JOSE REMENTERIA, TEENA REMENTERIA, CHARLES BRAUER, LAURA BRAUER, KAREN MARION, KATHERINE MADERA, CARL MCQUEARY, LYNN MCQUEARY, DONALD PATTERSON, KURTIS TRENT MANNING, TONY SCHAKER, PATRICK WHITE, HILDEGARD WHITE, QUEST REALTY TRUST, SECURE SELF STORAGE LLC, KURTIS TRENT MANNING LIVING TRUST, | **SECOND AMENDED COMPLAINT** **JURY DEMANDED** Case No. 2:23-cv-00407 Judge Ann Marie McIff Allen Magistrate Judge Cecilia M. Romero |
| *Plaintiffs,* | |
| v. | |
| COLLIERS INTERNATIONAL GROUP, INC.; COLLIERS INTERNATIONAL HOLDINGS (USA), INC.; COLLIERS INTERNATIONAL INTERMOUNTAIN, LLC; KEVIN LONG; MILLCREEK COMMERCIAL PROPERTIES, LLC; | |

ANDREW BELL; TREVOR WEBER; SPENCER TAYLOR; BLAKE MCDOUGAL, SCOTT RUTHERFORD; EQUITY SUMMIT GROUP; ELEVATED 1031; MILLROCK INVESTMENT FUND 1, LLC; MILLROCK INVESTMENT FUND 1 MANAGEMENT, LLC; KGL REAL ESTATE DEVELOPMENT PLLC; SMART COVE, LLC; GTR HOLDINGS, LLC; LONG HOLDINGS, LLC; BRENT SMITH; THOMAS SMITH; LEW CRAMER; MATTHEW HAWKINS; GIL BOROK; DAVID JOSKER; JERALD ADAM LONG; MARY STREET; CAMS REALTY, LLC; MOUNTAIN WEST COMMERCIAL, LLC; STEVE CATON; SARC US, INC.; EMANUEL BUTERA; JAMIE BUTERA; JAMESON, LLC DBA AMERICAN DEVELOPMENT PARTNERS; SCOTT KING; MERIT COMMERCIAL REAL ESTATE, LLC; MARK MACHLIS; LADY MIRA BLUE MACHLIS; HELLO BELLO, LLC; SAMUEL DUKE; KGL ADVISORS, LLC,

Defendants.

By and through undersigned counsel, Plaintiffs complaint of Defendants as follows:

**INTRODUCTION**

At least by 2020, Kevin Long, Millcreek Commercial, Colliers, and their related entities and associates began to develop, market, and sell or facilitate the sale of investments in in commercial properties—Tenant in Common (or "TIC") investments. These investments were designed to take advantage of so-called 1031 exchanges,

whereby individuals wanted to exchange an investment in one business for another—"a like kind exchange"— to avoid paying capital gains tax at the time of the transaction. 1031 exchanges were named after Section 1031 of Internal Revenue 26 U.S. Code § 1031 which was created to allow taxes to be deferred until later—typically upon the death of the investor.  A 1031 exchange, thus, was attractive to a certain type of investor, namely retirees who wanted to maximize their income stream for themselves and their partners during their final years to pay mortgages and costs of everyday living without worry.  After all, many of these elderly folks had worked their entire lives to earn the income to invest.  They would be unable to go back to work should their investment fail.  It was this population that Long et al. publicly declared to be the target of their 1031 program.

Long, through his position as Senior Vice President and Executive Vice President at the Utah division of Colliers, and President and founder of Millcreek Commercial Properties, marketed the TIC opportunities through word of mouth, publications, and by obtaining referrals from a network of real estate and 1031 exchange specialists. Although Long, et al., pushed at least 14 of these properties during the period relevant here, this case centers on the three located in Kennesaw, Georgia; Naperville, Illinois; and Keller, Texas.

Long conspired with others to market these properties to investors as ideal 1031 exchange properties.  According to Long and his affiliates, the properties were an

excellent 1031 investment because the location and condition of the buildings made them very valuable in themselves; the properties had already been leased by a "tenant of your dreams"; those tenants had been thoroughly "vetted" by Collier's team of analysts; the leases were guaranteed by a publicly traded company with very strong financials; the leases had "extremely attractive terms"; the leases were long term – usually 20 years in duration; they were triple net leases ("NNN"), which meant the tenant would pay insurance, day-to-day maintenance, and property taxes; the leases were insured by Lloyds of London; that the investment was unquestionably "safe, secure, and stable" with a capitalization rate of 6-9% over the term of the lease; and that the tenant was "such a good tenant" that they had even made pre-payments on rent.

In fact, these claims were false and replete with material omissions. The tenant failed to tender even a single payment at the Keller location and defaulted quickly on all its leases. Of course, the guarantor did not honor its obligation to cover the payments, nor was there ever a bond issued by Lloyds of London. In fact, both the tenant and the guarantor, as well as the individual who controlled the development company that was purportedly making tenant improvements to the Keller Property and others had easily discovered histories of fraud. The interior of the building at the Keller, Texas property had not been well maintained, had not possessed a certificate of occupancy—nor was one imminent. TIC owners were further surprised to learn that

4

certain payments, purportedly rent paid in advance, were not from the tenant at all.  In fact, Millcreek had quietly been making payments to the TIC owners on the tenant's behalf in order to hide the tenant's insolvency.

Long and Colliers should have known this.  In fact, it is likely that they did.  Long had known the man behind American Development Partners (ADP)- one of the developer parties responsible for renovations, improvement and construction on the Keller, Kennesaw, and Naperville properties- for many years.  In fact, records indicate that Long and Emanuel Butera (the owner and operator of ADP) had been partners in Utah businesses that sold TIC investments years before.  Colliers knew or should have known of Butera's shady past, not the least because Long was a broker, Senior Vice President, and Executive Vice President with the Utah division of Colliers.

Despite this knowledge, Millcreek-affiliated Millrock Investment Fund 1 paid these companies over 10 million dollars—most of which has disappeared, leaving the Plaintiffs, mostly elderly and retired, with title to properties that are some combination of unfinished, over-priced, subject to maintenance fees, insurance, management fees, taxes, and an investment many Plaintiffs fear will not be covered by the IRS 1031 exemption.  As one might expect, many of the Plaintiffs, particularly the elderly and vulnerable, have suffered very real and physical and emotional injury from these acts.

This Complaint arises from the omissions, misstatements, and outright lies that led to financial ruin and broken retirement dreams for the Plaintiffs.  Lead Defendant

Kevin Long, acting on behalf of his company Millcreek Commercial Properties and in concert with others, including the named Defendants, systematically targeted retirement investors with promises of nearly-risk-free investments in real property. He used lies and misdirection in conjunction with the strict timeline of the IRS 1031 exchange program to pressure his marks into investing in deals that were designed to fail and did in fact fail.

## PARTIES

### Defendants

1. Defendant Colliers International Intermountain, LLC ("Colliers Intermountain") is a Delaware limited liability company with its principal place of business in Salt Lake County, Utah. Defendant Colliers International Holdings (USA), Inc. ("Colliers USA") is a Delaware corporation that is the majority member of Colliers International intermountain, LLC, a wholly owned subsidiary of Defendant Colliers International Group, Inc. ("CIGI"), a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. CIGI controls the real estate and investment services provided by subsidiaries and affiliates using the "Colliers International" and "Colliers" brands and trademarks, and the profits from such services inure to CIGI's benefit (Colliers International Intermountain, LLC, Colliers International Holdings (USA), Inc., and CIGI are referred to as "Colliers" or "Colliers International").

2. Among other things, Colliers develops, markets, and sells commercial real estate, and provides investment management services to institutional investors, sovereign wealth funds, public and corporate pension funds, endowments, insurance companies, foundations, and family offices.

3. There are 4 Colliers offices located in Utah.

4. Colliers' acts that are the subject of this lawsuit were performed in close association with Millcreek and directed towards transactions having a nexus in Utah.

5. Colliers International Intermountain, LLC, Colliers International Holdings (USA), Inc., and CIGI employ uniform branding as "Colliers" or "Colliers International" in order create the impression and hold themselves out as a single international entity in order to foster a sense of confidence, trust, quality, and uniformity and to induce the reliance of potential customers, clients, and investors on their services.

6. Colliers' global website (colliers.com) lists properties sold or leased by its subsidiaries, or for which its subsidiaries otherwise provide professional services, including Colliers International Intermountain, Inc.  Colliers' global website also lists and provides means to contact the agents of its subsidiaries, including Colliers International Intermountain, Inc., to employ their professional services.

7. The Colliers agents named as Defendants herein are or were listed with their contact information on Colliers' global website at all material times.

8.    On information and belief, the Keller, Kennesaw, and Naperville Properties that are the subject of this suit were listed on Colliers' global website at all material times.

9.    Matthew Hawkins is an individual residing, on information and belief, in Toronto, Ontario, Canada.

10.   Gil Borok is an individual residing, on information and belief, in California.

11.   Gil Borok and Matthew Hawkins are managers of Colliers International Intermountain, LLC, and on information and belief held those positions at all times material to the allegations herein.

12.   Colliers' global website describes Gil Borok, President and CEO of the USA division of Colliers, as "lead[ing] Colliers for the United States [] region[]," which includes the Utah division of Colliers.

13.   Colliers' global website describes Matthew Hawkins as "Vice President" and "Legal Counsel" for CIGI, with "primary responsibility for CIGI's legal, corporate secretarial and regulatory status" with additional responsibilities extending to "oversight of any significant legal matters arising in CIGI's operating subsidiaries, with a focus on North America," which includes the USA and Utah divisions of Colliers.

14.   David Josker is an individual residing, on information and belief, in California.

15. Colliers' global website describes David Josker as "President of the Western Region Brokerage for Colliers," "responsible for the performance and entrepreneurial initiatives of the firm's offices across Arizona, California, Colorado, Hawaii, Nevada, Oregon, Texas, Utah, and Washington."

16. David Josker, on Colliers' behalf, approved draw payments for sales agents selling TIC offerings through the Colliers/Long TIC Program.

17. As alleged herein, a Colliers subsidiary, Colliers International North Texas, was a defendant in a suit alleging a fraudulent real estate scheme with a non-paying medical tenant similar to the scheme alleged in this case.

18. Gil Borok is the manager and director of Colliers International North Texas, LLC.

19. Matthew Hawkins is the secretary of Colliers International North Texas, LLC.

20. David Josker is the vice president of Colliers International North Texas, LLC.

21. Gil Borok and Matthew Hawkins are managers, members, or other officers of other divisions of Colliers in the United States.

22. Defendant Millcreek Commercial Properties, LLC ("Millcreek" or "Millcreek Commercial") is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.

23. Millcreek Commercial is managed by KGL Real Estate Development, PLLC, which at all material times directed, permitted, and was aware of Millcreek's conduct alleged herein.

24. KGL Real Estate Development, PLLC is a Utah professional limited liability company. On information and belief Kevin Long is its sole member and manager.

25. Kevin G. Long ("Long") is an individual residing in Utah.

26. Long was Principal Broker and COO of CBC Advisors, a real estate professional services and investment company acquired by Colliers in 2017.

27. After Colliers' acquisition of CBC Advisors, Long worked as a broker for Colliers.

28. In 2017 Long founded Millcreek Commercial Properties and affiliated commercial real-estate investment funds, including Millrock Investment Fund 1, LLC.

29. Long is "President of Millcreek with Colliers."

30. At all material times, Long was an employee and agent of Millcreek.

31. At all material times, Long was an employee and agent of Colliers.

32. Millrock Investment Fund 1, LLC ("Millrock") is a Utah limited liability corporation with its principal place of business in Lehi, Utah.

33.     Millrock Investment Fund 1 Management, LLC is a Utah limited liability corporation.  Kevin Long is the manager of Millrock Investment Fund 1 Management, LLC.

34.     At all material times Millrock Investment Fund 1 Management, LLC directed, permitted, and was aware of Millrock Investment Fund 1's conduct alleged herein.

35.     Andrew Bell ("Bell") is an individual residing in Utah.

36.     At all material times, Bell was an employee and agent of Millcreek.

37.     At all material times, Bell was an employee and agent of Colliers.

38.     Trevor Weber ("Weber") is an individual residing in Utah.

39.     At all material times, Weber was an employee and agent of Millcreek.

40.     At all material times, Weber was an employee and agent of Colliers.

41.     Blake McDougal ("McDougal") is an individual residing in Utah.

42.     At all material times, McDougal was an employee and agent of Millcreek.

43.     At all material times, McDougal was an employee and agent of Colliers.

44.     Spencer Taylor ("Taylor") is an individual residing in Utah.

45.     At all material times, Taylor was an employee and agent of Millcreek.

46.     At all material times, Taylor was a representative and agent of Millrock Investment Fund 1 LLC.

47.     Smart Cove, LLC is a Utah limited liability company with its principal place of business in South Jordan, Utah.  Smart Cove's sole member is Spencer Taylor.

48.     At all material times, Smart Cove, LLC was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

49.     Defendant Equity Summit Group ("Equity Summit") is a Utah professional corporation with its principal place of business in Saratoga Springs, Utah.

50.     Defendant Elevated 1031 ("Elevated") is an unregistered business entity with its principal place of business in Pleasant Grove, Utah. Upon information and belief, Elevated is managed by Scott Rutherford.

51.     Scott Rutherford ("Rutherford") is an individual residing in Utah.

52.     At all material times, Rutherford was an agent and representative of Millcreek.

53.     At all material times, Rutherford was an agent and representative of Equity Summit.

54.     At all material times, Rutherford was an agent and representative of Elevated 1031.

55.     Brent Smith is an individual residing in Utah.

56.     At all material times, Brent Smith was an agent and representative of Millcreek Commercial.

57.   At all material times, Brent Smith was an agent and representative of Millrock Investment Fund 1.

58.   GTR Holdings, LLC is a Utah limited liability company with its principal place of business in South Jordan, Utah.  Brent Smith is one of its two members.

59.   At all material times GTR Holdings was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

60.   Thomas ("Tom") Smith is an individual residing in Utah.

61.   At all material times, Tom Smith was an agent and representative of Millcreek Commercial.

62.   At all material times, Tom Smith was an agent and representative of Millrock Investment Fund 1 LLC.

63.   Lew Cramer ("Cramer") is an individual, on information and belief residing in Utah.  At all material times Lew Cramer was an agent and representative of Colliers.

64.   Jerald Adam Long ("Adam Long") is an individual temporarily residing in Massachusetts and is a citizen of Utah.  He is Kevin Long's son.

65.   At all material times, Adam Long was an agent and representative of Millcreek Commercial and represented that he was a founding partner of it.

66.     At all material times Adam Long was an agent and representative of Colliers and represented that he was the Chief Operating Officer of the Utah division of Colliers and Director of Special Projects for the USA division of Colliers.

67.     Long Holdings, LLC is a Utah limited liability company with its principal place of business in Provo, Utah.  Long Holdings' sole member is Jerald Adam Long.

68.     At all material times Long Holdings was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct alleged herein.

69.     At all material times, Long, Rutherford, Bell, Weber, Taylor, McDougal, Brent Smith, Tom Smith, Samuel Duke, Adam Long, Lew Cramer, and Mary Street acted as close business associates of one another, including through development of the Colliers/Long TIC Program, joint marketing, communications, social media, and transactional commission payments.

70.     At all material times, Millrock, Millcreek, Colliers, CAMS Realty, Mountain West Realty, SARC US Inc., Elevated 1031, Equity Summit Group, Millrock Investment Fund 1 LLC, Millrock Investment Fund 1 Management, and KGL Real Estate Development PLLC, Eastern 1031 Starker Exchange LLC, Eastern 1031 Starker Exchange LLP, Granite Exchange Services LLC, IPX1031, Merit Commercial Real Estate LLC, Accruit LLC, Beutler Exchange Group, and Hello Bello, acted as close business associates of one another, including through joint marketing, communications, social media, and transactional commission payments.

71.    Collectively, Millcreek, Colliers, Long, Rutherford, Bell, Weber, Taylor, McDougal, Brent Smith, Tom Smith, Adam Long, Elevated 1031, Equity Summit Group, Millrock Investment Fund 1 LLC, Millrock Investment Fund 1 Management, KGL Real Estate Development PLLC, Smart Cove LLC, GTR Holdings LLC, and Long Holdings LLC are referred to herein as the "Colliers/Long Parties."

72.    Mary Street is an individual residing in Utah.  She acted as lease administrator and property manager of the Keller, Kennesaw, and Naperville Properties, among other properties in the Colliers/Long TIC Program.

73.    CAMS Realty, LLC is a Utah limited liability company.  It is a division of Mountain West Commercial, LLC, dba Mountain West Commercial Real Estate.  Mary Street is its managing member and was its representative and agent at all material times.

74.    Mountain West Commercial, LLC, dba Mountain West Commercial Real Estate, is a Utah limited liability company with its primary place of business in Salt Lake City, Utah.  At all material times CAMS Realty and Mary Street were its representatives and agents.

75.    Hello Bello, LLC is a Utah domestic limited liability company with its principal place of business in South Jordan, Utah.

76.    Samuel Duke is an individual residing in Utah.  He is the manager and president of Hello Bello.

15

77.     At all material times, Samuel Duke was the Head of Marketing for Millcreek Commercial Properties.

78.     Constance L. Greenawalt ("Connie Greenawalt") is an individual residing in Pennsylvania.  At all material times she was a representative and agent of Eastern 1031 Starker Exchange LLC and Eastern 1031 Starker Exchange LLP.

79.     Eastern 1031 Starker Exchange LLC, is a Pennsylvania limited liability partnership with its principal place of business in Lewisberry, Pennsylvania.

80.     Eastern 1031 Starker Exchange LLP is a Pennsylvania limited liability partnership with its principal place of business in Lewisberry, Pennsylvania.

81.     Investment Property Exchange Services, Inc. ("IPX1031") is a California corporation with its principal place of business in Jacksonville, Florida.

82.     Kyle Williams is an individual residing in Washington.  At all material times he was a representative and agent of IPX1031.

83.     Max Hansen is an individual residing in Montana. At all material times, he was a representative and agent of Accruit LLC.

84.     Accruit LLC is a Delaware limited liability company with its principal place of business in Denver, Colorado.

85.     Rob Rettinhouse is an individual residing in California.  At all material times he was a representative and agent of Granite Exchange Services LLC.

86.    Granite Exchange Services LLC is a California limited liability company with its principal place of business in Granite Bay, California.

87.    Mark Adams is an individual residing in Oregon.  At all material times he was a representative and agent of Beutler Exchange Group.

88.    Beutler Exchange Group LLC is an Oregon domestic limited liability company with its principal place of business in Lake Oswego, Oregon.

89.    Collectively, Greenawalt, Eastern 1031 Starker Exchanges LLC & LLP, Kyle Williams, IPX1031, Max Hansen, Accruit LLC, Rob Rettinhouse, Granite Exchange Services LLC, Mark Adams, and Beutler Exchange Group are referred to as the "Qualified Intermediaries."

90.    Scott King is an individual residing in Oregon.  At all material times he was an agent and representative of Merit Commercial Real Estate.

91.    Merit Commercial Real Estate, LLC is a limited liability company, on information and belief organized in Oregon.

92.    Collectively, Scott King and Merit Commercial Real Estate are referred to as the "Referrers" for certain Plaintiffs.

93.    Mark Machlis is an individual residing in Utah.

94.    Lady Mira Blue Machlis is an individual residing in Utah.

95.    At all material times the Machlises were close business associates of the Colliers/Long Parties as development and investment partners, previous owners of TIC

interests in the Keller Property, the marketing and sale of TIC Properties in the Colliers/Long TIC Program, and on information and belief, the negotiation of the lease terms at one or more HSH-tenanted properties in the Colliers/Long TIC Program.

96.     Steve Caton is an individual residing in Illinois. At all material times, he was an agent and representative of SARC US, Inc. and Caton Commercial.

97.     SARC US, Inc. is a Missouri limited liability company with its principal place of business in Dexter, Missouri.

98.     Collectively, Steve Caton and SARC US, Inc. are referred to as the Caton Parties.

99.     Jameson, LLC, dba American Development Partners ("ADP"), is a Tennessee limited liability company.

100.    Emanuel ("Manny") Butera is an individual residing in Tennessee.

101.    On information and belief, Manny Butera is a member and manager of ADP.

102.    Jamie Butera is an individual residing in Tennessee.

103.    Jamie Butera is the registered agent of, and, on information and belief, a member and manager of ADP.

104.    At all material times, Manny and Jamie Butera acted as agents and representatives of ADP.

105.    Collectively, Manny Butera, Jamie Butera, and ADP are referred to as the "ADP Parties."

106.    Defendant KGL Advisors, LLC is a Utah domestic limited liability corporation with its principal place of business in Lindon, Utah. On information and belief, KGL Advisors, LLC is managed by Defendant Kevin Long.

107.    On information and belief, and based on the fact that in about late 2024 Millcreek Commercial indicated that it was closing but that KGL Advisors would assist Millcreek Commercial's former clients and that KGL Advisor's website adopted and incorporated large portions of Millcreek Commercial's website, KGL Advisors is an alter ego and/or successor in interest of Millcreek Commercial, continuing substantially similar operations and activities with substantially similar personnel, and should be held jointly and severally liable for any judgment against Millcreek Commercial in this case.

108.    Because Millcreek is dissolved, and pursuant to Utah Code § 48-3a-706(4)(b), claims against Millcreek may be enforced against its members KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; and Long Holdings, LLC.

**Plaintiffs**

109. *Robert and Ditas Tannehill* are residents of California and were aged 67 and 68 respectively at the time they purchased TIC ownership in the Keller Property.

110. *Jose and Teena Rementeria* are residents of Oregon and own the Secure Self Storage, LLC entity, which has its principal place of business in Oregon. The Rementerias were 69 and 62 years old respectively at the time their entity Secure Self Storage purchased TIC ownership in the Keller and Naperville Properties.

111. *Robert Myers* is a resident of Oregon. He was 75 years old at the time he purchased TIC ownership in the Keller Property.

112. *Charles and Laura Brauer* are residents of Massachusetts and are trustees of Quest Realty Trust. They were 70 and 64 years old respectively at the time they purchased TIC ownership in the Keller Property.

113. During all material times herein, Charles Brauer suffered from a disability associated with multiple sclerosis.

114. *Patti L. Klair* is a resident of Delaware. She was 60 years old at the time she purchased TIC ownership in the Keller Property.

115. *Robert and Annabelle Barnes* are residents of New Jersey. They were 55 and 54 years old respectively at the time they purchased TIC ownership in the Keller and Kennesaw Properties.

116. *Donald Patterson* is a resident of New Jersey. He was 75 years old at the time he purchased TIC ownership in the Keller and Kennesaw Properties.

20

117.    During all material times herein, Donald Patterson suffered from a disability associated with Parkinson's Disease.

118.    With regard to circumstances specifically involving the Kennesaw Property, the Barnes' and Donald Patterson are herein referred to as the Kennesaw Plaintiffs.

119.    *Patrick and Hildegard White* are residents of Pennsylvania.  They were both 55 years old at the time they purchased TIC ownership in the Keller Property.

120.    *Eric Carnrite and Elizabeth Hill-D'Alessandro* are residents of Washington.  They were 51 and 53 years old respectively at the time they purchased TIC ownership in the Keller Property.

121.    *Karen Marion* is a U.S citizen residing in the Netherlands.  She was 62 years old at the time she purchased TIC ownership in the Keller Property.

122.    *Katherine Madera* is a resident of Montana.  She was 75 years old at the time she purchased TIC ownership in the Keller Property.

123.    *Carl and Lynn McQueary* are residents of Montana.  They were 70 and 69 years old at the time they purchased TIC ownership in the Keller Property.

124.    *Kurtis T. Manning* is a resident of California.  He was 55 years old at the time he purchased TIC ownership in the Keller Property.

125.    *The Kurtis T. Manning Living Trust* is a California trust and Kurtis T. Manning is its representative.

126.   *Tony Schaker* is a resident of California.  He was 63 years old at the time he purchased TIC ownership in the Keller Property.

127.   All Plaintiffs invested in TIC interests in the Keller Property and, in cases specifically involving the Keller Property, are referred to herein as the Keller Plaintiffs.

## JURISDICTION AND VENUE

128.   Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.F §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

129.   The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

130.   Venue is appropriate in this forum pursuant to 28 U.S.C § 1391 (b)(2) and 15 U.S.C. § 78aa.

131.   In connection with the conduct alleged in this Complaint, Defendants directly and indirectly used the means and instruments of interstate commerce, including mail, telephone, and internet communications.

**THE Colliers/Long TIC PROGRAM**

**Overview of the Colliers/Long TIC Program**

132. Over the last several years, Kevin Long and his agents and affiliates have conspired with third parties in a sophisticated scheme to fraudulently induce vulnerable, often elderly investors to purchase TIC investments in commercial properties located throughout the United States at grossly inflated prices (the "Colliers/Long TIC Program").

133. Millcreek marketed TIC interests in real properties at multiple locations, including Naperville, Illinois; Romeoville, Illinois; Pine Bluff, Arkansas; Blytheville, Arkansas; Alpharetta, Georgia; Kennesaw, Georgia; Draper, Utah; Keller, Texas; Lehi, Utah; Bluffdale, Utah; South Jordan, Utah; Crockett, Texas; Tomball, Texas; and Katy, Texas.

134. Millcreek Commercial Properties' affiliate, Millrock Investment Fund 1, contracted with developers to purchase equipment and make renovations, improvements, and construction on the buildings at the Keller Property, Kennesaw Property, and Naperville Property.

135. The Colliers/Long Parties represented that they had already secured for each property a paying tenant with sufficient revenue to service their long-term lease.

136. This tenant was identified as Healthcare Solutions Holdings Inc. ("HSH").

137.  HSH is a Delaware corporation with its principal place of business in Glen Cove, New York.

138.  HSH is a wholly owned subsidiary of Healthcare Solutions Management Group.

139.  Healthcare Solutions Management Group, Inc. ("HSMG") is a Delaware corporation with its principal place of business in Glen Cove, New York.

140.  Joshua Constantin ("Constantin") is an individual residing in Louisiana.

141.  Justin Smith ("Smith") is an individual residing in Ohio.

142.  At all material times, Constantin acted as the Head of Commercial Real Estate for HSH.

143.  At all material times, Smith acted as HSMG's Chief Executive Officer.

144.  While not named as defendants in this lawsuit, collectively, HSH, HSMG, Constantin, Smith, and their affiliates and subsidiaries are referred to herein as the "HSH Parties."

145.  The HSH Parties are not parties in this action but allegations regarding them are included as context for claims against Defendants.

146.  Either the HSH Parties or their affiliates entered long-term leases to operate the Romeoville, Pine Bluff, Blytheville, Alpharetta, Kennesaw, and Naperville properties as urgent care centers or advanced care medical centers.

147. Either the HSH Parties or their affiliates entered long-term leases to operate the Keller Property as a surgical ambulatory regional center ("SARC").

148. Either the HSH Parties or their affiliates entered long-term leases to operate the Kennesaw Property and the Naperville Property as advanced medical care centers ("ACMs").

149. These leases were bundled with the sale of TIC interests in each property.

150. Millcreek represented this would result in investors receiving a return on their investment in the range of 6-9% over the term of each lease.

151. Millcreek represented that this would result in a steady stream of income along the way.

152. The Colliers/Long Parties represented that the rent payments on the lease were backed by two failsafe mechanisms to protect investors from potential losses.

153. The first of these was a corporate guarantee backing the lease.

154. The corporate guarantor for the Keller, Kennesaw, and Naperville leases was HSH and/or HSMG.

155. The second of these was represented by the Colliers/Long Parties to be a bond issued by Lloyds of London, the world's leading insurance/reinsurance market.

156. To locate potential investors and induce their investments, Millcreek Commercial Properties, Colliers, and their agents relied on a network of referring parties, including real estate agents, financial planners, attorneys, qualified

intermediaries, and 1031 exchange agents to locate and refer potential investors to them, some of whom are named as Defendants in this action.

### The Colliers/Long Parties Jointly Target Retirement Investors

157. From 2013 to 2016, Kevin Long was the Principal Broker and COO of CBC Advisors, a real estate company.

158. Kevin Long worked with Brandon Fugal at CBC Advisors.

159. Long and Fugal, at CBC Advisors, worked with Lew Cramer at Colliers.

160. Mary Street was an Associate Broker and Senior Vice President of Land and Investments at CBC Advisors.

161. All of the above-mentioned individuals can be seen in the following picture, published in a newsletter celebrating CBC Advisors accomplishments:

## CBC Advisors: Redefining Commercial Real Estate

 Meg Walter • Jul 14, 2016 • 2 min read



162. Lew Cramer went on to become Chief Executive Officer of the Utah division of Colliers.

163. In 2017, Colliers acquired Long's company, CBC Advisors.

164. Brandon Fugal went on to become Chairman of the Utah division of Colliers after the acquisition.

165. After the acquisition, Long worked as a broker for Colliers.

166. Long represented he was the Senior Vice President of the Utah division of Colliers, as shown in this email signature from communications with Plaintiffs below:

**Kevin G. Long**

Senior Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

167. Long represented he was also Executive Vice President of the Utah division of Colliers, as shown in his email signature from communications with Plaintiffs below:

**Kevin G. Long**

Executive Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

Colliers International – Utah | Millcreek Commercial
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com

 

168.     On or about April 27, 2017, Kevin Long founded Millrock Investment Fund 1, LLC and Millrock Investment Fund 1 Management, LLC.

169.     In or about September 26, 2019, Kevin Long also founded Millcreek Commercial Properties, LLC.

170.     Long was "President of Millcreek Commercial with Colliers International", as shown in this excerpt from his personal LinkedIn page:

 Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

## Experience

 President of Millcreek Commercial with Colliers International | Utah
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

171.    Long represented that Millcreek and Colliers worked in partnership with each other, as shown in this excerpt from the Millcreek/Colliers website:

In his previous position, Scott was the Executive Vice President of Sales and Marketing for the largest provider of Real Estate partial ownership projects in the United States. Through his efforts, he developed an impeccable reputation and a nationwide client base. The alliance between the Rutherfords and Millcreek Commercial will enable Millcreek to become the preeminent provider of tenant-in-common real estate in the US. Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners provide Millcreek Commercial with an unsurpassed national platform.

172.    At all material times, Millcreek Commercial used headers on their marketing materials, announcements, and other relevant documents that highlight their partnership with Colliers, as shown in the excerpt below:



173.    On information and belief, Brent Smith performed an instrumental role in developing the Millcreek/Colliers TIC Program including the development, marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in this case, including by identifying potential tenants and properties and calculating and

arranging the terms and details of leases, corporate guarantees, bonds, and other aspects of each TIC offering in order to package and sell a final TIC offering to potential investors.

174. In about 2020, Lew Cramer, on Colliers' behalf, approved terms with Kevin Long and his affiliates by which Colliers would partner with Long in the Colliers/Long TIC Program, including through brokerage activities, due diligence activities, and marketing.

175. Colliers and Kevin Long and his affiliates also agreed that Colliers would receive commissions on each TIC sale through the Colliers/Long TIC Program, and that Colliers and Kevin Long and his affiliates would implement a training program for agents.

176. David Josker, on behalf of Colliers International Holdings (USA), Inc. approved draw payments for agents in the training program.

177. By at least about 2020, Adam Long was an owner of Defendant Millrock Investment Fund 1 Management, together with his father, Kevin Long. Together, they managed Millrock Investment Fund 1 as it developed the Colliers/Long TIC Program.

178. At about the same time, Adam Long worked, in part, at Colliers' Toronto, Canada executive offices, and, along with Lew Cramer, mentored sales agents employed in the Colliers/Long TIC Program, including, on information and belief, Defendants Taylor, McDougal, and Strong.

30

179.   Kevin Long described Brent Smith as the "numbers guy" for the Colliers/Long TIC Program.

180.   In a call with Keller Property owners including Plaintiffs in about December 2022, Brent Smith described his own role as playing "part of the development process with ADP and making sure that the numbers work."

181.   Tom Smith provided "Oversight & Leadership" for the Colliers/Long TIC Program and was a financial partner for it, as shown in this slide from a presentation given by Scott Rutherford in about July 2020:



182.    Tom Smith's responsibilities with regard to the Colliers/Long TIC Program included "Accountability oversight," as shown in this slide from a presentation given by Scott Rutherford in about July 2020:



183.    In a presentation given on about July 20, 2020, Scott Rutherford stated that Tom Smith was "the main financial partner" for Millcreek and provided training to sales agents under Millcreek and Colliers' umbrella.

184.    "Every person at Millcreek," Rutherford stated, goes through "mandatory … training with Tom Smith. … show[ing] the level of oversight and integrity at Millcreek, that he is involved in overseeing everything."

185.    In about October 2020, Kevin Long described Tom Smith as "my financial partner" in the Colliers/Long TIC Program.

186. On information and belief, Tom Smith performed an instrumental role in developing and executing the Colliers/Long TIC Program including the development, marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in this case, including by providing necessary funding for the Colliers/Long TIC Program, including the Keller, Kennesaw, and Naperville Properties at issue in this case, and providing oversight and management of the Colliers/Long TIC Program and its sales agents including the development, marketing and sale of the Keller, Kennesaw, and Naperville Properties at issue in this case, including by identifying potential tenants and properties and calculating and arranging the terms and details of leases, corporate guarantees, bonds, and other aspects of each TIC offering in order to package and sell a final TIC offering to potential investors.

187. From about 2018-2020, Mary Street represented that she was an Executive Vice President of Colliers International.

188. On or about April 6, 2020, Mary Street registered CAMS Realty, LLC in Utah, dba Colliers Asset Management Services.

189. On or about April 7, 2020, Mary Street registered Colliers Asset Management Services in Utah.

190. Mary Street also registered the business name Commercial Asset Management Services.

191.    In or about 2020, Mary Street represented that she was the Principal Broker of Colliers Asset Management Services.

192.    Mary Street identifies herself as an Associate Broker with Mountain West Commercial Real Estate and manager of CAMS Realty, LLC.

193.    At all material times, Defendants Kevin Long, Scott Rutherford, Andrew Bell, Trevor Weber, Blake McDougal, Spencer Taylor, Mary Street, Brent Smith, Tom Smith, and other agents of Millcreek Commercial Properties and Colliers International were close business associates, including through joint marketing, communications, social media, and transactional commission payments.

194.    By no later than 2020, Millcreek Commercial Properties and its agents Rutherford, Bell, Weber, Taylor, and McDougal, under Long's leadership, began marketing and selling TIC interests in real property including the Keller, Kennesaw, and Naperville Properties.

195.    Defendants Colliers International, Millcreek Commercial, Long, Weber, McDougal, Taylor, Rutherford, and Bell are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

196.    Defendants Long, Weber, McDougal, Taylor, Rutherford, and Bell are not licensed with the states of Texas, Illinois, or Georgia to sell real estate.

197.    The TIC interests sold by the Colliers/Long TIC Program, including the Keller Property, Kennesaw Property, and Naperville Property, were not registered as

securities by the filing of a registration statement, nor were they exempt under the 1933 Securities Act.

198.    The Colliers/Long Parties marketed TIC interests to potential buyers who wished to take advantage of the IRS Section 1031 exchange program.

199.    A 1031 exchange permits those who sell business or investment property to postpone paying tax on the gain if the funds are reinvested in a "like-kind exchange"—i.e., property of the same nature or character as the sold property.

200.    1031 exchanges must take place over a constrained time frame, by law.

201.    From the date the original property is sold, the purchase of the new property must be completed within 180 days.

202.    Millcreek "markets to middle class retirement investors," as shown in this excerpt from the Frequently Asked Questions page of Millcreek's website:

**What is the exit strategy?**

Each co-owner has a separate deeded interest in the property and can buy and sell their interests as real estate independent of other owners. Every NNN leased investment, whether purchased as a Tenant In Common or as the sole owner, should be purchased as part of a long term investment strategy. But, as Robert Burns wrote, even "the best laid plans... can go awry". Because Millcreek Commercial Properties keeps minimums low and markets to middle class retirement investors we anticipate securing multiple retirement account investors in our properties. These investors have been coached to utilize a roll-up strategy whereby they leave their cash in their retirement account and compound their investment when additional shares of their investment property become available. There are no minimums on exchanges within a property.

Millcreek will facilitate these deed modifications and charge no marketing fees. If after your shares are offered to your partners and you still have a portion of your investment left to sell on the open market, Millcreel will market your property on our sales platform for a discounted listing fee of 3%. We are committed to maintaining the best resale program in the industry.

203.    The tax-deferral advantages of a 1031 exchange are appealing to retirees, particularly when such an exchange came with a promise of large monthly returns on which they could rely during their final years.

204.    Millcreek marketed that "Millcreek Commercial generates passive income for you."

205.    Typically, the Colliers/Long Parties bundled long-term, triple net leases with the sale of TIC interests.

206.    That is, they offered TIC interests in properties that already had leases in place with tenants.

207.    The lease connected with each TIC property was designed to be the income stream for the Colliers/Long Parties' targeted investors.

208.    Millcreek marketed their properties as a way to "leave the headaches of being a landlord behind."

209.    Millcreek also coaxed possible investors by saying "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer," as shown in this excerpt from Millcreek's website, on a page called "1031 Exchange":

# Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

210. Typically, a tenant was identified and acquired by the Developer Parties.

211. In or about 2020, the Colliers/Long Parties, under Long's direction, began marketing the Keller and Naperville Properties.

212. In or about 2021, the Colliers/Long Parties, under Long's direction, began marketing the Kennesaw Property.

213. The Colliers/Long Parties represented that the Keller Property was a former urgent care center that was renovated from 2019 to 2020.

214. The Colliers/Long Parties represented on the Keller Property's Offering Memorandum that rent commencement would be May 2021.

215. The Colliers/Long Parties represented that the Kennesaw Property was a former bank that was converted in 2021.

216.    The Colliers/Long Parties represented on the Kennesaw Property's Offering Memorandum that rent commencement would be in 2021.

217.    The Colliers/Long Parties represented that the Naperville Property was a newly constructed building completed in 2020.

218.    The Colliers/Long Parties represented on the Naperville Property's Offering Memorandum that rent commencement would be in 2020.

219.    According to the Colliers/Long Parties' marketing, the Keller, Kennesaw, and Naperville Properties were each under long-term lease to a single tenant.

220.    According to the Colliers/Long Parties' marketing, the Keller, Kennesaw, and Naperville Properties were backed by a corporate guarantor.

221.    Each of the Plaintiffs in this action purchased TIC interests for the desired purpose of deferring capital gains tax and to obtain an income-generating property.

222.    As part of each of Plaintiffs' purchases of TIC interests in the Keller, Kennesaw, and Naperville Properties, Colliers acted as the broker and received commission payments on each purchase.

**The Qualified Intermediaries/Referrers' Role in the Colliers/Long TIC Program**

223.    As part of their eventual investment in the Colliers/Long TIC Program, Plaintiffs were referred by, consulted with, and engaged the services of qualified intermediaries (herein, "Qualified Intermediaries").

224. Qualified intermediaries help exchangers such as Plaintiffs follow and comply with the complex legal rules governing 1031 exchanges, including special requirements for 1031 exchanges of TIC properties.

225. In some cases, Plaintiffs were referred to the Colliers/Long TIC program by an individual and/or business entity that was not a qualified intermediary and did not perform that Plaintiff's 1031 exchange, but referred Plaintiffs to the Colliers/Long TIC Program and endorsed, encouraged, and induced their investments (herein, "Referrers"). In most cases, Plaintiffs' respective Qualified Intermediaries referred Plaintiffs to the Colliers/Long TIC Program and endorsed, encouraged, and induced their investments.

226. Plaintiffs did not know at the time, and did not discover until much later, that some, and on information and belief all, of the Qualified Intermediaries and Referrers were being paid by the Colliers/Long Parties or their affiliates to refer them to the Colliers/Long TIC Program and conduct their exchanges.

227. As alleged more specifically herein, the Qualified Intermediaries and Referrers spoke of the Colliers/Long TIC Program in glowing terms and made specific misrepresentations of material facts and omitted to disclose key facts about the Colliers/Long TIC Program and the investments through it that they recommended to Plaintiffs.

228.    The Qualified Intermediaries also represented to Plaintiffs that, due to their expertise and professional qualifications, they could and would ensure that Plaintiffs' investments were 1031-compliant and advise Plaintiffs with respect to their investments' 1031-compliance.

229.    Additionally, to qualify as a 1031 exchange, purchases of TIC interests must also comply with requirements set forth in Revenue Procedure 2002-22. Some of these requirements include but are not limited to: co-owners holding a title to the Property, number of co-owners, no treatment of co-ownership as an entity, restrictions on alienation, that securities are non-eligible, and others.

230.    In reality, the Qualified Intermediaries did little or nothing to ensure that the investments they helped induce were 1031-compliant, and in at least some instances took deliberate steps that threatened the investments' 1031-compliant status. Numerous aspects of the investment were likely not compliant with IRS regulations, potentially exposing Plaintiffs to enormous tax liability that they specifically sought to avoid through the help of the Qualified Intermediaries and their investments through the Colliers/Long TIC Program.

231.    The IRS also identifies what qualifies as a "like-kind exchange," pertinent time limits to identify and complete an exchange, restrictions on "deferred and reverse exchanges", and how to report like-kind exchanges to the IRS in IRC Section 1031.

232.    A qualified intermediary should aid exchangers in identifying like-kind properties, complying with the timeline imposed by the IRS, and protecting exchangers from potential tax liabilities incurred by not adhering to §1031, Revenue Procedure 2002-22, and other applicable regulations.

233.    Upon information and belief, none of the defendants identified as qualified intermediaries in this suit ensured or verified that their clients, Plaintiffs, were compliant with the different regulations of Revenue Procedure 2002-22 and §1031.

234.    None of the Plaintiffs had ever heard of tenant-in-common properties.

235.    Many Plaintiffs had never done a 1031 Exchange before.

236.    None of the Plaintiffs had ever heard of Millcreek Commercial Properties beforehand.

237.    As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers recommended a TIC investment through the Colliers/Long TIC Program and assured the would-be owner that Millcreek had great TIC investment opportunities that would be 1031 exchange compliant.

238.    As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers pointed out that Millcreek had partnered with Colliers with respect to the TIC investments in the Colliers/Long TIC Program.

239.    As alleged more specifically herein, Plaintiffs' respective Qualified Intermediaries or Referrers counseled the respective Plaintiff with whom they were

dealing that a TIC investment through Millcreek partnered with Colliers would provide a 1031 compliant property that featured the kind of professional, safe, reliable, low-risk, and well-vetted investment that Plaintiffs were seeking.

240.   Upon information and belief, most or all of the Qualified Intermediaries and Referrers engaged in a referral agreement, referred to as an "Ambassador Agreement," with Millcreek Commercial and were paid a commission for successful referrals.

241.   The amount of commission each Qualified Intermediary or Referrer would receive was based on three tiers of sales, as pictured from a Millcreek Ambassador Agreement excerpt attached below.

| Calendar Year Sales Volume | |
| --- | --- |
| Up to $1,000,000 | 3.0% Commission |
| $1,000,000 to $2,000,000 | 3.5% Commission |
| Greater than $2,000,000 | 4.0% Commission |

MCP may, at their discretion, from time to time, offer additional cash, merchandise, or travel as incentives based on transaction or deal volume.

242.   None of the Qualified Intermediaries or Referrers mentioned to Plaintiffs that they would receive a commission or a similar type of compensation from the Colliers/Long Parties for the referral.

243.   On documents sent to the title companies used in each of Plaintiffs' TIC investments in this case, on information and belief, Millcreek instructed that the

Qualified Intermediaries' commissions should be reflected on the closing statement as a "Millcreek Commercial Cooperative Marketing Fee.".

244.    None of the Qualified Intermediaries or Referrers disclosed to Plaintiffs whether they had already engaged in the Ambassador Agreement, or even that it existed, with the Colliers/Long Parties before referring Plaintiffs to the Colliers/Long Parties.

### The Colliers/Long TIC Program Sales Pitch

245.    Plaintiffs communicated directly with representatives of Millcreek, including Long, Rutherford, Bell, Weber, Taylor, and McDougal.

246.    In addition, Colliers acted as the broker holding real estate agent licenses for Bell, McDougal, and on information and belief, other Millcreek representatives, agents, and employees.

247.     Each of the Millcreek representatives with whom Plaintiffs talked strongly recommended they invest in one of a portfolio of TIC properties sold by Millcreek.

248.    Each of the Plaintiffs was informed that a Millcreek TIC was a great investment because Millcreek always "hand-select[s] the best properties", as shown in this excerpt from Millcreek's promotional materials:



We help each of our investors enjoy monthly passive income by co-owning premium commercial real estate that is both recession-resilient and fully managed.  How do we achieve this?

**Removing Barriers to Investing in Commercial Real Estate**
First, we hand-select the best properties. Each property is thoroughly examined and vetted. It must meet at least three of these four criteria:

- Single tenant (avoids complexity)
- Long-term lease (15+ years reduces tenant shuffling)
- Triple net lease (tenants are responsible for improvements, taxes, maintenance, etc.)
- Backed by a corporate guarantee (a larger company guarantees the lease)

249.    Plaintiffs were told that "[i]n terms of commercial real estate, a 'bad investment' could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors,", as shown in this excerpt from Millcreek's website:

**Choosing a bad investment**
Another fear in the commercial real estate investment world may include choosing a bad investment. In terms of commercial real estate, a "bad investment" could equal a property that goes under, an unreliable tenant, or a property that requires extensive responsibility on part of the investor. Millcreek Commercial brings experience to the table by identifying and purchasing profitable properties that will benefit the portfolios of investors. One key way that Millcreek Commercial avoids a "bad investment" from the beginning is through purchasing properties with "recession resilience", or in other words, properties that have tenants who thrive in any economic environment.  The types of properties included in Millcreek Commercial's portfolio include pharmacies, convenience stores, and medical centers.

250.    Each Plaintiff was told that with every property, investors could "enjoy a quality property that has been identified and vetted by seasoned professionals,", as stated in this excerpt from the Millcreek website:

> After identifying the property, Millcreek will ensure that the property meets three of four requirements: single tenant, long-term lease, investment grade, and triple-net leased. In addition, Millcreek Commercial will travel to the property for a personalized inspection of the property, building, and the surrounding area. Millcreek Commercial's years of experience in identifying profitable properties allows investors to avoid having to fear getting stuck with a "bad investment". Their expertise can help investors enjoy a quality property that has been identified and vetted by seasoned professionals.

251.    Moreover, the Colliers/Long Parties represented that they had already secured "the tenant of your dreams" for the Keller, Kennesaw, and Naperville Properties.

252.    According to the Colliers/Long Parties, the tenant had already signed a 20-year lease with 2% annual increases and an average return on investment over that period of 6-9%.

253.    For some Plaintiffs, including Annabelle and Robert Barnes, Eric Carnrite, Charlie and Laura Brauer, Robert Myers, Karen Marion, Patti Klair, and Donald Patterson, Millcreek represented that the tenant was "such a good tenant" that they prepaid 6-8 months of rent in advance when these Plaintiffs closed on their purchase in the Keller Property.

254.    For other Plaintiffs, including Teena and Jose Rementeria, Bob and Ditas Tannehill, Katherine Madera, Patrick and Hildegard White, and Kurtis Manning, Millcreek represented that, after closing, they were receiving monthly payments of "rent" paid by the tenant when closing for the Keller Property.

255.    Millcreek represented the lease on each of its TIC properties in Keller, Kennesaw, and Naperville was triple-net ("NNN") – meaning the tenant, not the owner, would be responsible for paying taxes, paying insurance, and maintaining the property.

256.    Millcreek stated that "Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors.  Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather "benefit from a steady stream of passive income", as shown in this excerpt from an article from Millcreek Commercial titled "Investing Isn't Scary":

> Millcreek Commercial ensures that any commercial property has a corporate guarantee to protect investors. Investors with Millcreek Commercial properties can rest assured that they will not lose money, rather benefit from a steady stream of passive income.

257. Accordingly, the Colliers/Long Parties stated the lease was "backed by strength" by Healthcare Solutions Management Group, the guarantor on the lease and a member of the HSH Parties.

258. Millcreek represented that HSMG working "'in cooperation' with Millcreek" was developing a nationwide network of surgery centers.

259. The Colliers/Long Parties represented that HSMG was "a publicly traded medical service and device company", as shown in this excerpt from the Keller Property's Offering Memorandum:

**Backed By Strength**

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

HSH not only helps physicians deliver better healthcare but also assists them in remaining compliant with industry best practices.

260. The Colliers/Long Parties represented that "Healthcare Solutions Holdings, Inc. (HSH), meets [their] pillars for success", as shown in this excerpt from the Keller Property's Offering Memorandum:

**The Tenant of Your Dreams**

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

261. The Colliers/Long Parties represented that the lease was insured by the prestigious Lloyds of London insurance entity.

47

262.    The Colliers/Long Parties thus assured Plaintiffs that, even if the tenant defaulted in the first two years of a lease, Lloyds of London would pay a year of rent payments.

| Lease Type | Absolute NNN bonded |
|---|---|
| Landlord Responsibilities | Zero |
| Insurance/Taxes/CAM/Utilities | Tenant |
| ROFO | No |
| Estoppel | On file |
| Default Bond | 1 year of rent payments if in the first 48 months |
| Ownership Interest | Fee simple estate |

263.    The Colliers/Long Parties meant to imply, and Plaintiffs in fact inferred, that the involvement of Lloyds of London meant that reputable and reliable vetting and evaluation of the lease had been performed in connection with issuance of the bond.

264.     The Colliers/Long Parties told Plaintiffs that they could rest assured that the investment would be "safe, stable, [and] secure", as shown in this excerpt from marketing materials provided by Millcreek:

**Invest with Us**

At Millcreek Commercial, we take the benefits of investing in commercial real estate to the next level. Our "all-gain, no-pain model" produces monthly passive income, requires zero heavy-lifting, and tax-protects our co-owners.

Invest with us today and access premium commercial real estate that is a safe, secure, and stable place to put your hard-earned dollars to work.

265.    The Colliers/Long Parties represented that "every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction", as per this excerpt from Millcreek's Frequently Asked Questions page on their website:

## How is a purchase executed?

Every Millcreek Commercial transaction is treated with the same care and attention to detail that would occur in a typical $10 million commercial investment real estate transaction. After you have reviewed the Offering

266.    According to Millcreek Commercial, the Keller, Kennesaw, and Naperville Properties passed its "relative test."

267.    The "relative test," as Millcreek explained in its marketing material, was whether "we would sell [the property] to our mother, grandmother, best friend, or son".

268.    Millcreek Commercial stated that "our acquisition team only purchases properties that our principals want to hold in our portfolios", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**4. Philosophy and Core Values**

Our acquisition team only purchases properties that our principals want to hold in our portfolios. We purchase these properties debt free and then invite others to join us as Tenant In Common owners. Every property must pass the relative test – we would sell this to our mother, grandmother, best friend or son.

269. Millcreek stated that "we typically stay in our deals for the long term [...] This commitment provides our partners with added assurance that we believe in and are committed to our products", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

**5. Long Term Partners**

Millcreek Commercial typically stays in our deals for the long term. There are situations where we could sell all of a syndication, but our business model is for one of our partners or family member to stay in a deal for the long term. This commitment provides our partners added assurance that we believe in and are committed to our products.

270. The Colliers/Long Parties represented that they had done many such deals before.

271. Plaintiffs were told by the Colliers/Long Parties that Millcreek "utilizes Colliers International as [its] brokerage partner".

272. The Colliers/Long Parties represented to the Plaintiffs that the Colliers/Long partnership extended internationally inasmuch as Colliers was Millcreek's "global partner", as shown in this excerpt from an article on Millcreek's website titled "7 Reasons to Consider Millcreek Commercial":

## 2. A National Platform

Millcreek Commercial utilizes Colliers International as their brokerage partner and Old Republic Title to ensure the chain of title on every transaction. These two global partners along with Kevin's expansive network, provide Millcreek Commercial with an unsurpassed national platform.

273.    The Colliers/Long TIC Program's representatives communicated with Plaintiffs using their official Colliers email addresses.

274.    Colliers' logo was prominently placed right next to Millcreek's logo on every page of the Keller, Kennesaw, and Naperville Property Offering Memoranda.

275.    Colliers' logo was also prominently displayed on emails and marketing materials used by Long and other Millcreek Commercial Properties agents.

276.    Below is the front page of the Colliers/Long' parties Offering Memorandum for TIC investments in the Keller Property.



The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.



277.    Below is the heading of the second page of the Offering Memorandum for the Keller Property, again prominently featuring the logos of both Millcreek and its partner, Colliers International.



278.    On the front page of the Offering Memorandum, Millcreek and Colliers further state:

> The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

279.    Plaintiffs relied on each of these representations when each eventually purchased a TIC interest in the Keller, Kennesaw, and/or Naperville Properties.

**The Developer Parties' Role in the Colliers/Long TIC Program**

280.    While planning, developing, marketing, and selling the TIC offerings in the Colliers/Long TIC Program, the Colliers/Long Parties worked closely with developers, including ADP, Manny Butera, Jamie Butera, Steve Caton, and SARC US, Inc.

281.    Developers helped the Colliers/Long Parties identify and acquire potential tenants and properties, plan important aspects of the Colliers/Long TIC Program such as lease terms and sale prices to investors such as Plaintiffs, and

otherwise help coordinate and develop the TIC offerings in the Colliers/Long TIC Program.

282. Caton, SARC US, Inc., and Caton Commercial are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

283. ADP, Manny Butera, and Jamie Butera are not registered with FINRA (the Financial Industry Regulatory Authority) to sell securities.

284. Collectively, ADP, Butera, SARC US, Inc., and Caton, are referred to herein as the "Developer Parties."

285. While not all the Developer Parties are parties in this action, allegations regarding them are included as context for claims against Defendants.

286. Millcreek or its affiliates entered a series of contracts with one or more of the Developer Parties wherein the Developer Parties would develop and make renovations, improvements and construction on the Keller, Kennesaw, and Naperville Properties.

287. In approximately 2018, "Millcreek Commercial Properties [partnered] with American Development Partners to develop $50 million in single-tenant triple-net lease assets throughout the US."

288. "Millcreek [served] as the capital partner for American Development, which [would] build multiple single-tenant properties, including two facilities for Healthcare Solutions Holdings."

289.    Long stated: "They [ADP] have an extensive background in single tenant net lease product across the US.  We spent months exploring a venture together.  We have come together and are excited about the synergy that these two companies bring together for the American public."

290.    ADP played an instrumental role in the development and execution of the Colliers/Long TIC Program, including through helping to locate and acquire potential tenants including HSH and arranging lease terms and other essential aspects of property deals marketed and sold through the Colliers/Long TIC Program.

291.    Manny Butera communicated extensively with Kevin Long, Brent Smith, Mary Street from at least 2020-2022 as he helped develop and execute the Colliers/Long TIC Program.

292.    Jameson, LLC, dba American Development Partners, signed a "multi-unit development agreement" with HSMG and its affiliate Advance Care Medical, Inc., on or about July 29, 2018, under which HSMG or its affiliates agreed to enter 500 or more triple-net, 20-year leases with 2% annual rent increases and HSMG as the corporate guarantor.

293.    Manny Butera described ADP as the exclusive developer for HSH-affiliate Advance Care Medical.

294.    Two of these single-tenant properties that Millcreek contracted ADP to develop were the Keller Property and the Naperville Property.

295.    One of these single-tenant properties that Millcreek contracted SARC US, Inc. to develop was the Kennesaw Property.

296.    In about June 2021, SARC US, Inc. signed a lease agreement for the Kennesaw Property with an HSH-affiliate identified in the lease as "ADVANCE CARE MEDICAL KENNESAW GA – I, INC."

297.    On or about November 20, 2020, Jameson, LLC dba American Development Partners entered a "development contract" with Millrock under which Millrock agreed to disburse more than $10MM to ADP to pay for construction or renovation at the Keller Property.

298.    ADP, Manny Butera, and Jamie Butera knew or should have known that there was no realistic possibility of HSMG and its affiliates successfully entering into and servicing the leases at the Keller, Kennesaw, and Naperville Properties, let alone over 500 such leases.

299.    After HSH's default alleged herein at the Keller, Kennesaw, and Naperville Properties, the Colliers/Long Parties attempted to induce Plaintiffs at the Keller and Naperville Properties to re-tenant with Neuragenex.

300.    Jameson, LLC, dba American Development Partners, entered a "multi-unit development agreement" with Neuragenex, substantially similar to the one it entered with HSMG.

301.    ADP, Manny Butera, and Jamie Butera knew or should have known that there was no realistic possibility of Neuragenex entering into and successfully servicing triple-net, long-term leases under their agreement.

**Mary Street and CAMS Realty's Role in the Colliers/Long TIC Program**

302.    When Plaintiffs ultimately purchased the TIC interests in this case, they were introduced for the first time to Mary Street of CAMS Realty, whom the Colliers/Long Parties had enlisted as the lease administrator at the Keller, Kennesaw, and Naperville Properties, and whom the Colliers/Long Parties represented would fully manage the properties.

303.    To Plaintiffs, it initially appeared (and the other Colliers/Long Parties represented) that Mary Street was a neutral, professional, trustworthy third-party who would act in the new TIC owners' best interests as lease administrator.

304.    In reality, and as Plaintiffs did not fully discover until after the start of this litigation, Mary Street had a long history of professional collaboration with the Colliers/Long Parties in developing and implementing the Colliers/Long TIC Program.

305.    While purporting to represent Plaintiffs' best interests as owners of the ill-fated TIC investments offered by the Colliers/Long Parties, Mary Street collaborated with the Colliers/Long Parties to keep Plaintiffs and other investors in the dark and string them further along the disastrous path that was the Colliers/Long TIC Program.

306. Specifically, and as alleged more fully herein, Mary Street and CAMS Realty concealed and obfuscated the financial realities of Plaintiffs' investment, concealed the fact that there was no certificate of occupancy at the Keller Property and affirmatively misrepresented that there was a certificate of occupancy, and then after the failure of the HSH tenants, aided the Colliers/Long Parties in attempting to induce Plaintiffs to put up additional cash or sacrifice ownership interest to fund equipment purchases and renovations for a new, equally un-vetted tenant at the Keller and Naperville Properties.

307. At the Keller Property, Plaintiffs and other owners rejected the proposed new tenant; at Naperville, owners voted to lease the property to the new tenant, which, predictably and in the same basic pattern as the HSH tenants, promptly defaulted in its turn at Naperville and other Colliers/Long properties where it was tenanted.

**The Previous TIC Owners' Roles in the Colliers/Long TIC Program**

308. While the TIC interests ultimately purchased by Plaintiffs were marketed and sold to them by the Colliers/Long Parties, none of the TIC interests were owned by Millcreek or Colliers themselves.

309. Instead, the TIC interests Plaintiffs purchased through the Colliers/Long TIC Program were owned by Defendant Millrock Investment Fund 1, LLC, or a variety of other individuals or entities.

310. The Colliers/Long Parties did not disclose to Plaintiffs who really owned the TIC interests during the investment process, and Plaintiffs did not know that the TIC interests they were being induced to purchase were owned by other individuals and entities, not Millcreek or Colliers, until the final stages of the sale.

311. Some of the previous owners, such as Millrock Investment Fund 1, Mark Machlis, Lady Mira Blue Machlis, and Hello Bello, were affiliates of Millcreek Commercial and intentionally aided the development and execution of the Colliers/Long TIC Program, including through the development, marketing, and/or sale of Colliers/Long TIC offerings, including those in this case.

312. Additionally, because each purchased TIC interests in either the Keller, Kennesaw, or Naperville Properties, and then sold them to Plaintiffs at a drastically inflated rate, each received a direct financial benefit for their participation in the Colliers/Long TIC Program.

**Background of Defendants' Previous Schemes, Frauds, and Investigations**

313. Although Plaintiffs did not know it at the time, Plaintiffs have since discovered that many of Defendants, as well as several of the Qualified Intermediary and Developer parties, have previously been involved in similar TIC investment schemes, fraudulent activity, and SEC investigations.

314. Colliers International North Texas, LLC, and Colliers Nevada, LLC, which on information and belief are subsidiaries and agents of Defendants Colliers

International Group, Inc. and Colliers International Holdings (USA) Inc., were named as Defendants in Case No. 2:22-cv-00486, *Somerset At Sahara LLC v. Colliers International North Texas LLC, et al.,* in the United States District Court for the District of Nevada.

315. The plaintiff in that case alleged that Colliers' sales agents conspired in a fraudulent commercial real estate scheme. Colliers agents brokered and sold commercial properties under commercial leases with a medical company tenant. The tenant negotiated for and obtained generous allowances from the landlord for equipment acquisitions and renovations at the subject properties, but after receiving the money, immediately defaulted and failed to occupy the properties before substantially performing any of its lease obligations. Colliers' sales agents in that case made false and misleading representations of fact to investors about the strength and quality of the tenant and received commissions on each sale.

316. HSMG was named as a defendant in Case No. 21-107 in the Chancery Court for Maury County, Tennessee, in about March 2021. In that case, the plaintiff alleged that HSMG or one of its affiliates or subsidiaries entered a 20-year commercial lease, arranged by American Development Partners, with the prior owner of a commercial property. Plaintiff in that case then purchased the subject property and lease, and the HSMG-affiliated tenant defaulted almost immediately.

317. An offering memorandum exists listing the subject property for sale by Colliers agent Jim Morris and with Colliers' name, branding, and logo, similar to the

offering memoranda used in the Colliers/Long TIC Program.  On information and belief the plaintiff in that case relied on the Colliers-branded offering memorandum and purchased the subject property through Colliers with Colliers receiving a commission.

318.    ADP developed the lease at the subject property, for which the tenant was HSMG-affiliate Advance Care Medical, Inc., and for which HSMG was the corporate guarantor.

319.    Scott Rutherford was identified as a member of a principal party that operated a nearly identical TIC investment scheme in Case No. 2:19-cv-277 in the United States District Court for the District of Utah, filed April 23, 2019, and in Case No. 2:20-cv-00004 in the United States District Court for the District of Utah, filed January 3, 2020.

320.    The conspirators entered a consent decree with the Securities and Exchange Commission on December 30, 2020. Case No. 2:20-cv-918, Dkt. 7.

321.    On July 26, 2023, the DOJ filed an indictment against Scott L. Rutherford and other conspirators in that case, alleging wire fraud conspiracy.  The case is currently pending as Case No. 2:23-cr-00281.

322.    Plaintiffs allege that the Colliers/Long Parties knew or should have known that Scott Rutherford was named as a participant in a nearly identical fraudulent investment scheme.

323.    Connie Greenawalt and Eastern 1031 Starker Exchange were named as defendants in federal complaint 2:20-cv-004 for her involvement in referring potential investors to Rutherford.

324.    Plaintiffs allege that the Colliers/Long Parties knew or should have known that Connie Greenawalt and Eastern 1031 Starker Exchange were named as participants in a nearly identical fraudulent investment scheme.

325.    On April 25, 2013, a federal court in New York found Joshua Constantin and his related brokerage firm jointly and severally liable for $2.49 million, and Constantin and his related holding company jointly and severally liable for over $760,000. The court issued an opinion finding Constantin liable for fraud; noted that Constantin and his colleague had made a "litany of misrepresentations" to clients; found that Constantin had "diverted" investor funds "to his own purposes"; and found that Constantin had "provided clients with misleading documents to cover up the fraudulent nature of [his] investment scheme."

326.    The Millcreek Colliers Parties knew or should have known that Joshua Constantin was found liable for fraud in his past investment scheme.

327.    As of November 27, 2013, Joshua Constantin was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment adviser, or from associating with any broker, dealer, investment adviser,

municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court Southern District of New York.

328.   The Millcreek Colliers parties knew or should have known that Joshua Constantin was indefinitely barred by the SEC.

329.   Long justified this apparent oversight in a meeting on or about December 8, 2022, by admitting that "we're not in a practice of Googling individual executives of publicly traded companies".

330.   The HSH parties have defaulted on every operating lease in its portfolio—at least fourteen properties.

331.   Landes Capital was named as a defendant in a lawsuit styled Commodity Futures Trading Commission v. Financial Tree et al., case no. 2:20-cv-01184 in the United States District Court for the Eastern District of California. In this action, Financial Tree was found liable on claims of Commodity Option Fraud in Violation of 7 U.S.C. § 6c(b), Forex Fraud in violation of 7 U.S.C. § 6(b)(2)(A)-(C), among other claims. In this same action, Landes Capital was found liable on a claim of disgorgement for having received ill-gotten funds for which Landes Capital did not provide legitimate services and to which Landes Capital did not have a legitimate claim.

332.   The Colliers/Long Parties knew or should have known that Landes Capital was found liable for having received ill-gotten funds for which Landes Capital did not

provide legitimate services and to which Landes Capital did not have a legitimate claim.

333.    In or about October of 2006, Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee Nashville Division, a breach of lease agreement case.

334.    The Colliers/Long Parties knew or should have known that Emanuel Butera was named as a defendant in Case No. 3:06-cv-00938 in the United States District Court for the Middle District of Tennessee.

335.    In or about July 2022, Emanuel Butera and his associated entity Redstone, LLC were named as defendants in a similar real estate investment scheme in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

336.    The Colliers/Long Parties knew or should have known that Emanuel Butera was named as a defendant in Case No. 1:22-cv-22213-CMA in the United States District Court of the Southern District of Florida.

337.    In or about April 2020, Emanuel Butera was named as a defendant in Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside, a breach of contract and fraud real estate investment scheme.

338.    With respect to this information, Plaintiffs allege that Colliers/Long Parties knew or should have known that Emanuel Butera was named as a defendant in

Case No. 5:20-cv-00826 in the Superior Court of the State of California County of Riverside.

339. Justin Smith is the sole member of Landes Capital Management, LLC. He also has "voting and dispositive control" of the HSH shares held by Landes and Compagnie Trust Prive KB.

340. On information and belief, Justin Smith used Landes Capital Management, LLC and Landes and Compagnie Trust Prive KB as a façade for his personal operations, to siphon funds to himself, and/or promote fraud or injustice by siphoning funds away from HSMG to avoid its obligations under leases and contracts.

341. With respect to this information, Plaintiffs allege that the Colliers/Long Parties knew or should have known that Justin Smith was alleged to have used Landes entities for fraudulent purposes.

## MISREPRESENTATIONS AND OMISSIONS – QUALIFIED INTERMEDIARIES/REFERRERS

### Misrepresentations and Omissions to All Plaintiffs

342. Plaintiffs' Qualified Intermediaries held themselves out to Plaintiffs as competent professionals with the experience and expertise necessary to ensure that their clients' property exchanges through the Colliers/Long TIC Program would comply with applicable IRS regulations including section 1031 and Revenue Procedure 2002-22.

343.    The Qualified Intermediaries' purported expertise and reliability was instrumental to Plaintiffs' decisions to invest in the Colliers/Long TIC Program and to employ the services of the Qualified Intermediaries, not least because of the stringent timing requirements of 1031 exchanges and the complexity of navigating numerous IRS regulations.

344.    As Plaintiffs ultimately discovered and as described further herein, their investments in the Colliers/Long TIC Program suffered from numerous deficiencies that may render their investments noncompliant with IRS regulations.

345.    The Qualified Intermediaries and Referrers also made affirmative representations and omissions of material fact to Plaintiffs about the quality, safety, security, and stability of the Colliers/Long TIC Program and urged Plaintiffs to invest in it.

346.    The Qualified Intermediaries and Referrers made at least the following misrepresentations and omissions of material facts to individual Plaintiffs:

*Misrepresentations and Omissions to Robert and Annabelle Barnes*

347.    In about January and February of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange referred Robert and Annabelle Barnes to the Colliers/Long TIC Program.

348.    Shortly before January 30, 2022, on a phone call, Connie Greenawalt described Colliers/Long' TIC offerings to Robert and recommended them to him.

349.    She stated, among other things, that she had "upwards of $4M invested" herself, and just "gets a check every month."

350.    Greenawalt's statement was false, in that she had not herself invested in any of the Colliers/Long properties that she induced Robert and Annabelle Barnes to invest in.

351.    Greenawalt represented to Robert Barnes that there had not been a single complaint filed against them.

352.    This statement was false, in that she and Scott Rutherford, to whom she referred the Barnes, were previously co-defendants in another civil suit alleging TIC fraud in a nearly identical scheme.

353.    When Greenawalt referred the Barnes to Rutherford by email on or about January 30, 2022, she told Robert Barnes that "Millcreek offers commercial investment properties structured as tenants-in-common ownership in real properties which also pay a great rate of return."

354.    This statement was false, in that the HSH parties never paid any returns at all in either the Kennesaw or Keller Properties that the Barnes were induced to purchase, and in that third parties unknown to the Barnes, not Millcreek, were the previous owners from whom the Barnes were induced to purchase.

355.    Greenawalt told Robert Barnes that his investment was particularly safe with her, as she was an IRS agent and would probably be the one assigned if there was any audit of his purchase.

356.    This statement was false and misleading, as Greenawalt was not an IRS agent and had done little or nothing to vet the Barnes' investment for IRS compliance.

357.    Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

358.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Barnes to the Colliers/Long Parties.

359.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had been issued, that equipment and renovations were lacking, that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them, and that she had done little or nothing to verify or ensure that the Barnes' investment would comply with applicable IRS regulations.

360.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Barnes as they considered and ultimately chose to invest.

361.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Karen Marion*

362.    In about March and April of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange referred Karen Marion to the Colliers/Long TIC Program.

363.    By email on about March 15, 2022, Greenawalt told Karen Marion that the Colliers/Long' TIC offerings were "maintenance free to the owners and be[s]t of all – [paid] a great rate of return."

364.    This statement was false and misleading, as none of the Colliers/Long TIC offerings at issue in this case paid any return at all from the HSH tenants, and when the HSH tenants immediately defaulted, Karen Marion and other owners were immediately burdened with significant management and maintenance work.

69

365.    Greenawalt omitted to disclose key facts about purchase contracts for the properties in that she failed to disclose in a timely matter that there would be two contracts needing Karen Marion's signature.

366.    Greenawalt omitted to disclose that she had done little or nothing to verify whether Karen Marion's investments were compliant with applicable IRS regulations governing 1031 exchanges.

367.    Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

368.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring Karen Marion to the Colliers/Long Parties.

369.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

370.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to Karen Marion as she considered and ultimately chose to invest.

371.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Charles and Laura Brauer*

372.    In about March of 2022, Connie Greenawalt of 1031 Eastern Starker Exchange referred Charles and Laura Brauer to the Colliers/Long TIC Program.

373.    By email on about March 21, 2022, Greenawalt touted her reliability as a 1031 exchange company, with "never one single complaint ever filed against us" and having "never ever had one single client ever audited from their exchanges through Eastern 1031."

374.    These statements were false and misleading, as Greenawalt had previously been a co-defendant with Scott Rutherford, to whom she referred the Brauers, in a civil suit alleging TIC-related fraud in a nearly identical scheme.

375.    These statements were also false and misleading in that they assured the Brauers that their transactions through her would comply with IRS 1031 exchange

requirements when there was a substantial likelihood they did not, and Greenawalt had done little or nothing to verify or ensure that they would.

376. On about March 22, 2022, Greenawalt introduced the Brauers to Scott Rutherford by email. She represented that Colliers/Long TIC offerings would be "a wonderful fit for their retirement," in particular because of the "monthly income."

377. This statement was false and misleading, in that the Brauers were looking for a tax-deferred investment and Greenawalt had done little or nothing to verify or ensure that the Colliers/Long TIC offerings satisfied IRS tax deferral rules for TIC properties, and in that the tenant did not fulfill nor was able to fulfill its 20-year lease with attendant monthly income.

378. Greenawalt omitted to disclose that to qualify for tax deferral, the Brauers would need to hold the property for two years.

379. Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Brauers to the Colliers/Long Parties.

380. Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that

equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

381. Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Brauers as they considered and ultimately chose to invest.

382. As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Eric Carnrite and Elizabeth D'Alessandro*

383. In about March of 2022, Kyle Williams of IPX1031 referred Eric Carnrite and Elizabeth D'Alessandro to the Colliers/Long TIC Program.

384. On about March 2, 2022, Williams told Eric Carnrite that his firm's "protections we implement for our clients" were "the highest level in this industry," in an "unregulated market where billions of dollars have been lost by other companies due to fraud, cyber theft, and everything in between."

385. This statement was false and misleading, as Williams had done little or nothing to investigate or verify the quality of the Colliers/Long TIC Program and ensure that the TIC investments through it would be 1031-compliant, and completely failed to

73

protect Eric Carnrite and Elizabeth D'Alessandro, his clients, from the fraud or negligence of the Colliers/Long Parties to whom he recommended them.

386. On about March 30, 2022, Williams told Eric Carnrite that he was "a disinterested party."

387. This statement was false and misleading, as, on information and belief, Williams expected to and actually did receive a financial benefit for referring Eric Carnrite and Elizabeth D'Alessandro to the Colliers/Long Parties.

388. Williams further told Eric Carnrite that "Millcreek is owned by Colliers" and that Trevor Weber, to whom Carnrite and D'Alessandro were referred by him, was "a Licensed Commercial Real Estate Agent with Colliers International," upon which Carnrite and D'Alessandro relied for Colliers' reputation as they made their decision to invest.

389. This statement was false and misleading in that it assured Eric Carnrite that rigorous due diligence had been done by the Colliers/Long Parties on all material aspects of the investment.

390. Carnrite and D'Alessandro had initially contacted Williams to inquire about another kind of investment called a DST. Williams spontaneously suggested and recommended that they invest in a TIC offering through the Colliers/Long TIC Program.

391. Williams omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

392. Williams' false and misleading statements and his omissions of facts were material in that they altered the mix of information available to Eric Carnrite and Elizabeth D'Alessandro as they considered and ultimately chose to invest.

393. As to Williams' misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

### *Misrepresentations and Omissions to Patti Klair*

394. In about August through December of 2021, Connie Greenawalt of Eastern 1031 Starker Exchange referred Patti Klair to the Colliers/Long TIC Program.

395. On about August 20, 2021, by email, Greenawalt told Patti Klair that the Colliers/Long TIC Program would provide her with a TIC investment "pay[ing] a great rate of return – and the best part – maintenance free to you."

396. This statement was false and misleading, as the Keller Property that Patti Klair was induced to purchase into never paid any returns at all, nor did it ever have a tenant remotely capable of servicing the advertised lease. When the HSH tenants defaulted at the Keller Property, Patti Klair was immediately saddled with onerous maintenance and management responsibilities along with the other owners.

397. Greenawalt told Patti that she had recommended several clients to the Colliers/Long TIC Program and that this type of investment was "common practice" in 1031 exchanges.

398. This statement was false and misleading, as it implied that her other representations and the Colliers/Long Parties' representations about the Colliers/Long TIC Program were true, and that Greenawalt had sufficient knowledge to attest to the quality of the proposed investment and its compliance with applicable IRS regulations, when in fact she had done little or nothing to verify the compliance of the investment with applicable IRS regulations.

399. Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring Patti Klair to the Colliers/Long Parties.

400. Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was

equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

401. Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to Patti Klair as she considered and ultimately chose to invest.

402. As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Katherine Madera*

403. In about August and September of 2021, Max Hansen of Accruit referred Katherine Madera to the Colliers/Long TIC Program.

404. On about August 30, 2021, Hansen represented to Katherine Madera that there was $5.1MM available in the Keller Property, with a 20-year lease.

405. This statement was false and misleading, as it was based on an exorbitant overvaluing of the Keller Property completely unmoored from fair market rates, and the HSH tenant at the Keller Property was insolvent and wholly unable to service a 20-year lease.

406.   Hansen urged Katherina Madera to invest in the Keller Property, highlighting the annual rent increases, the triple-net nature of the lease, and the absence of landowner responsibilities.

407.   Hansen omitted to mention the financial benefits that, on information and belief, he anticipated receiving and ultimately did receive, by referring Katherine Madera to the Colliers/Long Parties.

408.   Hansen omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

409.   Hansen omitted to disclose that he had done little or nothing to verify or ensure that Katherine Madera's investment would comply with applicable IRS regulations governing 1031 exchanges.

410.   Hansen's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to Katherine Madera as she considered and ultimately chose to invest.

411.   As to Hansen's misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with

reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Kurtis Trent Manning*

412.    On or about October 5, 2021, Rob Rettinhouse referred Kurtis Trent Manning to the Colliers/Long TIC Program and sent him links to Colliers/Long' marketing materials.

413.    In his initial conversation with Kurtis Trent Manning, Rettinhouse said that his grandfather had invested in Millcreek's properties a few years prior and they had done very well for him.

414.    After an initial meeting with Trevor Weber and Rettinhouse, Kurtis Trent Manning emailed them on or about October 8, 2021, and asked about the seemingly overinflated lease price per square foot at the Keller Property.

415.    Rettinhouse omitted to disclose that the proposed lease rates were far above the market standard for commercial properties.

416.    On or about October 18, 2021, Rettinhouse instructed Kurtis Trent Manning in how to fill out his closing documents, specifically saying that "The date you [Trent] need to fill in is 7/6/2021."

417.    Rettinhouse omitted to disclose possible tax liabilities that Kurtis Trent Manning may incur from backdating documents, including by potentially making his exchange 1031-inelegible.

418.    On or about October 25, 2021, while advising as to different properties that Kurtis Trent Manning could invest in, Rettinhouse said that he had reviewed the Millcreek investment opportunities.

419.    This statement was false and misleading, as Williams had done little or nothing to investigate or verify the quality of the Colliers/Long TIC Program, and completely failed to protect Kurtis Trent Manning, his client, from the fraud or negligence of the Colliers/Long Parties to whom he recommended him.

420.    Rettinhouse failed to disclose the financial benefits he anticipated receiving, and ultimately did receive, by referring Kurtis Trent Manning to the Colliers/Long Parties.

421.    Rettinhouse omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

422.    Rettinhouse omitted to disclose that he had done little or nothing to verify whether Kurtis Trent Manning's investment would comply with applicable IRS regulations governing 1031 exchanges.

423.    Rettinhouse's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to Kurtis Trent Manning as he considered and ultimately chose to invest.

424.    As to Rettinhouse's misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Carl and Lynn McQueary*

425.    In about September of 2021 through January of 2022, Max Hansen of Accruit referred Carl and Lynn McQueary to the Colliers/Long TIC Program.

426.    On about September 3, 2021, Hansen suggested that, instead of alternative investments the McQuearys were considering, they should invest in the Keller Property.  He represented to the McQuearys that the Keller Property was worth $20MM with a triple net lease, no owner responsibility, and annual rent increases, adding that "[it] looks good."

81

427. These statements were false and misleading, as it exorbitantly overvalued the Keller Property, the HSH tenant promptly defaulted with no payments on the lease at all (let alone increases), the owners including the McQuearys were promptly burdened with owner responsibilities.

428. Starting on or about September 14, 2021, and continuing at least until December 9, 2021, Max Hansen and his representatives represented to the McQuearys that they would be purchasing a 2.5% interest in the Keller Property.

429. This statement was false and misleading, as it overinflated the projected share the McQuearys were going to have in the Keller Property, including their influence in making ownership decisions.

430. Further, this misled the McQuearys to identify the Keller Property in a particular way on their IRS filings, putting their 1031 exchange at risk of not being compliant with applicable regulations.

431. Despite regarding the McQuearys as "old family friends," Hansen omitted to mention the financial benefits that on information and belief he anticipated receiving, and ultimately did receive, by referring the McQuearys to the Colliers/Long Parties.

432. Hansen omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was

equally insolvent and unreliable, that no bond from Lloyds of London had been issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

433. Hansen omitted to disclose that he had done little or nothing to verify whether the McQuearys' investment would comply with applicable IRS regulations governing 1031 exchanges.

434. Hansen's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to the McQuearys as they considered and ultimately chose to invest.

435. As to Hansen's misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Robert Myers*

436. In about January of 2022, Scott King referred Robert Myers to the Colliers/Long Parties and encouraged him to invest in one or more Colliers/Long TIC offerings.

437. After initially referring him to Millcreek agent Andrew Bell, Scott King made contact with Robert Myers again to encourage him to invest, and was present on

all or nearly all the phone calls and cc'd on all or nearly all emails that Robert Myers

had with Andrew Bell, and tacitly endorsed Andrew Bell's representations of material

fact alleged herein.

438.    Through phone and email communications he told Robert Myers that

Millcreek's TIC offerings were fully backed by Colliers and that Robert Myers didn't

need to worry about it and could trust it without reservation.

439.    Scott King told Robert Myers that the Colliers/Long TIC Program would

be a far better investment than another alternative that Robert Myers had been

considering.

440.    Scott King told Robert Myers that the Keller Property he ultimately

invested in was backed by a bond and that construction would finish in July for the

tenant to occupy the building.

441.    Robert Myers asked Scott King if he had experience with prior clients

investing with Millcreek.  Scott King replied that he did and that his prior clients had a

very successful experience with the Colliers/Long Parties.  He assured Robert Myers

that he was familiar with Millcreek and its employees and leadership.

442.    These statements were false and misleading in that there was little or no

vetting done on the tenant and other key aspects of the investment by the Colliers/Long

Parties, there was no bond at the Keller Property, that Scott King's prior clients

referred to had not had a successful investment through the Colliers/Long TIC

Program, and Scott King did not have a reasonable basis to make the affirmative representations he made.

443. Scott King omitted to mention the financial benefits he anticipated receiving, and ultimately did receive, by referring Robert Myers to the Colliers/Long Parties.

444. Scott King omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had been issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

445. Scott King omitted to disclose that he had done little or nothing to verify whether Robert Myers' investment was compliant with applicable IRS regulations governing 1031 exchanges.

446. Scott King's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to the Robert Myers as they considered and ultimately chose to invest.

447. As to Scott King's misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he

either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

448. In about January of 2022, Kyle Williams of IPX1031 began to communicate and work with Robert Myers with respect to his investment in the Colliers/Long TIC Program.

449. On about January 6, 2022, Williams told Robert Myers that his firm's "protections we implement for our clients" were "the highest level in this industry," in an "unregulated market where billions of dollars have been lost by other companies due to fraud, cyber theft, and everything in between."

450. Williams additionally stated that his firm's "nationwide staff" included "industry experts" and "veteran attorneys."

451. These statements were false and misleading, as Williams had done little or nothing to investigate or verify the quality of the Colliers/Long TIC Program, and completely failed to protect Robert Myers, his client, from the fraud or negligence of the Colliers/Long Parties to whom he recommended them.

452. Williams omitted to disclose the financial benefit that, on information and belief, he received for referring Robert Myers to the Colliers/Long Parties.

453. Williams omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was

equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

454.    Williams omitted to disclose that he had done little or nothing to ensure or verify that Robert Myers' investment would comply with applicable IRS regulations governing 1031 exchanges.

455.    Williams' false and misleading statements and his omissions of facts were material in that they altered the mix of information available to Robert Myers as they considered and ultimately chose to invest.

456.    As to Williams' misrepresentations alleged herein, he either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to his omissions alleged herein, he either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Donald Patterson*

457.    By email on about November 9, 2021, Greenawalt touted her reliability as a 1031 exchange company, with "never one single complaint ever filed against us" and having "never ever had one single client ever audited from their exchanges through Eastern 1031."

458.    These statements were false and misleading, as Greenawalt had previously been a co-defendant with Scott Rutherford, to whom she referred to Donald Patterson, in a civil suit alleging TIC-related fraud.

459.    These statements were also false and misleading in that they assured Donald Patterson that his transactions through her would comply with IRS 1031 exchange requirements when there was a substantial likelihood they did not.

460.    Greenawalt told Patterson that her previous clients had invested through Millcreek with great success.

461.    This statement was false and misleading in that it assured Donald Patterson that the Colliers/Long TIC Program had a reliable track record of success and that his investment would likely be successful.  On information and belief few or none of Greenawalt's previous clients' investments through Millcreek were financially successful.

462.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring Donald Patterson to the Colliers/Long Parties.

463.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that

equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

464.    Greenawalt omitted to disclose that she had done little or nothing to verify whether Donald Patterson's investment was compliant with applicable IRS regulations governing 1031 exchanges.

465.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to Donald Patterson as he considered and ultimately chose to invest.

466.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Teena and Jose Rementeria*

467.    In about July 2021, Scott King referred the Rementerias to the Colliers/Long TIC Program, urged them to purchase a TIC through the Colliers/Long Parties, and sent them Marketing Materials.

468.    Scott King omitted to disclose the financial benefit that he expected to receive, and ultimately did receive, for referring the Rementerias to the Colliers/Long TIC Program.

469.    King omitted to disclose key facts about the Colliers/Long TIC Program, in that he failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

470.    King omitted to disclose that he had done little or nothing to verify whether the Rementerias' investment was compliant with applicable IRS regulations governing 1031 exchanges.

471.    King's false and misleading statements and his omissions of facts were material in that they altered the mix of information available to the Rementerias as they considered and ultimately chose to invest.

472.    As to King's misrepresentations alleged herein, King either knew or should have known that his statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to King's omissions alleged herein, King either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

473.    By about July 29, 2021, Mark Adams of Beutler Exchange began working with the Rementerias to conduct their 1031 exchange in connection with their investment in the Colliers/Long TIC Program.

474.   Mark Adams omitted to disclose that he had done little or nothing to verify or ensure that the Rementerias' investment was compliant with applicable IRS regulations, including Section 1031 and Revenue Procedure 2002-22.

475.   Mark Adams omitted to provide substantive consultation or ensure that the replacement property selected by Jose and Kathy Rementeria complied with IRS 1031 exchange requirements, including TIC-specific rules.

476.   Mark Adams' omissions were material in that they altered the mix of information available to Jose and Kathy Rementeria as they considered and ultimately completed their 1031 exchange.

477.   As to Adams' omissions alleged herein, Adams either knew or should have known that his omissions were material and that he had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Tony Schaker*

478.   In about November 2021, Connie Greenawalt introduced Tony Schaker to Scott Rutherford and the Colliers/Long TIC Program by email.

479.   When Greenawalt referred Tony Schaker to Rutherford by email on or about November 2, 2021, she told him that "Millcreek offers commercial investment properties structured as tenants-in-common ownership in real property ... Can you please show Tony some of the properties Millcreek has to offer?"

480.    Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

481.    Greenawalt told Tony Schaker that she used to audit exchanges such as the one she would help him conduct in the course of his investment.

482.    This statement was false and misleading as it implied that Greenawalt had taken due care to ensure and verify that Tony Schaker's investment would comply with applicable IRS regulations governing 1031 exchanges.

483.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring Tony Schaker to the Colliers/Long Parties.

484.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

485.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to Tony Schaker as he considered and ultimately chose to invest.

92

486.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Robert and Ditas Tannehill*

487.    In about August 2022, Connie Greenawalt referred Robert and Ditas Tannehill to the Colliers/Long TIC Program.

488.    Connie Greenawalt told Robert and Ditas Tannehill that she and Eastern 1031 Starker Exchange had "never ever had one single client ever audited for their exchanges" and "never one single complaint ever filed against us."

489.    These statements were false and misleading, in that she and Scott Rutherford, to whom she referred the Tannehills, were previously co-defendants in another civil suit alleging TIC fraud in a nearly identical scheme.

490.    Greenawalt told the Tannehills that she was an IRS agent and one of their go-to experts for 1031 exchange questions.

491.    This statement was false and misleading in that it assured the Tannehills that Greenawalt had taken and would take reasonable steps to verify and ensure their investment's compliance with applicable IRS regulations governing 1031 exchanges.

492.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Tannehills to the Colliers/Long Parties.

493.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

494.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Tannehills as they considered and ultimately chose to invest.

495.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

*Misrepresentations and Omissions to Patrick & Hildegard White*

496.    In about January 2022, Connie Greenawalt introduced Patrick and Hildegard White to Scott Rutherford by email.

497.    When Greenawalt referred the Whites to Rutherford by email on or about January 20, 2022, she told Patrick White that "Millcreek offers commercial investment properties structured as tenants-in-common ownership in real properties which also pay a great rate of return."

498.    Greenawalt omitted to mention that she had previously been a co-defendant with Rutherford in a civil suit alleging TIC fraud in a nearly identical scheme.

499.    Greenawalt omitted to mention the financial benefits she anticipated receiving, and ultimately did receive, by referring the Whites to the Colliers/Long Parties.

500.    Greenawalt omitted to disclose key facts about the Colliers/Long TIC Program, in that she failed to disclose that the HSH parties were insolvent and utterly incapable of fulfilling their lease obligations, that their corporate guarantor was equally insolvent and unreliable, that no bond from Lloyds of London had issued, that equipment and renovations were lacking, and that the Colliers/Long Parties were grossly overvaluing their properties and the leases on them.

501.    Greenawalt omitted to disclose that she had done little or nothing to verify whether the Whites' investment was compliant with applicable IRS regulations governing 1031 exchanges.

502.    Greenawalt's false and misleading statements and her omissions of facts were material in that they altered the mix of information available to the Whites as they considered and ultimately chose to invest.

503.    As to Greenawalt's misrepresentations alleged herein, Greenawalt either knew or should have known that her statements were false or misleading or made them with reckless disregard to their truth or falsity, and as to Greenawalt's omissions alleged herein, Greenawalt either knew or should have known that her omissions were material and that she had a duty to disclose the truth of them.

## MISREPRESENTATIONS AND OMISSIONS – COLLIERS/LONG PARTIES

### Misrepresentations and Omissions to All Plaintiffs

504.    Long, Rutherford, Bell, Weber, Taylor, and McDougal provided written marketing materials, including materials in electronic form, to all of the Plaintiffs.

505.    This included Offering Memoranda for each of the Keller, Kennesaw, and Naperville Properties, and property descriptions on their website.

506.    Together, these materials are referred to herein as the "Marketing Materials."

507.    The Colliers/Long Parties developed the Marketing Materials with input from the Developer Parties and the HSH Parties, and the Developer Parties and HSH Parties were aware of and approved, either expressly or tacitly, all of the content of the Marketing Materials.

508.    Rutherford, Taylor, Bell, Weber, and McDougal reviewed and were made aware of the information contained in the Marketing Materials.

509.    Rutherford, Taylor, Bell, Weber, and McDougal distributed the Marketing Materials to each Plaintiff with whom they had contact by means including but not limited to:

    a.    Emailing the Marketing Materials.

    b.    Directing Plaintiffs to the Marketing Materials through the Millcreek website.

*Misrepresentations in Marketing Materials to All Plaintiffs*

510.    The Marketing Materials provided by the Colliers/Long Parties represented that tenant (HSH) was a publicly traded medical company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools, as shown in this excerpt from the Keller Offering Memorandum:

### Backed By Strength

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

511.    With respect to this misrepresentation, Plaintiffs allege as follows:

512.    The representation is false, because HSH is a shell company with little or no revenue, business operations, or assets.

97

513.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial solvency of the tenant company.

514.    The Colliers/Long Parties knew or should have known that HSH Parties did not have the capital or the cashflow to service rent payments on leases at the Keller, Kennesaw, or Naperville Properties.

515.    The Marketing Materials provided by Colliers/Long represented that HSH "will capture revenue and margins that have historically been 'lost,'" resulting in "significantly enhanced operating margins."

516.    With respect to this misrepresentation, Plaintiffs allege as follows:

517.    This representation is false, because HSH is a shell company without the genuine business operations necessary to capture any meaningful revenue or margins at all.

518.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial status of the tenant company.

519.    Colliers/Long Parties knew or should have known that HSH was patently unable to make good on this representation.

520.    The Marketing Materials provided by Colliers/Long represented that "ACM, in cooperation with HSH will sign a 20-year NNN lease with 2% rent escalations annually," as shown in this excerpt from the Keller Offering Memorandum:

## The Tenant of Your Dreams

Millcreek Commercial is developing properties specifically for Advance Care Medical. ACM, in cooperation with Healthcare Solutions Holdings, Inc. (HSH), meets our pillars for success. With each property, ACM will sign a 20-year NNN lease with 2% rent escalations annually, all backed by an HSH corporate guarantee and insured by Lloyds of London.

521.    With respect to this misrepresentation, Plaintiffs allege as follows:

522.    This representation is false, because HSH did not have the financial ability to commit to a 20-year NNN lease with 2% rent escalations annually.

523.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of the investment and the viability of the tenant.

524.    Colliers/Long Parties knew or should have known that HSH did not have the financial ability to commit to and service 20-year NNN leases with 2% annual rent escalations.

525.    The Marketing Materials provided by Colliers/Long represented that the Keller, Kennesaw, and Naperville Leases were "all backed by an HSH corporate guarantee."

526.    With respect to this misrepresentation, Plaintiffs allege as follows:

527.    This representation was false, because neither HSH nor any of the HSH Parties had the financial capability to fulfill this obligation.

528.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial viability of the tenant and the risk profile of the investment.

529.    Colliers/Long Parties knew or should have known that HSH was incapable of providing a reliable corporate guarantee.

530.    The Marketing Materials provided by Colliers/Long represented that the leases bundled with the Keller, Kennesaw, and Naperville Properties were "insured by Lloyds of London."

531.    With respect to this representation, Plaintiffs allege as follows:

532.    This representation was false, because Lloyds of London never insured the leases bundled with the Keller, Kennesaw, or Naperville Properties.

533.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

534.    The Colliers/Long Parties knew or should have known that HSH did not secure this bond from Lloyds of London.

*Omissions of Material Fact to all Plaintiffs*

535.    Millcreek made the following omissions of material fact:

536.    Millcreek omitted to disclose their sale of their TIC ownership in the Keller, Kennesaw, and Naperville Properties, even though they represented to Plaintiffs that they would always retain 5% to 20% ownership.

537.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the profile of Millcreek/Collier's risk in the Keller, Kennesaw, and Naperville Properties.

538.    Millcreek omitted to disclose that public SEC filings stated that HSH underwent a reverse merger in order to go public.

539.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

540.    Millcreek omitted to disclose that public SEC filings stated that HSH's supposed assets disclosed as part of their reverse merger appear to be merely loans.

541.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the financial stability and viability of the tenant and its affiliate entities.

542. Millcreek omitted to fully and fairly disclose that the tenant was late to pay rent as early as December 2021.

543. This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

544. The Colliers/Long Parties omitted to disclose that the tenant was late on rent and continued to represent to potential buyers that the tenant was a "tenant of your dreams".

545. This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

546. Millcreek omitted to timely disclose that its affiliate entity Millrock Investment Fund 1, LLC, or other undisclosed and unknown entities and individuals, not Millcreek Commercial itself, held TIC interests in the Keller Property and would sell their TIC interests to Plaintiffs.

547. This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, Millcreek's risk profile in its own TIC investments.

548. Millcreek omitted to include financial reports about HSH in the due diligence materials for Keller, Kennesaw, and Naperville.

549.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, HSH's financial viability. It also encouraged Plaintiffs to rely on Millcreek's other false representations about the financial strength of HSH.

550.    Upon information and belief, the Colliers/Long Parties made other misrepresentations and omissions regarding material facts in order to induce Plaintiffs' investment, which will be further uncovered and alleged as a result of the discovery process in this action.

### Misrepresentations and Omissions Regarding the Keller Property

*Misrepresentations and Omissions to All Keller Plaintiffs*

551.    The Marketing Materials given to all Plaintiffs made a series of untrue and misleading misrepresentations to induce investments into the Keller Property.

552.    The Marketing Materials provided by the Colliers/Long Parties represented that the TIC interests sold as part of the Colliers/Long TIC Program were not securities under federal law, as shown in this excerpt from the Offering Memorandum for the Keller Property:

The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com

Millcreek Commercial | 2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

553.    With respect to this misrepresentation, Plaintiffs allege as follows:

554.    The representation is false, because the TIC interests are securities under federal law and under the applicable laws of several states.

555.    The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Defendants' trustworthiness, the legal status of the investment, and the regulatory environment concerning the investment.

556.    The Marketing Materials provided by the Colliers/Long Parties represented that HSH was poised to create the most extensive branded system in the country, as shown in this excerpt from the Offering Memorandum:

## Surgical Ambulatory Regional Centers (SARC)

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

557. With respect to this misrepresentation, Plaintiffs allege as follows:

558. This representation is false, because HSH was a shell company unable to occupy and conduct business at even the Keller Property, much less extend its "operations" across the country.

559. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial strength and business aptitude of the Keller tenant.

560. Colliers/Long Parties knew or should have known that HSH Parties were not financially stable enough to "create the most extensive branded system in the country."

561. The Marketing Materials provided by the Colliers/Long Parties represented that the Keller Property's fair market value was as much as $21MM, but always more than $4MM, depending on the version of the

## Property Information

| Tenant | Surgical Ambulatory Regional Centers |
| --- | --- |
| Location | 1220 Keller Parkway, Keller, TX |
| Property Type | Freestanding, Medical |
| Building Size | 10,260 SF |
| Purchase Price | $21,336,982 |
| Cap Rate | 6.00% |

Offering Memorandum given to each Plaintiff.

562.    With respect to this misrepresentation, Plaintiffs allege as follows:

563.    This representation was false, because the Keller Property is likely worth only approximately $4MM, but in any case much less than $21MM.

564.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the Keller Property.

565.    The Colliers/Long Parties knew or should have known that the actual value of the Keller Property was substantially lower than $21MM.

566.    Millcreek represented that the renovations on the building on the Keller Property would be minimal because "[t]he facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model", as shown in this excerpt from the Offering Memorandum:

### The Property History

This 10,250 SF facility was originally constructed as a freestanding Emergency Room facility five years ago. Due to reductions in reimbursement rates and other business decisions the tenant mothballed the facility after only six months of use. They have continued to pay rent. The facility remains in as new conditions and many of the ER elements lend themselves very well to a conversion to the SARC Ambulatory Surgery Center model.

567.    With respect to this misrepresentation, Plaintiffs allege as follows:

568.    This representation was false, because required renovations were so extensive that, left uncompleted, the building would be unfit for occupation by any tenant.

569.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment.

570.    The Colliers/Long Parties knew or should have known that the building on the Keller Property was not in "as new conditions" and would require extensive renovations.

571.    The Millcreek/Collies parties represented that the Keller Property was a "state of the art" SARC.

572.    With respect to this misrepresentation, Plaintiffs allege as follows:

573.    This representation was false, because required renovations had not been completed on the Keller Property, so it could not be a "state of the art" SARC.

574.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile and value of their investment.

575.    The Colliers/Long Parties knew or should have known that the building on the Keller Property was not a "state of the art" SARC.

576.    The Colliers/Long Parties omitted to timely disclose that Millcreek was the party paying the "rent" payments that Plaintiffs received, rather than the tenant.

577.    This omission concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the reliability and financial viability of the tenant.

*Misrepresentations to Robert and Ditas Tannehill*

578.    In or about May 2021, Robert and Ditas Tannehill began considering a 1031 exchange property for an apartment complex they owned as a way for them to simplify their life and begin the process of retirement.

579.    In June 2021, the Tannehills put their apartment complex on the market and began looking for a suitable 1031 exchange property.

580.    The Tannehills were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

581.    From approximately May to December 2021, through emails, phone calls, and other communications, Scott Rutherford made many representations to the Tannehills to induce their investment in the Keller Property. Specifically, Rutherford stated to the Tannehills:

  a.  That the Keller Property was already occupied by its tenant.

  b.  That the Keller Property was in operation as a "state of the art" SARC facility.

  c.  That the tenant was "solid" and that their 6% return would be guaranteed for 20 years.

d.  That their TIC investment in the Keller Property would be "turnkey"—that is, the Tannehills would not have to do anything (or very little) to manage their TIC investment.

e.  That due to Colliers' involvement and the safe, secure nature of Millcreek's investment strategy, it would be easy for the Tannehills to sell their TIC interest if they desired to do so at a later point.

f.  That there was "always a buyer for the property" and that when they sold their share, they would get their cash "within 24 hours of close".

g.  That the Keller Property was "going fast" and that they would have to move quickly to purchase a TIC ownership in the same, per an email correspondence in or about July 2021.

582.  Scott Rutherford omitted material facts in discussing the Keller Property with the Tannehills:

a.  Rutherford failed to provide the Tannehills with a link to the online portal containing due diligence information.

b.  Rutherford failed to provide the Tannehills with the tenant lease agreement until after the tenant defaulted.

c.  Rutherford failed to provide the Tannehills with the final recorded deed.

d.  Rutherford failed to disclose that the building was still undergoing renovations.

e. Rutherford failed to disclose that the certain disbursed payments represented as "rent" would not be rent payments from the tenant, but from the Colliers/Long Parties.

*Misrepresentations to Jose and Teena Rementeria*

583.    In approximately May 2021, Jose and Teena Rementeria and Secure Self Storage, LLC were referred to Andrew Bell to help them find a suitable 1031 exchange property.

584.    From May to July 2021, through emails, phone calls, and other communications, Andrew Bell made at least the following representations to the Rementerias in order to induce their investment in the Keller Property:

a. That they would "never have to worry" about this investment since the tenant was on a 20-year lease with a guaranteed 6% return.

b. That a TIC investment in the Keller Property would provide a cashflow with a "good company".

c. That the purchase price of the building was about $15 MM.

d. That payments distributed to the Rementerias were rent from the tenant.

e. That the tenant for the Keller Property had been vetted by Millcreek in collaboration with Colliers.

585.    Andrew Bell made at least the following omissions of material fact to the Rementerias as he induced their investment in the Keller Property:

a. Bell failed to disclose that the Keller building was undergoing significant renovations.

b. Bell failed to provide the Rementerias with an Assignment of Lease.

c. Bell failed to disclose that the Rementerias would not be buying their share from Millcreek Commercial, but rather from a previously unknown entity, Millrock Investment Fund 1.

d. Bell failed to disclose the commissions paid to Qualified Intermediary and Referrer parties, Millcreek Commercial, and Colliers International as a part of the sale transaction.

*Misrepresentations to Robert Myers*

586. On February 25, 2022, Robert Myers was referred to Andrew Bell to help him find a suitable 1031 exchange property.

587. From approximately February to April 2022, through emails, phone calls, and other communications, Andrew Bell made at least the following representations to Robert Myers in order to induce his investment in the Keller Property:

a. That Colliers was a Millcreek partner on the Keller Property deal, and that this was a "Collier's Deal".

b. That Colliers did the due diligence for the Keller Property deal, and that the investment opportunity was therefore especially trustworthy.

c. That the Keller Property was debt-free with a cash flow of 6% annually.

111

d.  That the tenant was a "solid" public company with corporate guarantees and "totally vetted by Millcreek/Colliers".

e.  That there was a bond to guarantee the lease and ensure rent payments.

f.  That the Keller Property was a newly remodeled, state of the art surgery center almost equivalent to a hospital.

g.  That all of the surgery center equipment would be in place and renovations completed in July 2022.

h.  That the tenant was ready to occupy the Keller Property in July 2022.

i.  That TIC ownership was "liquid" and Millcreek would buy Myers' TIC interest in the future if Myers decided to sell it.

j.  That Millcreek would retain 5% to 20% ownership in the Keller Property.

588.  Andrew Bell made at least the following omissions of material fact to Robert Myers as he induced his investment in the Keller Property:

a.  Bell failed to disclose that Robert Myers was buying his TIC share from third-party sellers instead of from Millcreek Commercial.

*Misrepresentations to Charles and Laura Brauer*

589.  In approximately March 2022 Charles and Laura Brauer decided to look to retire and were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

590.    From approximately March to May 2022, through emails, phone calls, and other communications, Scott Rutherford made at least the following representations to the Brauers in order to induce their investment in the Keller Property:

    a.  That Millcreek's properties were highly sought after and presented on a "first come, first served" basis, per an email correspondence in or about March 2022.

    b.  That Millcreek's properties had "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about March 2022.

    c.  That Millcreek was "backed by Colliers" and therefore the Keller Property deal was very secure.

    d.  That the Keller Property tenant was "rock solid" and a "reputable health care company" with several instances of their business model already up and running.

    e.  That there was a Lloyds of London bond to guarantee the lease and ensure rent payments.

    f.  That Millcreek had done $10MM in renovations to the Keller Property and that a certificate of occupancy was coming soon.

    g.  That the building was equipped with state-of-the-art medical equipment.

h.  That due to the NNN lease, 6% cap rate, and property manager, all the Brauers would have to do is collect their check every month.

i.  That the Keller Property would give the Brauers a "hands-off revenue stream."

j.  That "construction is mostly complete" and the equipment just needed to be "set up," per an email correspondence in or about April 2022.

k.  That "even if they were to vacate the property, that would not release the parent company from the responsibility of paying the monthly rent and fulfilling the terms of the lease," per an email correspondence in or about April 2022.

l.  That Charles Brauer would receive an individual deed filed with Tarrant County, per an email correspondence in or about April 2022.

m.  That the Millcreek-estimated $21MM value of the Keller Property was based on comparable medical-purpose properties, per an email correspondence in or about April 2022.

n.  That Millcreek would purchase the Brauer's TIC interest at a premium if the Brauers decided to sell it.

o.  That the tenant had had other ventures that had been "up and running for a while," per an email correspondence in or about April 2022.

*Misrepresentations to Patti L. Klair*

114

591.  In approximately August 2021, Patti L. Klair was referred to Scott Rutherford to help her find a suitable 1031 exchange property.

592.  From approximately August 2021 to May 2022, through emails, phone calls, and other communications, Scott Rutherford represented to Patti L. Klair at least the following in order to induce her investment in the Keller Property:

  a. That Millcreek's properties had "strong returns and some of the most attractive lease terms we've seen in decades," per an email correspondence in or about August 2021.

  b. That Millcreek's properties were "in very high demand and are presented on a 'first come, first served' basis," per an email correspondence in or about August 2021.

  c. That an investment in a Millcreek property would "provide great asset value and cash flow," per an email correspondence in or about August 2021.

  d. That the tenant would not default and was "a very strong tenant," per phone call.

  e. That even if the tenant defaulted, rent would be paid through a bond securing the lease, per a phone call.

  f. That if the bond was exhausted, "surgery centers are typically associated with larger entities such as hospitals who would then be obligated to pay

the rent and have insurance for these types of situations," per a phone call.

g. That even if anything went wrong, Klair would have plenty of warning of any potential problem and easily be able to sell her shares, per a phone call.

h. That Klair was "lucky" to have an opportunity to invest in the Keller Property as it was "coveted" and shares were going fast.

i. That the tenant would occupy the building and be operating in June 2022.

j. That the additional month's rent would be added bonus to Klair if "new lease was signed in June and not delayed."

k. That "Phase 1 of this property sold out in less than 2 weeks," per an email correspondence in or about January 2022.

l. That the tenant was paying eight months of rent upfront as a good faith bonus.

593. Scott Rutherford made at least the following omissions of material fact to Patti Klair as he induced her investment in the Keller Property:

a. Rutherford failed to disclose that the building was not finished.

b. Rutherford failed to provide the due diligence materials to Klair before she closed her Keller Property TIC purchase.

c. Rutherford failed to provide Patti L. Klair with the final recorded deed.

116

*Misrepresentations to Robert and Annabelle Barnes*

594.    In or about February 2022, Robert Barnes was referred to Scott Rutherford to help find a suitable 1031 exchange property.

595.    In or about February 2022 to April 2022, through phone calls, email, and other communications, Scott Rutherford made at least the following representations in order to induce the Barnes' investment in the Keller Property:

a.  That an investment with Millcreek is "safe, secure, stable, and simple."

b.  That "someone is always looking for investments like this."

c.  That there would be "no landlord hassles, just a check."

d.  That there would be "passive income."

e.  That Millcreek had chosen a "solid tenant" for the Keller Property.

f.  That Millcreek would purchase the Barnes' TIC share back if the Barnes decided to sell.

g.  That the investment would be passive and hands off.

h.  That Millcreek owns a percentage of all of their properties.

596.    Scott Rutherford made at least the following omissions of material fact to the Barnes as he induced their investment in the Keller Property:

a.  Rutherford failed to provide Robert Barnes with due diligence materials.

b. Rutherford failed to disclose that the building was under construction, the terms of that construction, the significance of the construction, and the state of the construction or any related risks.

c. Rutherford failed to disclose that the building did not have a certificate of occupancy.

d. Rutherford failed to disclose that the tenant had not yet taken possession of the building.

e. Rutherford failed to disclose that Millcreek no longer owned any percentage of the property.

597. When the Barnes' began to consider closing with Millcreek Commercial, Kevin Long began communicating by email with the Barnes' using the email address "kevin.long@colliers.com."

*Misrepresentations to Patrick and Hildegard White*

598. In approximately January 2022 Patrick & Hildegard White were referred to Scott Rutherford to help them find a suitable 1031 exchange property.

599. Patrick and Hildegard White were told by their Qualified Intermediary that investment in a Millcreek property would be a safe, suitable investment, "no hassle investment" and were directed to Scott Rutherford in January 2022.

600.    From January to April 2022, through phone calls, emails, and other communication, Scott Rutherford represented to Patrick and Hildegard White at least the following to induce their investment in the Keller Property:

    a.    That because Millcreek "operates under the umbrella of Colliers International, the fifth largest commercial real estate brokerage in the country" it would be easy to sell their TIC ownership if they ever desired to, per an email correspondence in or about January 2022.

    b.    That "Millcreek's core properties provide cash flow immediately upon closing," per an email correspondence in or about January 2022.

    c.    That Millcreek's commercial properties were "under corporate-guaranteed lease terms."

    d.    That the Keller Property was new and fully renovated and ready for use as a medical facility.

    e.    That the tenant was a "publicly traded medical service."

    f.    That TIC ownership opportunities in the Keller Property were "in VERY high demand and are presented on a 'first come, first served' basis" and that their "most recent properties had sold out in 2-3 weeks," per an email correspondence in or about January 2022.

    g.    That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades" and "provide great asset

119

value and cash flow," per an email correspondence in or about January 2022.

h. That the tenant was "under corporate-guaranteed lease terms" and were "insured by Lloyds of London," per email correspondence.

i. That if a tenant defaulted the building could be re-rented for the value that was sold and there was room for the building to appreciate as part of the natural market, per email correspondence in or about January 2022.

j. That the rent commencement date was May 2022.

k. That they would receive eight months of "rent paid by the tenant" in advance at the time the Whites closed on their purchase.

601. Scott Rutherford made at least the following omissions of material fact to the Whites as he induced their investment in the Keller Property:

a. Rutherford failed to disclose that the building was under construction, the terms of that construction, the significance of the construction, the state of the construction or any related risks.

b. Rutherford failed to disclose that the TIC ownership they were purchasing was not from Millcreek Commercial, but rather from two previously unknown and undisclosed sellers.

*Misrepresentations to Eric Carnrite and Elizabeth Hill-D'Alessandro*

602. In approximately March 2022 Eric Carnrite was referred to Trevor Weber to help find a suitable 1031 exchange property.

603. In or about March to May 2022, through phone calls, emails, or other communications, Trevor Weber made at least the following representations in order to induce the Carnrite's and Hill-D'Alessandro's investment in the Keller Property:

    a. That Millcreek's buildings were purchased debt free and had "corporate guarantees to protect you financially," per an email correspondence in or about March 2022.

    a. That the Keller Property had a "double corporate guarantee", per an email correspondence in or about March 2022.

    b. That due to the triple-net nature of the lease, there would be no regular or ongoing expenses to the TIC owners.

    c. That Millcreek properties were "first come first serve due to high demand," per an email correspondence in or about March 2022.

    d. That "you can sell out of your property share at any time", per an email correspondence in or about April 2022.

    e. That if the tenant could not pay rent there was a corporate guarantee whereby other corporations "have both agreed to pay rents for remainder of the lease," per an email correspondence in or about April 2022.

f. That Carnrite and Hill-D'Alessandro's risk on investing through Millcreek was "minimal, almost completely mitigated."

g. That there was a "long-term, vetted tenant in place" for the Keller Property.

h. That the tenant, HSH, was "The Tenant of Your Dreams" and met Millcreek's "pillars for success," per an email correspondence in or about May 2022.

i. That Millcreek maintains at least 5% ownership in all their properties.

j. That the tenant's rent payments on the lease had been insured by Lloyds of London.

k. That if anything went wrong, the corporate guarantees would financially protect the TIC investors.

l. That renovations to the Keller Property would be complete in June and that they were only waiting on "one building item," and a certificate of occupancy would follow a month later, per an email correspondence in or about May 2022.

m. That Kevin Long of Millcreek takes "a lot of time to personally vet all our properties, do on-site visits, review financials, etc.," per an email correspondence in or about May 2022.

n. That they were buying into the Keller Property at a fair price.

604.    Trevor Weber made at least the following omissions of material fact to Eric Carnrite as he induced their investment in the Keller Property:

  a.  Weber failed to provide a link to the due diligence materials for the Keller Property.

  b.  Weber failed to disclose that the occupancy permit was not only waiting on final inspections, but also waiting on the completion of the renovations.

  c.  Weber failed to disclose that no bond had been secured.

  d.  Weber failed to disclose that Millcreek intended to fully sell out of the property and not maintain ownership.

  e.  Weber failed to disclose that there were commissions paid as part of the sales process.

  f.  Weber failed to disclose that the Millcreek parties had been paying HSH's 'rent' for other TIC owners since December 2021 due to HSH's cash flow problems.

### Misrepresentations to Karen Marion

605.    In or about March 2022, Karen Marion was referred to Scott Rutherford to help her find a suitable 1031 exchange property.

606. In or about March 2022, through emails, Zoom calls, and other communications, Scott Rutherford represented to Karen Marion at least the following to induce her investment in the Keller Property:

a. That Millcreek's "high-grade" commercial properties are under "corporate-guaranteed lease terms for steady monthly cash flow," per an email correspondence in or about March 2022.

b. That Millcreek's properties "provide cash flow immediately upon closing," per an email correspondence in or about March 2022.

c. That Millcreek's properties are in "VERY high demand and are presented on a 'first come, first served' basis," per an email correspondence in or about March 2022.

d. That Millcreek's properties have "strong returns and some of the most attractive lease terms we've seen in decades," per an email correspondence in or about March 2022.

e. That working with Millcreek would "simplify your search process and provide great asset value and cash flow," per an email correspondence in or about March 2022.

f. That Millcreek's commercial properties (including the Keller Property) were under corporate-guaranteed lease terms to protect tenant's investment, per an email correspondence in or about March 2022.

g. That investment in a Keller Property TIC interest would perfectly suit Karen Marion's goal of providing a reliable income stream, per a Zoom call in or about March 2022.

h. That if Marion desired to sell her TIC interest at a later point it would "not be a problem," per a Zoom call in or about March 2022.

i. That Marion would receive 8 months of prepaid rent from the tenant at the time of closing and that the tenant would start paying regular rent in October 2022, per a Zoom call in or about March 2022.

*Misrepresentations to Katherine Madera*

607. In or about August 2021, Katherine Madera was referred to Blake McDougal to help her find a suitable 1031 exchange property.

608. When Blake McDougal communicated with Madera regarding the Keller Property and TIC investments with Millcreek, he sometimes did so from his Colliers email address.

609. From approximately August to October 2021, through emails, phone calls, and other communications, Blake McDougal represented to Madera at least the following to induce her investment in the Keller Property:

a. That TIC ownership opportunities in the Keller Property were going fast and that Madera should make her decision soon if she wanted to take advantage of the opportunity.

b. That the Keller Property was a "surgical center."

c. That the deal was "backed by Colliers."

d. That HSH was evaluated by Colliers as part of their "process."

e. That the tenant was already in the building.

f. That the Keller Property was fully renovated and ready for use as a medical facility.

610. Blake McDougal made at least the following omissions of material fact to Katherine Madera as he induced their investment in the Keller Property:

a. McDougal failed to disclose that the building on the Keller Property was undergoing significant renovations.

b. McDougal failed to disclose that HSH was late making rent payments at other properties in December of 2021.

_Misrepresentations to Carl and Lynn McQueary_

611. In approximately December of 2021 Carl and Lynn McQueary were referred to Spencer Taylor to help them find a suitable 1031 exchange property.

612. From approximately December 2021 to January 2022, through emails, phone calls, and other communications, Spencer Taylor made at least the following representations to Carl and Lynn McQueary to induce their investment in the Keller Property:

a. That the tenant had signed the lease and had begun paying rent payments.

b. That the building would complete construction and renovations in September 2022.

c. That there would be no problem selling or exchanging his TIC investment ownership.

*Misrepresentations to Donald Patterson*

613.    In approximately February 2022, Donald Patterson was referred to Scott Rutherford to help him find a suitable 1031 exchange property.

614.    From approximately February to May 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Donald Patterson at least the following in order to induce his investment in the Keller Property:

a. That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about February 2022.

b. That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors", per an email correspondence in or about February 2022.

127

c.  That Millcreek's properties are "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about February 2022.

d.  That Millcreek's properties have a "[p]roven track record", per an email correspondence in or about February 2022.

e.  That "Millcreek's core properties provide cash flow immediately upon closing, so you [Patterson] are able to put your funds to work as quickly as possible", per an email correspondence in or about February 2022.

f.  That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about February 2022.

g.  That "Millcreek's mantra of 'safety, security, and stability' (and I would add 'simplicity') is the priority with each property", per an email correspondence in or about February 2022.

h.  That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about February 2022.

i.  That Rutherford's "goal is to provide you with solutions which simultaneously simplify your search process and provide great asset

value and cash flow", per an email correspondence in or about February 2022.

j.  That triple net leases were Millcreek's specialty "hands off investment," per a meeting in or about February 2022.

k.  That Millcreek properties were in high demand and that their inventory continues to be "depleted quickly," and that a Millcreek property being available was a "limited opportunity that you need to jump on," per a meeting in or about February 2022.

l.  That there was a "team" of individuals that vetted properties to ensure they were the "right property in the right location at the right price" per a meeting in or about February 2022.

m.  That "he had never had an investor get out of a [Millcreek] property and lose money," per a meeting in or about February 2022.

n.  That the "Millcreek properties appreciate and there hasn't been tenant issues," per a meeting in or about February 2022.

o.  That the tenant for the Keller Property was a renowned surgical center, per a phone call in or about February 2022.

p.  That the tenant for the Keller Property had been fully vetted.

q.  That in the case of selling, Millcreek would always purchase your share, per a meeting in or about February 2022.

r. That he would never have to worry about this investment since the tenant was on a 20-year lease with a guaranteed 6% return, per meeting in or about February 2022.

s. That the Keller properties "were going fast" and he needed to proceed with a sense of "urgency."

*Misrepresentations to Tony Schaker*

615. In or about November 2021 Tony Schaker was referred to Millcreek Commercial to help him find a suitable 1031 exchange property.

616. Schaker was told that investment in a Millcreek property would be a safe, suitable investment, and was directed to Scott Rutherford.

617. When discussing some of the details of the Keller Property, Scott Rutherford introduced Tony Schaker to Kevin Long.

618. In email correspondence with Long, Rutherford, and other individuals at Millcreek, Long used the email "kevin.long@colliers.com."

619. From approximately November 2021 to January 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Tony Schaker at least the following to induce the plaintiff's investment in the Keller Property:

a. That Millcreek provides "high-quality, passive commercial properties," as per an email correspondence in or about November 2021.

130

b. That "Millcreek Commercial to rank among the finest real estate experiences you will ever have", per an email correspondence in or about November 2021.

c. That Millcreek's "properties are in very high demand and are presented on a 'first come, first served' basis," per an email correspondence in or about November 2021.

d. That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades," per an email correspondence in or about November 2021.

e. That investing in a Millcreek property would "simplify your search process and provide great asset value and cash flow," per an email correspondence in or about November 2021.

f. That the Keller Property would have a 6% capitalization rate and 2% annual increase in rent payments.

g. That the lease on the Keller Property was backed by a bond issued by Lloyds of London.

*Misrepresentations to Kurtis Trent Manning*

620. In or about March 2021, Kurtis Trent Manning began looking for options to take advantage of the 1031 exchange process and was referred to Trevor Weber to help him find a suitable 1031 exchange property.

621.    Manning went to Millcreek's website and was impressed by what was represented as their partnership with Colliers International.

622.    From approximately May 2021 to November 2021, through phone calls, emails, and other communications, Trevor Weber represented to Manning at least the following to induce Manning's investment in the Keller Property:

   a.  That each year, the property would yield a 6% return on investment.

   b.  That the property had a tenant ready with a "20-year lease."

   c.  That the tenant at the Keller Property was already paying rent.

   d.  That the building was complete and ready for tenant's business operations to begin.

   e.  That Millcreek had been working with the Keller tenant, HSH, and its associated entities for a long time.

   f.  That the Keller Property had a bond that was backed by Lloyds of London.

   g.  That certain monthly payments disbursed to Manning were rent payments from the tenant.

**Misrepresentations and Omissions Regarding the Kennesaw Property**

*Misrepresentations and Omissions to All Kennesaw Plaintiffs*

623.    The Marketing Materials given to the Kennesaw Plaintiffs made untrue and misleading misrepresentations to induce their investment into the Kennesaw Property.

624.    The Kennesaw Offering Memorandum provided by the Colliers/Long Parties had Colliers' logo prominently placed right next to Millcreek's logo on every page, as shown in this excerpt:



625.    The Marketing Materials provided by the Colliers/Long Parties represented that the tenant was a "large[] network" and a "[d]evelopment of 350 Comprehensive Care Centers [which] will create the most extensive branded system in the country", as shown in this excerpt:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

Building a Brand: A key element to their strategy is to acquire reputable family practice to establish themselves in each community they target. Clusters of facilities will provide better access and more consistent care to patients in their system.

New Technologies: They intend to use new technologies and more comprehensive diagnostic capabilities to improve patient care and access and to give their medical teams more tools to provide superior care.

626.    With respect to this misrepresentation, Plaintiffs allege as follows:

627.    This representation is false, because neither the tenant on the lease nor any of the HSH Parties realistically had the ability to operate any care centers at all.

628. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the reliability and financial stability of the tenant and its affiliated entities.

629. The Colliers/Long Parties knew or should have known that none of the entities among the HSH Parties could realistically operate any care centers.

630. The Marketing Materials provided by Colliers/Long represented that the tenant would generate "significant margins" and that "[b]y vertically integrating, they will capture revenue and margins that have historically been 'lost' in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins."

631. With respect to this misrepresentation, Plaintiffs allege as follows:

632. This representation is false, because the tenant and its associated entities did not have any significant revenue or normal business operations and therefore no ability to generate significant margins of any kind.

633. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the financial viability of the tenant.

634. The Colliers/Long Parties knew or should have known that neither the tenant nor any of its affiliate entities had sufficient business operations or revenue.

635.  The Colliers/Long parties failed to disclose that the tenant listed on the Marketing Materials, Advance Care Medical, differed from the tenant listed on the lease, Advance Care Medical Kennesaw GA-1.

636.  This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding their ability to do the necessary due diligence on the tenant.

637.  The Colliers/Long parties failed to disclose that the tenant, Advance Care Medical Kennesaw GA-1, was not a legitimate business entity.

638.  This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the viability of the tenant.

639.  The Colliers/Long parties failed to disclose that the guarantor for the Kennesaw Property's lease, Heathcare Solutions Holdings, Inc., was not financially capable of providing a corporate guarantee.

640.  This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

641.  The Colliers/Long parties failed to disclose that the HSH parties had yet to install the $500K worth of equipment necessary for the tenant to generate revenue.

642.     This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the state of the building and its ability to generate revenue.

643.     The Colliers/Long parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying taxes, maintenance fees, insurance, and fees related to re-tenanting.

644.     This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the cost of their investment.

*Misrepresentations and Omissions to Robert and Annabelle Barnes Regarding the Kennesaw Property*

645.     In or about February 2022 to April 2022, through phone calls, email, and other communications, Scott Rutherford made at least the following representations in order to induce the Barnes' investment in the Kennesaw Property:

a.  That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about January 2022.

b.  That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors, as well

as whole properties or a combination of both whole and percentage-based ownership", per an email correspondence in or about January 2022.

c. That investing in Millcreek's properties would be "perfect solutions for [the Barnes']", per an email correspondence in or about January 2022.

d. That Millcreek's properties were "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about January 2022.

e. That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about January 2022.

f. That "Millcreek's mantra of "safety, security, and stability" (and I [Rutherford] would add "simplicity") is the priority with each property", per an email correspondence in or about January 2022.

g. That Millcreek's properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about January 2022.

h. That Millcreek's properties had a "[p]roven track record", per an email correspondence in or about January 2022.

i. That "properties available from Millcreek to rank among the finest real estate experiences you will ever have", per an email correspondence in or about January 2022.

j. That "Millcreek's core properties provide cash flow immediately upon closing, so you [the Barnes] are able to put your funds to work as quickly as possible", per an email correspondence in or about January 2022.

k. That "the [Kennesaw] building was built in 2021", per an email correspondence in or about February 2022.

l. That there was a "default bond which included a years' worth of payments if the tenant defaulted in the first 48 months", per an email correspondence in or about February 2022.

m. That the "Lease was Absolute NNN and bonded – an absolute NNN bonded lease places significant financial responsibilities on the tenant while minimizing the landlord's obligations, providing a stable and predictable rental income for the landlord", per an email correspondence in or about February 2022.

*Misrepresentations and Omissions to Donald Patterson Regarding the Kennesaw Property*

646.    From approximately February to May 2022, through phone calls, emails, and other communications, Scott Rutherford represented to Donald Patterson at least the following in order to induce his investment in the Kennesaw Property:

a. That "Millcreek Commercial properties are uniquely structured to perfectly meet your needs", per an email correspondence in or about February 2022.

b. That "Millcreek Commercial provides properties where you can purchase a deeded ownership percentage of high-quality, passive commercial properties that would otherwise be unavailable for most investors", per an email correspondence in or about February 2022.

c. That "you [Patterson] will find the properties available from Millcreek to rank among the finest real estate experiences you will ever have", per an email correspondence in or about February 2022.

d. That Millcreek's properties are "[h]igh-grade commercial properties under corporate-guaranteed lease terms for steady monthly cash flow", per an email correspondence in or about February 2022.

e. That Millcreek's properties have a "[p]roven track record", per an email correspondence in or about February 2022.

f. That "Millcreek's core properties provide cash flow immediately upon closing, so you [Patterson] are able to put your funds to work as quickly as possible", per an email correspondence in or about February 2022.

g. That "Millcreek's properties are in VERY high demand and are presented on a 'first come, first served' basis", per an email correspondence in or about February 2022.

h. That "Millcreek's mantra of 'safety, security, and stability' (and I would add 'simplicity') is the priority with each property", per an email correspondence in or about February 2022.

i. That Millcreek properties have "strong returns and some of the most attractive lease terms we've seen in decades", per an email correspondence in or about February 2022.

j. That Rutherford's "goal is to provide you with solutions which simultaneously simplify your search process and provide great asset value and cash flow", per an email correspondence in or about February 2022.

k. That the tenant for the Kennesaw Property was a renowned surgical center, per a phone call in or about February 2022.

**<u>Misrepresentations and Omissions Regarding the Naperville Property</u>**

647. The Marketing Materials given to the Rementerias made a series of untrue and misleading misrepresentations to induce investments into the Naperville Property.

648.    The Marketing Materials provided by Colliers/Long represented that the TIC interests sold as part of the Colliers/Long TIC Program were not securities under federal law, as shown in this excerpt from the Offering Memorandum from the Naperville Property:

> The Tenant in Common (TIC) interests sold by Millcreek Commercial Properties constitute interests in real property. They do not constitute securities. Consequently, federal and state laws regulating the sale of securities do not apply with respect to the sale of TIC interests, and purchases of TIC interests will not be entitled to the protection afforded to purchasers of securities under federal and state securities laws. Nothing in the attached offering documents should be construed as an offer or a solicitation of an offer to buy or sell securities.

Office: 801.899.1943 | www.MILLCREEKCOMMERCIAL.com
Millcreek Commercial  |  2100 S Pleasant Grove Blvd. Ste 200, Pleasant Grove, UT

649.    With respect to this misrepresentation, Plaintiffs allege as follows:

650.    The representation is false, because the TIC interests are securities under federal law and under applicable state laws.

651.    The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Defendants' qualifications, trustworthiness, and the legal nature of their investment.

652.    The Colliers/Long Parties knew or should have known that under federal law and applicable state laws, the TIC investments they sold were securities.

653.    The Marketing Materials provided by the Colliers/Long Parties represented that the tenant's business strategy is to" vertically integrate urgent care facilities with ancillary services and new technologies" with the outcome of "providing a broader continuum of patient care at a lower cost and generate significantly higher operating margins", as shown in this excerpt from the Offering Memorandum from the Naperville Property:

## Property Information

| | |
|---|---|
| **Tenant** | Advance Care Medical |
| **Location** | 2975 Showplace Dr., Naperville, IL 60564 |
| **Property Type** | Freestanding, Medical |
| **Building Size** | 3,500 Square Feet |
| **Purchase Price** | $5,078,231.42 |
| **Cap Rate** | 6.00% |

Advance Care's mission and business strategy is to provide better, more consistent, comprehensive care solutions by vertically integrating urgent care facilities with ancillary services and new technologies. The intended outcome is to provide a broader continuum of patient care at a lower cost and generate significantly higher operating margins.

654.    With respect to this misrepresentation, Plaintiffs allege as follows:

655.    This representation is false, because the tenant named on the lease is not a registered entity at all, and neither HSH nor HSMG have the revenue or business operations necessary to service a 20-year lease on the Naperville Property.

656.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the reliability and financial viability of the tenant.

657.    The Colliers/Long Parties knew or should have known that the tenant did not have the capital or the cashflow to sign a 20-year lease for the Naperville Property.

658.    The Marketing Materials provided by the Colliers/Long Parties represented that the tenant's development of 350 Comprehensive Care Centers will create "the most extensive branded system in the country", as shown in this excerpt from the Naperville Property Offering Memorandum:

**Advance Care Medical**

Largest Network: Development of 350 Comprehensive Care Centers will create the most extensive branded system in the country.

Significant Margins: By vertically integrating, they will capture revenue and margins that have historically been "lost" in the channel to sales, marketing, and third-party providers. This will result in significantly enhanced operating margins.

659.    With respect to this misrepresentation, Plaintiffs allege as follows:

660.    This representation is false, because the tenant had no realistic ability to develop 350 care centers or "the most extensive branded system in the country."

661.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information concerning the reliability and financial viability of the tenant.

662.    The Colliers/Long Parties knew or should have known that the tenant had no realistic ability to develop 350 care centers or "the most extensive branded system in the country."

663.    The Marketing Materials provided by the Colliers/Long Parties represented that the Naperville Property's fair market value was as much as $5MM.

664.    With respect to this misrepresentation, Plaintiffs allege as follows:

665.    This representation was false, because the realistic value of the property is likely about $700,000, but in any case substantially less than $5MM.

666.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the actual market value of the property they were investing in.

667.    The Colliers/Long Parties knew or should have known that the value of the actual value of the Naperville property was substantially lower than $5MM.

668.    The Marketing Materials provided by the Colliers/Long Parties represented that the Naperville Property Lease Guarantor is Healthcare Solutions

Holdings Inc, as shown in this excerpt from the Naperville Property Offering Memorandum:



**Lease Information**

| | |
|---|---|
| Lease Guarantor | Healthcare Solutions Holdings Inc |
| Initial Lease Term | 20 years |
| Rent Increases | 2% increases every year |
| Renewal Options | Two 5-year options |
| 20 Yr. Avg. Return | 7.25% |

669.    This representation was misleading, because HSH is a shell company with insufficient revenue and business operations and was incapable of acting as a lease guarantor with the financial burden of repayment responsibility in case the tenant defaults.

670.    This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, the risk profile of their investment.

671.    The Marketing Materials provided by the Colliers/Long Parties represented that the Naperville property lessee was Advance Care Medical, Inc. which

would operate a surgical ambulatory regional center. With respect to this misrepresentation, Plaintiffs allege as follows:

672. This representation was false, because Advance Care Medical, Inc. - Naperville, LLC is the lessee entity named in the lease.

673. This representation concerned an issue of material fact, because it limited the investors' ability to do due diligence on the tenant.

674. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including information about the lessee and more specifically, the likelihood of the lessee's ability to occupy the Naperville Property and service the lease.

675. The Colliers/Long Parties knew or should have known that the entity named in the lease was not a registered business entity.

676. The Colliers/Long Parties failed to disclose that the corporate guarantor for the Naperville Property lease was not financially capable of providing a corporate guarantee.

677. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

678. The Colliers/Long parties failed to disclose that the tenant on the Naperville Property Lease was not a legitimate business entity.

679. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the viability of the tenant.

680. The Colliers/Long parties failed to disclose that the bond included in their due diligence folder was incomplete and therefore invalid.

681. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the security of their investment.

682. The Colliers/Long parties failed to disclose that if the tenant defaulted after a Certificate of Occupancy had been issued, the Plaintiffs may be subject to paying taxes, maintenance fees, insurance, and fees related to retenanting.

683. This representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including, specifically, information regarding the cost of their investment.

684. In or about July 2021 to August 2021, through phone calls, emails, and other communications, Andrew Bell made at least the following representations in order to induce the Rementerias' investment in the Naperville Property:

    a. That "[y]ou will receive rental income via direct deposit each month as you experience our motto of 'Exchanging Hassle for Happiness'", per an email correspondence from July 2021.

147

b. That Millcreek and the Rementerias would be "co-owners" as they would each share a percentage of Naperville, per an email correspondence in or about July 2021.

c. That the Naperville building was "built in 2020".

685.    Andrew Bell made at least the following omissions of material fact to Teena and Jose Rementeria as he induced their investment in the Naperville Property:

a. Bell failed to disclose to the Rementerias the significant commissions he would receive for their purchase into the Naperville Property.

b. Bell failed to disclose that the market value lease per square foot of the Naperville Property was less than $85.06.

c. Bell failed to disclose that the represented value of the Naperville Property fluctuated several times.

d. Bell failed to provide access to the due diligence materials until the day that the Rementerias were closing on the Naperville Property.

e. Bell failed to provide financial statements or reports for the tenant in Naperville's due diligence materials.

**PLAINTIFFS INVEST IN THE MILLCREEK TIC PROGRAM**

686.    Relying on the misrepresentations, omissions, and general deception of the Colliers/Long Parties, their Qualified Intermediaries and Referrers, the HSH

Parties, the Developer Parties, and their principals, the Plaintiffs invested into the Keller Property, the Kennesaw Property, and the Naperville Property.

687.    The Plaintiffs invested a total of approximately $8MM in the Keller, Kennesaw, and Naperville Properties.

688.    All Plaintiffs' purchases of the Keller and Naperville Properties, through their respective Qualified Intermediaries, were conducted through either Forest Anthony at Old Republic Title or through Jay Thompson or Felicia Saez at First American Title Company.

**Commissions**

689.    In connection with each of Plaintiffs' purchases in the Keller, Kennesaw, and Naperville Properties, commissions and similar compensation payments were made to third parties in each transaction.

690.    Plaintiffs did not know about these commissions and similar compensation payments until they saw settlement statements for their respective transactions.

691.    Some of the Plaintiffs, including at least Donald Patterson, Tony Schaker, and Robert Barnes, have not been given one or more settlement statements from the title company involved in their respective transactions.

692.    All of the Plaintiffs' settlement statements listed commissions to Colliers.

693.    Colliers' commissions varied from approximately 1% to 4% of the total purchase amount of the TIC interest.

694.    Most of the Plaintiff's Settlement Statements stated that commissions were paid to a broker party.

695.    These broker parties were either Equity Summit Group or Merit Commercial Real Estate.

696.    Brokers' commissions varied anywhere from 3% to 6% of total purchase amount.

697.    All settlement statements state that Millcreek received a "marketing fee" from the seller as part of the transaction.

698.    The marketing fees paid to Millcreek varied from approximately 1% to 3% of the total purchase amount of the TIC interest.

699.    The Barnes had at least the following commissions or other payments made in their settlement statement:

   a.  Colliers received at least $3,659.39 in total in commissions.

   b.  Millcreek received at least $7,992.00 in total in marketing fees.

   c.  Equity Summit Group received at least $7,992.00 in total in commissions.

700.    The Brauers had the following commissions or other payments made in their settlement statement:

   a.  Colliers received $6,608.99 in total in commissions.

b. Millcreek received $19,826.97 in total in marketing fees.

c. Equity Summit Group received $19,826.97 in total in commissions.

701. The Carnrite/Hill-D'Alessandro's had the following commissions or other payments made in their settlement statement:

a. Colliers received $25,617.20 in total in commissions.

b. Millcreek received $19,219.90 in total in commissions.

c. There were no broker's commissions listed.

702. Patti Klair had the following commissions or other payments made in their settlement statement:

a. Colliers received $8,369.58 in total in commissions.

b. Millcreek received $8,369.58 in total in marketing fees.

c. Equity Summit Group received $25,108.73 in total in commissions.

703. Katherine Madera had the following commissions or other payments made in their settlement statement:

a. Colliers received $19,106.40 in total in commissions.

b. Millcreek received $9,553.20 in total in marketing fees.

c. There were no broker's commissions listed.

704. Kurtis Manning had the following commissions or other payments made in their settlement statement:

a. Colliers received $9,650.79 in total in commissions.

b. Millcreek received $14,885.11 in total in marketing fees.

c. There were no broker's commissions listed.

705. Karen Marion had the following commissions or other payments made in their settlement statement:

a. Colliers received $3,000.00 in total in commissions.

b. Millcreek received $9,000.00 in total in marketing fees.

c. Equity Summit Group received $9,000.00 in total in commissions.

706. The McQuearys' had the following commissions or other payments made in their settlement statement:

a. Colliers received $8,000.00 in total in commissions.

b. Millcreek received $4,000.00 in total in marketing fees.

c. There were no broker's commissions listed.

707. Donald Patterson was not provided with his settlement statements.

708. As such, the commissions and marketing fees paid to Colliers, Millcreek, and any broker parties are unknown.

709. Robert Myers had the following commissions or other payments made in their settlement statement:

a. Colliers received $4,705.88 in total in commissions.

b. Millcreek received $11,294.42 in total in marketing fees.

710.    Merit Commercial Real Estate received $12,792.28 in total in commissions.

711.    The Rementerias had at least the following commissions or other payments made in their settlement statement:

    a.  Colliers received at least $6,678.80 in total in commissions.

    b.  Millcreek received at least $10,301.201 in total in commissions.

    c.  Merit Commercial Real Estate received at least $16,980.00.

712.    Tony Schaker had at least the following commissions or other payments made in their settlement statement:

    a.  Colliers received at least $3,061.14 in total in commissions.

    b.  Millcreek received at least $3,061.14 in total in marketing fees.

    c.  Equity Summit Group received at least $9,183.42 in total in commissions.

713.    The Tannehills had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $4,493.18 in total in commissions.

    b.  Millcreek received $4,493.18 in total in marketing fees.

    c.  Equity Summit Group received $26,959.06 in total in commissions.

714.    The Whites had the following commissions or other payments made in their settlement statement:

    a.  Colliers received $1,976.80 in total in commissions.

b. Millcreek received $5,930.40 in total in marketing fees.

c. Equity Summit Group received $5,930.40 in total in commissions.

715. Neither the Colliers/Long Parties nor any Qualified Intermediary or Referrer Parties disclosed these commissions in advance.

716. Colliers International received a total of at least $103,932.61 in commissions from Plaintiffs' TIC purchases.

717. Millcreek Commercial Properties received a total of at least $127,920.10 in commissions from Plaintiffs' TIC purchases.

718. Equity Summit Group received a total of at least $104,000.58 in commission from Plaintiffs' TIC purchases.

719. Merit Commercial Real Estate received a total of at least $29,772.28 in commission from Plaintiffs' TIC purchases.

**Plaintiffs' Final Ownership Percentages and Total Investments**

720. According to their respective closing documents, Plaintiffs have the following ownership percentages and total investments in the Keller Property:

a. Robert and Annabelle Barnes have 1.2485% ownership of the Keller Property with an investment of approximately $266,392.

b. Eric Carnrite and Elizabeth Hill-D'Alessandro have 3.0015% ownership of the Keller Property with an investment of approximately $640,430.

c. Charles and Laura Brauer have 3.0974% ownership of the Keller Property with an investment of approximately $660,899.13.

d. Teena and Jose Rementeria have 2.6527% ownership of the Keller Property with an investment of approximately $566,000.

e. Patti Klair has 3.9226% ownership of the Keller Property with an investment of approximately $836,957.35.

f. Robert Myers has 1.8747% ownership of the Keller Property with an investment of approximately $400,000.

g. Karen Marion has 1.4060% ownership of the Keller Property with an investment of approximately $300,000.

h. Robert and Ditas Tannehill have 2.1058% ownership of the Keller Property with an investment of approximately $449,318.19.

i. Katherine Madera has 2.2368% ownership of the Keller Property with an investment of approximately $477,000.

j. Patrick and Hildegard White have 0.9265% ownership of the Keller Property with an investment of approximately $194,679.89.

k. Tony Schaker has 3.7698% ownership of the Keller Property, with an investment of approximately $804,354.

l. Carl and Lynn McQueary have 0.9373% ownership of the Keller Property with an investment of approximately $200,000.

m. Donald Patterson has 2.8803% ownership of the Keller Property with an investment of approximately $614,581.21.

n. Kurtis Trent Manning has 3.8331% ownership of the Keller Property with an investment of approximately $817,463.46.

721. Robert and Annabelle Barnes invested approximately $232,800 and received 4.1928% ownership in the Kennesaw Property.

722. Donald Patterson invested approximately $300,800 and received 5.4218% ownership share in the Kennesaw Property.

723. Jose and Teena Rementeria's entity Secure Self Storage LLC invested approximately $160,800 and received 3.0249% ownership share in the Naperville Property.

## FAILURE OF KELLER, KENNESAW, AND NAPERVILLE INVESTMENTS

### HSH Parties are Late Paying Rent

724. In or about December 2021, "HSMG failed to pay its portion of the rent obligations under the Keller Lease".

725. "Millrock had paid HSMG's portion of the rent obligations starting around December 2021."

726. In or about August 2022, HSMG disclosed to Millcreek that they needed "cash flow relief". These problems with cash flow caused HSMG to be late with rent payments and they "incurred certain late fees."

727.    On or about August 5, 2022, Millrock and HSMG entered into a Loan Agreement and Promissory Note, called the "Millrock/HSMG Agreement".

728.    The existence of this agreement was not revealed to Plaintiffs until much later, after the tenant's default alleged below.

729.    "The Millrock/HSMG Agreement contemplated that through the Agreement, Millrock would provide HSMG with cash flow relief and assist HSMG with its obligations under the Leases."

730.    "Pursuant to the Millrock/HSMG Agreement, Millrock loaned HSMG the principal amount of $350,000."

731.    On information and belief, the total amount that Millrock paid HSMG or its affiliates was in fact much larger, as Millrock had been paying rent at the Keller Property since at least December 2021, but at least this sum.

732.    "Pursuant to the Millrock/HSMG Agreement, HSMG's also agreed that within ten days of August 5, 2022, it would cause the Leases to be secured by the Bonds."

733.    "The parties also agreed in the Millrock/HSMG Agreement that HSMG would be solely responsible for any payments due under the Keller Lease as of October 1, 2022."

734.    "Under the Millrock/HSMG Agreement, Millrock and HSMG agreed that if any obligation under the Agreement were not timely met, the remaining unpaid principal balance and interest would become due immediately at Millrock's option."

**The Tenant Defaults and the Guarantee and Bond Fail**

735.    For months after their purchase, Plaintiffs did not suspect anything had gone wrong with their TIC investments.

736.    They received payments that they were told were rent payments and they believed that the tenant either had or imminently would occupy the buildings in Keller, Kennesaw, and Naperville.

737.    Some of the payments some Plaintiffs received were lump sums identified as rent on the seller's settlement statements for their transactions, which were not provided to these Plaintiffs as part of the closing process.

738.    In or about early October 2022 the TIC owners of the Keller Property, the Kennesaw Property, and the Naperville Property, including Plaintiffs, were informed by the lease administrator (Mary Street of CAMS Realty) that the tenant at all three properties had defaulted.

739.    The tenant had defaulted on all seven of the properties in the Colliers/Long TIC Program that involved the tenant.

740.    Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that the HSH-affiliated tenant named on each lease agreement was an unregistered entity.

741.    Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that the HSH Parties were shell companies with insufficient revenue or business operations and were unable to service their rent obligations under the lease.

742.    What Millcreek had billed as the "tenant of your dreams" became the tenant of the Plaintiffs' nightmares.

743.    The Colliers/Long Parties represented to some of the Plaintiffs that the "rent payments" they were receiving after closing on the Keller Property were either a lump sum of prepaid rent from the tenant or a monthly rent payment from the tenant.

744.    Mary Street, however, told Plaintiffs that none of these purported rent payments were from the tenant.

745.    The tenant has never produced any revenue at the Keller or Kennesaw Properties.

746.    The payments purporting to be rent from the Keller Property were paid by Millcreek Commercial.

747.    Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and Naperville Properties that HSH and HSMG—the corporations that

purportedly had backed the tenant with a guarantee on the lease—was unable or unwilling to make good on that guarantee.

748.   Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that HSMG was a shell company with insufficient revenue or business activities and was unable to fulfill its obligations on the guarantee.

749.   Long further informed Plaintiffs and other owners of the Keller, Kennesaw, and Naperville Properties that there was no bond from Lloyd's of London guaranteeing the leases at those properties.

750.   Long, Millcreek, Colliers, and the other Colliers/Long Parties knew or should have known that no bond from Lloyd's of London had been issued backing the leases at the Keller, Kennesaw, and Naperville Properties.

751.   Long informed the Keller owners, including Plaintiffs, that Millrock had filed a lawsuit (the "Millrock-HSH Lawsuit") against several of the HSH Parties for misusing the Equipment Allowance Funds.

752.   The Millrock-HSH Lawsuit is ongoing.

753.   Long told the Keller owners, including Plaintiffs, that the Millrock-HSH Lawsuit was for their benefit and was filed on their behalf.

754.   Millrock is only seeking damages in the amount of $4,642,000 for the "Equipment Allowance Funds," and only for equipment at the Keller and Draper Properties.  None of the Plaintiffs in this action own an interest in the Draper Property.

160

755.    None of the Keller owners, including Plaintiffs, are parties or beneficiaries in that lawsuit.

756.    Millrock did not retain any ownership of the Keller or Naperville Properties during the relevant time period, and so is not similarly situated to the Keller or Naperville owners, including Plaintiffs.

757.    Under a triple-net lease like the ones bundled with the Keller, Kennesaw, and Naperville Properties, the tenant pays for taxes, maintenance costs, and insurance.

758.    After the tenant defaulted, Plaintiffs at the Keller, Kennesaw, and Naperville Properties were burdened with the need to pay for taxes, maintenance, and insurance.

### **Plaintiffs Discover Keller and Kennesaw Renovations and Construction Are Incomplete**

759.    As alleged previously, the Colliers/Long Parties represented that the Keller Property was in a finished or nearly finished state following renovations.

760.    In the Offering Memorandum, it was represented to the investors that the building would be in "'as new' condition" after a period of renovation.

761.    In at least one version of an Offering Memorandum given to Plaintiffs as part of the sales process, the period of renovation was stated to be "2019 - 2020".

762.    A visit to the property in March 2023 revealed that the Keller building's renovations are nowhere near completion.

763.    As of at least March 2023, the Keller building is not able to function as a surgical center because of its incomplete renovations. For instance:

a.  Ceilings are not in a finished state.

b.  Walls have not been sheet rocked.

c.  Walls have not been painted.

d.  Flooring is not in place.

e.  Furniture has not been installed.

f.  Surgical equipment has not been installed.

g.  Electrical work has not been completed.

h.  Construction materials have not been removed.





764.    The Colliers/Long Parties promised Plaintiffs a completed building ready to be occupied at the Keller Property in their sales pitch.

765.    Indeed, the Colliers/Long Parties induced Robert and Ditas Tannehill, Teena and Jose Rementeria, Charles and Laura Brauer, Patti Klair, Robert and Annabelle Barnes, Patrick and Hildegard White, Katherine Madera, and Kurtis Manning to invest by stating that Keller renovations were already complete.

766.    The Colliers/Long Parties also induced Robert and Ditas Tannehill, Robert and Annabelle Barnes, and Katherine Madera to invest by stating that the tenant had already occupied the building.

767.   The Colliers/Long Parties induced Tony Schaker to invest by stating that the Keller renovations were well underway and would be completed by July 2022.

768.   Instead, the funds for the renovation were diverted by the Developer Parties and HSH Parties.

769.   Millrock disbursed at least $9,381,669.99 to Jamie Butera of ADP for purported construction or renovation activities at the Keller Property.

770.   ADP did not perform, cause to be performed, nor exercise reasonable diligence in supervising or ensuring that would be performed over $9MM worth of construction or renovation activities at the Keller Property.

771.   On information and belief, none or virtually none of those funds were ever used for legitimate construction or renovation purposes.  Instead, ADP deliberately diverted those funds to benefit itself instead of Plaintiffs and other Keller owners.

772.   Millcreek's affiliate Millrock Investment Fund 1 authorized the disbursement of these funds without verifying that the renovations had been completed or that significant progress was being made.

773.   The Keller Property in its current state is unusable for any tenant.

774.   The Kennesaw Property, while renovated, is also not usable for any tenant in its current state and was ultimately sold at a significant discount from the inflated price that Plaintiffs paid.

775.    Upon information and belief, no surgical equipment has yet been installed at the Kennesaw Property.

**Plaintiffs Discover the Keller, Kennesaw, and Naperville Property Values are Overinflated**

776.    Plaintiffs were further distraught to discover that the Keller, Kennesaw, and Naperville Properties were worth a fraction of what Defendants had represented.

777.    In the Offering Memorandum the Colliers/Long Parties gave to Plaintiffs during the sales process, the value of the Keller Property was represented to be $21MM.

778.    But according to the City of Keller Tax Assessment, the value of the Keller Property is approximately $4MM, which Long and others have since confirmed.

779.    Millcreek-affiliated Millrock Investment Fund 1, along with a number of other individuals and entities, purchased the Keller Property in November of 2020 for approximately $4MM.

780.    Millrock has confirmed that $4MM, not $21MM, is the real market value of the property.

781.    The Kennesaw Property was marketed by Millcreek's representatives as being worth over $5.5MM.

782.    The realistic market value of the Kennesaw Property is substantially less than $5.5MM and sold for about $1.35MM in about July 2024.

783.   The Naperville Property was marketed by Millcreek's representatives as being worth as much as $5MM.

784.   The realistic market value of the Naperville Property is approximately $700,000.

785.   At Kennesaw, $500,000 in equipment purchase funds had been allotted to developer Steve Caton and his company SARC US, Inc.

786.   The $500,000 in equipment funds for the Kennesaw Property have been unaccounted for and on information and belief, Caton and SARC US, Inc. have retained those funds or conveyed them to a third-party, and Plaintiffs have still not received the benefit from them they expected and were entitled to.

### **Plaintiffs Discover the Keller, Kennesaw, and Naperville Lease Rates Are Overinflated**

787.   Long assured the Keller, Kennesaw, and Naperville owners, including Plaintiffs, that they could simply find a new tenant.

788.   However, Plaintiffs discovered that the lease terms that the HSH Parties agreed to pay under the Keller, Kennesaw, and Naperville leases, signed by Mary Street as Millrock's agent, were wildly overvalued compared to accurate market rates.

789.   Depending on the specific representations made by the Colliers/Long Parties, the rent per square foot in the lease bundled with the sale of the Keller Property was between $100-$125 per square foot.

790.    However, accurate market rates for medical facilities in the area are typically between $26-30 per square foot.

791.    The rent per square foot in the lease bundled with the Kennesaw Property was approximately $104 per square foot.

792.    Realistic market rates for leasing the Kennesaw Property are approximately $30 per square foot.

793.    The rent per square foot in the lease bundled with the Naperville Property was approximately $90 per square foot.

794.    Realistic market rates for leasing the Naperville Property are approximately $30 per square foot.

795.    Long knew or should have known that re-tenanting the Properties with the same lease rate that the HSH parties had agreed to through the lease negotiated by Millrock would be impossible.

796.    Not only were Plaintiffs stuck without a tenant and with endless empty promises from the Colliers/Long Parties, but due to the overinflated rent rate and property value, finding a new tenant to occupy the Keller, Kennesaw, or Naperville Properties or selling their TIC ownerships was simply not feasible.

797.    Plaintiffs lost the expected value of their investment—a reliable tenant, a 20-year lease backed by a guarantee and a bond, a monthly stream of income, the value of the property itself, the scheduled rent increases over the term of the lease, the 6-9%

capitalization rate over the term of the lease, and the "safe, secure, and stable" investment they were repeatedly promised.

## THE QUALIFIED INTERMEDIARIES' PROFESSIONAL FAILURES REGARDING 1031 REQUIREMENTS

798.    Plaintiffs had engaged the Qualified Intermediaries as professionals to help them navigate the complex, legally fraught requirements of a 1031 exchange.

799.    These requirements include both IRC Section 1031, which imposes conditions on 1031 exchanges generally, and IRS Revenue Procedure 2002-22, which imposes additional conditions on 1031 exchanges involving TIC interests.

800.    The Qualified Intermediaries held and transacted substantial funds belonging to Plaintiffs in the course of their responsibilities performing 1031 exchanges for Plaintiffs.

801.    The Qualified Intermediaries held themselves out as having superior knowledge and experience related to 1031 exchanges, and Plaintiffs engaged them and relied on them as such.  Plaintiffs' reliance was reasonable and essential, given the stringent requirements and timeline with which their investments needed to comply to qualify as 1031 exchanges.

802.    It has become apparent that Plaintiffs' investments were plagued by numerous factors and conditions which may render their investments non-compliant

in the eyes of the IRS and impose unknown and potentially enormous tax burdens and other legal consequences upon them.

803. These factors and conditions include, among others, the following:

a. That construction and renovation during the exchange period may have subjected Plaintiffs' exchanges to additional requirements that were not met;

b. That the leases at the Keller, Kennesaw, and Naperville Properties were not fair market value leases;

c. That the TIC interests Plaintiffs purchased in the Keller, Kennesaw, and Naperville Properties were not sold at fair market rates;

d. That the owners of the Keller, Kennesaw, and Naperville Properties were required by the TIC Agreements to participate in all management decisions;

e. That equipment purchases were bundled with the sale of the Keller and Kennesaw Properties;

f. That Mary Street's compensation was based upon profits generated by the Keller, Kennesaw, and Naperville Properties; and

g. That the TIC interests sold to Plaintiffs are securities.

804. These factors and conditions, and others with a substantial likelihood of compromising the 1031-compliant status of Plaintiffs' investments, either existed at the

time the Qualified Intermediaries advised Plaintiffs and conducted their 1031 exchanges, or else were reasonably foreseeable by a competent and diligent 1031 professional at the time the Qualified Intermediaries rendered services to Plaintiffs.

805.   The Qualified Intermediaries either knew or reasonably should have known of the many factors and conditions which may render Plaintiffs' investments non-compliant in the eyes of the IRS and thereby impose liabilities upon them.

806.   Because of the Qualified Intermediaries' failures to verify or ensure that Plaintiffs' investments would be 1031-compliant, Plaintiffs have also been compelled to independently investigate and verify whether and attempt to ensure that their investments are 1031-compliant.

## THE PREVIOUS OWNERS' PARTICIPATION IN THE OVERALL SCHEME

807.   As part of their purchase in Colliers/Long TIC interests, Plaintiffs signed Purchase and Sale Agreements with the previous owners of TIC interests in the Keller, Kennesaw, and Naperville Properties.  For applicable Plaintiffs, these previous owners included Defendants Millrock Investment Fund 1, Hello Bello, and Mark and Lady Mira Blue Machlis.

808.   Each Purchase and Sale Agreement conveyed a percentage interest in each respective property.

809.   In selling TIC interests to Plaintiffs, Defendants Millrock Investment Fund 1, Hello Bello, Samuel Duke, and Mark and Lady Mira Blue Machlis intended to

and actually did participate in and further the objectives of the Colliers/Long TIC Program.

810.    Samuel Duke, the principal of Hello Bello, was the Head of Marketing for Millcreek during the period relevant to this litigation.

811.    He described himself as being "[r]esponsible for all marketing programs and campaigns", having "[b]uilt and maintained the website", having "[s]upported all partners with marketing materials and leading gen programs", having "[r]aised capital for commercial development projects", and having "[d]elivered over 1,000 marketing qualified leads per month."

812.    Millrock Investment Fund 1 played an instrumental role in the development of the Colliers/Long TIC Program, including through entering development and lease agreements that were material to Plaintiffs' decisions to invest.

813.    Kevin Long described Millrock Investment Fund 1, Hello Bello, and Mark and Lady Mira Blue Machlis as his "development partners" or "investment partners."

814.    Through their close association and partnership with the other Colliers/Long Parties, Defendants Millrock Investment Fund 1, Hello Bello, Samuel Duke, and Mark and Lady Mira Blue Machlis knew or should have known about the misrepresentations, omissions, and general deceptions practiced in the course of the Colliers/Long TIC Program.

815. Despite their knowledge of the material defects of the investments sold to Plaintiffs through the Colliers/Long TIC Program, set forth herein, Defendants Millrock Investment Fund 1, Hello Bello, Samuel Duke, and Mark and Lady Mira Blue Machlis did not disclose these material defects to the Plaintiffs they sold to.

**MARY STREET'S ROLE IN THE FRAUDULENT ENTERPRISE**

816. After purchasing their TIC interests through the Colliers/Long' TIC Program, Plaintiffs and other owners were introduced to Mary Street and CAMS Realty, the property manager for upwards of 32 properties offered by the Colliers/Long Parties.

817. All properties in the Colliers/Long TIC Program were marketed as being managed by a property manager "with extensive experience in property management" that would work to "provide the safety, security, and stability that is expected by each Millcreek Commercial Owner."

818. Managing commercial property is time-consuming and complicated. A commercial property manager's responsibilities often include overseeing the operations, maintenance, and profitability of the property, understanding and navigating lease agreements, coordinating tenant move-ins, enforcing the lease according to local law, handling rent collection and disbursement, tracking expenses, and keeping owners informed. In a property with TIC ownership such as those offered by the Colliers/Long Parties, the property manager is the *de facto* representative of the

owners and their interests, and an instrumental part of the promise of the Colliers/Long Program that Plaintiffs' investments would be hands-off.

819.  After their purchases, Mary Street and CAMS Realty were presented to Plaintiffs as a property manager who could be trusted to deliver on the promises of the Colliers/Long TIC Program and defend the interests of the new property owners.  She was in a position of superior knowledge, experience, and authority relative to Plaintiffs and their investments in the Colliers/Long TIC Program.

820.  In reality, as Plaintiffs later discovered, Mary Street had a long history of association with Kevin Long, Millcreek Commercial, Colliers International, and the other Colliers/Long Parties and had an integral role in the planning, development and execution of the Colliers/Long TIC Program.

821.  In fact, the Lease Agreements for the Keller Property, dated November 19, 2020, listed Mary Street as the contact for the "Landlord," Millrock Investment Fund 1, LLC:

IF TO LANDLORD:
Millrock Investment fund 1 LLC
C/O Mary Street
Mary.street@mtnwest.com
2015 West Grove Parkway, Suite J, Pleasant Grove, UT 84062

822.    Plaintiffs were compelled to rely on and did in fact rely on Mary Street due to her superior knowledge, expertise, and her position of authority and responsibility as the lease manager at the Keller, Kennesaw, and Naperville Properties.

823.    Mary Street dispensed advice to Plaintiffs and other owners from her position of superior knowledge, expertise, authority, and responsibility. She deliberately gave the impression that she was acting in their best interests in managing the leases and properties for them.

824.    In reality, in her position as lease manager and through her prior planning and development of the Colliers/Long TIC Program with the other Colliers/Long TIC Parties, she served the interests of the Colliers/Long Parties through concealment of material information, faulty advice, failure to perform her duties in the best interests of the new owners, posturing as a third-party acting in the interest of Plaintiffs and other owners, and a general pattern of manipulation designed to maneuver Plaintiffs and other owners into decisions favorable to the Colliers/Long Parties.

**Mary Street's Failure to Manage the Keller, Kennesaw, and Naperville Properties**

825.    Mary Street failed to timely provide bank statements to Plaintiffs and other owners, and in fact did not provide any at all until at least March 23, 2023, depriving them of essential financial information in order to keep them in the dark.

175

826.    In her position managing and administering Plaintiffs' investments, Mary Street and CAMS Realty had responsibility to enforce the terms of the leases and collect rents, including late rent fees, from the HSH Parties.

827.    After HSH's late rent payment in December 2021, HSH owed additional rent fees under their lease.

828.    Mary Street and CAMS Realty did not collect all additional rent fees due from HSH and disburse them to Plaintiffs and other owners, nor did she take reasonable steps to do so.  Instead, she approved an alternative form of payment from Millcreek or its affiliates that concealed the real financial state of Plaintiffs investment from them and deceived them into believing that the tenant was still paying rent.

829.    She did, however, begin charging her elevated "crisis rate" under the Lease Administration Agreement after the October 2022 default, and did not fully and fairly inform Plaintiffs of this fact until months later.

830.    At the same time, prior to the October 2022 default, she did not inform Plaintiffs and other owners that supposed "rent" payments were not coming from the tenant at all, and she failed to make serious efforts to collect on late fees due.

831.    For example, by email on about July 14, 2022, Mary Street told the Kennesaw and Naperville Plaintiffs and other owners that "I received rent for the following HSH-leased properties today: ACM Kennesaw, SARC Pine Bluff, ACM Romeoville, and ACM Naperville. I did not, however, receive the late fees. I sent a

message to HSH thanking them for the rent, but reminding them that late fees are assessed for rent that is not received by the due date per their Lease Agreement. For July, late fees are due for Pine Bluff, Romeoville, and Naperville."

832.    Late fees were also due at the Keller Property in at least March and July 2022, but Mary Street did not collect these late fees nor make reasonable efforts to do so—nor did she even inform Plaintiffs that the "rent" payments were late at all.

833.    Mary Street knew and had known since at least December 2021 that HSH was refusing to pay late fees.

834.    Mary Street's communications, including her email on July 14, 2022, concealed the scope of this problem from Plaintiffs and other owners and deliberately implied to them that HSH had paid and would pay late fees due and that Mary Street would make reasonable efforts and had made reasonable efforts to collect any late fees due.

835.    Few or no late fees were ever collected by Mary Street, and some late fees that appear to have been collected were not distributed to owners including Plaintiffs.

836.    Monthly transfers from Mary Street to Plaintiffs for "rent" payments were described as such by her in the description/memo field of the transfers, despite not being from the tenant at all.

837.    At Kennesaw, a Rent Funds Agreement was entered into by CAMS Realty, Millrock, and SARC US, Inc., obligating Mary Street to hold in trust funds until October

2022 from Millrock and SARC US, Inc., that would be paid to the Kennesaw Plaintiffs
and other owners as ostensible "rent" payments.

838.    The existence of the Rent Funds Agreement was not fully and fairly
disclosed to Plaintiffs by Mary Street, and they did not discover its existence until long
after the tenant's default in October 2022.

839.    As in other instances, Mary Street concealed the fact that these funds
were not coming from the tenant at all.

840.    Mary Street failed to collect the amounts due from Millrock under that
agreement, against the best interests of the Kennesaw Plaintiffs.

841.    Mary Street, at SARC US, Inc.'s request and without the permission of the
Kennesaw Plaintiffs or other owners or authorization from the Kennesaw Rent Funds
Agreement, refunded a portion of SARC US, Inc.'s funds.

842.    Mary Street sent owners 1099 forms identifying monies Plaintiffs and
other owners received as "rent."

843.    As Mary Street knew, however, no actual rent had ever been paid at the
Keller Property; the "rent" they received was paid by Millcreek Commercial or its
affiliates, not HSH.

844.    Additionally, for Plaintiffs owning TIC interests in more than one of the
Keller, Kennesaw, and Naperville Properties, Mary Street sent 1099 forms improperly
combining payments from multiple properties on a single form.

178

845.  Under their leases at the Kennesaw and Naperville Properties, the HSH Parties were obligated to provide a security deposit (the Keller lease had a similar provision, but never obtained the prerequisite certificate of occupancy).  The HSH parties never did so, and Mary Street did not attempt to compel them to comply with their lease obligations to do so.

846.  The cities of Keller and Kennesaw cited owners of each respective property multiple times for code violations.

847.  The Colliers/Long Parties represented to Plaintiffs that the properties would be fully managed.

848.  Mary Street did not take reasonable steps to prevent or resolve the cities of Keller and Kennesaw from citing Plaintiffs and other owners.

849.  In October 2022, Mary Street told Plaintiffs and other owners that the Keller Property had received a certificate of occupancy.  This was not true, as the Keller Property had never received a certificate of occupancy and still has not to this day.

850.  Mary Street concealed or downplayed key details of HSH's trouble paying rent until the default in October 2022, lulling Plaintiffs and other owners into a false sense of security and preventing them from taking earlier action to remedy or attempt to salvage the value of their investment.

851.  Mary Street held herself out as a competent real estate professional.  She knew or should have known the truth about the manifold deficiencies of Plaintiffs'

investments in the Colliers/Long TIC Program—the absence of a bond, the unreliability of the tenant and guarantor, the state of renovations at the Keller Property, and other key misrepresentations and omissions alleged herein.  Yet, she did nothing to alert Plaintiffs or other owners.

852.   Mary Street knew that Plaintiffs and other owners had invested in the Colliers/Long TIC Program reasonably expecting and based on the Colliers/Long Parties' representations to that effect that their investments would be 1031-eligible, and that this was material to their decision to invest.

853.   Mary Street failed to take reasonable precautions to ensure that their investments would remain 1031-eligible, including by accepting a compensation model that appears to be inconsistent with IRS guidelines and failing to warn Plaintiffs about other ways the 1031-eligible status of their investments were at risk.

854.   Mary Street held no real-estate related licenses in Texas, Georgia, or Illinois, where the Keller, Kennesaw, and Naperville Properties are located.

855.   Mary Street permitted the previous owners of TIC interests in the Keller, Kennesaw, and Naperville Properties to sell their interests to Plaintiffs without the right of first refusal for other Plaintiffs, thereby concealing from each Plaintiff information about the overall operation of the Colliers/Long TIC Program.

856.    Mary Street additionally concealed information from Plaintiffs and other owners about the ownership of each property by blind cc'ing each owner on emails prior to the October 2022 default.

## Mary Street's and Other Defendants' Efforts to Convince Plaintiffs to Re-Tenant with Neuragenex

857.    After the HSH Parties defaulted on their leases at Keller, Kennesaw, Naperville, and other Colliers/Long TIC locations in October 2022, Mary Street, Kevin Long, and other Colliers/Long Parties attempted to induced Plaintiffs and other owners to re-tenant with a new company, Neuragenex.

858.    According to Mary Street, Kevin Long, and their associates, Neuragenex (like HSH) was willing to pay a high lease rate, $139 per square foot at the Naperville Property.  According to two independent brokers, market rates for a lease at the Naperville Property would likely be $30-35 per square foot.

859.    Mary Street held herself out as a professional, reliable realtor, and she knew or should have known that the lease rates for Neuragenex (like HSH before it) were far above market rates, and with no justifiable basis for being overvalued.

860.    Plaintiffs were told Neuragenex would require renovations and equipment purchases at the Naperville Property, to be funded by a $1.15MM capital call on Plaintiffs and other Naperville owners.  Cash payments would be made to Slope Construction, a company managed by Millcreek affiliate Brent Smith.

861.    Owners not able to fund the capital call in cash would have the option to sign over the percentage interests in Naperville to Millcreek-affiliated Millrock Investment Fund 1.

862.    Mary Street endorsed the plan to re-tenant with Neuragenex and encouraged Plaintiffs and other owners to accept the proposal.

863.    Steve Caton, the developer of the Kennesaw Property, also endorsed to Plaintiffs and other owners the plan to re-tenant with Neuragenex.

864.    The reality was that Neuragenex was as thin and flimsy a tenant as HSH was.

865.    Neuragenex "financials" eventually provided to owners were unaudited.

866.    At the Keller Property, the owners refused to re-tenant with Neuragenex.

867.    At Naperville, despite the fact that agreements between TIC owners must make leasing decisions unanimous in order to comply with IRS regulations, the TIC Agreement had been drafted in such a way that, according to Kevin Long, a unanimous vote was not required.  By majority vote, the Naperville owners decided to re-tenant with Neuragenex at Mary Street's and Kevin Long's urging.

868.    Delays in renovations, equipment purchases, and rent commencement plagued the re-tenanting process with Neuragenex.  By October 2023, the first month Neuragenex was due to pay rent, it defaulted.

869. Owners who had been manipulated into accepting Neuragenex as a tenant suffered the further loss of additional cash outlay or reduction in TIC ownership, paid to Millrock Investment Fund 1.

870. Neuragenex also failed to pay rent at two other locations in the Colliers/Long TIC Program in Bluffdale and Lehi, Utah.

871. In January 2024, Neuragenex filed for bankruptcy.

872. In short, despite Kevin Long's statement that "[w]e have, of course, been lobbying for your interests," the Colliers/Long Parties' deployment of tenant Neuragenex was as ill-conceived and ill-fated as the rest of the Colliers/Long TIC Program.

873. On information and belief, the Colliers/Long Parties' efforts to induce Plaintiffs to re-tenant with Neuragenex are part of a "rinse and repeat" plan operating at dozens of Colliers/Long TIC properties nationwide whereby vulnerable, retirement-age investors are defrauded of their life savings in fatally flawed TIC investments.

**RACKETEERING ACTIVITY**

874. Defendants' conduct described herein constitutes multiple forms of "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

875. These instances of racketeering activity were all related, because they shared common goals, targeted common victims, and were committed by the same group of associated individuals and entities.

876.    These instances of racketeering activity were not isolated or sporadic, but rather occurred over a substantial period of time spanning multiple years.

877.    Defendants' racketeering activity is also ongoing and threatens to continue indefinitely, evidenced in part by the fact that they have formed new entities to carry on the Colliers/Long TIC Program and similar schemes.

**Fraud-Related Acts**

*Schemes and Artifices to Defraud*

878.    As Plaintiffs have alleged at length herein, each Defendant has participated in the planning and/or operation of the Colliers/Long TIC Program, which involved one or more plans or patterns of conduct intended or reasonably calculated to deceive persons of ordinary prudence and comprehension, namely, Plaintiffs and other TIC owners.

879.    Defendants have therefore devised or intended to devise one or more schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

*Wire Fraud*

880.    On multiple occasions, Defendants have used interstate wire communications to further the objectives of the Colliers/Long TIC Program.

881.    For example, because they were located in a different state than each Plaintiff, each of the Colliers/Long Parties' misrepresentations to Plaintiffs detailed

herein were necessarily made using interstate wire communications, as previously detailed at length.

882.    The Referrers also communicated with Plaintiffs via interstate wire communications for the purpose of executing the Colliers/Long TIC Program, including, but not limited to, the following examples previously described at length:

a.  As alleged at length herein, Defendants Scott King and Merit Commercial Real Estate LLC made misrepresentations to Plaintiff Robert Myers via phone and email.

b.  Scott King and Merit Commercial also made misrepresentations to Plaintiffs Teena and Jose Rementeria over phone and email.

883.    Finally, Kevin Long, Brent Smith, and Mary Street used interstate wire communications in their discussions with Plaintiffs after the tenant defaults, including via email and video call, for the purpose of executing the Colliers/Long TIC Program, including, to conduct fraudulent capital calls and persuade Plaintiffs to accept new tenants based on inaccurate, incomplete, or otherwise misleading information.

884.    The Colliers/Long Parties, ADP Parties, and Caton Parties also used interstate wire communications with each other in devising and executing their schemes and artifices to defraud.

885.    Defendants have therefore transmitted, or caused to be transmitted, writings, signs, signals, pictures, and/or sounds by means of interstate wire

communications for the purpose of executing their schemes and artifices to defraud, which is indictable under 18 U.S.C. § 1343.

*Bank Fraud*

886.    The Colliers/Long TIC Program involved obtaining moneys and funds from Plaintiffs by means of false or fraudulent pretenses, representations, or promises.

887.    These moneys and funds were in the custody or control of financial institutions.

888.    Additionally, the Referrers and other Defendants received commissions paid from such moneys and funds, an act which was itself fraudulent because no one disclosed these commissions to Plaintiffs until at least the closing date of their TIC interest purchase, to the extent they were disclosed at all.

889.    In fact, Defendants explicitly represented to some Plaintiffs that no commissions would be paid from their invested funds.

890.    Later, Plaintiffs the Rementerias, Barnes, and Pattersons all transferred money directly to the Mary Street Parties for, among other things, lease administration fees at an elevated "crisis rate", compounded on an already-inflated lease rate.

891.    The ADP Parties and Caton Parties also participated in the planning and execution of the Colliers/Long TIC Program, and received large transfers of Plaintiffs

invested funds, ostensibly for renovations to be performed on the Keller, Kennesaw, and Naperville Properties.

892.    Defendants' knowing execution of schemes and artifices to obtain moneys and funds in the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises, is indictable under 18 U.S.C. § 1344(2).

**Trafficking in Counterfeit Goods and Services**

893.    The Colliers/Long Parties repeatedly represented to multiple Plaintiffs, both orally and in writing, that their purchases of TIC interests were backed by a bond from "Lloyd's of London" or "Lloyds of London," which would pay for one year of rent in the event HSH defaulted.

894.    Defendant Kevin Long later revealed that, in reality, there never was a bond from Lloyd's of London.

895.    On information and belief, Lloyd's of London never had any connection with the Colliers/Long TIC Program.

896.    The Colliers/Long Parties traffic or trafficked in services, namely, selling TIC interests in commercial real estate, which are or were (ostensibly) underwritten by an insurance bond.

897.    "Lloyd's of London" is an active Collective Service Mark ("the Lloyd's wordmark") registered with the United States Patent and Trademark Office and owned

by The Lloyd's Corporation, a United Kingdom corporation with its principal place of business in London; it bears the Serial Number 730687455 and the Registration Number 111

898. 425.

899. The Lloyd's wordmark "consists of standard characters without claim to any particular font style, size, or color." *Id.*

900. The Lloyd's wordmark is used for "underwriting insurance by the underwriting members of Lloyd's, London." *Id.*

901. The Colliers/Long Parties' spurious use of the Lloyd's wordmark (or a substantially similar mark) in connection with the same services for which it is registered and in a manner which was likely to (and did, in fact) deceive or cause confusion or mistake constitutes a "counterfeit mark," as that term is defined under 18 U.S.C. § 2320(f)(1)(A).

902. The Colliers/Long Parties' knowing use of a counterfeit mark in connection with services in which they traffic is an indictable act under 18 U.S.C. 2320(a)(1).

**Obstruction of Justice**

*Misleading Conduct, Generally*

903. As alleged at length herein, many Defendants made false statements to Plaintiffs regarding their investments, which constitutes misleading conduct, as that

term is defined in 18 U.S.C. § 1515(a)(3)(A). In relevant part, this includes, but is not limited to, the following instances:

 a. The Colliers/Long Parties misrepresented to Plaintiffs that they would be receiving rent payments from tenants.

 b. The Colliers/Long Parties misrepresented that in the event of a tenant default, Plaintiffs' exposure to risk of loss to the value of their investments would be low because the leases were secured by bonds and corporate guarantees.

 c. After Plaintiffs purchased their TIC interests, Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties represented that Plaintiffs were receiving monthly rent payments from the tenants, when the payments came from Millcreek, Millrock, and/or Plaintiffs' own invested funds instead.

 d. After Plaintiffs purchased their TIC interests, Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties misrepresented to Plaintiffs that the Keller, Kennesaw, and Naperville Properties would be occupied and operational imminently.

 e. After the HSH default, Long and Millrock represented to Plaintiffs that Millrock was filing a lawsuit against the HSH Parties on Plaintiffs' behalf and for their benefit, when, in reality:

      i.  Plaintiffs are neither parties nor beneficiaries to the Millrock-HSH Lawsuit, and they have assigned no claims to Millrock which it may bring on their behalf.

     ii.  Millrock had no ownership interest in the Keller or Naperville Properties during HSH's tenancy and was therefore not similarly situated to the Plaintiffs who do own those two properties (or did at the time the lawsuit was filed).

   iii.  In any event, the lawsuit only seeks damages for misuse of equipment funds paid for the Keller and Draper Properties; the Kennesaw and Naperville Properties are not included, and Plaintiffs hold no ownership interest in the Draper Property.

    iv.  Millrock is not pursuing any claims against Defendant Steve Caton, who received $500,000 in equipment funds for the Kennesaw Property which are likewise unaccounted for.

  f.  After the HSH default, Millcreek, Kevin Long, Brent Smith, the Mary Street Parties, and Steve Caton misrepresented Neuragenex's viability as a replacement tenant for all three properties following the HSH defaults.

904. Additionally, as alleged at length herein, many Defendants intentionally omitted information from statements they made to Plaintiffs which rendered them misleading, and/or intentionally concealed material facts from Plaintiffs and thereby

created a false impression upon them, which constitutes misleading conduct, as that term is defined in 18 U.S.C. § 1515(a)(3)(B). In relevant part, this includes, but is not limited to, the following instances:

a. The Colliers/Long Parties and Mary Street Parties failed to timely disclose tenant defaults.

b. The Colliers/Long Parties omitted their expectation that tenant defaults would expose Plaintiffs to a substantial risk of loss to the value of their investments, and concealed underlying facts indicating the same, including that the properties and leases were substantially overvalued and insufficiently underwritten.

c. The Colliers/Long Parties and Mary Street Parties did not disclose that the Keller Property was nowhere near completion.

d. The Colliers/Long Parties and Mary Street Parties did not disclose that the Kennesaw Property was not complete and still required the installment of $500,000 worth of equipment.

e. Millcreek, Kevin Long, Brent Smith, and the Mary Street Parties failed to timely disclose that Millcreek, Millrock, SARC US, Inc., and others were lending money to tenants to cover rent payments.

f. The Mary Street Parties concealed bank statements from Plaintiffs until March 2023 and failed to produce them in a timely manner after that.

191

g.  The Colliers/Long Parties and Mary Street Parties concealed the identities of Plaintiffs' co-owners until October 2022.

*The Release Agreement*

905.   In October 2022, when Kevin Long and other Defendants disclosed to the Keller owners that HSH had defaulted, they indicated that Millcreek would pay the next year's property taxes on the Keller building and return $250,000 paid by the owners for purposes of securing a bond which was never obtained.

906.   Kevin Long stated he felt morally obligated to pay the taxes and return the bond payment as the building was unfinished and untenanted.

907.   Over the following 8 weeks or so, the Colliers/Long Parties continued discussing the property taxes and bond payment with the Keller owners during weekly meetings.

908.   As the payment date for the Keller property taxes drew closer, the Colliers/Long Parties increasingly began to place conditions on their existing promise to cover the cost of property taxes and return the bond payment.

909.   In January 2023, Millcreek Commercial, through counsel, sent a proposed "Confidential Release Agreement" ("the Release") to the TIC owners of each property leased (or intended to be leased) to HSH, including all three properties owned by Plaintiffs.

910. The parties negotiated the terms of this agreement over the following weeks, and during the course of these negotiations, the Colliers/Long Parties continued to misrepresent and omit material facts to Plaintiffs, including, without limitation, that:

a. Construction on the Keller Property was nearly finished, the only outstanding items were minor tasks, and construction could be completed within a couple of months at most.

b. The Colliers/Long Parties would find a quality replacement tenant.

c. The property values and lease rates were not inflated and Plaintiffs paid fair market value for their investments.

d. Plaintiffs' damages related to the loss of Equipment Allowance funds could be recovered from HSH or HSMG.

e. Millcreek could restore the value of Plaintiffs' investments.

911. Moreover, the Release itself contained recitals which greatly distorted the factual narrative underlying Plaintiff's investments and the tenant default.

912. Under the Release, the "Millcreek Group" (i.e., Millcreek and Millrock) would agree to pay Plaintiffs as if the properties were tenanted for one year, including by covering all expenses for which the tenant was to be responsible.

913. Plaintiffs, in turn, would agree to delay pursuing any legal claims related to their investments until at least January 1, 2024.

193

914.    Additionally, the Release would have required Plaintiffs to permanently waive any claims against the Millcreek Group and all of its owners, members, predecessors, assigns, agents, directors, officers, employees, representatives, attorneys, and all persons acting with or for them, related to:

   a.  misrepresentations about a bond being secured on the Properties, or

   b.  misrepresentations about the status of construction on the Properties.

915.    Similar agreements were presented to the owners of the Kennesaw and Naperville Properties.

916.    Plaintiffs did not sign any of the Releases.

917.    Defendants' conduct related to the Release involved knowingly making false statements to Plaintiffs, making misleading statements to Plaintiffs by intentionally omitting information from them, and intentionally concealing material facts from Plaintiffs to create a false impression, all of which constitutes misleading conduct, as that term is defined in 18 U.S.C. §§ 1515(a)(3)(A)-(B).

918.    Additionally, or alternatively, the Colliers/Long Parties' conduct described above involved voluntary and intentional acts undertaken to suppress or influence Plaintiffs' testimony with the expectation of some benefit to them or another person, and as such, they were corruptly persuading Plaintiffs.

*Tampering With a Witness, Victim, or Informant*

919.   As detailed above, the Colliers/Long Parties attempted to corruptly persuade Plaintiffs and engaged in misleading conduct towards them and other TIC owners with intent to:

a.   delay, or prevent their testimony in an official proceeding;

b.   withhold testimony or a record, document, or other object, from an official proceeding; or

c.   to hinder, delay, or prevent the communication of information relating to the commission or possible commission of a Federal offense to a law enforcement officer or judge of the United States,

920.   Defendants' conduct just described is indictable under 18 U.S.C. § 1512(b).

921.   Additionally, the Colliers/Long Parties concealed from the TIC owners material information contained on documents and records, with the intent to impair their availability for use in an official proceeding, which is indictable conduct under 18 U.S.C. § 1512(c)(1), including, but not limited to, the following:

a.   A promissory note and between Millrock and HSH providing that, among other things, Millrock would pay HSH's financial obligations to the TIC owners, along with other documents related to this promissory note.

b.   Communications from ADP indicating that HSH was not cooperating with their efforts to obtain a bond.

c.   Documents for a bond held by Millrock from Talisman, which included statements that the bond could not be sold, transferred, hypothecated, pledged, or otherwise encumbered.

922.   Defendants' conduct just described is indictable under 18 U.S.C. § 1512(c)(1).

### Illegal Money Transmitting

923.   As lease administrators, the Mary Street parties were responsible for handling payments between the tenants and owners of each of the three Properties.

924.   On information and belief, the Mary Street parties performed these services for at least 23 properties offered under the Colliers/Long TIC Program.

925.   These services involved transferring funds on behalf of the public, which constitutes "money transmitting" as that term is defined under 18 U.S.C. § 1960(b)(2).

926.   Additionally, by engaging in the business of receiving money for transmission and transmitting money within the United States and to locations abroad, the Mary Street parties' performance of these services likewise constitutes "money transmission," as that term is defined under Utah Code § 7-25-102(9)(a).

927.   According to the Utah Department of Financial Institutions, all money transmitter licenses for the State of Utah are issued through the Nationwide Multistate Licensing System ("NMLS").

928.    A search of the NMLS database reveals that none of the Mary Street parties have been issued a money transmitter license.

929.    On information and belief, none of the Mary Street parties are conducting their money transmission services as authorized agents of a licensed money transmitter.

930.    The Mary Street parties' performance of money transmission services without a license is a violation of Utah Code § 7-25-201(1) and is punishable as a misdemeanor under Utah Code § 7-24-405(1)(a).

931.    Accordingly, the Mary Street parties' money transmission operation constitutes an "unlicensed money transmitting business," as that term is defined under 18 U.S.C. § 1960(b)(1)(a).

932.    The money transmission operation would also be classified as an "unlicensed money transmitting business" under 18 U.S.C. § 1960(b)(1)(c), because it involved funds which were known to them to have been derived from a criminal offense and/or were intended to be used to promote or support unlawful activity.

933.    The criminal offenses and unlawful activity in question include, without limitation, the other offenses described in this Amended Complaint.

934.    The Mary Street parties have thus knowingly conducted, controlled, managed, supervised, directed, and/or owned all or part of an unlicensed money transmitting business, which is an indictable act under 18 U.S.C. § 1960(a).

197

**Interstate Transportation of Stolen Property**

935.    As alleged above, Plaintiffs' settlement statements revealed, among other things, that the Colliers/Long Parties had paid large commissions to third parties, including the Qualified Intermediaries, Brokers, and Colliers itself.

936.    These commissions were obtained by fraud because they were never disclosed to Plaintiffs when they made their purchases of TIC interests, and the Colliers/Long Parties represented that the purchase price of their TIC interests would reflect the dollar value of their ownership interest.

937.    The total value of commissions received by each Defendant from Plaintiffs was $5,000 or more.

938.    On information and belief, most, if not all, of the commission payments were transferred in interstate or foreign commerce.

939.    Additionally, Defendants have engaged in other transactions involving the transfer or receipt in interstate or foreign commerce of $5,000 or more of funds obtained from Plaintiffs through fraud, including but not limited to:

   a.  Millcreek and Millrock's transfer of large portions of Plaintiffs' invested funds to the ADP Parties and Caton Parties; and

   b.  the ADP Parties and Caton Parties' subsequent transfers of Plaintiffs' invested funds to purported contractors, subcontractors, and medical equipment suppliers.

940.    Defendants' transfers of $5,000 or more in interstate or foreign commerce knowing the same to have been obtained by fraud are indictable acts under 18 U.S.C. § 2314.

941.    Defendants' receipts of $5,000 or more in interstate or foreign commerce knowing the same to have been stolen, unlawfully taken, or converted are indictable acts under 18 U.S.C. § 2315.

**Money Laundering and Related Acts**

*Money Laundering*

942.    Defendants have conducted or attempted to conduct various financial transactions involving funds derived from their unlawful activities, including the other instances of racketeering activity described herein.

943.    In some cases, Defendants conducted or attempted to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of specified unlawful activity, as that term is defined under 18 U.S.C. § 1956(c)(7). This includes, but is not limited to:

  a.  Millcreek, Millrock, Kevin Long, Brent Smith, and the Mary Street parties' capital call following HSH's default on the Naperville Property, for over $1 million to be paid to a construction company controlled by Brent Smith, which then used the money for unknown purposes;

b. the Colliers/Long Parties' payment of commissions to various third parties;

c. the prior owners' (including Millrock Investment Fund 1, Mark Machlis, Lady Mira Blue Machlis, Samuel Duke, and Hello Bello, LLC) sale of TIC interests to Plaintiffs at inflated rates;

d. the transfer of large sums of money to property development, construction, and medical equipment companies, including the ADP Parties and Caton Parties; and

e. the ADP Parties and Caton Parties' subsequent transfers of Plaintiffs' invested funds, including to purported contractors, subcontractors, and equipment companies.

944.    In other cases, Defendants conducted or attempted to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity, and that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, as that term is defined under 18 U.S.C. § 1956(c)(7). This includes, but is not limited to:

a. Brent Smith and Slope Construction's receipt of over $1 million paid for a capital call on the Naperville Property, which are unaccounted for

because all final payments for renovations to the Naperville Property were remitted by KGL Real Estate Development, not Slope Construction;

b. the Colliers/Long Parties' payment of purported monthly "rent" to Plaintiffs which was, in fact, derived from other sources;

c. Millcreek, Millrock, and SARC US, Inc.'s loan of Plaintiff's invested funds to financially-distressed tenants;

d. the transfer of large sums of money to the ADP Parties and Caton Parties, which are insufficiently accounted for; and

e. the ADP Parties and Caton Parties' subsequent transfers of Plaintiffs' invested funds, including to purported contractors, subcontractors, and equipment companies.

945. Defendants' conduct described herein is indictable under 18 U.S.C. § 1956(a).

*Transactions in Property Derived from Unlawful Activity*

946. Defendants knowingly engaged or attempted to engage in multiple monetary transactions in criminally derived property of a value greater than $10,000, which is indictable under 18 U.S.C. § 1957(a).

947. This includes, but is not limited to, the Colliers/Long Parties transferring large sums of Plaintiffs' invested funds to property development and construction companies, including to the ADP Parties and the Caton Parties.

948. Likewise, the ADP Parties and Caton Parties received those funds transferred by the Colliers/Long Parties and engaged in subsequent transactions with those funds, including by transferring them to purported contractors, subcontractors, and equipment companies.

*Travel or Transportation in Aid of Racketeering*

949. Defendants have traveled in interstate or foreign commerce, or used the mail or other facilities in interstate or foreign commerce, with intent to either distribute the proceeds of unlawful activity, or otherwise promote, manage, establish, or carry on any unlawful activity, or facilitate the same, which is indictable under 18 U.S.C. §§ 1952(a)(1) & 1952(a)(3).

950. This includes, without limitation, traveling to visit the properties sold under the Colliers/Long TIC Program, transferring money to property development and construction companies for renovation work on the properties, and ordering medical equipment for tenants.

**FIRST CAUSE OF ACTION**

*(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Thereunder Against Colliers International Group, Inc.; Colliers International Holdings (USA), Inc.: Colliers International Intermountain, LLC; Kevin Long, Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Brent Smith; Thomas Smith; Lew Cramer; Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American*

*Development Partners; Emanuel Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello; Samuel Duke; Scott King; Merit Commercial Real Estate; KGL Advisors, LLC)*

951.    Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties as tenants, guarantor, and affiliated entities, and the Colliers/Long Parties as those who developed and coordinated the TIC offerings.

952.    Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

953.    The material misrepresentations and omissions were made in connection with the offer to sell a security.

954.    Such material misrepresentation and omissions include, as alleged more fully and specifically herein:

    a.  That the Colliers/Long Parties had conducted due diligence on the tenants for the Millcreek Properties;

    b.  That the investments sold to Plaintiffs would comply with applicable IRS regulations to be 1031-compliant, and that applicable Defendants would verify and ensure that Plaintiffs investments were compliant.

c. The risk analysis of the Keller, Kennesaw, and Naperville Properties;

d. The average capitalization rate of 6-9%% over the initial 20-year lease term;

e. That Millcreek Commercial retained, and would continue to retain, an ownership interest in the Keller, Kennesaw, and Naperville Properties;

f. That the tenants for the Millcreek Properties were "dream tenants";

g. That the guarantor was a solvent company;

h. That there was a bond in place in case of tenant and guarantor default,

i. That the Keller Property was finished or nearly finished and would be operational by July of 2022; and

j. That Millcreek's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

955. Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with the Plaintiffs, or through the marketing materials.

956. Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

957.    Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with severe recklessness as to their truth.

958.    The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase interests in the Keller, Kennesaw, and Naperville Properties. The Plaintiffs would not have invested had they known the true facts.

959.    Plaintiffs justifiably relied on the foregoing misrepresentations.

960.    The statutory safe harbor and bespeaks caution doctrine that apply to forward looking statements under certain circumstances do not apply to this action because no meaningful cautionary statements were made regarding material risks and facts known by Defendants.

961.    The Colliers/Long TIC Program, including the development, marketing, and sale of the Keller, Kennesaw, and Naperville Properties to Plaintiffs in this case, was a device, scheme, or artifice to defraud Plaintiffs, and a series of acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs under the meaning of the Securities Exchange Act.

962.    Defendants participated in, planned, furthered, and executed the Colliers/Long TIC Program as alleged more fully and specifically herein, including by:

    a.  The development of the Colliers/Long TIC Program;

    b.  Oversight of each component part of the Colliers/Long TIC Program;

c.  The selection of and negotiation with tenants;

d.  The development of each TIC offering including lease terms, guarantees, bonds, projections, forecasts, and other aspects of each TIC offering as constituted and marketed;

e.  Planning, negotiations and oversight of equipment purchases, renovations, and construction;

f.  The creation of marketing materials and their dissemination to Plaintiffs;

g.  Referring Plaintiffs to the Colliers/Long TIC Program and endorsing their investment in the same;

h.  The execution of each of Plaintiffs' 1031 exchange and related transactions;

i.  The investment of funds necessary to purchase TIC interests and otherwise operate the Colliers/Long TIC Program; and

j.  The concealment of financial information, communications, and other material facts regarding Plaintiffs investment to prevent Plaintiffs' discovery of said facts and information.

963.  The foregoing misrepresentations, omissions, schemes and artifices to defraud, and actions and course of business on the part of Defendants caused Plaintiffs to suffer extensive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

206

*(Sale of Unregistered Securities Against Colliers International Group, Inc.; Colliers International Holdings (USA), Inc.; Colliers International Intermountain, LLC; Kevin Long, Millcreek Commercial Properties, LLC; Andrew Bell, Trevor Weber, Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management; Brent Smith; Thomas Smith; Jerald Adam Long; Lew Cramer; Mary Street; CAMS Realty; Mountain West Realty; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Scott King, Merit Commercial Real Estate LLC, Mark Machlis; Lady Mira Blue Machlis; Hello Bello; Samuel Duke; and KGL Advisors, LLC)*

964.    Investment in TIC interests in the Keller, Kennesaw, and Naperville Properties was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, for example, the HSH Parties as tenants, guarantor, and affiliated entities, and the Colliers/Long Parties as those who developed and coordinated the TIC offerings.

965.    The TIC interests in the Keller, Kennesaw, and Naperville Properties which are the subject of this Complaint were not registered by the filing of a registration statement.

966.    During the time in which the Colliers/Long Parties and other Defendants developed, marketed and sold TIC interests in the Keller, Kennesaw, and Naperville Properties, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering,

207

selling, and delivering interests in the Keller, Kennesaw, and Naperville Properties, in violation of Section 5 (a) and 5 (c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

967.    Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security.  For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interests in the Keller, Kennesaw, and Naperville Properties to Defendants upon receipt of the amount specified in this paragraph, as may be proven at trial.

968.    In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

969.    In either case, Plaintiffs are further entitled to an award of pre and post-judgment interest, attorney's fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

## THIRD CAUSE OF ACTION

*(Control Person Liability Under the Securities Exchange Act Against Colliers International Group, Inc.; Colliers International Holdings (USA), Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; KGL Real Estate Development PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Lew Cramer; Brent Smith; Thomas Smith; Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel*

*Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello; Samuel Duke; Scott King; Merit Commercial Real Estate; KGL Advisors, LLC)*

970.    Defendants named in Plaintiffs' First and Second Causes of Action are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

971.    At all times relevant to this Complaint, and as alleged specifically herein the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

972.    Defendants were officers, directors, agents, or other control people of entities that are Liable Persons.

973.    Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

974.    Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

975.    Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

976.    Defendants participated in the business operations of the Liable Persons generally.

977.   Defendants had power over the specific transactions and activities at issue in this Complaint.

978.   With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the First Cause of Action.

979.   Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's First Cause of Action.

980.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

**FOURTH CAUSE OF ACTION**

*(State Law Securities Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; KGL Real Estate Development PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Brent Smith; Thomas Smith; Lew Cramer;*

*Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello; Samuel Duke; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

981.    The investments in Millcreek TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law[1].

982.    Section 61-1-1(2) of the Utah Uniform Securities Act (UUSA) makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to ... make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

983.    As described herein, in connection with the Defendants' offer and sale of investments in the Keller, Kennesaw, and Naperville Properties, Defendants made untrue statements of material fact to the Plaintiffs; omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

---

[1] Applicable state law regarding securities fraud includes at least the following statutes: California, CA Corp Code § 25401; Georgia, Ga. Code § 10-5-50; Massachusetts, Mass. Gen. Laws Ch. 110A § 101; Pennsylvania, 70 Pa. Stat. § 1-401; Illinois, 815 ILCS 5/12; Delaware, DE Code § 73-201; New Jersey, N.J. Stat. § 49:3-71; Montana, MT Code 30-10-301; Washington, RCW § 21.20.010; Utah, Utah Code §61-1-1; Texas, TX GOVT § 4007.203; Missouri, V.A.M.S. § 409.5-501.

which they were made, not misleading; or otherwise engaged in conduct that worked

fraud or deceit upon the Plaintiffs in violation of applicable provisions of the UUSA and

other applicable provisions of state law.

984.    The Defendants engaged in the conduct violating the applicable laws with

knowledge of their failure to make a full and fair disclosure to Plaintiffs.

985.    Plaintiffs did not know that Defendants' misrepresentations were false

and were not aware of the material facts that Defendants omitted to disclose in

connection with their purchase of securities.

986.    Each untrue statement of a material fact or omission of a material fact,

including but not limited to those specifically alleged herein, is alleged as a separate

violation of Section 61-1-1(2) of the UUSA and other applicable provisions of state law.

987.    Section 61-1-7 of the UUSA makes it unlawful "for any person to offer or

sell any security in this state unless it is registered under this chapter, the security for

which a notice filing has been made pursuant to the provisions of Section 61-1-15.5."

988.    As described herein, Defendants have violated and continue to violate

Section 61-1-7 of the UUSA by offering and selling securities in Utah that are not federal

covered securities for which a notice filing has been made.

989.    By reason of Defendants' violations of applicable state statutes governing

securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory

remedies, which may be measured by the total amount of Plaintiffs investment plus

interest at applicable rates, less the value of what Plaintiffs received from the investment.

990.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CAUSE OF ACTION

*(State Law Securities Violation/Sale by Unlicensed Broker or Investment Adviser Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management; Mark Machlis; Lady Mira Blue Machlis; Hello Bello; Samuel Duke; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

991.    The investments in Millcreek TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law, including Section 61-1-3(1) of the UUSA[2].

992.    Section 61-1-3(1) of the UUSA makes it unlawful "to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter."

993.    As described herein, Defendants have violated and continue to violate Section 61-1-3(1) of the UUSA by, among other things, offering and selling securities in and from the State of Utah, in return for compensation, without a license.

994.    Defendants functioned as securities agents in selling the investment in Millcreek TIC Properties to the Plaintiffs.

995.    Defendants' conduct violates provisions of applicable state law[2] which requires securities agents to be licensed.

996.    By reason of Defendants' unlicensed participation in the sale of securities to the Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs received from the investment.

997.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CAUSE OF ACTION

*(Materially Aiding State-Law Securities Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity*

---

[2]  Applicable state law regarding the licensing of securities agents includes at least the following statutes: California, CA Corp Code § 25210; Georgia, Ga. Code § 10-5-31; Pennsylvania, 70 Pa. Stat. § 1-301; New Jersey, NJ Stat. § 49:3-56; Illinois, 815 ILCS 5/12; Massachusetts, Mass. Gen. Laws. Ch. 110A § 201; Washington, RCW § 21.20.040; Delaware, 6 DE Code § 73-202; Montana, Mt. Code 30-10-201; Utah Code §61-1-3;  Texas, TX GOVT § 4004.052; Missouri, V.A.M.S. § 409.4-401.

*Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; KGL Real Estate Development PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Brent Smith; Thomas Smith; Lew Cramer; Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello, LLC;  Samuel Duke; Scott King; Merit Commercial Real Estate, LLC; and KGL Advisors, LLC)*

998.    The Defendants identified in Plaintiffs' Fourth and Fifth Causes of Action are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Cause of Action as the "Liable Persons."

999.    At all times relevant to this Complaint, the Defendants identified in this Cause of Action materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

a.  Defendants were officers, directors, agents, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

b.  As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

c.  Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

215

1000.    Defendants did not act in good faith, and Defendants knew or acted in reckless disregard of the facts in carrying out their conduct relating to the sale of securities to the Defendants.

1001.    Pursuant to applicable state law relating to those who materially aid securities violations[3]Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Fourth and Fifth Causes of Action.

1002.    Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CAUSE OF ACTION

*(Common Law Fraud Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek*

---

[3] Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following: California, § 25403; Georgia, Ga. Code § 10-5-58; Massachusetts, Mass. Gen. Laws. Ch. 110A § 410; Pennsylvania, 70 Pa. Stat. § 1-503; Washington, RCW 21.20.430; Illinois, Il. Code 815 ILCS 5/14; Delaware, 6 DE Code § 73-201; Montana, MT. Code 30-10-105; New Jersey, NJ Stat. § 49:3-71; Utah Code §61-1-22; Texas, TX GOVT § 4008.055; Missouri, V.A.M.S. § 409.5-509.

*Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC: Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

1003.   As alleged more fully herein, Defendants made false statements about vital facts regarding Plaintiffs' investments in the Keller, Kennesaw, and Naperville Properties, including the representations within the Marketing Materials and the representations made to each individual Plaintiff, as well as false statements to Plaintiffs following their investments in the Colliers/Long TIC Program.

1004.   Defendants made the statements knowing that they were false.

1005.    Alternatively, Defendants made the statements recklessly and without regard for their truth.

1006.   Defendants intended that the Plaintiffs would rely on the statements.

1007.   Plaintiffs reasonably relied on the statements by investing in the Keller, Kennesaw, and Naperville Properties and in continuing to rely on the Millcreek/Colliers Parties and Mary Street to guide and manage their investment.

1008.   As a result of Defendants' conduct, Plaintiffs suffered damages in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**

*(Negligent Misrepresentation Against Colliers International Group, Inc.; Colliers International Holdings (USA), Inc.; Colliers International Intermountain, LLC; Kevin*

*Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

1009. Defendants had a duty to inspect and to disclose fully and fairly all facts that materially affected or related to the condition of the Keller, Kennesaw, and Naperville Properties, the viability of the investment, the legitimacy of the tenant and corporate guarantor, and compliance with applicable IRS regulations including Section 1031 and Revenue Procedure 2002-22.

1010. Defendants made false representations to Plaintiffs as detailed above.

1011. Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

1012. Defendants knew such representations were false or were negligent in making such representations.

1013. Defendants were negligent in investigating the tenant and the corporate guarantor.

1014. Defendants were negligent in ensuring and/or verifying that the investments complied with applicable IRS regulations for 1031 exchanges, including Revenue Procedure 2002-22.

1015.  Defendants knew or should have known the misrepresentations were false.

1016.  The Defendants made the misrepresentations in an effort to induce the Plaintiffs into purchasing the Keller, Kennesaw, and Naperville Properties for a grossly inflated price.

1017.  The foregoing misrepresentations and omissions were not only material, but the information was critical to the Plaintiffs' evaluation of whether to purchase the Keller, Kennesaw, and Naperville Properties and their continued reliance on Mary Street and the Colliers/Long Parties thereafter.

1018.  Plaintiffs would not have invested in the Keller, Kennesaw, and Naperville Properties, nor continued to rely on Mary Street and the Colliers/Long Parties to manage their investments, had they known the true facts.

1019.  Plaintiffs justifiably relied on the foregoing misrepresentations.

1020.  As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

*(Breach of Fiduciary Duty Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Brent Smith; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC;*

***Steve Caton; SARC US, Inc.; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)***

1021.   Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the Keller, Kennesaw, and Naperville Properties.

1022.   Defendants expected that Plaintiffs would put particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely on their judgment and skill regarding their TIC investments in the Keller, Kennesaw, and Naperville Properties.

1023.   The TIC investment structure and IRS rules made Plaintiffs weaker parties with unique vulnerabilities, including, *inter alia*, Plaintiffs' age, experience, abilities, disabilities as applicable, and the fact that that Plaintiffs were prohibited from actively managing their investments.

1024.   Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with Defendants.

1025.   Defendants owed Plaintiffs fiduciary duties of honesty, loyalty, care, and a duty to use their special skills for Plaintiffs' benefit.

1026.   Plaintiffs reposed absolute trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

1027.   Defendants accepted that trust and confidence from Plaintiffs.

1028. Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

1029. Defendants were also Plaintiffs' agents.

1030. Defendants also had access to superior and exclusive knowledge about the Keller, Kennesaw, and Naperville investment opportunities, such as information about the financial performance of the tenants, HSH, HSMG, their affiliate entities, the flow of funds to and from those entities, the status of promised renovations and equipment purchases, and the investments' degree of likely compliance with applicable IRS regulations for 1031 exchanges.

1031. Defendants breached their fiduciary duties to Plaintiffs by, *inter alia*, failing to do any investigation into the legitimacy of the tenant and guarantor or else concealing their knowledge regarding the same, by making the materially false or misleading representations or omissions alleged above, by actively concealing information concerning Plaintiffs' investments from them, and otherwise acting in the best interests of parties other than Plaintiffs.

1032. Defendants' breach of their fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

1033. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**

221

*(Concealment/Fraudulent Nondisclosure Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

1034.    As alleged more fully herein, a special relationship existed between Plaintiffs and the Colliers/Long Parties identified as Defendants in this Cause of Action, in that the Colliers/Long Parties had and held themselves out as having superior knowledge, expertise, and access to information concerning all aspects of the TIC investments they developed, marketed, and sold to Plaintiffs, and Plaintiffs were in a uniquely vulnerable position due to their lack of relative experience, knowledge, and access to information, including due to IRS regulations governing the timing, management, and other conditions of 1031 exchanges.

1035.    The Colliers/Long Parties identified as Defendants in this Cause of Action knew the truth of their numerous misrepresentations and omissions alleged herein, including concerning the absence of the advertised bond, the financial and operational state of the tenant and guarantor; the reliability and trustworthiness of the Developer Parties, HSH Parties, and others with whom they partnered in the Colliers/Long TIC Program; the status of renovations and equipment acquisitions; the many factors giving rise to a substantial likelihood that Plaintiffs' investments were not 1031-

222

compliant; and others, but failed to disclose these facts to Plaintiffs.

1036.   As alleged more fully herein, special relationship existed between Plaintiffs and Mary Street and CAMS Realty, in that Mary Street and CAMS Realty had agreed to act in Plaintiffs' best interests, had and held themselves out as having superior knowledge and experience concerning all aspects of their role as lease administrator and/or property manager, and held Plaintiffs' funds in the course of their administration of the Keller, Kennesaw, and Naperville Investments.

1037.   Mary Street and CAMS Realty knew that the HSH Parties were not paying rent, that Millcreek or its affiliates were actually paying rent, that there was no certificate of occupancy at the Keller Property nor was one imminent, that there was no bond from Lloyds of London, and that they had done little or nothing to vet Plaintiffs investment or act in their best interests with respect to their investments in the Colliers/Long TIC Program, but failed to disclose these facts to Plaintiffs, as alleged more fully herein.

1038.   As alleged more fully herein, special relationship existed between Plaintiffs and each of their respective Qualified Intermediaries or Referrers, in that the Qualified Intermediaries had and held themselves out as having superior knowledge and experience concerning all material aspects of the transactions they conducted on Plaintiffs behalf and held Plaintiffs' funds to conduct their respective 1031 exchanges, and Plaintiffs were in a uniquely vulnerable position due to their lack of relative

experience, knowledge, and access to information regarding, *inter alia*, the Colliers/Long TIC Program and IRS regulations governing the timing and other conditions of 1031 exchanges.

1039. The Qualified Intermediaries and Referrers knew that they had done little or nothing to verify or ensure that Plaintiffs potential investments through the Colliers/Long TIC Programs were 1031-compliant or to verify the truth of the Colliers/Long Parties representations about their TIC investments, and knew the truth of their other misrepresentations about the Colliers/Long TIC Program and their own credentials, experience, reliability, and services, but failed to disclose these facts to the respective Plaintiffs with whom they interacted, as alleged more fully herein.

1040. As alleged more fully herein, a special relationship existed between Plaintiffs and Steve Caton and SARC US, Inc., in that Caton and his company were entrusted with substantial funds on behalf of Plaintiffs with respect to their investments, and in that Caton and his company integrated themselves into the development and execution of the Colliers/Long TIC Program into which Plaintiffs invested and had superior knowledge, expertise, and access to information concerning all aspects of Plaintiffs' investment, and Plaintiffs were in a uniquely vulnerable position due to their lack of relative experience, knowledge, and access to information, including due to IRS regulations governing the timing, management, and other conditions of 1031 exchanges.

1041.   Caton and SARC US, Inc. knew the truth about substantial aspects of Colliers/Long TIC Program, including the absence of the advertised bond, the financial and operational state of the tenant and guarantor; the reliability and trustworthiness of the HSH Parties, the deceptive marketing of the Colliers/Long Parties, the status of renovations and equipment acquisitions, and others, but failed to disclose these facts to Plaintiffs.

1042.   Plaintiffs did not know the facts described above, including the lack of vetting for either the tenant or the investment as a whole, the investments' 1031-compliant status, the absence of a bond, the unreliability of the corporate guarantor, and other material facts described more fully herein.

1043.   Each of Defendants' failures to disclose the above-identified facts were a substantial factor in causing Plaintiffs' damages, the amount of which will be determined at trial.

**ELEVENTH CAUSE OF ACTION**

*(Elder Abuse/Abuse of Vulnerable Adults By Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, and Donald Patterson, Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC;*

*Steve Caton; SARC US, Inc.; Scott King; Merit Commercial Real Estate; and KGL Advisors, LLC)*

1044.   Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Katherine Madera, Carl McQueary, Donald Patterson, Charles Brauer and Lynn McQueary were 65 or older at the time their investments were induced.

1045.   Plaintiff Charles Brauer suffers from a disability stemming from multiple sclerosis and is older than 65 years old.

1046.   Plaintiff Donald Patterson suffers from a disability stemming from Parkinson's disease and is older than 65 years old.

1047.   At all relevant times herein, Plaintiffs Robert Tannehill, Ditas Tannehill, Jose Rementeria, Robert Myers, Charles Brauer, Katherine Madera, Carl McQueary, Lynn McQueary, and Donald Patterson were "vulnerable adults" as that term is defined in Utah Code § 76-5-111 and is therefore entitled to the protections provided under Utah Law.

1048.   Defendants were in a position of trust and confidence or had a business relationship with these vulnerable adults, who put substantial trust and confidence in Defendants.

1049.   Defendants knowingly, by deception, obtained or used these vulnerable adult's funds, credit, assets, or other property.

1050. Defendants intended to temporarily or permanently deprive the vulnerable adults of the use, benefit, or possession of the Plaintiffs' property, for their own benefit.

1051. Defendants were aware of and exploited Plaintiffs' dependency upon Defendants' purported knowledge, skills, and expertise.

1052. To sell the TIC investments to Plaintiffs, Defendants made misrepresentations of material facts and committed other wrongful acts as alleged herein. Defendants were motivated by greed and intended to generate fees ,commissions, and other benefits for themselves by causing Plaintiffs to invest while exposing Plaintiffs to an unreasonable risk of harm.

1053. Defendants received commissions, fees, and other benefits on the sale of the TICs to Plaintiffs and their management.

1054. Oftentimes, these commissions were not disclosed to Plaintiffs.

1055. Defendants have made written and oral misrepresentations and misleading statements of material facts in connection with the offer and sale of the TICs for the purpose of inducing Plaintiffs to invest.

1056. In engaging in such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest.

1057. In engaging in such conduct, Defendants intended to defraud Plaintiffs within the meaning of Utah's elder abuse statute.

1058. Under applicable state statutes and related tort principles, including the doctrine of *prima facie* tort or negligence *per se*, Defendants' conduct constitutes abuse of vulnerable persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable under other claims asserted herein, together with additional general damages as may be determined at trial.

1059. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## TWELFTH CAUSE OF ACTION

***(Conspiracy to Engage in Tortious Conduct Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; KGL Real Estate Development PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Brent Smith; Thomas Smith; Lew Cramer; Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello, LLC; Samuel Duke; Scott King; Merit Commercial Real Estate, LLC; and KGL Advisors, LLC)***

1060. With respect to the tortious conduct alleged herein, the Colliers/Long Parties and other Defendants entered into a combination with each other and with the

HSH Parties and Developer Parties and other Defendants to accomplish the object of the tortious behavior, namely fraudulently inducing Plaintiffs' investment in the Keller, Kennesaw, and Naperville Properties and continuing to conceal the fraud from and exploit Plaintiffs after their investments.

1061. Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the Causes of Action and other facts above, and was reached expressly in communications between the parties regarding the Colliers/Long TIC Program, or was tacit or implied in the parties' intent as evidenced by their conduct.

1062. In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful acts, including the acts described in the Causes of Action above.

1063. By reason of Defendants' participation in the civil conspiracy, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of property that Plaintiffs actually received.

1064. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as

consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## THIRTEENTH CAUSE OF ACTION

*(Aiding and Abetting Tortious Conduct Against Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Kevin Long; Millcreek Commercial Properties, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Summit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Brent Smith; Thomas Smith; Lew Cramer; Jerald Adam Long; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Mark Machlis; Lady Mira Blue Machlis; Hello Bello, LLC;  Samuel Duke; Scott King; Merit Commercial Real Estate, LLC; KGL Advisors, LLC)*

1065.  As set forth in the allegations above, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

1066.  As alleged more fully herein,  Colliers, Kevin Long, and their employees, agents, and affiliates identified as Defendants for this Cause of Action knowingly aided and abetted the underlying tortious conduct including by developing, marketing, and selling the Colliers/Long TIC Program, distributing sales materials concerning the Millcreek TIC properties, recommending investment in Millcreek TIC properties, selling and closing sales of investment transactions, causing a substantial portion of Plaintiffs' investment funds to be diverted to the payment of excessive commissions or other compensation to the Colliers/Long Parties and the referring Qualified

Intermediaries, and making the remaining proceeds of Plaintiffs' investments freely available to the Developer Parties and/or the HSH Parties without restriction as to use.

1067.  As alleged more fully herein, the  Colliers, Kevin Long, and their employees, agents, and affiliates identified as Defendants for this Cause of Action engaged in such conduct with knowledge of the underlying tortious conduct including in that they were intimately familiar with the HSH Parties, their operations, their financial weakness, their failures to pay property taxes, and their failing business based on frequent and on- going communication with the HSH Parties and their principals, negotiations of loans and other inter-party transactions, and receipt of financial information.

1068.  The HSH Parties knowingly aided and abetted the underlying tortious conduct by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Colliers/Long Parties to induce Plaintiffs' investment, as well as by diverting funds intended for Plaintiffs' benefit in connection with renovations at the Keller Property.

1069.  The HSH Parties engaged in such conduct with knowledge of the underlying tortious conduct, in that they were aware that the Colliers/Long Parties would use false and misleading statements in order to induce investment, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

1070.  As alleged more fully herein, the Developer Parties knowingly aided and abetted the underlying tortious conduct including by participating in the creation of the Marketing Materials containing material misrepresentations that enabled the Colliers/Long Parties to induce Plaintiffs' investment, by helping to locate and negotiate lease terms with the HSH Parties, by diverting funds intended for Plaintiffs' benefit in connection with renovations at the Keller and Kennesaw Properties.

1071.  As alleged more fully herein, the Developer Parties engaged in such conduct with knowledge of the underlying tortious conduct, including in that they were aware that the Colliers/Long Parties would use false and misleading statements in order to induce investment, that they knew that the HSH Parties had no ability to deliver on the terms of the leases, and that their diversion of funds would deprive Plaintiffs of the renovated building they were promised at the Keller Property.

1072.  As alleged more fully herein, the Qualified Intermediaries and Referrers knowingly aided and abetted the underlying tortious conduct including by entering referral agreements with the Colliers/Long Parties and receiving fees for their referrals, referring Plaintiffs to the Colliers/Long TIC Program and endorsing it to Plaintiffs, and failing to verify or ensure the investments' compliance with applicable IRS regulations.

1073.  As alleged more fully herein, the Qualified Intermediaries and Referrers engaged in such conduct with knowledge of the underlying tortious conduct, including

in that they were aware that they had done little or nothing to verify the truth of the Colliers/Long Parties' and their own representations with respect to the investments marketed and sold, that they had done little or nothing to verify or ensure that Plaintiffs' investments were compliant with applicable IRS regulations, and in that they received undisclosed referral fees for inducing Plaintiffs' investments.

1074.   As alleged more fully herein, Mary Street, CAMS Realty, and Mountain West Realty knowingly aided and abetted the underlying tortious conduct including by aiding in the development and planning of the Colliers/Long TIC Program, in their concealment, misrepresentation, and manipulation of crucial information regarding Plaintiffs' investments, and by acting against Plaintiffs' best interests with respect to their investments.

1075.   As alleged more fully herein, Mary Street, CAMS Realty, and Mountain West Realty engaged in such conduct with knowledge of the underlying tortious conduct, including in that they aided the Colliers/Long Parties in the development and planning of the Colliers/Long TIC Program and had knowledge of the deceptive and exploitative nature of its design and operation, knew the truth of material issues regarding Plaintiffs investment including "rent" from the tenant and the status of a certificate of occupancy at the Keller Property but concealed and misrepresented the truth, and knew Plaintiffs' best interests but acted against them.

1076.   By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the property that Plaintiffs actually received.

1077.   Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### FOURTEENTH CAUSE OF ACTION

*(Negligence against Colliers International Group, Inc; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; David Josker; Lew Cramer; Millcreek Commercial Properties, LLC; Andrew Bell; Trevor Weber; Spencer Taylor; Blake McDougal; Scott Rutherford; Equity Sumit Group; Elevated 1031; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Brent Smith; Thomas Smith; Jerald Adam Long; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, LLC; Mary Street; CAMS Realty, LLC; Mountain West Commercial, LLC; Steve Caton; SARC US, Inc.; Jameson, LLC dba American Development Partners; Emanuel Butera; Jamie Butera; Scott King; Merit Commercial Real Estate, LLC; and KGL Advisors, LLC)*

1078.   At all material times, Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; and David Josker had the authority to direct and exercised

substantial control over the activities and affairs of Colliers' subsidiaries and agents, as set forth more fully herein.

1079.   As set forth more fully herein, Colliers International Group, Inc; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; and David Josker negligently allowed Colliers' subsidiaries and agents to plan, develop, and execute the fraudulent scheme that was the Colliers/Long TIC Program.  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; and David Josker knew or should have known that their agents and subsidiaries were performing the unlawful acts alleged herein.

1080.   Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; and Colliers International Intermountain, LLC permitted, encouraged, and/or instructed their subsidiaries and agents to use, at all material times, the uniform branding, logo, and name of "Colliers" and "Colliers International" in connection with the Colliers/Long TIC Program.  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; and Colliers International Intermountain, LLC did this with the express intent of inducing customers, clients, business partners, and others to rely on the deliberately created impression that Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC and their subsidiaries constitute a single global entity.  Matthew Hawkins; Gil

Borok; and David Josker were aware of and instructed, ratified, and/or approved of this course of conduct.

1081.  Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; and David Josker failed to regulate, control, observe, train, monitor, supervise, or maintain appropriate and necessary safeguards to prevent or minimize the risk of their subsidiaries and agents conducting the fraudulent scheme alleged herein.

1082.  By reason of Colliers International Group, Inc.; Colliers International Holdings (USA) Inc.; Colliers International Intermountain, LLC; Matthew Hawkins; Gil Borok; and David Josker's negligence, Plaintiffs have suffered damages in an amount to be proved at trial.

1083.  At all material times other Defendants identified in this Cause of Action had the authority to direct and exercised substantial control over the activities and affairs of their respective agents, employees, and entities, as alleged more fully herein.

1084.  Other Defendants identified in this Cause of Action failed to regulate, control, observe, train, monitor, supervise, or maintain appropriate and necessary safeguards to prevent or minimize the risk of their respective agents, employees, and entities, as alleged herein.

1085.  At all material times other Defendants identified in this Cause of Action owed Plaintiffs a duty of care, as alleged more fully herein.

1086. Other Defendants identified in this Cause of Action breached their duty of care as alleged more fully herein, including by failing to properly vet the HSH Parties as tenants and HSMG as a corporate guarantor; failing to secure and misrepresenting the existence of a bond from Lloyd's of London; failing to supervise or monitor the disbursement of funds for equipment and renovations; failing to monitor and truthfully represent to Plaintiffs key aspects of the investments sold to them; failing to properly vet their partners, affiliates, agents, and associates in the Colliers/Long TIC Program; and other failures as alleged more fully herein.

1087. By reason of the negligence of other Defendants identified in this Cause of Action, Plaintiffs have suffered damages in an amount to be proved at trial.

## FIFTEENTH CAUSE OF ACTION

### *(Violations of 18 U.S.C. § 1962(a) by All Plaintiffs Against Defendants Kevin Long, Jerald Adam Long, Brent Smith, and Spencer Taylor)*

1088. Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c).

1089. In November 2024, Kevin Long formed KGL Advisors LLC ("KGL Advisors").

1090. Recently, Millcreek's website has indicated that the business is closing, and it refers visitors directly to a website for KGL Advisors instead. On December 4,

2024, Millcreek's website consisted of a single page with the following message: "Our friends at KGL Advisors have agreed to assist Millcreek Commercial Clients. The Millcreek agents that moved to KGL Advisors can assist you with Tenant in Common Investments from that brokerage. We appreciate the trust our clients and partners have placed in us over the years."

1091.  Kevin Long is also the principal of KGL Real Estate Development, PLLC ("KGL Real Estate"), which was recently identified as the one of the four principals of Millcreek at the time of its dissolution. KGL Advisors and KGL Real Estate are collectively referred to herein as "the KGL Companies."

1092.  Millcreek's other principals at the time of its dissolution were Defendants Smart Cove, LLC ("Smart Cove"); GTR Holdings, LLC ("GTR Holdings"); and Long Holdings, L.L.C. ("Long Holdings"); these entities are controlled, in whole or in part, by Defendants Spencer Taylor, Brent Smith, and Adam Long, respectively. These entities are collectively referred to herein as "the Other Millcreek Members."

1093.  In 2021 Axia Partners, LLC ("Axia"), a Delaware Limited Liability Company with its principal place of business in Lehi, Utah, was founded by Defendant Adam Long and others, and Adam Long has maintained leadership positions at Axia ever since.

1094.  Axia is a commercial real estate investment company with a similar business model to Millcreek.

1095.   Kevin Long has recently begun marketing Axia's properties to prospective investors, in what appears to be a similar scheme to the Colliers/Long TIC Program, along with Parker Peterson, a member of Axia's leadership team and former Millcreek and Colliers employee who worked closely on the Colliers/Long TIC Program.

1096.   Axia has promoted properties sold under the Colliers/Long TIC Program as "case studies" to potential investors in its development fund.

1097.   Axia has also promoted Adam Long's role and experience at Millcreek and Colliers as evidence of its leadership team's successful track record.

1098.   Axia is also affiliated with Colliers, which provides brokerage, market research, and property management services.

1099.   One of Axia's "strategic partners" is Brandon Fugal, one of the principals of Colliers International Intermountain.

1100.   One of the founders of Axia Partners was Aaron Wagner, an individual who was recently indicted on charges of fraud and money laundering.

1101.   On March 5, 2024, Brent Smith formed Sky High Capital Partners, LLC. Brent Smith is its sole member and manager.

1102.   On June 7, 2024, Sky High Capital Partners, LLC formed SHC Management, LLC. Sky High Capital Partners, LLC is its sole member and manager.

1103.   Sky High Capital Partners, LLC and SHC Management, LLC are hereinafter referred to as "the SHC companies."

1104.   On June 17, 2024, SHC Management, LLC became the sole member and manager of Millrock.

1105.   On April 24, 2023, Brent Smith formed Slope Construction, LLC ("Slope Construction"), a Utah company whose principal place of business is also in Utah. Brent Smith is its sole member and manager.

1106.   As previously alleged at length, after NGX defaulted on its lease of the Naperville Property, Brent Smith made a fraudulent capital call to the Naperville Owners.

1107.   Those who responded to the capital call were instructed to make payments to Slope Construction, who would oversee the proposed improvements to the property.

1108.   However, all final payments for those improvements were remitted by KGL Real Estate Development, not Slope Construction.

1109.   Consequently, the money paid to Slope Construction is unaccounted for.

1110.   In 2024, Brent Smith and others formed NextPain Care, a healthcare company specializing in pain management.

1111.   NextPain Care is believed to be a marketing name or dba of one or more legal entities; however, Plaintiffs have been unable to identify the exact entity or entities operating as NextPain Care. The unidentified entity or entities doing business as NextPain Care are referred to herein as "NextPain."

1112. Brent Smith contributed startup capital to NextPain and serves as its Chief Financial Officer.

1113. NextPain was heavily promoted by the Mary Street parties as a replacement tenant for the Naperville Property following the default and eviction of NGX.

1114. A majority of the Naperville owners voted to select NextPain as their new tenant.

1115. NextPain has not yet executed a lease on the Naperville Property.

1116. However, NextPain agreed to pay monthly "triple net fees" to the Naperville owners after they were selected as the new Naperville tenant.

1117. NextPain paid monthly triple net fees through January 2025.

1118. In February 2025, without warning or explanation, NextPain stopped paying the triple net fees for the Naperville Property.

1119. As legal entities, the KGL Companies, the Other Millcreek Members, Axia, Millrock, the SHC Companies, Slope Construction, and NextPain are each "enterprises," as that term is defined under 18 U.S.C. § 1961(4).

1120. By purchasing, developing, and selling commercial real estate located in multiple states to customers both across the United States and internationally, the KGL Companies and Axia are engaged in interstate and/or foreign commerce.

1121.   On information and belief, the Other Millcreek Members are also engaged in interstate and/or foreign commerce.

1122.   By acquiring and selling investment properties across the United States, Millrock (and, by extension, its principals the SHC Companies) engages in interstate commerce.

1123.   By coordinating construction projects in one or more states other than the one in which it is registered and primarily does business, Slope Construction engages in interstate commerce.

1124.   NextPain holds itself out as operating in and presently expanding to multiple states, and it is therefore a business engaged in interstate commerce.

1125.   On information and belief, including based on their roles at Colliers and/or Millcreek, their close involvement in the operation and management of Millcreek and the Colliers/Long TIC Program, and their vicarious ownership of Millcreek prior to its dissolution, Kevin Long, Adam Long, Brent Smith, and Spencer Taylor have received income derived, directly or indirectly, from a pattern of racketeering activity.

1126.   On information and belief, Kevin Long used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating the KGL Companies, in violation of 18 U.S.C. § 1962(a).

1127. On information and belief, Adam Long used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating Axia and Long Holdings, in violation of 18 U.S.C. § 1962(a).

1128. On information and belief, Brent Smith used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and operating GTR Holdings, Millrock, the SHC Companies, Slope Construction, and NextPain, in violation of 18 U.S.C. § 1962(a).

1129. On information and belief, Spencer Taylor used or invested, directly or indirectly, part of such income, or the proceeds thereof, in establishing and/or operating Smart Cove, in violation of 18 U.S.C. § 1962(a).

1130. Kevin Long's violations of 18 U.S.C. § 1962(a) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

    a. The Keller and Kennesaw Properties were unusable for any tenant in their current state, forcing their owners to sell the properties at a substantial discount, but not before they had already incurred significant losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

    b. The Naperville Property is not operational, and its owners are incurring ongoing losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

c. Plaintiffs' invested funds have been diverted to other purposes to the detriment of the value of their TIC interests.

d. Winding up Millcreek and transferring its assets and operations to other entities frustrates Plaintiffs' ability to discover evidence relevant to their claims and obtain recovery for their losses.

1131. Adam Long's violations of 18 U.S.C. § 1962(a) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

a. The Keller and Kennesaw Properties were unusable for any tenant in their current state, forcing their owners to sell the properties at a substantial discount, but not before they had already incurred significant losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

b. The Naperville Property is not operational, and its owners are incurring ongoing losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

c. Plaintiffs' invested funds have been diverted to other purposes to the detriment of the value of their TIC interests.

d. Winding up Millcreek and transferring its assets and operations to other entities frustrates Plaintiffs' ability to discover evidence relevant to their claims and obtain recovery for their losses.

1132. Brent Smith's violations of 18 U.S.C. § 1962(a) have proximately caused injury to Plaintiffs the Rementerias and Self Storage in several respects, including, but not limited to:

a. The Keller and Kennesaw Properties were unusable for any tenant in their current state, forcing their owners to sell the properties at a substantial discount, but not before they had already incurred significant losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

b. The Naperville Property is not operational, and its owners are incurring ongoing losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

c. Plaintiffs' invested funds have been diverted to other purposes to the detriment of the value of their TIC interests.

d. Winding up Millcreek and transferring its assets and operations to other entities frustrates Plaintiffs' ability to discover evidence relevant to their claims and obtain recovery for their losses.

e. With respect to Plaintiffs the Rementarias and Self Storage, specifically, Brent Smith has leveraged his position at NextPain and his ownership interest in the Naperville Property to secure yet another high-risk startup tenant with dubious prospects, no proven track record, and unknown

financial circumstances which has not even executed a lease and has already begun defaulting on a separate, preliminary payment obligation to the Naperville Owners, thereby exacerbating their losses as they bear the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

f.  With respect to Plaintiffs the Rementarias and Self Storage, specifically, by potentially diverting funds paid to Slope Construction for renovations to the Naperville Property, Brent Smith has misrepresented the cost of those improvements and thereby further distorted the property value.

1133.  Spencer Taylor's violations of 18 U.S.C. § 1962(a) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

a.  The Keller and Kennesaw Properties were unusable for any tenant in their current state, forcing their owners to sell the properties at a substantial discount, but not before they had already incurred significant losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

b.  The Naperville Property is not operational, and its owners are incurring ongoing losses by bearing the cost of taxes, maintenance, insurance, and elevated "crisis rate" Lease Administration fees.

c.  Plaintiffs' invested funds have been diverted to other purposes to the detriment of the value of their TIC interests.

d.  Winding up Millcreek and transferring its assets and operations to other entities frustrates Plaintiffs' ability to discover evidence relevant to their claims and obtain recovery for their losses.

1134.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

1135.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTEENTH CAUSE OF ACTION

*(Violations of 18 U.S.C. § 1962(c) by All Plaintiffs Against Colliers International Intermountain, LLC; Colliers International Holdings (USA), Inc.; Colliers International Group, Inc.; Kevin Long; Jerald Adam Long; Brent Smith; Spencer Taylor; Andrew Bell; Blake McDougal; Scott Rutherford; Trevor Weber; Scott King; Mark Machlis; Lady Mira Blue Machlis; Samuel Duke; Mary Street; Emanuel "Manny" Butera; Jamie Butera; Steve Caton; Millcreek Commercial Properties, LLC; KGL Advisors, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, L.L.C.; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Merit Commercial Real Estate LLC; Hello Bello, LLC; CAMS Realty, LLC; Mountain West Commercial, LLC; Jameson LLC dba American Development Partners; and SARC US, Inc.)*

1136.  Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c),

1137. The Colliers/Long TIC Program consists of a union or group of individuals associated in fact by virtue of their participation in the planning and execution of the Program, including each of the Defendants named in this action, and as such, constitutes an "enterprise," as that term is defined under 18 U.S.C. § 1961(4).

1138. Alternatively, the Colliers/Long TIC Program involved the participation of multiple legal entities, which are themselves "enterprises," as that term is defined under 18 U.S.C. § 1961(4).

1139. For purposes of this cause of action, the Colliers/Long TIC Program and the legal entities that participated in it are collectively and interchangeably referred to as "the enterprise."

1140. The enterprise engaged in both interstate and foreign commerce, as evidenced by Plaintiffs and Defendants' respective domiciles and the locations of the Properties.

1141. As alleged at length above, since at least 2018 each Defendant has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

1142. Defendants' violations of 18 U.S.C. § 1962(c) have proximately caused injury to Plaintiffs in several respects, including, but not limited to:

   a. the loss of substantially all the value of their original investments caused by the complete and utter failure of their Colliers/Long TIC interests;

b. the immediate loss of the expected value of their original investments through the payment of undisclosed commission payments to themselves and third parties;

c. the loss of 20 years of progressively-increasing passive income due to Defendants' chronic inability to lease the properties;

d. exposure to increased tax liability and potential penalties for failing to comply with the requirements of a 1031 exchange; and

e. additional losses arising from or connected with the defaults of the original tenants of each property, including bearing the costs of taxes, maintenance, insurance, and elevated "crisis rate" lease administration fees for the vacant properties.

1143. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

1144. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTEENTH CAUSE OF ACTION

*(Violations of 18 U.S.C. § 1962(d) by All Plaintiffs Against Colliers International Intermountain, LLC; Colliers International Holdings (USA), Inc.; Colliers International Group, Inc.; Kevin Long; Jerald Adam Long; Brent Smith; Spencer Taylor; Andrew Bell; Blake McDougal; Scott Rutherford; Trevor Weber; Scott King; Thomas Smith; Lew Cramer; Mark Machlis; Lady Mira Blue Machlis; Samuel Duke; Mary Street; Emanuel*

249

*"Manny" Butera; Jamie Butera; Steve Caton; Millcreek Commercial Properties, LLC; KGL Advisors, LLC; KGL Real Estate Development, PLLC; Smart Cove, LLC; GTR Holdings, LLC; Long Holdings, L.L.C.; Millrock Investment Fund 1, LLC; Millrock Investment Fund 1 Management, LLC; Merit Commercial Real Estate LLC; Hello Bello, LLC; CAMS Realty, LLC; Mountain West Commercial, LLC; Jameson LLC dba American Development Partners; and SARC US, Inc.)*

1145.  Plaintiffs plead each of the allegations stated or incorporated by reference under this cause of action in the alternative, to the extent any may be barred under 18 U.S.C. 1964(c).

1146.  Defendants' violations of 18 U.S.C. §§ 1962(a) & 1962(c) described above also constitute conspiracy to commit such violations, in that they participated in the planning and execution of the Colliers/Long TIC Program, in violation of 18 U.S.C. § 1962(d).

1147.  Additionally, Defendants committed other acts in furtherance of this conspiracy not identified in the previous two causes of action, including but not limited to the following:

    a.  Defendant Lew Cramer approved the terms of an agreement whereby Colliers partnered with Kevin Long and his affiliates to execute the Colliers/Long TIC Program.

    b.  Colliers supported the Colliers/Long TIC Program through brokerage activities, due diligence activities, marketing, staffing and sales training.

c. Colliers also provided financial support to the Colliers/Long TIC Program, in which Defendant Colliers USA also participated by approving such payments.

d. Defendant Tom Smith provided "Oversight & Leadership" and "Accountability oversight," including sales training, as well as financial support, for the Colliers/Long TIC Program.

e. Defendants the ADP Parties and Caton Parties also collaborated in the Colliers/Long TIC Program and received large transfers of Plaintiffs' invested funds.

1148.  On information and belief, Defendants had a meeting of the minds, based on the extent of their involvement in coordinating and executing the Colliers/Long TIC Program.

1149.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to a judgment in their favor for an amount to be determined at trial.

1150.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees, treble damages, and such further relief as the Court may deem appropriate under the circumstances.

**EIGHTEENTH CAUSE OF ACTION**

*(Unjust Enrichment of Defendants – All Defendants)*

251

1151.  Plaintiffs conferred benefits on the Defendants by making their investment in Millcreek TIC Properties.

1152.  Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

1153.  Defendants appreciated, acknowledged, or had knowledge of the benefits incurred upon them as they directly received money from the proceeds of the Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Millcreek TIC Program, obtain, and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiffs.

1154.  Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

1155.  By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

1156.  Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

1. An award of actual damages, treble damages under applicable statutes, punitive damages, attorney fees and costs, in an amount to be proven at trial, plus interest as set forth by applicable law.

2. Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

3. If the 1031 exchanges are deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

4. Such other relief as may be just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

RESPECTFULLY SUBMITTED this February 27, 2026.

DEISS LAW, P.C.

*/s/ Corey D. Riley*
Andrew G. Deiss
Corey Riley
*Attorneys for Plaintiffs*