Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
DEISS LAW PC
375 W 200 S, Ste 201
Salt Lake City, Utah 84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com

*Counsel for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATTI KLAIR, et al., <br> *Plaintiffs,* <br><br> vs. <br><br> KEVIN LONG, et al., <br><br> *Defendants.* | **PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 173, 179, 180, AND 181)** <br><br> Case No. 2:23-cv-00407 <br><br> Judge Ann Marie McIff Allen <br><br> Magistrate Judge Cecilia M. Romero |

Plaintiffs, by and through counsel of record, hereby submit this Omnibus

Memorandum in Opposition to: (1) Defendant Colliers International

Intermountain LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint

(ECF No. 173); (2) Defendant Kevin G. Long's Partial Motion to Dismiss for

Failure to State a Claim, seeking dismissal of Plaintiffs' Second, Fourth, Fifth,

Sixth, and Eleventh Causes of Action (ECF No. 179); (3) Defendant Spencer

1

Taylor's Motion to Dismiss for Failure to State a Claim and Memorandum in Support (ECF No. 180); and (4) Defendant Trevor Weber's Motion to Dismiss (ECF No. 181) (collectively, the "Motions"). Plaintiffs respectfully request that the Court deny the Motions for the reasons set forth below.

### INTRODUCTION

Defendants' four motions to dismiss advance overlapping arguments that rest on the same incorrect premises: that the Second Amended Complaint ("SAC") must plead proof rather than plausibility; that a coordinated fraudulent scheme must be atomized into isolated statements attributable to individual defendants; and that factual disputes may be resolved at the pleading stage. Rule 12 does not permit that result.

The SAC alleges a unified scheme to market and sell tenant-in-common ("TIC") interests through standardized misrepresentations and omissions concerning tenant stability, guarantees, and risk. It pleads scienter through Defendants' central roles, access to information, and continued promotion of the investments despite mounting red flags. It further pleads reliance, transaction causation, loss causation, and damages consistent with Rule 9(b), the PSLRA, and Utah and other state law.

Defendants' motions largely repackage merits defenses, inappropriate at the pleadings stage. When the SAC is evaluated as a whole, as controlling law

requires, it states actionable federal and state claims. The motions should be

denied.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................2

ARGUMENT ........................................................................................................8

    I.    GOVERNING PLEADING STANDARDS................................................8

        A.    Rule 12(b)(6) Requires Plausible Allegations, Not Proof ...............8

        B.    Rule 9(b) Requires Particularity, Not Atomization ........................8

        C.    The PSLRA Requires a Holistic Scienter Analysis ........................8

    II.   THE SAC PLAUSIBLY ALLEGES PRIMARY VIOLATIONS OF § 10(b) AND RULE 10b-5 ........................................................................................9

        A.    The SAC Pleads Material Misrepresentations and Omissions ........9

        B.    The SAC Pleads Scienter Under a Holistic Tellabs Analysis ........ 11

        C.    Defendant-Specific Discussion .................................................... 13

        D.    Defendants' "Group Pleading" Arguments Fail. ........................... 15

    III.  DEFENDANTS' FEDERAL STATUTE-OF-LIMITATIONS AND STATUTE-OF-REPOSE ARGUMENTS FAIL................................................................ 17

    IV.  DEFENDANTS' § 20(a) CONTROL-PERSON ARGUMENTS FAIL .................... 22

    V.   DEFENDANTS' STATE-SECURITIES ARGUMENTS FAIL................................ 25

        A.    The SAC Plausibly Alleges That the TIC Interests Are Securities Under Utah Law.......................................................................................................... 26

        B.    Plaintiff's State Securities Claims Satisfy Rule 9(b)...................... 31

        C.    Plaintiffs' State Securities Claims Under Applicable Non-Utah State Statutes Are Adequately Pleaded .................................................................. 33

    VI.  PLAINTIFFS ADEQUATELY PLEAD COMMON-LAW FRAUD, NEGLIGENT MISREPRESENTATION, AND SIMPLE NEGLIGENCE ............................................. 38

        A.    Common-Law Fraud and Fraudulent Concealment ...................... 38

        B.    Negligent Misrepresentation........................................................ 41

        C.    Simple Negligence ...................................................................... 42

    VII.  PLAINTIFFS ADEQUATELY PLEAD BREACH OF FIDUCIARY DUTY ............ 43

    VIII.  PLAINTIFFS ADEQUATELY PLEAD CIVIL CONSPIRACY AND AIDING-AND-ABETTING .................................................................................................. 47

A.    Civil Conspiracy .......................................................................... 47

B.    Aiding-and-Abetting ...................................................................... 48

IX.    PLAINTIFFS ADEQUATELY PLEAD UNJUST ENRICHMENT ......................... 49

X.    PLAINTIFFS ADEQUATELY PLEAD ELDER ABUSE ........................................ 50

XI.    PLAINTIFFS' CIVIL RICO CLAIMS ARE ADEQUATELY PLED IN THE
ALTERNATIVE .................................................................................................... 54

CONCLUSION ....................................................................................................... 56

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ...................................... 10

*Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036 (10th Cir. 1980) .............................. 17, 20

*Anderson v. Kriser*, 2011 UT 66, 266 P.3d 819 ................................................................ 38

*Anixter v. Home-Stake Production Co.*, 939 F.2d 1420 (10th Cir. 1991) ........................... 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 7

*B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228 ...................................................... 41

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 7

*Biggans v. Bache Halsey Stuart Shields Inc.*, 638 F.2d 605 (3d Cir. 1980) ........................ 35

*C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47 (Utah App. 1995) ........................... 43

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023) ........................... 16, 32

*Fid. Nat'l Title Ins. Co. v. Worthington*, 2015 UT App 19, 344 P.3d 157 .......................... 37

*First Security Bank of Utah, N.A. v. Banberry Development Corp.*, 786 P.2d 1326, 1333 (Utah 1990) .......................................................................................................... 42

*Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500 (11th Cir. 1986) 34

*Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014 (5th Cir. 1990) ................................... 34

*Herrera v. City of Espanola*, 32 F.4th 980 (10th Cir. 2022) ............................................. 17

*Hussein v. UBS Bank USA*, 2019 UT App 100, 446 P.3d 96 ............................................. 43

*Jackson v. Integra, Inc.*, 952 F.2d 1260 (10th Cir.1991) .................................................. 29

*Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998) .................................................................... 48

*Kittilson v. Ford*, 93 Wash. 2d 223, 608 P.2d 264 (1980) ................................................ 35

*Koch v. Koch Indus., Inc.*, 203 F.3d 1202 (10th Cir. 2000) .............................................. 31

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ................................................................ 8, 14, 16

*Lormand v. Us Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) ............................................ 12

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998) ................................. 21, 24

*Malouf v. SEC,* 933 F.3d 1248 (10th Cir. 2019) ............................................................ 8, 14

*Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43 (2004) ........................................ 35

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ............................................ 10

*MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249 (10th Cir. 1989) ......................................................................................................... 34

*Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015) ............................................ 10, 12

*Novak, Nieman, et al. v. Kasaks, et al.*, 216 F.3d 300 (2nd Cir. 1999) ............................. 12

*Payable Acct. Corp. v. McKinley*, 667 P.2d 15 (Utah 1983) ........................................ 27, 35

*People v. Simon*, 9 Cal. 4th 493 (1995) ......................................................................... 35

*Pohl, Inc. v. Webelhuth,* 2008 UT 89, 201 P.3d 944 ...................................................... 46

*Pyper v. Reil,* 2018 UT App 200, 437 P.3d 493 ............................................................. 46

*Rawlings v. Rawlings,* 2010 UT 52, 240 P.3d 754 .......................................................... 48

*Russell/Packard Development, Inc. v. Carson,* 2003 UT App 316, 78 P.3d 616 ................... 38

*Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246 (10th Cir. 1997) ............... 7, 14, 31, 33

*State v. Larsen,* 865 P.2d 1355 (Utah 1993) ................................................................. 27

*State v. Schwenke,* 2009 UT App 345, 222 P.3d 768 ...................................................... 27

*Sterling Tr. Co. v. Adderley,* 168 S.W.3d 835 (Tex. 2005) .............................................. 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ................................. 8, 10

*Wilson v. Millcreek Properties, LLC,* No. 2:24-cv-00624-TC-CMR, 2025 WL 2256685 (D. Utah Aug. 7, 2025) ............................................................................................. 30

## Statutes

15 U.S.C. § 77b .................................................................................................... 27

15 U.S.C. § 77l ..................................................................................................... 34

15 U.S.C. § 77m .................................................................................................... 17

15 U.S.C. § 78t ..................................................................................................... 21

15 U.S.C. § 78u-4 ............................................................................................... 7, 10

Utah Code § 61-1-1 ............................................................................................... 26

Utah Code § 61-1-13 .......................................................................................... 27, 29

Utah Code § 61-1-22 ............................................................................................. 26

Utah Code § 61-1-3 ............................................................................................... 26

Utah Code § 62A-3-314 .......................................................................................... 50

Utah Code § 76-5-111.4 ...................................................................................... 49, 51

## Rules

Fed R. Civ. P. 12(b)(6) .................................................................................... 7, 29, 30

Fed. R. Civ. P. 9(b) ......................................................................................... 7, 14, 16

## Regulations

17 C.F.R. § 240.10b-5 ....................................................................................... 8, 13, 25

**ARGUMENT**

I.     **GOVERNING PLEADING STANDARDS**

A. ***Rule 12(b)(6) Requires Plausible Allegations, Not Proof***

A complaint survives Fed R. Civ. P. 12(b)(6) if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must draw reasonable inferences in the plaintiff's favor and may not resolve factual disputes or weigh competing explanations.

B. ***Rule 9(b) Requires Particularity, Not Atomization***

Fed. R. Civ. P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with sufficient particularity to give defendants fair notice of the claims and the grounds upon which they rest. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). The rule does not require plaintiffs to plead evidence, internal corporate deliberations, or a defendant-by-defendant matrix of every communication.

C. ***The PSLRA Requires a Holistic Scienter Analysis***

The PSLRA requires plaintiffs to plead facts giving rise to a strong inference of scienter, evaluated holistically rather than in isolation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). Courts may not dismiss

simply because an innocent inference is conceivable; the inference of scienter need only be at least as compelling as competing inferences.

## II.  THE SAC PLAUSIBLY ALLEGES PRIMARY VIOLATIONS OF § 10(b) AND RULE 10b-5

*(Taylor MTD at 4–8; Weber MTD at 6–8)*

Primary liability under Rule 10b-5 is not limited to the person who drafted or uttered a statement. In *Lorenzo v. SEC,* the Supreme Court held that defendants who disseminate false or misleading statements, or who otherwise engage in deceptive conduct as part of a scheme, may be primarily liable under Rule 10b-5(a) and (c), even if they are not the "speaker" under subsection (b), 139 S. Ct. 1094, 1100–1102 (2019). The Tenth Circuit adopted and applied that principle in *Malouf v. SEC,* confirming that scheme liability reaches those who orchestrate, implement, or further a deceptive scheme, 933 F.3d 1248, 1260–1261 (10th Cir. 2019).

Against that settled backdrop, as discussed further below, each defendant's motion fails.

### A.  *The SAC Pleads Material Misrepresentations and Omissions*

As an initial matter, the SAC pleads actionable misrepresentations. It alleges that Defendants marketed the TIC investments as safe, conservative income-producing assets supported by creditworthy tenants, long-term leases,

and meaningful guarantees or insurance protections designed to mitigate risk. SAC ¶¶ 245-301. These were not aspirational statements or opinions about future performance. They were representations about tenant stability, lease strength, and the presence of risk-mitigation mechanisms—and they were made to induce Plaintiffs' purchases.

The SAC further alleges that these representations were disseminated through standardized offering materials, broker communications, and Colliers led training sessions that emphasized the purported safety and stability of the investments. SAC ¶¶ 174-176, 245-252, 273-279. Plaintiffs allege that they received and relied on these representations before purchasing their TIC interests. SAC pgs. 96–156.

Critically, the SAC alleges that Defendants omitted known adverse facts that rendered these representations misleading. Plaintiffs allege that Defendants knew, or recklessly disregarded, that key tenants lacked the financial stability represented, that purported guarantees were illusory or materially inadequate, and that the investments carried risks inconsistent with the conservative profile being marketed. *Id.* Plaintiffs further allege that Defendants continued to market the investments as stable even as tenants defaulted and the promised protections failed. SAC ¶¶ 724-750.

At the pleading stage, allegations that defendants misrepresented present tense facts or omitted known risks are actionable. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Accordingly, the SAC plausibly alleges material misrepresentations and omissions.

### B. *The SAC Pleads Scienter Under a Holistic Tellabs Analysis*

Defendants next argue that the SAC fails to plead scienter because it does not allege direct admissions of intent or individualized knowledge. That argument ignores the holistic inquiry required by the PSLRA and the Tenth Circuit's recognition that scienter may be inferred from circumstantial evidence.

Scienter may be pled by alleging facts showing that defendants occupied central roles in the challenged conduct, had access to information contradicting their public representations, and continued promoting the investments despite mounting red flags. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105–1109 (10th Cir. 2003). "While omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 310. "[S]cienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015).

The SAC alleges that Defendants were not peripheral actors. Plaintiffs allege that the moving Defendants structured the TIC program, selected or approved tenants, approved and disseminated marketing materials, trained brokers, and received financial benefits from the sales. SAC pgs. 96–156. The moving defendants were partners in that enterprise. SAC ¶¶ 39-40, 45-48, 69-71, 67-68, 193-194, 1092.[1] These allegations support an inference that Defendants had access to information about tenant instability and the inadequacy of the purported guarantees.

The SAC further alleges that Defendants continued to market the investments as stable and conservative after tenants began defaulting and the promised protections proved ineffective, as well as marketing similarly unstable tenants under similar assurances and representations. SAC ¶¶ 724-750, 825-850, 857-873, 903-910. Continued promotion in the face of contrary information supports a strong inference of at least recklessness. *See, e.g., Novak, Nieman, et*

---

[1] *See* MOU, attached as Exhibit A. Documents "referred to in the complaint and is central to the plaintiff's claim" may be considered on Rule 12(b)(6) if authenticity is undisputed. *GFF Corp.*, 130 F.3d at 1384–1385; *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–942 (10th Cir. 2002); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Because the SAC expressly references and relies on the MOU and the OMs, which are central to the claims, as explained herein, the Court may consider those documents on this Rule 12(b)(6) motion. *See* SAC ¶¶ 174–178, 273–278, 504–509, 546–549, 951–963, 1147(a)–(c).

*al. v. Kasaks, et al.*, 216 F.3d 300, 311 (2nd Cir. 1999); *Lormand v. Us Unwired, Inc.*, 565 F.3d 228, 252 (5th Cir. 2009); *Nakkhumpun*, 782 F.3d at 1152–1153.

When these allegations are considered collectively, as *Tellabs* requires, the inference that Defendants acted with scienter is at least as compelling as any non-culpable explanation. Defendants' competing inferences ask the Court to weigh evidence and resolve factual disputes, which is improper at the pleading stage.

### C. *Defendant-Specific Discussion*

**1. Spencer Taylor** *(Taylor MTD at 4-8)*

The SAC alleges that Taylor and Smart Cove endorsed and reinforced misrepresentations concerning the safety and stability of the investments in connection with sales. SAC ¶¶ 194, 209, 264, 504–509, 611–612, 686-688, 903-910. Also, Taylor (as sole member of Smart Cove, LLC) had an ownership stake in the enterprise. SAC ¶¶ 45–48, 108, 1092. In other words, the SAC alleges specific misrepresentations made by Taylor, extensive knowledge of the scheme, as well as his stakeholder position. Those allegations are sufficient to plead scheme liability and scienter at the pleading stage.

Contrary to his arguments, Taylor's statements about the Keller tenant signing the lease, beginning rent payments, construction and renovations being completed, and the ability to sell or exchange TIC ownership are alleged to be

false or misleading. Taylor MTD at 4–6; SAC ¶¶ 611-612, 724–750, 796-797, 847–856, 903–910.

**2. Trevor Weber (Weber MTD at 3-8)**

The SAC alleges that Weber endorsed and reinforced misrepresentations concerning the safety and stability of the investment. SAC ¶¶ 39–40, 69–71, 193–194, 245, 504–509, 602–604, 620–622. Weber was an employee and agent of both Millcreek and Colliers. SAC ¶¶ 39–40. He was also alleged to be part of the Colliers/Long Parties' joint marketing, communications, social-media, and transactional-commission network, and one of the Millcreek agents who marketed and sold TIC interests in the Keller, Kennesaw, and Naperville Properties. SAC ¶¶ 69–71, 193–194. He reviewed the Marketing Materials. SAC ¶¶ 504–509. And he made specific representations to Plaintiffs concerning the safety and stability of the investment. SAC ¶¶ 602-604, 620–622. In other words, the SAC alleges specific misrepresentations made by Weber, his participation in disseminating the Marketing Materials, and his role as a Millcreek and Colliers sales agent. Those allegations are sufficient to plead scheme liability and scienter at the pleading stage.

Weber's arguments that he merely passed along employer-provided marketing materials is unavailing.  The SAC alleges he made specific misrepresentations to specific plaintiffs.  SAC ¶¶ 504–509, 602–604, 620–622.

14

And under *Lorenzo* and *Malouf*, defendants who disseminate false or misleading statements or implement or further a deceptive scheme may be primarily liable under Rule 10b-5(a) and (c).  At the pleading stage this is more than sufficient to establish primary liability.

### D.  <u>*Defendants' "Group Pleading" Arguments Fail.*</u>

*(Taylor MTD at 4–8; Weber MTD at 2–8.)*

Defendants argue that the SAC impermissibly relies on "group pleading" because it does not attribute each alleged misrepresentation to a specific defendant. That argument misstates the pleading standard and ignores the nature of the alleged scheme.

Rule 9(b) requires plaintiffs to plead the circumstances of the fraud with sufficient particularity to give defendants fair notice. It does not require plaintiffs to plead a defendant-by-defendant breakdown of every internal act or communication. *Celestial Seasonings, Inc.*, 124 F.3d at 1252–1254.

As discussed above, the SAC alleges a coordinated marketing and sales scheme involving standardized offering materials, centralized broker training, and overlapping roles among Defendants. It identifies the substance of the misleading representations, the channels through which they were disseminated, when they were made, and the roles Taylor and Weber allegedly

15

played in creating, approving, or reinforcing those representations.  SAC ¶¶ 38–48, 69–71, 171–176, 178, 193–194, 245–279, 504–514, 603–604, 611–612, 951–963.

The SAC alleges that Weber was an employee and agent of both Millcreek and Colliers. SAC ¶¶ 38–40. It alleges that Taylor was an employee and agent of Millcreek and a representative and agent of Millrock, and that Smart Cove—Taylor's entity—was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 44–48. It further alleges that Weber and Taylor acted as close business associates of Long, Millcreek, Colliers, and the other sales participants through the development of the Colliers/Long TIC Program, joint marketing, communications, social media, and commission payments. SAC ¶¶ 69–71, 193–194.

The SAC also alleges specific sales-channel allegations.  Weber and Taylor provided deceptive and misleading written marketing materials and statements to Plaintiffs. SAC ¶¶ 504–509, 603–604, 611–612, 724-750, 787-797.  The SAC alleges they were among those who developed the materials, reviewed the materials, were aware of their contents, and distributed them.  SAC ¶ 507-509. Weber and Taylor each made specific misrepresentations about the safety and stability of the investment to specific Plaintiffs.  SAC ¶¶ 603–604, 611-612.  Those allegations provide fair notice. Plaintiffs allege that Taylor and Weber participated in an integrated sales program, reviewed and distributed common

Marketing Materials, communicated directly with investors, and did so against the backdrop of a pleaded scheme.

Where defendants are alleged to have acted collectively through an integrated scheme, collective allegations satisfy Rule 9(b). *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023). This is especially true after *Lorenzo*, which confirms that defendants who disseminate or participate in deceptive conduct may be primarily liable even if they are not the ultimate speakers, 139 S. Ct. at 1101–02.

Defendants' argument ultimately seeks to impose a pleading requirement that would nullify scheme liability at the outset. The SAC provides fair notice of the claims and the grounds upon which they rest. That is all Rule 9(b) requires.

## III.   DEFENDANTS' FEDERAL STATUTE-OF-LIMITATIONS AND STATUTE-OF-REPOSE ARGUMENTS FAIL

*(Long MTD 8–10; Taylor MTD 8–10; Weber MTD 7–8)*

Defendants argue that Plaintiffs' Second Cause of Action for sale of unregistered securities is barred by Section 13's one-year statute of limitations and three-year statute of repose. Those arguments fail because Defendants do not establish untimeliness on the face of the SAC.

Long, Taylor, and Weber move to dismiss the Second Cause of Action on the ground that Plaintiffs allegedly failed to plead compliance with the one-year

statute of limitations set forth in Section 13 of the Securities Act, 15 U.S.C. § 77m. That argument fails because the SAC pleads facts showing that the Plaintiffs filed their Section 12(a)(1) claims within one year of discovering the alleged violations, after Defendants' conduct prevented earlier discovery.

Section 13 provides that an action under Section 12(a)(1) must be brought "within one year after the violation upon which it is based." 15 U.S.C. § 77m. Where plaintiffs allege that defendants' affirmative conduct concealed the violation, courts have recognized that equitable tolling may apply, and that dismissal is improper unless untimeliness is clear from the face of the complaint. *See Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041–1042 (10th Cir. 1980); *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) ("Typically, facts must be developed to support dismissing a case based on the statute of limitations.").[2]

The SAC alleges that Plaintiffs purchased TIC interests in the Keller, Kennesaw, and Naperville Properties and Defendants' own chronology places those purchases between August 11, 2021, and May 26, 2022. Long MTD at 4–7; SAC ¶¶ 686–688. It further alleges that Plaintiffs did not discover the alleged

---

[22] Whether the court applies the inquiry notice framework from *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1202 (10th Cir. 1998), or equitable tolling, fraudulent concealment bears on the accrual of the affirmative defense of statute of limitations.

unregistered-securities violations or that the investment was not Defendants

represented any sooner than the October 2022 default, when TIC owners were

first informed that HSH had defaulted at the Keller, Kennesaw, and Naperville

Properties. SAC ¶¶ 735–746. The SAC further alleges that concealment continued

after that point, including through delayed disclosure of substitute rent-payment

arrangements, misstatements about purported rent payments, bank statements

withheld until March 2023, and continued post-default omissions during release

negotiations. SAC ¶¶ 724–728, 735–746, 904(e), and 962(j). These allegations

apply to the Colliers/Long Parties' concealment generally, while the SAC

separately ties Taylor and Weber to the marketing and investor communications

through which the scheme was carried out. SAC ¶¶ 194, 504–509, 603–604, 611–

612.

The SAC pleads a coordinated and complex scheme that plausibly

impeded earlier discovery. Defendants allegedly targeted individual investors—

many of them elderly or retirement-age—operating under the compressed and

legally complex timeline imposed by Section 1031 exchanges, limiting their

ability to conduct independent due diligence before closing. SAC ¶¶ 109–127,

132, 156, 198–201. During this period, Defendants—including Colliers, Kevin

Long, and their agents—marketed the TIC interests as "safe, secure, and stable,"

and as appropriate vehicles for passive retirement income, supported by

purported corporate guarantees, reputable institutional participants, and triple-net leases. SAC ¶¶ 203–209, 219–221, 245–264.  Defendants' marketing materials specifically told investors the TIC interests were not securities, further concealing the potential existence of a claim for unregistered securities. SAC ¶¶ 552–555, 648–652, 954(j), 964–969.

The SAC further alleges that Defendants' concealment continued after the sales closed. SAC ¶¶ 1034–1043 (Concealment/Fraudulent Nondisclosure Claim). According to the complaint, Defendants retained control over the properties, lease administration, and the flow of information to investors, continued to provide reassurances, and selectively disclosed information even after HSH defaulted on the leases. SAC ¶¶ 724–728, 735–746, 834–850, 903–910. Plaintiffs allege that this post-sale conduct further delayed their discovery of the alleged violations.  SAC ¶¶ 904–921, 962(j).

Taken as true, these allegations plausibly support equitable tolling of the one-year limitations period until Plaintiffs discovered the alleged violations no sooner than the October 2022 default. Plaintiffs acted diligently thereafter, filing this action on June 21, 2023—less than one year after discovery and within the three-year repose period.

Defendants treat the purchase dates as dispositive and contend that Plaintiffs were required to plead compliance with Section 13 solely by reference

to those dates. But where, as here, the complaint alleges affirmative concealment and delayed discovery, *Aldrich* makes clear that dismissal at the pleading stage is improper. 627 F.2d at 1041–1042. Plaintiffs are not required at this stage to prove equitable tolling; they need only allege facts that plausibly support its application. The SAC does so.

Defendants invite the Court to treat Section 13's one-year limitations period as an absolute time-bar. *See* Taylor MTD at 8–9; Weber MTD at 7–8. But that position renders the three-year statute of repose in Section 13 meaningless. "Congress did not obliterate [equitable tolling and related] doctrines so much as it set bounds on the length of delay." *Anixter v. Home-Stake Production Co.*, 939 F.2d 1420, 1435 (10th Cir. 1991). By including the one-year limitations and three-year repose periods together, Congress opened the door to extending the limitations period in exceptional circumstances—until the door permanently closes at the three-year mark.

Finally, Defendants rest their statute-of-limitations and repose arguments on the premise that Plaintiffs were required "to plead facts showing timely compliance with Section 13." Long MTD at 10; *see also* Taylor MTD at 8–9; Weber MTD at 7–8. Assuming Plaintiffs are required to anticipate that affirmative defense and address it in the pleadings, Plaintiffs have complied, alleging

specific examples of concealment throughout the lengthy complaint—as discussed *supra*.

Defendants fraudulently concealed material facts such that Plaintiffs were not on notice of their claims at least until the October 2022 default. Plaintiffs filed their Unregistered Securities claim on June 21, 2023—less than one year after the October 2022 default and within Section 13's three-year repose period.

## IV.   DEFENDANTS' § 20(a) CONTROL-PERSON ARGUMENTS FAIL

*(Taylor 10-11; Weber 6-8)*

Defendants argue that Plaintiffs fail to plead control-person liability under Section 20(a) of the Exchange Act. That argument fails because the SAC plausibly alleges both primary federal securities violations and control establishing a secondary violation.

To plead a Section 20(a) claim, Plaintiffs must allege (1) a primary violation and (2) control over the primary violator. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). At the pleading stage, Plaintiffs need only allege facts supporting a plausible inference of control.  And a "control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss." *Id.* at 1306.

The meaning of "control" within the statute is interpreted and applied liberally and flexibly in the Tenth Circuit.  "The statute is remedial and is to be

22

construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Id.* at 1305, quoting *Richardson v. MacArthur*, 451 F.2d 35, 41–42 (10th Cir. 1971). *Maher* also adopted the SEC's definition, which describes "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.*, quoting 17 C.F.R. § 230.405. Thus, control within the meaning of the statute does not depend exclusively on a defendant's formal title, ownership, or executive status. Rather, the liberally construed standard includes direct or indirect influence over policies, transactions, or activities as forms of control establishing liability. Such direct or indirect influence over primary violators is plausibly alleged against the Taylor Defendants and Weber.

The SAC pleads the underlying primary violations in the First and Second Causes of Action. SAC ¶¶ 951–969. It then identifies the defendants named in those causes of action as "Liable Persons" and alleges that the defendants named in the Third Cause of Action controlled them through, among other things, agency, supervisory authority, economic influence, contractual rights, operational participation, and power over the specific transactions at issue. SAC ¶¶ 970–979.

Those allegations are reinforced by defendant-specific facts. Taylor was an employee and agent of Millcreek and a representative and agent of Millrock. SAC ¶¶ 45–46.  He was a close business associate of others in the Colliers/Long TIC Program, and collaborated with them in the program's development and execution through marketing, financial transactions, and other means.  SAC ¶¶ 69–71.  Smart Cove was Taylor's entity, and the SAC alleges Smart Cove was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 47–48. The SAC further alleges that Smart Cove was one of Millcreek's principals at its dissolution and was controlled, in whole or in part, by Taylor. SAC ¶ 108, 1092. These allegations plausibly allege control at the pleading stage as to both Taylor and Smart Cove.

The SAC plausibly alleges Weber's control, including through agency, operational participation, and control over particular transactions at issue that permit the plausible inference of influence over primary violations. The SAC alleges that Weber had an embedded role as a close business associate of specific other Defendants and developed and executed the Colliers/Long TIC Program with them through marketing, financial transactions, and other means. SAC ¶¶ 69–71, 193–194.  It alleges that he was an agent and employee of Millcreek and Colliers, both primary violators.  SAC ¶¶ 39–40.  It alleges that he participated in creating the deceptive marketing materials, that he personally

reviewed them, and that he disseminated them to market the investments. SAC ¶¶ 71, 245, 504–509, 962(f). He personally induced Plaintiffs' investment in the program and guided Plaintiffs through their transactions. SAC ¶¶ 245, 602–604, 620–622. He participated in a transactional commission payment network by which Millcreek and Colliers profited from inducing Plaintiffs' investments. SAC ¶¶ 69, 175, 193, 222.

Weber's argument that he lacked formal corporate authority is therefore not dispositive at the pleading stage because *Maher* asks whether he plausibly possessed direct or indirect influence over the relevant transactions, and the SAC alleges that Weber exercised such influence through his role as a Millcreek and Colliers agent, his participation in the Colliers/Long TIC Program, investor communications, review and dissemination of Marketing Materials, and guidance of Plaintiffs through the TIC sales process. SAC ¶¶ 39–40, 69–71, 193–194, 245, 504–509, 602–604, 620–622. These facts plausibly allege control at the pleading stage as to Weber.

Defendants' good-faith and lack-of-culpable-participation arguments raise factual defenses that cannot be resolved on a motion to dismiss. *Maher*, 144 F.3d at 1305.

V.      **DEFENDANTS' STATE-SECURITIES ARGUMENTS FAIL**

*(Raised by Colliers at MTD 2–4; Long at MTD 10–12; Taylor at MTD 11–12;*

*Weber at MTD 8–9)*

Defendants argue that Plaintiffs' state-securities claims fail for three reasons. First, Defendants contend that the TIC interests are not securities under Utah law. Second, Defendants argue that Plaintiffs have not adequately pleaded their alternative state-securities theories. Third, Defendants argue that alternative state securities statutes are not adequately pleaded.  All three arguments fail. The first argument misstates Utah law and ignores the SAC's allegations. The second misstates the pleading standard and ignores the state-law claims actually pleaded in the SAC.  The third misstates and misapplies Utah's 9(b) pleading standard to the SAC's allegations and ignores the essential similarity between state and federal securities statutes, as recognized and applied by federal and state courts.

A. **The SAC Plausibly Alleges That the TIC Interests Are Securities Under Utah Law.**

In this argument, Defendants primarily seek a determination of law, based on what has been pleaded, about whether the investments in this case were securities under Utah law. That determination cannot be made without reaching to matters outside of the pleadings and drawing unreasonable inferences in the defendants' favor.

26

The SAC states a case for securities fraud under federal, Utah, and other applicable state law: The TIC offerings at issue were securities; each of the Defendants was a culpable participant in marketing and selling them to Plaintiffs under false pretenses; Plaintiffs suffered damages thereby when the investments failed. SAC ¶¶ 948–963, 981–990; 17 C.F.R. § 240.10b-5; Utah Code § 61-1-1. Utah law and other applicable state securities laws additionally provide causes of action for sale of securities by unlicensed brokers or investment advisers, which the SAC pleads against the Defendants. SAC ¶¶ 991–997; Utah Code § 61-1-3. Utah law and other applicable state securities laws also provide causes of action against those who control or materially aid primary violations, which the SAC also pleads against the Defendants. SAC ¶¶ 998–1002; Utah Code § 61-1-22.

Notably, moving Defendants do not meaningfully dispute that the TIC offerings in this case were securities under federal law. Their developed argument is instead that, even if the TIC offerings would otherwise qualify as securities, Utah's statutory carveout for certain fractionalized real-property interests removes them from the UUSA. This matters because Utah securities-fraud law generally follows federal securities-fraud law both as to statute and

case law. *State v. Schwenke*, 2009 UT App 345, ¶ 15, 222 P.3d 768.[3] Specifically, the language defining securities is comparable between the Utah and federal statutes, including specific inclusion of "investment contracts" as securities. 15 U.S.C. § 77b(a)(1); Utah Code §§ 61-1-13(1)(s) & (ee)(i). And Utah courts have formally adopted the federal *Howey* test for defining and identifying securities. *See Payable Acct. Corp. v. McKinley*, 667 P.2d 15 (Utah 1983). The SAC pleads that the TIC offerings are securities under federal law, SAC ¶¶ 951, 964, and so, due to identical statutory inclusion of "investment contracts," adoption of the Howey test, and Utah's general policy of following federal securities law in applying its own state securities fraud statute, they are presumptively securities under Utah law, as well.

Defendants' argument to the contrary rests on a particular statutory carveout in Utah law—essentially, an exception to the norm which might constate an affirmative defense in Defendants' favor, and which they must

---

[3] "Although these federal cases are not dispositive when we are interpreting our state's securities legislation, *see State v. Larsen,* 865 P.2d 1355, 1360 (Utah 1993) ('[T]he Utah legislature has not required the courts to interpret the Utah Uniform Securities Act in lockstep with federal decisions.'), reliance on federal cases is certainly proper, *see Payable Accounting Corp. v. McKinley,* 667 P.2d 15, 17 (Utah 1983) (discussing that the Utah statute setting forth the definition of a security came from the federal version and stating that '[b]ecause most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts')."

establish. Under this carveout, certain types of real-estate offerings—not all—

may be excluded from the UUSA's definition of a security if specific statutory

requirements apply to the offering. Defendants have the burden of showing that

the carveout applies here, based solely on the materials in the pleadings and

with all reasonable inferences in Plaintiffs' favor. As set forth below, they do

not.

The specific statutory carveout is as follows, in pertinent part:

(ii)    "Security" does not include:

[...]

(C)    [...]

    (II)    an undivided fractionalized long-term estate in real property that consists of 10 or fewer owners; or

    (III)    an undivided fractionalized long-term estate in real property that consists of more than 10 owners if, when the real property estate is subject to a management agreement:

        (Aa)    the management agreement permits a simple majority of owners of the real property estate to not renew or to terminate the management agreement at the earlier of the end of the management agreement's current term, or 180 days after the day on which the owners give notice of termination to the manager; and

        (Bb)    the management agreement prohibits, directly or indirectly, the lending of the proceeds earned from the real property estate or the use or pledge of its assets to

29

> a person or entity affiliated with or under common control of the manager.

Utah Code § 61-1-13(1)(ee)(ii)(C).

Thus (and contrary to Defendants' assertion) the carveout doesn't apply to *all* fractionalized real estate offerings.  It only applies to those which are subject to the terms of either subsections (II) or (III), and if (III), also subject to (Aa) and (Bb) thereunder.

To show that the carveout applies, Defendants would need to show from the pleadings how many owners there are at each relevant property (in order to determine if (II) or (III) applies based on their numerical ownership requirements), and (if there are more than 10 owners), whether the specific terms of any applicable "management agreement" match those described in (III)(Aa) or (Bb).  And because the posture is a rule 12(b)(6), Defendants must do so only from the allegations in the SAC itself. *Jackson v. Integra, Inc.*, 952 F.2d 1260, 1261 (10th Cir.1991). Defendants don't make this required showing, and so fail to carry their burden to show from the pleadings that the statutory carveout applies.

In fact, the allegations in the SAC do not permit this showing.  These facts—the total number of owners at each property, whether there was any "management agreement" under the meaning of the statute (or indeed, more than one such agreement), and whether any such undefined agreement(s) contained any of the specific terms required in subsections

(Aa) and (Bb) aren't explicitly addressed in the SAC and can only be investigated through discovery to bring in extrinsic evidence. Findings about these factual matters would necessarily require generous inferences in defendants' favor. Whether the statutory carveout applies here can't be the subject of a rule 12(b)(6) motion.

To be clear, Plaintiffs do contend and intend to show through discovery and development of the evidence in this case, that the TIC offerings in this case are securities under Utah law and not subject to the statutory carveout.   But this is a matter that need not, cannot and should not be resolved through Defendants' rule 12(b)(6) motions.

Defendants' reference to a ruling in a parallel case, *Wilson v. Millcreek Properties, LLC*, is inapplicable here.  Colliers MTD at 3.  There, the court did not consider the arguments or the detailed analysis of the statute Plaintiffs advance here and therefore it should not have persuasive weight in this case. *See Wilson v. Millcreek Properties, LLC*, No. 2:24-cv-00624-TC-CMR, 2025 WL 2256685 at *12 (D. Utah Aug. 7, 2025).

### B. ***Plaintiff's State Securities Claims Satisfy Rule 9(b).***

Defendants also argue that Plaintiffs' state securities fraud claims are not pleaded with sufficient particularity under Rule 9(b). That argument fails for the same reasons addressed *supra* when discussing Plaintiff's federal securities fraud claims, applying the same authorities.  At the pleading stage, rule 9(b)

requires particularity sufficient to give defendants fair notice of the claims and the grounds on which they rest. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). Stated another way, the pleading must identify the time, place, contents, speaker, and consequences of the alleged misrepresentation. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). But the rule does not require Plaintiffs to plead evidence, internal corporate deliberations, or a defendant-by-defendant matrix of every communication. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997).

The SAC gives that notice. It alleges a defined Colliers/Long TIC Program; identifies the Colliers/Long Parties and their roles in developing, marketing, and selling the TIC interests; identifies the standardized sales pitch and Marketing Materials; and identifies the substance of the alleged misrepresentations and omissions. SAC ¶¶ 69–71, 132–156, 194, 245-249, 504–509, 951–958, 981-986. Those allegations include, among other things, representations concerning tenant due diligence, 1031 compliance, risk, capitalization rates, retained ownership, "dream tenants," guarantor solvency, bond protection, Keller completion, and the claimed non-security status of the TIC offerings. SAC ¶¶ 951–958. The SAC also alleges specific misrepresentations made by Weber and Taylor. Weber made marketing-material representations concerning HSH, corporate guarantees, triple-net/ protections, professional vetting, and the

32

ownership structure. SAC ¶¶ 603–604, 620–622. Taylor made specific representations to the McQuearys concerning the signed lease, rent payments, expected completion of renovations, and ability to sell or exchange the TIC interest. SAC ¶¶ 611–612.

Nor does Defendants' "group pleading" characterization change the result. Where defendants are alleged to have acted collectively through an integrated scheme, collective allegations can satisfy Rule 9(b), and the complaint should be taken as a whole. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023). That is especially true where, as here, the SAC defines the relevant participants, pleads their relationships to Millcreek, Colliers, Millrock, and the TIC sales program, and alleges how the standardized misrepresentations and omissions were used to sell the TIC interests. SAC ¶¶ 69–71, 132–156, 951–958.

Defendants' argument therefore reduces to the same atomization argument already addressed above. The SAC pleads the sales program, the participants, the statements, the omissions, the channels of communication, the plaintiff purchases, and the resulting harm. That is enough at the pleading stage.

C. **_Plaintiffs' State Securities Claims Under Applicable Non-Utah State Statutes Are Adequately Pleaded_**

33

Colliers and Long argue that Plaintiffs failed to plead the non-Utah state securities statutes with sufficient specificity because the SAC identifies those statutes in footnotes. Colliers MTD at 3–4; Long MTD at 11–12. That argument fails. Rule 9(b) requires Plaintiffs to plead the circumstances of the alleged fraud with enough particularity to give Defendants fair notice of the claims and the grounds on which they rest. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). It does not require Plaintiffs to plead a treatise on state security law, nor to plead separate repetitive counts for each materially similar state blue-sky statute. Rule 9 simply requires Plaintiffs to identify the state statutes under which they seek relief.[4] Plaintiffs did so, as well as the facts about the conduct on which the claims are based. SAC ¶¶ 981 n.1, 991–995 n.2, 998–1001 n.3, SAC ¶¶ 954–963.

Plaintiff's approach makes particular sense in this context because individual state securities fraud/blue-sky statutes are not unrelated legal regimes.  Plaintiff's pleaded state securities laws are essentially similar instances of a shared securities-law framework, based on the federal statute and

---

[4] To the extent Defendants are arguing that the SAC does not allege sufficient factual content to satisfy rule 9(b) particularity, the SAC's specific, detailed allegations regarding Defendants' direct misrepresentations, dissemination of deceptive marketing materials, scienter, and their participation in the overall scheme, as well as Plaintiffs' reliance thereon and subsequent damages, and other factual allegations are addressed *supra* in this briefing and described in exhaustive length in the SAC.

the Uniform Securities Acts and coordinated through case law that seeks to

harmonize them.  Because of these essential similarities, federal courts have

repeatedly recognized that state securities statutes are properly read as

analogues of federal securities law, interpreted in harmony with each other

because of their fundamental likeness.   For instance, the Tenth Circuit has

recognized that a state securities act may be "read in coordination with the

related federal securities provision," and relied on federal § 12(2) case law where

the state act directed courts to make uniform the law of states enacting it and to

coordinate interpretation with related federal regulation. *MidAmerica Fed. Sav. &*

*Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249, 1254–56 & n.3 (10th

Cir. 1989). Federal appellate courts applying several of the same state securities

regimes pleaded here have reached the same conclusion. The Eleventh Circuit

held that the Georgia Securities Act serves "precisely the same purpose" as §

10(b) and Rule 10b-5, that its language "substantially tracks" federal securities-

law language, and that Georgia blue-sky law is more analogous to Rule 10b-5

than common-law fraud. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore*,

788 F.2d 1500, 1505–06 (11th Cir. 1986). The Fifth Circuit held that the Texas

Securities Act's misstatement-and-omission language is "virtually identical" to §

12(2) of the Securities Act. *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1031

n.9 (5th Cir. 1990). And the Third Circuit recognized that Pennsylvania Securities

Act § 1-401 is "modeled on Rule 10b-5" and covers conduct analogous to Rule 10b-5. *Biggans v. Bache Halsey Stuart Shields Inc.*, 638 F.2d 605, 608–09 (3d Cir. 1980). State courts construing Plaintiff's pleaded statutes confirm the same point. *See, e.g., Payable Accounting Corp. v. McKinley*, 667 P.2d 15, 17 (Utah 1983) ("[b]ecause most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts"); *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 51 (2004) (Massachusetts § 410(a)(2) is "almost identical" to § 12(2)); *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 840–42 (Tex. 2005) (Texas Securities Act intended to be "interpreted in harmony with federal securities law"); *Kittilson v. Ford*, 93 Wash. 2d 223, 226–27, 608 P.2d 264 (1980) (Rule 10b-5 is identical to RCW 21.20.010 except for jurisdictional language); *People v. Simon*, 9 Cal. 4th 493, 510 (1995) (California §§ 25401 and 25501 modeled after federal securities-law provisions).  Plaintiff's pleaded state securities statutes identify state-specific versions of the same general securities law regime, based on the same factual allegations pleaded in the SAC.

Defendants' specific arguments to the contrary are unavailing.  Colliers says that rule 9(b) requires Plaintiffs to "indicate the state statutes under which they seek relief." Colliers MTD at 3.  The SAC does that.  SAC ¶¶ 981 n.1, 991–995 n.2, 998–1001 n.3. Long characterizes Plaintiff's pleaded statutes as a

"generalized, non-specific list of statutes," but this does not accurately describe

the SAC.  Long MTD at 11–12.  The pleaded state statutes are not random; they

have nexus and application to the SAC's allegations.  For instance, the Keller,

Kennesaw, and Naperville Properties at issue are located in Texas, Georgia, and

Illinois, which are among the pleaded statutes.  SAC ¶ 133.  Other applicable

state statutes, such as Utah, are where one or more Defendants are located,

including moving Defendants.  SAC ¶¶ 1–4, 22-32, 38-48, 55-68, 69-71.  And the

SAC identifies Plaintiffs and other relevant parties with alleged connections to

other pleaded states statutes. SAC ¶¶ 78–92, 109–127.  Plaintiffs did not

indiscriminately plead the relevant statutes from all 50 states; they pleaded state

statutes directly relevant to the SAC's allegations.

Notably, Defendants do not develop in any significant detail the argument

that there are material differences between the SAC's pleaded state statutes, nor

analyze in any depth how any differences that may exist may be allegedly

material at the pleading stage or allegedly constitute a pleading-stage notice

defect.  Defendants bear the rule 12 burden to show that the SAC fails to put

them on notice about claims against them and the alleged factual basis and

applicable law, and Defendants do not meet that burden.

To the extent that the state statutes may contain differences, Defendants

do not address them specifically. If material at all, they should be addressed as

the case progresses and discovery develops.  But such technical and fact-intensive matters are not rule 9(b) notice defects.  At the pleading stage, the SAC puts Defendants on notice about the factual allegations against them and the laws under which Plaintiffs seek relief.  That is enough.

## VI.   PLAINTIFFS ADEQUATELY PLEAD COMMON-LAW FRAUD, NEGLIGENT MISREPRESENTATION, AND SIMPLE NEGLIGENCE

*(Taylor MTD at 12–14, 16-17; Weber MTD at 3–6)*

Defendants Taylor and Weber argue that Plaintiffs fail to plead common-law fraud, fraudulent concealment, and negligent misrepresentation because the SAC allegedly lacks particularity, duty, knowledge, or reliance. Taylor also argues that Plaintiffs have not pleaded duty, breach or causation for a negligence claim.  Those arguments mischaracterize the SAC.

### A. *Common-Law Fraud and Fraudulent Concealment*

Under Utah law, common-law fraud requires:

(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Fid. Nat'l Title Ins. Co. v. Worthington*, 2015 UT App 19, ¶ 10, 344 P.3d 157.

"To prevail on a claim [for] fraudulent nondisclosure, a plaintiff must

38

prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed to disclose, and (3) the nondisclosed information was material." *Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819.

Liability for these torts extends to those who authorize or participate in the misrepresentation. *See Russell/Packard Development, Inc. v. Carson*, 2003 UT App 316, ¶ 29 n.12, 78 P.3d 616. Under rule 9(b), knowledge may be alleged generally.

Taylor's and Weber's rule 9(b) arguments fail for the reasons addressed above in connection with Plaintiffs' federal securities-fraud claims. As outlined above, the SAC makes particularized allegations about specific false or misleading statements made to specific investors by these specific Defendants. SAC ¶¶ 245–301, 504–509, 602–604, 611–612, 620–622, 724–750, 759–797, 903–910. The SAC further alleges that Taylor and Weber knew or recklessly disregarded those facts, intended investor reliance, and made direct Keller representations or omissions to Plaintiffs. SAC ¶¶ 602–604, 611–612, 620–622. Plaintiffs allege reliance and damages. SAC ¶¶ 951–959, 1003–1008. These allegations satisfy Utah's fraud elements.

Nor were Taylor's or Weber's misrepresentations mere forward-looking statements or nonactionable speculation. The SAC alleges Taylor made concrete

statements about rent payments, completion of renovations, and resale/exchangeability that were materially false or misleading because of then-existing facts when made, including HSH's failure to pay rent, Millrock-funded rent payments, missing bond protection, incomplete renovations, and occupancy defects. SAC ¶¶ 611–612, 724–750, 759–797, 903–910. The same is true of Weber's concrete representations concerning tenant quality and the existence of corporate guarantees, Lloyds bond protection, rent payments, completion of renovations, the ownership structure, and resale: the SAC alleges concrete contemporaneous omissions that made those statements misleading, including the absence of the promised bond, Millcreek-funded rent, tenant cash-flow problems, unfinished work, and Millcreek's intention to sell out of Keller. SAC ¶¶ 603–604, 620–622, 724–750, 759–797. These statements were material to Plaintiffs' decisions to invest because they were statements of actual alleged fact about concrete aspects of the investments, not mere aspirational statements.

The fraudulent-concealment claim is also adequately pled. The SAC plausibly alleges the required special relationship because the Colliers/Long Parties, including Taylor and Weber held themselves out to the Plaintiffs they communicated with as having superior knowledge, expertise, and access to information about the TIC investments, while Plaintiffs lacked comparable experience, knowledge, and access to information, especially due to the time-

sensitive nature of 1031 exchanges and the hands-off nature of the investment.

SAC ¶¶ 198–205, 221–239, 1021–1030, 1034.

### B. *Negligent Misrepresentation*

Negligent misrepresentation arises when a party makes a careless or

negligent misrepresentation of material fact causing pecuniary harm to a party

with a pecuniary interest in the transaction, where the speaker was in a superior

position to know the facts and should have reasonably foreseen reliance. *Price-*

*Orem Inv. Co. v. Rollins, Brown and Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986).

Under rule 9(b), knowledge may be alleged generally.

Taylor's and Weber's arguments fail for the reasons already discussed

above. The SAC does not allege undifferentiated group conduct. It alleges that

Taylor and Weber performed specific acts and made specific misrepresentations

in the course of advancing the Colliers/Long TIC Program, that they reviewed or

distributed marketing materials, communicated directly with investors, and

repeated and reinforced representations concerning tenant quality, lease terms,

rent payments, corporate guarantees, insurance or bond protection, completion

of renovations, occupancy, ownership structure, and resale or exchangeability.

SAC ¶¶ 39–40, 44–48, 69–71, 193–194, 504–509, 602–604, 611–612, 620–622.

Plaintiffs allege that Taylor and Weber occupied positions of superior

knowledge relative to Plaintiffs, had access to the sales materials used to induce

Plaintiffs' investments, and failed to exercise reasonable care in communicating or reinforcing those representations. SAC ¶¶ 527–546, 603–604, 620–622, 724–750, 759–797, 834–850, 903–910, 951–959, 1019–1030. Based on Defendants' alleged acts, Plaintiffs plausibly state negligent-misrepresentation claims against Taylor and Weber.

### C. *Simple Negligence*

To assert a successful negligence claim in Utah, a plaintiff must establish that (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, and that (3) the breach was the proximate cause of (4) plaintiff's injuries or damages. *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228.

Taylor argues that the negligence claim fails because the SAC does not allege as to him duty, breach, or causation. Taylor MTD at 16–17. That argument fails because the SAC pleads Taylor's role in the Colliers/Long TIC Program and the negligent acts that caused Plaintiffs' losses.

As discussed at length above, the SAC alleges that Taylor was Millcreek's employee and agent and Millrock's representative; that Smart Cove was Taylor's LLC; and that Smart Cove was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 45–48. It further alleges that Taylor and the other Colliers/Long Parties acted as close business associates in developing the TIC Program through joint marketing, communications, social media, and

42

transactional payments. SAC ¶¶ 69–71. Taylor also provided marketing materials and communicated with the McQuearys about the Keller Property, including representations concerning the tenant's lease, rent payments, construction completion, and resale or exchange of the TIC interest. SAC ¶¶ 504, 612.

Those allegations plausibly plead a duty of reasonable care in communicating material facts about the TIC investments and Taylor's participation in and ability to affect the Colliers/Long TIC Program, breaches including through the misrepresentations and omissions concerning tenant performance, rent payments, corporate guarantees, completion of renovations, resale, and investment risk, and harm when Plaintiffs purchased overvalued TIC interests and the concealed risks materialized. SAC ¶¶ 245–301, 611–612, 724–750, 951–959.

## VII.    PLAINTIFFS ADEQUATELY PLEAD BREACH OF FIDUCIARY DUTY

*(Taylor MTD at 14–16; Weber MTD at 8–9)*

Utah courts have repeatedly held that fiduciary duties do not arise in every commercial transaction, but they do arise where one party reposes particular confidence in another and the other party has superior knowledge or influence and undertakes to act in the first party's interest. *First Security Bank of Utah, N.A. v. Banberry Development Corp.*, 786 P.2d 1326, 1333 (Utah 1990).

43

*Banberry* does not hold that fiduciary duties are categorically unavailable in sales or investment contexts. It holds only that a fiduciary duty does not arise automatically from an arm's-length relationship absent additional facts showing trust, dependence, or advisory conduct. *Id.* The fiduciary-duty analysis is highly fact-intensive. *See Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 29, 446 P.3d 96, 105; *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 53 n.7 (Utah App. 1995).

The SAC alleges a coordinated sales and marketing scheme by the Colliers/Long Parties aimed at individual investors—many of whom were retirees—operating under the time pressure inherent in Section 1031 exchanges. SAC ¶¶ 132, 156, 171–176, 193–194. Taylor and Weber are alleged to have actively collaborated in and furthered that scheme including through the development, review, and dissemination of deceptive marketing. SAC ¶¶ 39–40, 45–48, 193–194, 504–509. These allegations describe more than arm's-length sales conduct. They plead a deliberate effort to cultivate trust and dependence in a vulnerable investor population facing statutory time constraints and complex tax consequences. And Defendants invited Plaintiffs to repose special trust in them both before and during the transaction by assuring Plaintiffs that the investments were vetted, safe, passive, 1031-suitable, and professionally managed. SAC ¶¶ 1017–1018, 1021–1030.

It alleges that Taylor and Weber held themselves out as having superior

skill, knowledge, training, and experience concerning the TIC transactions;

expected Plaintiffs to place particular trust and confidence in them; and

affirmatively invited Plaintiffs to rely on their judgment and skill regarding the

Keller, Kennesaw, and Naperville TIC investments. SAC ¶¶ 1021–1027. Those

allegations are reinforced by the TIC structure, the IRS 1031-exchange time

pressure, Plaintiffs' age and vulnerabilities, and Plaintiffs' inability to actively

manage the investments. *Id.*  The SAC further alleges that Plaintiffs reasonably

relied on the Colliers/Long Parties and others, including Taylor and Weber, not

only in purchasing the TIC interests, but in continuing to rely on them to guide

and manage the investments. SAC ¶¶ 1007, 1017–1018.

As to Taylor, the SAC alleges that the McQuearys were referred to Taylor

for assistance identifying a suitable 1031 exchange property, and that Taylor

then communicated directly with the McQuearys to induce their Keller

investment, including by representing that the tenant had signed the lease and

begun paying rent, that construction and renovations would be completed, and

that there would be no problem selling or exchanging the TIC interest. SAC ¶¶

611–612.  Taylor was an employee and agent of Millcreek and a representative

and agent of Millrock. SAC ¶¶ 44–46. It also alleges that Smart Cove, Taylor's

entity, permitted, supervised, ratified, and authorized Millcreek's conduct, and

that Taylor participated in the marketing and investor communications used to

induce TIC purchases. SAC ¶¶ 47–48, 504–509, 611–612. These allegations plausibly place Taylor in an advisory and influential position over Plaintiffs' investment decisions where he invited their necessary reliance on his expertise, particularly when considered against the backdrop of the larger alleged scheme.

As to Weber, the SAC alleges that certain Plaintiffs were referred to him for assistance in identifying suitable 1031 exchange properties.  SAC ¶¶ 602, 620. Weber was an employee and agent of both Millcreek and Colliers and that he reviewed and distributed the Marketing Materials used to present the TIC interests as vetted, safe, income-producing 1031 investments. SAC ¶¶ 39–40, 504–509. The SAC alleges that Weber communicated directly with investors concerning the Keller investment, including representations and omissions about guarantees, tenant quality, risk, insurance, completion, resale, due diligence, commissions, Millcreek's intended sellout, and Millcreek-funded "rent." SAC ¶¶ 603–604, 620–622.  These allegations plausibly place Taylor in an advisory and influential position over Plaintiffs' investment decisions where he invited their necessary reliance on his expertise, particularly when considered against the backdrop of the larger alleged scheme.

Taken together, these allegations support the inference that these defendants assumed advisory and influential roles with respect to Plaintiffs' investment decisions.

Even if Defendants dispute whether their conduct ultimately gives rise to fiduciary duties, Utah law does not permit dismissal where the complaint plausibly alleges facts supporting such a relationship. Whether Defendants in fact assumed positions of trust and influence over Plaintiffs is a question for the finder of fact, not one to be resolved on a Rule 12(b)(6) motion.

### VIII. PLAINTIFFS ADEQUATELY PLEAD CIVIL CONSPIRACY AND AIDING-AND-ABETTING

*(Taylor MTD at 14-15; Weber MTD at 6)*

Defendants argue that Plaintiffs' conspiracy and aiding-and-abetting claims fail because no underlying tort is adequately pled. That premise is wrong. Defendants' argument depends on their prior attacks on Plaintiffs' tort claims. Because those underlying tort claims are adequately pled for the reasons stated above, Defendants' derivative attack on Plaintiff's conspiracy and aiding and abetting claims fails.

### A. *Civil Conspiracy*

Civil conspiracy under Utah law requires an agreement to accomplish an unlawful objective and an overt act in furtherance. *Pohl, Inc. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944. But "[i]t is not necessary that each member of the conspiracy commit an unlawful act in furtherance of the conspiracy to be liable." *Pyper v. Reil,* 2018 UT App 200, ¶ 16, 437 P.3d 493.

47

The SAC alleges coordinated conduct among the Colliers/Long Parties, including Taylor and Weber, to structure, market, and sell TIC investments using misleading representations and omissions. SAC ¶¶ 38–48, 69–71, 132–135, 193–194, 245–301, 504–509, 603–604, 611–612, 1060–1064. This alleged conduct supplies underlying tort claims including breach of fiduciary duties, negligent misrepresentation, fraud, and fraudulent concealment, as discussed above. These allegations also plausibly state a case for Defendants' agreement, concerted action, and overt acts.

## B. *Aiding-and-Abetting*

The SAC alleges that Taylor and Weber knowingly assisted the underlying tortious conduct through their roles in the Colliers/Long TIC sales operation, including investor communications, distribution or reinforcement of marketing materials, property-specific representations and omissions, and facilitation of TIC sales. SAC ¶¶ 504–509, 603–604, 611–612, 1065–1067. The underlying conduct states a claim against Defendants for torts including breach of fiduciary duties, negligent misrepresentation, fraud, and fraudulent concealment, as discussed above.  These allegations also plausibly allege Taylor's and Weber's substantial assistance in that conduct.  Thus, Plaintiffs adequately plead claims for aiding and abetting tortious conduct.

## IX.    PLAINTIFFS ADEQUATELY PLEAD UNJUST ENRICHMENT

*(Taylor MTD at 16–17; Weber MTD at 10–12)*

Unjust enrichment requires (1) a benefit conferred, (2) the defendant's knowledge of it, and (3) retention under circumstances that make it unjust. *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754; *Jeffs v. Stubbs*, 970 P.2d 1234, 1248–1249 (Utah 1998).

Taylor and Weber argue that Plaintiffs fail to allege a direct benefit. But the SAC alleges Plaintiffs invested in the Millcreek TIC properties, Taylor and Weber received or benefitted from commissions, compensation, access to investment proceeds, and benefits from perpetuating the TIC program, and retention of those benefits would be inequitable. SAC ¶¶ 1151–1156.  These allegations tied to concrete allegations about the financial structure of the Colliers/Long TIC Program.  The SAC alleges a transaction-based commission network: Colliers and Long's affiliates agreed that Colliers would receive commissions on each TIC sale; draw payments were approved for sales agents; Taylor and Weber were among the Millcreek/Colliers agents and close business associates participating through joint marketing, communications, and transactional commission payments; and they marketed and sold TIC interests in the Keller, Kennesaw, and Naperville Properties. SAC ¶¶ 39–48, 69, 71 174–176, 193–194. The SAC also alleges that a substantial portion of Plaintiffs'

49

investment funds was diverted to excessive commissions or other compensation to the Colliers/Long Parties, which fact was concealed for or not disclosed to Plaintiffs. SAC ¶ 935–937, 1066. Plaintiffs allege identifiable proceeds and direct use or diversion of proceeds from Plaintiffs' investments to Defendants.

The SAC further ties Taylor and Weber to the sales operation and investor communications that induced investments. SAC ¶¶ 504–509, 603–604, 611–612. As to Taylor specifically, the SAC further alleges that Smart Cove is Taylor's LLC, that Smart Cove ratified or authorized Millcreek's conduct, and that claims against dissolved Millcreek may be enforced against Smart Cove as a Millcreek member. SAC ¶¶ 47–48, 108.

The exact financial structure of the Colliers' Long TIC Program is within Defendants' knowledge and control and the details must be adduced through discovery.  However, at the pleading stage, Plaintiffs plead sufficient factual material to plausibly allege that Defendants unjustly received and retained benefits from their wrongful conduct.

### X.   PLAINTIFFS ADEQUATELY PLEAD ELDER ABUSE
*(Colliers MTD at 4–5; Kevin Long MTD at 12-13; Taylor MTD at 17–22)*

Whether an elder's "property" was taken or retained by undue means does not turn mechanically on whose name appears on purchase documents. For example, Utah Code § 76-5-111.4(2) casts a wide net over the deprivation of a

vulnerable adult's "funds," "assets," "property," "credit," and "resources." Utah Code § 62A-3-314 (renumbered as 26B-6-213) extends a private right of action for any "harm or financial loss" suffered by the vulnerable adult as a result of exploitation. Plaintiffs allege that vulnerable-adult Plaintiffs—including Jose Rementeria and Carl and Lynn McQueary—had their funds, assets, credit, or resources solicited and used in the TIC purchases, and that Colliers/Millcreek targeted vulnerable and retirement-aged 1031 investors. SAC ¶¶ 110, 123, 132, 150–156, 1044–1059.

Plaintiffs allege a concerted effort by Defendants, including Colliers and Long, to take retirement investors' funds, assets, credit, and resources through deception—under Utah law, that is financial exploitation. The SAC alleges that Jose Rementeria was 69 years old when his and Teena Rementeria's entity, Secure Self Storage, purchased TIC interests in the Keller and Naperville Properties. SAC ¶ 110. It further alleges that the Colliers/Long TIC Program was designed to fraudulently induce vulnerable, often elderly investors to purchase TIC investments at grossly inflated prices; that Colliers and Millcreek used the Colliers/Long structure to market those investments; and that the Rementeria/Secure Self Storage purchases involved substantial investment funds. SAC ¶¶ 110, 132, 171–176, 193–194, 245–252, 467–477, 720, 723, 886–891. Defendants will have an opportunity to discover the extent of Jose Rementeria's

51

financial loss, including the relationship between his funds, assets, credit, or resources and Secure Self Storage's TIC purchases. SAC ¶¶ 1044–1059. In its principal and operational role in the Colliers/Long TIC Program, Colliers allegedly participated in financial exploitation of Jose Rementeria. Colliers' and Long's titleholder arguments therefore do not warrant dismissal at the pleading stage.

The Taylor Defendants' argument that Plaintiffs do not plead them as a statutory perpetrator of elder abuse likewise fails.  The SAC alleges that Carl and Lynn McQueary were 70 and 69 years old when they purchased their Keller TIC interest. SAC ¶ 123. Taylor was an employee and agent of Millcreek, a representative and agent of Millrock, and the sole member of Smart Cove, LLC, which allegedly permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 44–48. The McQuearys were referred to Taylor to find a suitable 1031 exchange property, and from approximately December 2021 to January 2022 Taylor communicated with them by email, phone, and other communications to induce their Keller investment. SAC ¶¶ 611–612.

Those allegations are sufficient under Utah Code § 76-5-111.4(2)(a). Taylor had, at minimum, a pleaded business relationship with the McQuearys in connection with their 1031 exchange investment. SAC ¶¶ 611–612. He was part of the Millcreek/Millrock sales operation and communicated with elderly 1031

52

investors for the purpose of inducing them to invest. SAC ¶¶ 44–48, 611–612. The SAC further alleges that the Colliers/Long Parties held themselves out as having superior knowledge, expertise, and access to information concerning the TIC investments they developed, marketed, and sold, while Plaintiffs were in a uniquely vulnerable position because of the timing and technical requirements of 1031 exchanges. SAC ¶¶ 1034–1035.  Taylor's remaining statutory arguments attack theories Plaintiffs need not plead.

Plaintiffs also plead specific deceptions.  The SAC alleges that Taylor represented to the McQuearys that the tenant had signed the lease and had begun paying rent, that construction and renovations would be completed in September 2022, and that there would be no problem selling or exchanging the TIC investment, and that these statements were false and misleading. SAC ¶ 610-612, 843, 849–850.  The SAC also plausibly alleges Smart Cove participated in the deceptive conduct: Taylor was Smart Cove's sole member, Smart Cove allegedly knew of, permitted, supervised, ratified, and authorized Millcreek's conduct, and Defendants including Smart Cove participated in, furthered, or materially aided the Colliers/Long TIC Program through the creation and dissemination of marketing materials and other deceptive sales conduct. SAC ¶¶ 47–48, 504-509 886–891, 1048–1055.

Taken with the SAC's allegations of deceptive sales conduct, vulnerable investors, and resulting harm, those allegations adequately plead elder abuse at the pleading stage. SAC ¶¶ 1052–1059.

## XI. PLAINTIFFS' CIVIL RICO CLAIMS ARE ADEQUATELY PLED IN THE ALTERNATIVE

*(Taylor MTD at 23–26)*

Federal Rule of Civil Procedure 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically," and Rule 8(d)(3) further allows parties to "state as many separate claims or defenses as it has, regardless of consistency." That rule applies where, as here, a threshold legal issue is disputed. Plaintiffs allege that the TIC interests are securities under federal law. SAC ¶¶ 951, 964. At least one Defendant in this action has denied allegation.  ECF 15, Answer of Scott Rutherford and Equity Summit Group, ¶ 495.  Defendant Long also disputes the allegation.  Long MTD at 9.  Until those disputes are resolved, Rule 8 permits Plaintiffs to plead a non-securities statutory theory in the alternative. See, e.g., *Bald Eagle Area School Dist. v. Keystone Financial*, 189 F.3d 321, 330 (3d Cir. 1999); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019) (rejecting the PSLRA bar for lack of a security and addressing the merits of the RICO claim).

Taylor's motion asks the Court to assume, at the Rule 12 stage, that the TIC

54

interests are actionable securities under federal law—and then use that assumption to foreclose alternative statutory remedies. Rule 8 does not permit that.

Taylor also argues that Plaintiffs rely on generalized RICO allegations against him. But the SAC alleges more. Taylor was a Millcreek employee and Millrock representative, and Smart Cove—Taylor's entity—was aware of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 45–48. Taylor and Smart Cove were part of the Colliers/Long Parties and acted with the other participants in developing, marketing, communicating about, and receiving transactional payments from the Colliers/Long TIC Program. SAC ¶¶ 69–71. The SAC further alleges that Taylor reviewed, was aware of, and distributed the Marketing Materials to Plaintiffs with whom he had contact. SAC ¶¶ 504–509.  Taylor directly communicated with the McQuearys concerning the Keller Property, including representations concerning lease execution, rent payments, completion of construction and renovations, and resale or exchangeability of their TIC interest. SAC ¶¶ 611–612. And the SAC alleges that, based on his roles at Colliers and/or Millcreek, close involvement in the operation and management of Millcreek and the Colliers/Long TIC Program, and vicarious ownership of Millcreek before dissolution, Taylor received income derived from a pattern of racketeering activity and used or invested that

income in Smart Cove. SAC ¶¶ 961-962, 1092, 1125-1129, 1133.

Taylor used the Colliers/Long TIC Program to participate in a scheme that he helped operate and from which he allegedly benefitted. The scheme and his role therein are pleaded with particularity. The Civil RICO claims should not be dismissed as to Taylor.

## CONCLUSION

The Second Amended Complaint pleads detailed, transaction-specific facts supporting plausible federal and Utah law claims. Defendants' motions improperly seek to resolve factual disputes, impose proof-level requirements, and dismantle a unified fraudulent scheme at the pleading stage. Rule 12 does not permit that result.

For these reasons, Defendants' motions to dismiss should be denied.

DATED this 1st day of May 2026.

Respectfully Submitted,

/s/ Andrew G. Deiss
Andrew G. Deiss (Utah Bar # 7184)
Corey D. Riley (Utah Bar # 16935)
Deiss Law P.C.
375 W 200 S, Ste 201
Salt Lake City, UT  84101
Telephone: (801) 433-0226
deiss@deisslaw.com
criley@deisslaw.com
*Attorneys for Plaintiffs*