Andrew G. Deiss (Utah Bar # 7184)

Corey D. Riley (Utah Bar # 16935)

DEISS LAW PC

375 W 200 S, Ste 201

Salt Lake City, Utah 84101

Telephone: (801) 433-0226

deiss@deisslaw.com

criley@deisslaw.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATTI KLAIR, et al.,<br>*Plaintiffs,*<br><br>vs.<br><br>KEVIN LONG, et al.,<br>*Defendants.* | **PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (ECF NOS. 287, 288, AND 296)**<br><br>Case No. 2:23-cv-00407-AMA-CMR<br><br>Judge Ann Marie McIff Allen<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Patti Klair, Robert Myers, Robert Barnes, Eric Carnrite, Elizabeth Hill-D'Alessandro, Robert Tannehill, Ditas Tannehill, Jose Rementeria, Teena Rementeria, Charles Brauer, Laura Brauer, Karen Marion, Katherine Madera, Carl McQueary, Lynn McQueary, Donald Patterson, Kurtis Trent

1

Manning, Tony Schaker, Patrick White, Hildegard White, Quest Realty Trust, Secure Storage LLC, and Kurtis Trent Manning Living Trust, by and through counsel of record, hereby submit this Omnibus Memorandum in Opposition to: (1) Defendants Millrock Investment Fund 1, LLC, GTR Holdings, LLC, Brent Smith, Thomas Smith, Hello Bello LLC, and Samuel Duke's Motion To Dismiss Second Amended Complaint (ECF No. 287), (2) Defendants Jerald Adam Long and Long Holdings, LLC's Motion To Dismiss Second Amended Complaint (ECF No. 288), and (3) Defendants Lew Cramer, Matthew Hawkins, Gil Borok, and David Josker's Motion To Dismiss Plaintiffs' Second Amended Complaint (ECF No. 296).

*          *          *

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 6

ARGUMENT ..................................................................................................... 7

I.    GOVERNING PLEADING STANDARDS....................................................7

   a.    Rule 12(b)(6) Requires Plausible Allegations, Not Proof. ...................... 7

   b.    Rule 9(b) Requires Particularity, Not Atomization ............................... 8

   c.    The PSLRA Requires a Holistic Scienter Analysis ................................ 8

II.    THE SAC PLAUSIBLY ALLEGES PRIMARY VIOLATIONS OF § 10(b) AND RULE 10B-5 ....................................................................................................8

   a.    The SAC Pleads the Fraudulent Scheme and Its Misrepresentations with Particularity............................................................................................ 9

   b.    The SAC Supports a Strong Inference of Scienter ...............................13

   c.    The SAC Connects the Moving Defendants to the Misrepresentations and Scheme .................................................................................................16

III.    DEFENDANTS' FEDERAL STATUTE-OF-LIMITATIONS ARGUMENTS FAIL  23

IV.    THE SAC PLAUSIBLY ALLEGES CONTROL-PERSON LIABILITY........... 25

   a.    Adam Long ...........................................................................................26

   b.    Lew Cramer...........................................................................................27

   c.    The Millrock Defendants......................................................................28

V.    THE SAC PLAUSIBLY ALLEGES STATE-SECURITIES CLAIMS .............. 31

   a.    Defendants Have Not Established That the TIC Interests Are Excluded from the UUSA.......................................................................................31

   b.    The State Securities-Fraud Claims Satisfy Rule 9(b) ...........................34

VI.    THE SAC ADEQUATELY PLEADS COMMON-LAW FRAUD, FRAUDULENT CONCEALMENT, NEGLIGENT MISREPRESENTATION, AND NEGLIGENCE............................................................................................. 39

   a.    Common-Law Fraud and Fraudulent Concealment ............................39

   b.    Negligent Misrepresentation ...............................................................43

c.   Simple Negligence ......................................................................45

VII.   THE SAC ADEQUATELY PLEADS BREACH OF FIDUCIARY DUTY ........ 50

VIII.   THE SAC ADEQUATELY PLEADS CIVIL CONSPIRACY AND AIDING AND ABETTING ....................................................................... 53

a.   Civil Conspiracy.................................................................53

b.   Aiding and Abetting .......................................................55

IX.   THE SAC ADEQUATELY PLEADS UNJUST ENRICHMENT ................... 57

X.   THE SAC ADEQUATELY PLEADS ELDER ABUSE.................................. 59

a.   Purchasing Through an LLC or Trust Does Not Preclude Personal Financial Loss.....................................................................60

b.   The SAC Plausibly Alleges the Moving Defendants' Participation. ........62

XI.   THE SAC ADEQUATELY PLEADS ITS CIVIL RICO CLAIMS ................... 65

a.   The PSLRA Does Not Bar Plaintiffs from Pleading RICO in the Alternative...............................................................65

b.   Sections 1962(a) and 1962(d) Do Not Require Each Defendant to Have Personally Committed Two Predicate Acts ...............................66

c.   The SAC Adequately Pleads Predicate Conduct Against Adam Long and the Millrock Defendants. .......................................69

XII.   THE COURT SHOULD RETAIN JURISDICTION OVER THE REMAINING CLAIMS ......................................................................... 71

CONCLUSION ......................................................................72

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Kriser*, 2011 UT 66, 266 P.3d 819 ........................................................40

*Anixter v. Home-Stake Production Co.*, 939 F.2d 1420 (10th Cir. 1991) ..................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 7

*B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228 ..............................................45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 7

*Bixler v. Foster*, 596 F.3d 751 (10th Cir. 2010) ......................................................65

*C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47 (Utah Ct. App. 1995)..............51

*Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009) .............................71

*CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014) ......................67

*Fernandez v. Clean House, LLC*, 883 F.3d 1296 (10th Cir. 2018) ............................33

*Fidelity National Title Insurance Co. v. Worthington*, 2015 UT App 19, 344 P.3d 157 ........................................................................................................................39

*First Security Bank of Utah, N.A. v. Banberry Development Corp.*, 786 P.2d 1326 (Utah 1990) ........................................................................................................51

*Gee v. Pacheco*, 627 F.3d 1178 (10th Cir. 2010) ....................................................12

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997) .....12

*Goldsmith v. Long,* No. 2:24-cv-00499-AMA-CMR, ECF No. 114 (D. Utah July 28, 2026) ........................................................................................ 29, 32, 54, 57

*Herrera v. City of Española*, 32 F.4th 980 (10th Cir. 2022) ....................................25

*Hussein v. UBS Bank USA*, 2019 UT App 100, 446 P.3d 96.............................. 51, 55

*Israel Pagan Estate v. Cannon*, 746 P.2d 785 (Utah Ct. App. 1987) ........................40

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002) .................................12

*Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, 355 P.3d 1000...................58

*Lawrence v. Intermountain, Inc.*, 2010 UT App 313, 243 P.3d 508........................54

*Lorenzo v. SEC*, 587 U.S. 71 (2019)................................................................. 9, 19

*Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) ......................................................23

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998) ............................25

*Malouf v. SEC*, 933 F.3d 1248 (10th Cir. 2019) ...................................................... 9

*Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015) ................................. 13, 22

*Payable Accounting Corp. v. McKinley*, 667 P.2d 15 (Utah 1983) ..........................31

*Pohl, Inc. v. Webelhuth*, 2008 UT 89, 201 P.3d 944.............................................53

*Price-Orem Investment Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55 (Utah 1986)..................................................................................................................43

*Pyper v. Reil*, 2018 UT App 200, 437 P.3d 493 ....................................................54

*Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249 (D. Utah 2017)....................56

*Rawlings v. Rawlings*, 2010 UT 52, 240 P.3d 754 ................................................57

*Russell/Packard Development, Inc. v. Carson*, 2003 UT App 316, 78 P.3d 616.........40

*Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997) ................. 8, 12

*State v. Schwenke*, 2009 UT App 345, 222 P.3d 768 ............................................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................ 8, 13

*Weber v. Colliers International Group, Inc.*, No. 2:25-cv-00162-DBB-DBP, Dkt. 216
    (D. Utah June 8, 2026) ............................................................... passim

*Zurich American Insurance Co. v. Ascent Construction, Inc.*, No. 1:20-cv-00089, 2022
    WL 102256 (D. Utah Jan. 3, 2022) ............................................................... 55

**Statutes**

15 U.S.C. § 77m ............................................................................................ 21

15 U.S.C. § 78j ............................................................................................ 8

15 U.S.C. § 78t ............................................................................................ 23

18 U.S.C. § 1962 ........................................................................................... 61

18 U.S.C. § 1964 ........................................................................................... 60

18 U.S.C. § 2 ............................................................................................... 61

28 U.S.C. § 1331 ........................................................................................... 66

28 U.S.C. § 1367 ........................................................................................... 66

Utah Code § 26B-6-213 ............................................................................... 54, 55

Utah Code § 61-1-1 ....................................................................................... 31

Utah Code § 61-1-13 ...................................................................................... 29

Utah Code § 76-5-111.4 ............................................................................... 54, 55

**Rules**

Fed. R. Civ. P. 8 .......................................................................................... 60

Fed. R. Civ. P. 12 ......................................................................................... 7

Fed. R. Civ. P. 9 .......................................................................................... 7

**Regulations**

17 C.F.R. § 240.10b-5 ................................................................................... 8, 10

## <u>INTRODUCTION</u>

The motions attempt to dismantle the SAC by separating each Defendant

from the coordinated enterprise in which the SAC alleges each participated. But

the SAC does not rely merely on titles, associations, or the fact that the

investments ultimately failed. It alleges a common program through which

Defendants developed, financed, marketed, and sold TIC interests using standardized representations concerning Colliers' due diligence, financially sound tenants, long-term leases, guarantees, bonds, completed properties, and stable returns. It then alleges that the same participants concealed facts fundamentally inconsistent with those representations, including the tenants' inability to pay rent, the absence of promised protections, unfinished renovations, inflated property and lease values, and the substitution of Millrock, Millcreek, or investor funds for purported tenant rent.

The SAC identifies the program's structure, the representations used to sell the investments, the investors who received and relied on them, the facts making them false or misleading, and the moving Defendants' respective roles in developing, approving, financing, marketing, selling, and continuing to administer the investments. Taken as true and evaluated collectively, those allegations plausibly plead Plaintiffs' federal and state claims. The motions should be denied.

**ARGUMENT**

## I.     GOVERNING PLEADING STANDARDS

### a.  Rule 12(b)(6) Requires Plausible Allegations, Not Proof.

A complaint survives Rule 12(b)(6) if it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

7

Courts must draw reasonable inferences in Plaintiffs' favor and may not resolve factual disputes or weigh competing explanations.

### b. Rule 9(b) Requires Particularity, Not Atomization

Rule 9(b) requires Plaintiffs to plead the circumstances of the alleged fraud with sufficient particularity to give Defendants fair notice of the claims and the grounds upon which they rest. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997). The Rule does not require Plaintiffs to plead evidence, internal corporate deliberations, or a defendant-by-defendant recitation of every communication.

### c. The PSLRA Requires a Holistic Scienter Analysis

The PSLRA requires Plaintiffs to plead facts giving rise to a strong inference of scienter, evaluated holistically rather than in isolation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). The inference of scienter need only be cogent and at least as compelling as any competing nonculpable inference. *Id.* at 324.

## II.   THE SAC PLAUSIBLY ALLEGES PRIMARY VIOLATIONS OF § 10(b) AND RULE 10b-5

The motions attempt to isolate each statement, omission, and Defendant from the broader course of conduct alleged in the SAC. But Plaintiffs do not allege a collection of unrelated mistakes. They allege a coordinated scheme to develop, market, and sell TIC interests at inflated values by representing that the

investments were safe, stable, fully developed, supported by financially sound

tenants, and protected by guarantees and bonds. The participants then

concealed the tenants' inability to pay rent, the source of purported rent

payments, the absence of promised protections, the condition and value of the

properties, and the diversion or misuse of construction and equipment funds.

SAC ¶¶ 171–221, 245–301, 504–685, 724–797, 807–815, 903–910, 951–963.

Primary liability under Rule 10b-5 is not limited to the person who drafted

or uttered a statement. In *Lorenzo v. SEC*, the Supreme Court held that

defendants who disseminate false or misleading statements or otherwise engage

in deceptive conduct as part of a scheme, may be primarily liable under Rule

10b-5(a) and (c), even if they are not the "maker" of the statements under

subsection (b). 139 S. Ct. 1094, 1100–02 (2019). The Tenth Circuit applied that

principle in *Malouf v. SEC*, confirming that scheme liability reaches those who

implement or further a deceptive scheme. 933 F.3d 1248, 1260–61 (10th Cir.

2019).

Against that settled backdrop, each motion fails.

### a. The SAC Pleads the Fraudulent Scheme and Its Misrepresentations with Particularity

The SAC identifies what Plaintiffs were told, why those representations

were false or misleading, how they reached Plaintiffs, when Plaintiffs received

them, and how Plaintiffs relied on them. Defendants represented that the

investments had been thoroughly vetted; that the tenants were financially sound "dream tenants"; that Plaintiffs would receive rent under long-term triple-net leases; that the leases were protected by corporate guarantees and bonds; that the properties were completed or nearly completed; that the properties and leases supported the advertised values and capitalization rates; and that the TIC interests were not securities. SAC ¶¶ 245–301, 504–685, 951–959.

The SAC also pleads why those representations were false or misleading. HSH and its guarantor lacked the assets and cash flow necessary to perform; the promised bond had not issued; the properties remained incomplete or unusable; the properties and lease rates were grossly inflated; and some payments presented to Plaintiffs as tenant rent came from Millrock, Millcreek, or Plaintiffs' own invested funds. SAC ¶¶ 510–575, 624–675, 724–797, 903–904. Plaintiffs identify the Offering Memoranda, websites, emails, telephone calls, and other communications through which the representations were disseminated, as well as the particular investors who received and relied on them. SAC ¶¶ 342–509, 552–685, 951–959.

The SAC also places both the communications and the deceptive acts within a defined chronology. By no later than 2020, the Program was marketing the Keller, Kennesaw, and Naperville offerings to investors operating under Section 1031's constrained timetable; during that same period, the moving

Defendants allegedly selected tenants and properties, structured the leases, guarantees, bonds, and financial terms, approved Colliers' brokerage, due-diligence, marketing, commission, and agent-training arrangement, financed and managed the Program, and trained the agents who sold the interests. SAC ¶¶ 173–186, 194–202. From at least 2020 through 2022, Long, Brent Smith, Mary Street, and ADP communicated extensively while developing and executing the Program, and on November 20, 2020, Millrock entered the Keller development contract under which it agreed to disburse more than $10 million for construction and renovations. *Id.* ¶¶ 291, 297. The plaintiff-specific allegations identify the recipients, means of communication, and bounded solicitation periods preceding the pleaded purchases, while the later allegations identify the acts used to continue and conceal the scheme: supplying payments represented as tenant rent, withholding ownership and financial information, concealing the tenants' defaults, promoting Neuragenex and a $1.15 million capital call after the October 2022 defaults, and continuing to mislead Plaintiffs during the January 2023 Release negotiations. Id. ¶¶ 342–509, 552–685, 735–752, 855–868, 903–910.  Rule 9(b) does not require that every act or statement be alleged; it simply requires sufficiently detailed allegations to fairly put Defendants on notice as to the circumstances constituting fraud, and the SAC does that.

11

That is not shotgun pleading. It is a detailed account of an integrated development and sales program using standardized Offering Memoranda, centrally developed Marketing Materials, coordinated sales training, paid referral networks, and overlapping financial and managerial roles. SAC ¶¶ 69–71, 171–186, 193–240, 245–301, 504–509. The MOU corroborates that centralized structure: it describes the TIC interests as a resale product and establishes coordinated acquisition, brokerage, marketing, commission, due-diligence, and agent-training functions. Ex. A, MOU.[1] Rule 9(b) requires fair notice of the fraudulent conduct, not the artificial division of a coordinated scheme into unrelated fragments. *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252–54 (10th Cir. 1997).

The SAC also pleads scheme liability under Rules 10b-5(a) and (c). It identifies the acts through which Defendants developed and executed the

---

[1] See Memorandum of Understanding ("MOU"), attached as Exhibit A. The SAC describes and relies on the MOU's material terms, including Colliers' brokerage, due-diligence, commission, and sales-training roles; Adam Long's ownership and management interest; and the mentoring roles assigned to Adam Long and Lew Cramer. SAC ¶¶ 174–178. A court deciding a Rule 12(b)(6) motion may consider a document referred to in the complaint and central to the plaintiff's claims when the parties do not dispute its authenticity. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The MOU is central because it memorializes the structure, compensation, marketing, supervision, and sales-training arrangements through which the SAC alleges the Colliers/Long TIC Program was conducted. See SAC ¶¶ 171–186, 193–221, 951–963, 1147(a)–(c).

scheme, including selecting properties and tenants, negotiating inflated leases, arranging purported guarantees and bonds, creating and disseminating the Marketing Materials, training sales agents, selling the TIC interests, supplying substitute rent payments, and concealing financial and operational information. SAC ¶¶ 171–186, 245–301, 504–509, 724–797, 807–815, 903–910, 961–963. These allegations describe the deceptive acts and each Defendant's role in carrying them out, not merely the existence of a scheme in the abstract.

### b. The SAC Supports a Strong Inference of Scienter Under a Holistic *Tellabs* Analysis

The motions likewise atomize the scienter allegations and characterize each Defendant's conduct as an ordinary corporate function. *Tellabs* requires the opposite approach. The Court must consider "all of the facts alleged, taken collectively," and determine whether the inference of scienter is at least as compelling as the competing innocent inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). Scienter includes recklessness, including "reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015).

The inference rests on what the moving Defendants did, not the titles they held. They developed the offerings, selected tenants and properties, calculated the financial terms, approved the Colliers partnership, financed the program, created the Marketing Materials, trained the sales agents who disseminated

them, and directly sold the TIC interests. SAC ¶¶ 69–71, 171–186, 193–222, 504–509, 807–815. In taking those actions, the moving Defendants obtained, evaluated, approved, and communicated information concerning the properties, tenants, leases, guarantees, bonds, construction, rent payments, and use of investor proceeds.  They implemented the Colliers/Long TIC Program.

The scienter inference follows from what each moving Defendant did to develop, finance, market, and sell the TIC Program and from the direct connection between those acts and the facts concealed from investors. Millrock owned and directly sold TIC interests, knew what it paid for the Keller Property, participated in the leases and financial arrangements used to support the offering price, authorized substantial construction disbursements, and later supplied money presented as tenant rent. SAC ¶¶ 724–746, 759–780, 787–797, 807–815. Brent Smith was responsible for "making sure that the numbers work," participated in structuring the leases, guarantees, bonds, and property packages, and later made statements concerning rent payments, property operations, capital calls, and replacement tenants. SAC ¶¶ 173, 179–180, 883, 903(c), (d), (f). Samuel Duke directed the marketing operation that created and distributed the Program's website, partner materials, investor leads, and capital-raising campaigns, while Hello Bello directly owned and sold TIC interests. SAC ¶¶ 75–77, 807–815.

14

Adam Long likewise acted on both the development and sales sides of the Colliers/Long TIC Program. He co-owned and managed Millrock Management while Millrock developed the offerings, held himself out as a founding partner of Millcreek and a senior Colliers executive, worked from Colliers' executive offices, and mentored the agents who disseminated the Program's standardized representations. SAC ¶¶ 64–71, 177–178. Adam thus helped manage the organization developing the offerings and helped guide the sales force marketing them. When considered with the magnitude and commonality of the concealed defects, they support the inference that he at least recklessly disregarded the substantial likelihood that the sales program he helped manage and implement was conveying misleading information.

As to Cramer, the SAC alleges that he approved the particular agreement (the MOU) through which Colliers agreed to supply its brokerage, due-diligence, marketing, and training functions to the Colliers/Long TIC Program, and that he then personally mentored the participating sales agents. SAC ¶¶ 174–178. With Cramer's approval, the Program invoked Colliers' due diligence and reputation as reasons investors could trust the offerings. SAC ¶¶ 171–176, 209, 222, 245–301. Cramer therefore approved the partnership that supplied those assurances and mentored the agents who conveyed them.  These actions support an inference that (at minimum) Cramer recklessly disregarded whether the Colliers/Long

partnership he approved and the sales agents he mentored to carry out the Program were built on unverified representations concerning the tenants, leases, guarantees, bonds, renovations, and offering values.

### c. The SAC Connects the Moving Defendants to the Misrepresentations and Scheme

#### i. *The Millrock Defendants*

Millrock was a developer, previous owner, and direct seller of the TIC interests. It entered the development and lease agreements used to structure the offerings, owned and sold TIC interests to Plaintiffs, and participated in setting the financial terms used to market the investments. SAC ¶¶ 177, 309–311, 779–780, 807–815. Millrock therefore knew what it had paid for the Keller Property, participated in the leases and financial arrangements used to justify the $21 million offering value, and sold the interests without disclosing the investments' material defects. SAC ¶¶ 776–780, 787–797, 807–815.

Millrock also participated in the representations and concealment after the sales. Millrock's agent, Brent Smith, represented that Plaintiffs were receiving tenant rent when the money came from Millrock, Millcreek, or Plaintiffs' invested funds. SAC ¶¶ 57, 724–746, 903(c), 904(e). Millrock further represented that it was pursuing litigation against HSH for Plaintiffs' benefit, although Plaintiffs were neither parties nor beneficiaries and the action did not seek relief corresponding to all three properties. SAC ¶ 903(e). Those statements

reinforce the inference that Millrock knew of the financial and operational facts concealed during the sales.

Brent Smith was Millcreek's and Millrock's agent, the TIC Program's "numbers guy," and part of the development process responsible for "making sure that the numbers work." SAC ¶¶ 55–57, 173, 179–180. He participated in developing the offerings, including the terms of the leases, guarantees, bonds, and property packages. SAC ¶¶ 173, 179–180. He then participated in representing that Plaintiffs were receiving tenant rent, that the properties would soon become occupied and operational, and that Neuragenex was a viable replacement tenant. SAC ¶ 903(c), (d), (f). His responsibility for the program's numbers, followed by his participation in statements contradicted by those numbers, supports a strong inference of at least recklessness.

Tom Smith provided "Oversight & Leadership" and "Accountability oversight," acted as Millcreek's principal financial partner, funded the TIC Program, and conducted mandatory training for sales agents operating under Millcreek and Colliers. SAC ¶¶ 60–62, 181–186. He also helped develop, market, and sell the properties, including by identifying tenants and properties and arranging the leases, guarantees, bonds, and other offering terms. SAC ¶ 186. By structuring the offerings and training the sales force that conveyed the Program's representations to investors, Tom directly participated in the alleged

scheme. Those same responsibilities support the inference that he recklessly disregarded whether the representations generated through the program he financed and supervised were true.

The SAC alleges management and operational participation, not passive ownership. GTR Holdings, owned in part by Brent Smith, knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 58–59. Kevin and Adam Long owned Millrock Investment Fund 1 Management and together managed Millrock as it developed the Colliers/Long TIC Program; Millrock Management likewise directed, permitted, and knew of Millrock's conduct. SAC ¶¶ 33–34, 168, 177. Millrock, in turn, entered the development and lease agreements material to the offerings, contracted for equipment and improvements at the three properties, owned and sold TIC interests to Plaintiffs, and allegedly profited from their resale at inflated prices. SAC ¶¶ 134, 308–312, 812–815. Their liability arises through their authorization and supervision of the entities and individuals that structured the offerings, developed and conveyed the misrepresentations, and concealed the investments' defects.

Hello Bello directly sold TIC interests to Plaintiffs, and Samuel Duke— Hello Bello's principal and Millcreek's Head of Marketing—participated in those sales. SAC ¶¶ 75–77, 807–815. Duke ran Millcreek's marketing programs and campaigns, website, partner marketing materials, lead-generation programs,

18

and capital raising for commercial-development projects. SAC ¶¶ 810–811. Hello Bello and Duke were also development or investment partners in the TIC Program. SAC ¶¶ 813–815. The Marketing Materials containing the pleaded misrepresentations were produced by the marketing operation Duke directed. Their roles as sellers, development partners, and marketing leadership support their liability for the representations and omissions used to sell the TIC interests and a strong inference that they knew, or recklessly disregarded, the investments' material defects.

### ii. *Adam Long and Long Holdings*

Adam Long incorrectly treats the absence of a statement personally communicated by him as affecting his liability. Rule 10b-5(a) and (c) are not confined to the person who "made" a misstatement under subsection (b), but also reach deceptive conduct undertaken in furtherance of a fraudulent scheme. *Lorenzo v. SEC*, 587 U.S. 71, 78–85 (2019). The SAC alleges that the Colliers/Long Parties, expressly including Adam, developed the Marketing Materials containing the challenged representations. SAC ¶¶ 71, 507, 510–555, 648–652. It then ties Adam individually to that conduct through his personal mentoring of the sales agents who implemented the TIC Program, his ownership and management of the Fund's managing entity, and his joint management of

19

Millrock as it developed the TIC Program. SAC ¶¶ 65–66, 69, 177–178; Ex. A, MOU.

These allegations also support a strong inference of scienter. Scienter includes reckless disregard of a substantial likelihood of misleading investors. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). The MOU, which was copied to Adam, provided that the management entity he co-owned would be paid to evaluate the properties, while Colliers would develop due-diligence packages and be identified as the broker on the marketing materials. Ex. A, MOU. The Program then represented that the properties had been identified and vetted by seasoned professionals and that the Colliers/Long Parties had conducted due diligence concerning the tenants. SAC ¶¶ 250, 954(a). Adam co-owned the entity the Fund paid to evaluate the properties, and personally mentored the agents who conveyed those representations. Those actions support an inference that he knew or recklessly disregarded the substantial likelihood that the Marketing Materials would mislead investors.

The SAC likewise attributes conduct to Long Holdings itself. The SAC identifies Long Holdings as a principal of Millcreek, alleges that it knew of, permitted, supervised, ratified, and authorized Millcreek's conduct, and includes it among the Colliers/Long Parties that developed the challenged Marketing Materials. SAC ¶¶ 67–68, 71, 507, 1092. Taken as true, these

allegations plead Long Holdings' own role in authorizing and developing the challenged course of conduct.

### iii. _Lew Cramer_

Cramer, acting on Colliers' behalf, approved the agreement through which Colliers partnered with Kevin Long and his affiliates to operate the TIC Program through brokerage, due diligence, marketing, and sales training. SAC ¶¶ 174–175. The MOU, which was directed to Cramer, projected approximately $100 million in annual transaction volume through Colliers; retained the Kevin Long Team, through Colliers, as the Fund's exclusive acquisition agent; required all acquisition commissions to be processed through Colliers; placed the TIC resale product under a perpetual Colliers listing agreement; and entitled Colliers to a commission on sales. Ex. A. It further required that Colliers be identified as the broker on all brokerage marketing materials, provided for Colliers marketing support, and assigned Colliers responsibility for developing the due-diligence packages. _Id._ The MOU also assigned Cramer a personal role mentoring the participating sales agents, and the SAC alleges that he performed that role. _Id._; SAC ¶ 178.

These allegations identify Cramer's specific role and conduct in furthering the deceptive TIC Program. Cramer approved and implemented a structure that used Colliers' name and purported due diligence to create investor confidence.

The Program then implemented the structure Cramer approved and used Colliers' name and logo throughout the Offering Memoranda and Marketing Materials, and investors were specifically told that the investments were especially trustworthy because Colliers had performed the due diligence. SAC ¶¶ 271–279, 587(b), 954(a). Read in Plaintiffs' favor, Cramer's approval and implementation of that structure and his participation in training the agents who carried it out plausibly constitutes participation in the alleged deceptive course of business under Rule 10b-5(a) and (c).

These allegations also support a strong inference of scienter. Scienter includes reckless disregard of a substantial likelihood of misleading investors. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). The MOU put Cramer directly on notice that Colliers' name and due-diligence role would be used to market the investments, while the same agreement placed property evaluation outside Colliers and sought to insulate Colliers from underwriting and property-selection liability. Ex. A. Having approved and implemented that structure, Cramer at least recklessly disregarded the obvious danger that investors would understand Colliers' branding and purported due diligence as assurance that Colliers had vetted the offerings. SAC ¶¶ 174–178, 271–279, 587(b), 954(a). Considered collectively, that inference is at least as compelling as the competing inference that Cramer merely performed a routine corporate function without

appreciating how Colliers' role would be presented to investors and the manner in which they would rely on it to their detriment.

### III.    DEFENDANTS' FEDERAL STATUTE-OF-LIMITATIONS ARGUMENTS FAIL

The Millrock Defendants, Adam Long, and Long Holdings argue that Plaintiffs' Second Cause of Action for the sale of unregistered securities is untimely under Section 13 of the Securities Act. Those arguments do not establish untimeliness on the face of the SAC.

Section 13 contains two distinct time bars. A Section 12(a)(1) claim must be brought "within one year after the violation upon which it is based," and may not be brought more than three years after "the security was bona fide offered to the public." 15 U.S.C. § 77m. The one-year period is a statute of limitations, while the three-year period is an absolute statute of repose.

Although Section 12(a)(1) does not contain a statutory discovery rule, that does not make its one-year limitations period an absolute bar immune from equitable tolling. Federal statutes of limitations are presumptively subject to equitable tolling unless tolling is inconsistent with the statutory text. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014). In construing Section 13, the Tenth Circuit likewise explained that it is inaccurate to say equitable tolling has no application. Rather, equitable tolling and related doctrines cannot extend the

limitations period beyond Section 13's three-year outer boundary. *Anixter v. Home-Stake Production Co.*, 939 F.2d 1420, 1435 (10th Cir. 1991).

The SAC alleges affirmative conduct calculated to conceal the potential registration claim. The Offering Memoranda expressly represented that the TIC interests were not securities and that federal securities laws did not apply. SAC ¶¶ 552–555, 648–652, 954(j). Plaintiffs allege that those representations were false because the investments were part of a centrally developed and coordinated TIC Program whose success depended primarily on the efforts of the tenants and the Colliers/Long Parties. SAC ¶¶ 132, 171–221, 964. Thus, Plaintiffs do not rely merely on a failure to disclose that the interests were unregistered. They allege that Defendants affirmatively misrepresented the legal character of the investments and the applicability of the very regulatory scheme underlying the Second Cause of Action.

The SAC further alleges that Defendants maintained control over the information provided to investors and continued concealing facts inconsistent with the manner in which the investments had been presented. Plaintiffs received payments represented as tenant rent while Millrock, Millcreek, or other sources were supplying the funds; the underlying loan and substitute-payment arrangements were not timely disclosed; and the tenant defaults were not disclosed until October 2022. SAC ¶¶ 724–728, 735–746, 903(c), 904(e), 921(a).

24

These allegations plausibly support the inference that Defendants' affirmative representations and continuing control over the relevant information prevented Plaintiffs from discovering a potential claim earlier.

Plaintiffs commenced this action on June 21, 2023, less than one year after the October 2022 disclosures. Whether Plaintiffs exercised reasonable diligence and when they reasonably should have recognized the potential registration claim present factual questions that should not be resolved against them on the pleadings. See *Herrera v. City of Española*, 32 F.4th 980, 991 (10th Cir. 2022). Because the SAC plausibly supports equitable tolling and does not establish expiration of the three-year repose period, the Second Cause of Action should not be dismissed as untimely.

## IV.    THE SAC PLAUSIBLY ALLEGES CONTROL-PERSON LIABILITY

The moving Defendants argue that the SAC fails to identify a primary violator and does not plead their control over any such person. Both arguments fail.

To state a claim under § 20(a), Plaintiffs must plead "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). Contrary to Cramer's motion, Plaintiffs need not plead that the control person actually or culpably participated in the primary violation. *Id.*

Control includes the direct or indirect power to direct or cause the direction of another person's management and policies, whether through ownership, contract, or otherwise. *Id.* And because control is ordinarily a factual question, dismissal is appropriate only when the complaint contains no facts supporting a reasonable inference of control. *Id.* at 1306.

The SAC identifies the primary violators. Paragraph 970 defines the "Liable Persons" as the Defendants named in the First and Second Causes of Action, and those causes identify each person and entity against whom the primary securities violations are asserted. SAC ¶ 970. As explained above, the First Cause of Action adequately pleads primary violations by multiple Defendants. The Third Cause of Action therefore cannot be dismissed merely because other Defendants dispute whether they personally committed a primary violation. *See Weber v. Colliers International Group, Inc.*, No. 2:25-cv-00162-DBB-DBP, Dkt. 216 at 33–34 (D. Utah June 8, 2026).

### a. Adam Long

*Weber* rejected Long's same control argument based on materially similar allegations concerning Adam Long and Millrock Management. The complaint there alleged that Adam owned Millrock Management with Kevin Long and jointly managed it while it developed the TIC program. The court held that this management role, combined with Adam's substantial ownership interest,

plausibly established his ability to control Millrock Management's policies and daily operations. *Id.* at 37–38.

The SAC makes the same allegations here. Adam co-owned Millrock Management with Kevin Long, and together they managed Millrock while it developed the Colliers/Long TIC Program. SAC ¶ 177. Adam also served as a Millcreek founding partner, represented that he was Colliers Utah's Chief Operating Officer and Colliers USA's Director of Special Projects, and mentored the agents who sold the TIC investments. SAC ¶¶ 65–66, 178. Millrock Management is named as a primary violator in the First Cause of Action. These allegations plausibly plead Adam's control under the reasoning adopted in *Weber*.

### b. Lew Cramer

Cramer was CEO of Colliers' Utah division. SAC ¶ 162. In that position, he approved the specific agreement through which Colliers partnered with Kevin Long and his affiliates to conduct the TIC Program through brokerage, due diligence, marketing, and sales training. SAC ¶¶ 174–175. Cramer also mentored the agents who marketed and sold the investments. SAC ¶ 178. The MOU corroborates that Cramer's authority was operational rather than merely titular: it places him within the joint agent-training program and integrates Colliers into

agent selection, commission advances, brokerage marketing, and preparation of due-diligence packages. Ex. A, MOU.

These allegations identify both the primary violators and the means of control. Cramer exercised authority over Colliers Intermountain and its sales operation, approved the Program's governing commercial relationship, and trained the agents who communicated the misrepresentations to Plaintiffs. Colliers Intermountain and those sales agents are among the primary violators identified in the First Cause of Action. At the pleading stage, Cramer's executive authority, approval of the Program, and supervision of its sales force plausibly establish the direct or indirect power to influence their management, policies, and conduct.

### c. The Millrock Defendants

The SAC also pleads control by the Millrock Defendants through their management, financing, training, ownership, and direction of the persons and entities that developed and sold the TIC investments.

Brent Smith was Millcreek's agent and Millrock's representative. SAC ¶¶ 55–57. He played an instrumental role in developing, marketing, and selling the offerings, including selecting tenants and properties and structuring the leases, guarantees, bonds, and other terms used to package the investments. SAC ¶¶ 173, 179–180. These allegations plausibly establish his ability to direct the

conduct of Millcreek, Millrock, and the offering process through which the primary violations occurred.

Thomas Smith provided "Oversight & Leadership" and "Accountability oversight" for the Program, served as Millcreek's principal financial partner, and supplied mandatory training to the Millcreek and Colliers sales agents. SAC ¶¶ 181–185. He also provided the funding, management, and oversight necessary to develop and sell the Keller, Kennesaw, and Naperville offerings. SAC ¶ 186. Those allegations describe actual operational authority over the Program and its sales personnel, not merely a passive financial interest.

Millrock owned and directly sold TIC interests to Plaintiffs and entered development and lease agreements material to the offerings. SAC ¶¶ 779–780, 807–815. Kevin Long founded Millrock and its managing entity, served as the manager of Millrock Management, and, together with Adam Long, managed Millrock as it developed the TIC Program. SAC ¶¶ 33–34, 168, 177. The SAC also attributes to Kevin and Millrock specific post-sale representations concerning rent payments, property operations, litigation, and replacement tenants. SAC ¶ 903(c)–(f).

These allegations plausibly plead Millrock's control over the agents and transactions through which the securities violations were committed. That conclusion is reinforced by *Goldsmith v. Long,* where this Court held that Kevin

Long's statements could plausibly be attributed to Millrock because corporations act through their agents and that Millrock's scienter followed from Long's. No. 2:24-cv-00499-AMA-CMR, ECF No. 114, at 19–22 (D. Utah July 28, 2026).

Samuel Duke was Hello Bello's manager and president and Millcreek's Head of Marketing. SAC ¶¶ 75–77, 810. He controlled the marketing programs and campaigns, maintained the website, supplied partners with marketing materials, generated investor leads, and raised capital for the developments. SAC ¶¶ 810–811. Hello Bello directly sold TIC interests to Plaintiffs and participated in furthering the Program's objectives. SAC ¶¶ 807–815. Duke's management of Hello Bello and control of the Program's marketing establish his ability to direct both a primary-violator entity and the communications through which the investments were sold.

GTR was a principal of Millcreek, was controlled by Brent, and knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 58–59, 1092. Read together with Brent's detailed operational role in developing and structuring the offerings, those allegations plausibly support the inference that GTR exercised control over Millcreek's participation in the Program. Whether that authority ultimately amounted to control under § 20(a) presents a factual question that should not be resolved on the pleadings.

V.      **THE SAC PLAUSIBLY ALLEGES STATE-SECURITIES CLAIMS**

The Millrock Defendants and Adam Long argue that the Fourth, Fifth, and Sixth Causes of Action fail because Utah law excludes the TIC interests from its definition of a security. Millrock MTD at 12; Adam Long MTD at 11–12. The Millrock Defendants and Cramer also argue that the state claims fail to satisfy Rule 9(b). Millrock MTD at 12–14; Cramer MTD at 13–14. The *Weber* court recently rejected the same categorical interpretation of Utah's TIC exclusion and held that identifying the specific, substantially similar state securities-fraud provisions provides adequate notice. *Weber v. Colliers International Group, Inc.*, No. 2:25-cv-00162-DBB-DBP, ECF No. 216, at 38–43 (D. Utah June 8, 2026).

### a.  Defendants Have Not Established That the TIC Interests Are Excluded from the UUSA.

The SAC alleges that the TIC interests were securities under federal law because they involved investments in a common enterprise whose success depended primarily on the efforts of others, and that they were securities under applicable state law. SAC ¶¶ 964, 981. Utah's definition of a security, like its federal counterpart, expressly includes an "investment contract." 15 U.S.C. § 77b(a)(1); Utah Code § 61-1-13(1)(ee)(i). Utah applies the federal *Howey* test to determine whether an investment is an investment contract and regularly consults federal authority when interpreting its securities laws. *Payable Accounting Corp. v. McKinley*, 667 P.2d 15, 17–19 (Utah 1983); *State v. Schwenke,*

2009 UT App 345, ¶ 12 n.2, 222 P.3d 768. A recent decision from this District held that an analogous Millrock-promoted TIC and leaseback arrangement plausibly constituted an investment contract under *Howey*. *Goldsmith v. Long*, No. 2:24-cv-00499-AMA-CMR, ECF No. 114, at 12–16 (D. Utah July 28, 2026).

The Millrock Defendants and Adam Long argue that the TIC interests are categorically excluded from the Utah Uniform Securities Act's definition of a security. Millrock MTD at 12; Adam Long MTD at 11–12. But the statutory exclusion does not apply to any TIC interest. Its application depends on facts that Defendants cannot establish from the SAC.

The UUSA excludes:

> (II) an undivided fractionalized long-term estate in real property that consists of 10 or fewer owners; or
> (III) an undivided fractionalized long-term estate in real property that consists of more than 10 owners if, when the real property estate is subject to a management agreement:
> (Aa) the management agreement permits a simple majority of owners of the real property estate to not renew or to terminate the management agreement at the earlier of the end of the management agreement's current term, or 180 days after the day on which the owners give notice of termination to the manager; and
> (Bb) the management agreement prohibits, directly or indirectly, the lending of the proceeds earned from the real property estate or the use or pledge of its assets to a person or entity affiliated with or under common control of the manager.

Utah Code § 61-1-13(1)(ee)(ii)(C)(II)–(III).

The exclusion therefore turns on the number of owners and, if there are more than ten, the existence and contents of the applicable management

agreement. Defendants must establish from the face of the pleadings either that a property had ten or fewer owners or that the management agreement contained both protections required by subsections (Aa) and (Bb).

The recent *Weber* order rejected the same categorical argument. The court held that the UUSA "does not categorically exempt TIC interests from the definition of 'security.'" *Weber v. Colliers International Group, Inc.,* No. 2:25-cv-00162-DBB-DBP, ECF No. 216, at 41 (D. Utah June 8, 2026). Instead, whether a TIC interest falls within the exclusion depends on facts including "the number of owners, the existence of a management agreement, and whether the management agreement permits or prohibits certain actions." *Id.*

*Weber* further held that the exclusion operates as an affirmative defense. *Id.* at 41–42. Plaintiffs need not anticipate and disprove that defense in the SAC; Defendants bear the burden of establishing it. *Id.* Dismissal based on an affirmative defense is proper only when the complaint "admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Id.* at 42 (quoting *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)).

Defendants cannot make that showing here. The SAC does not establish the total number of owners at each property or the contents of every applicable management agreement. It therefore does not establish whether subsection (II) or subsection (III) governs, much less whether an applicable agreement satisfies

33

both subsections (Aa) and (Bb). Resolving those questions would require facts and documents beyond the pleadings.

That is precisely why *Weber* declined to dismiss the Utah state-securities claims. Because the complaint did not establish the number of owners or the contents of the management agreements, the court could not conclude that the exclusion applied. *Weber*, ECF No. 216, at 42. The same reasoning informs the analysis here.

Defendants may attempt to prove after discovery that the TIC interests fall within the statutory exclusion, but they cannot obtain dismissal by presuming facts the SAC does not establish and drawing inferences in their own favor. Whether the TIC interests are excluded from the UUSA cannot be resolved through these Rule 12(b)(6) motions.

### b.  The State Securities-Fraud Claims Satisfy Rule 9(b)

The Fourth Cause of Action alleges securities fraud under Utah Code § 61-1-1 and the specific securities-fraud statutes of the other applicable states. SAC ¶¶ 981–90 & n.1. It also alleges the sale of unregistered securities under Utah Code § 61-1-7. *Id.* ¶¶ 987–88.  Plaintiffs' state securities claims are pleaded with sufficient rule 9(b) particularity for the same reasons that Plaintiffs' federal securities claims meet rule 9(b) and PSLRA standards.

The SAC identifies the representations and omissions supporting the fraud claims, including statements concerning due diligence, tenant viability, lease security, guarantees, bonds, rent payments, property completion, projected returns, investment risk, and the legal status of the TIC interests. *Id.* ¶¶ 245–301, 342–685, 903–04, 951–62. It identifies the Offering Memoranda and Marketing Materials through which the representations were disseminated, the Plaintiffs and transactions involved, why the representations were false or misleading, and the resulting losses. *Id.*

Defendants' particularity arguments examine the concluding paragraphs of the Fourth Cause of Action without the detailed allegations incorporated into it. The SAC need not repeat under each count the facts already pleaded concerning each Defendant's conduct and each Plaintiff's transaction.

The SAC identifies the particular Offering Memoranda and Marketing Materials, quotes the challenged representations, explains why they were misleading, and alleges the roles through which the moving Defendants developed, approved, disseminated, or implemented them. SAC ¶¶ 71, 171–186, 504–555, 648–652.

Brent Smith identified tenants and properties and arranged the leases, guarantees, bonds, and financial terms used to package the offerings. *Id.* ¶¶ 173, 179–80. He also participated in post-investment representations concerning the

source of rent payments, completion and operation of the properties, Neuragenex's viability, and the Naperville capital call. *Id.* ¶¶ 743–48, 866–70, 903(c), (d), (f).

Thomas Smith supplied financial support, "Oversight & Leadership," "Accountability oversight," and mandatory sales training. *Id.* ¶¶ 181–86. Millrock acquired interests in the properties, entered material development and lease agreements, authorized development disbursements, and directly sold TIC interests to Plaintiffs. *Id.* ¶¶ 309–11, 772, 779, 807–15. Hello Bello also directly owned and sold TIC interests, while its principal, Samuel Duke, served as Millcreek's Head of Marketing and controlled its marketing programs, website, materials, lead generation, and capital-raising efforts. *Id.* ¶¶ 75–77, 807–15.

Cramer approved the agreement through which Colliers partnered with Kevin Long and his affiliates to provide brokerage, due-diligence, marketing, commission, and sales-training functions. *Id.* ¶¶ 174–75. He then mentored the agents who marketed the offerings. *Id.* ¶ 178.

These allegations identify the misrepresentations, publications, transactions, and each moving Defendant's participation. They provide the notice Rule 9(b) requires.

The PSLRA's strong-inference requirement does not govern the state claims. Rule 9(b) expressly permits knowledge and intent to be alleged

generally. Fed. R. Civ. P. 9(b). Defendants therefore cannot import the federal scienter standard into the Fourth Cause of Action.

### c. The SAC Adequately Pleads the Applicable State-Securities Claims

The Millrock Defendants argue that Plaintiffs cannot plead claims under non-Utah securities laws by identifying the applicable statutes. Millrock MTD at 12–13. But Plaintiffs' pleaded state securities statutes are not unrelated legal regimes. They are state-specific versions of a shared securities-law framework derived from the federal securities laws and the Uniform Securities Acts. In applying an analogous Uniform Securities Act provision, the Tenth Circuit recognized that the state act was intended to be "read in coordination with the related federal securities provision." *MidAmerica Federal Savings & Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249, 1254–56 & n.3 (10th Cir. 1989). Utah likewise recognizes that, "[b]ecause most state blue sky laws and the federal securities acts are similar, states frequently rely on federal case law in interpreting state security acts." *Payable Accounting Corp. v. McKinley*, 667 P.2d 15, 17 (Utah 1983).

Consistent with those principles, *Weber* rejected the same argument. The complaint there identified the specific state securities-fraud provisions allegedly violated, and the court held that those citations provided adequate notice of the statutes and their requirements. *Weber*, ECF No. 216, at 42–43. The same

statutory text and pleading principles apply here, and the Court should reach the same conclusion.

The SAC identifies the applicable California, Georgia, Massachusetts, Pennsylvania, Illinois, Delaware, New Jersey, Montana, Washington, Utah, Texas, and Missouri provisions. SAC ¶ 981 n.1. Those provisions are nearly identical to Rule 10b-5 or prohibit the same core securities-fraud conduct addressed by the Rule. *See* Cal. Corp. Code § 25401; Ga. Code Ann. § 10-5-50; Mass. Gen. Laws ch. 110A, § 101; 70 Pa. Stat. § 1-401; 815 Ill. Comp. Stat. 5/12(F), (G), (I); 6 Del. C. § 73-201; N.J. Stat. Ann. §§ 49:3-52(a)–(c), 49:3-71(a); Mont. Code Ann. § 30-10-301(1); Wash. Rev. Code § 21.20.010; Utah Code § 61-1-1; Tex. Gov't Code §§ 4007.203(a), 4008.052; Mo. Rev. Stat. § 409.5-501. The SAC then pleads the misrepresentations, omissions, and deceptive conduct underlying those claims. SAC ¶¶ 245–301, 342–685, 903–904, 951–962, 981–986. The Fifth and Sixth Causes of Action likewise identify substantially parallel state provisions governing broker and agent licensing and material assistance and plead the unlicensed sales and assistance supporting those claims. SAC ¶¶ 991–1002 & nn.2–3. Rule 9(b) does not require Plaintiffs to repeat those allegations in separate counts for each state.

## VI.   THE SAC ADEQUATELY PLEADS COMMON-LAW FRAUD, FRAUDULENT CONCEALMENT, NEGLIGENT MISREPRESENTATION, AND NEGLIGENCE

The motions' challenges to these claims are unavailing.[2] The SAC identifies the challenged misrepresentations and omissions, the circumstances in which they were made or concealed, and the involvement of the Defendants against whom each claim is asserted. The SAC adequately pleads common-law fraud, fraudulent concealment, negligent misrepresentation, and negligence.

### a.  Common-Law Fraud and Fraudulent Concealment

Under Utah law, common-law fraud requires:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Fidelity National Title Insurance Co. v. Worthington,* 2015 UT App 19, ¶ 10, 344 P.3d 157. "To prevail on a claim [for] fraudulent nondisclosure, a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed

---

[2] The Seventh, Eighth, and Tenth Causes of Action are not asserted against Adam Long, Brent Smith, Thomas Smith, Lew Cramer, Matthew Hawkins, Gil Borok, David Josker, Hello Bello, or Samuel Duke. Among the movants, those claims are asserted only against GTR Holdings, Long Holdings, Millrock, and Millrock Management.

to disclose, and (3) the nondisclosed information was material." *Anderson v. Kriser*, 2011 UT 66, ¶ 22, 266 P.3d 819.

As the Utah Court of Appeals has explained: "A person cannot be liable for fraud unless he made the false representations himself, authorized someone to make them for him, or participated in the misrepresentation in some way, such as through a conspiracy." *Russell/Packard Development, Inc. v. Carson*, 2003 UT App 316, ¶ 29 n.12, 78 P.3d 616, quoting *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 792 (Utah Ct. App. 1987). Under Rule 9(b), knowledge may be alleged generally.

The moving entities' Rule 9(b) arguments fail for the reasons addressed above in connection with Plaintiffs' federal securities-fraud claims. The SAC identifies the specific misrepresentations and omissions, the investors to whom they were communicated, the properties and transactions involved, and the facts making the statements false or misleading. SAC ¶¶ 245–301, 504–509, 603–685, 724–797, 903–910. Plaintiffs further plead reliance and resulting damages. SAC ¶¶ 686–687, 951–959, 1003–1008.

The SAC also connects the moving entities to those representations through both direct participation, authorization, ratification, and conspiracy which make them liable under *Russell/Packard Development*. Millrock owned and directly sold TIC interests to Plaintiffs, entered the development and lease

40

agreements material to Plaintiffs' investment decisions, and participated in developing and executing the TIC Program. SAC ¶¶ 309–311, 779–780, 807–815. Millrock and its agents (including Brent Smith and Kevin Long) represented that Plaintiffs were receiving tenant rent when the payments came from Millrock, Millcreek, or Plaintiffs' invested funds; represented that the properties would become operational imminently; and misrepresented the litigation supposedly pursued for Plaintiffs' benefit. SAC ¶ 903(c)–(e). Millrock Management directed, permitted, and knew of Millrock's conduct. SAC ¶¶ 33–34.

GTR and Long Holdings were not remote entities with only incidental connections to the speakers. They were principals of Millcreek, controlled by Brent Smith and Adam Long, respectively, and knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 58–59, 67–68, 1092. Their principals participated in developing the offerings, structuring the leases and guarantees, managing Millrock, training the sales agents, and coordinating the marketing and transactional commission arrangements through which the misrepresentations reached Plaintiffs. SAC ¶¶ 65–71, 173, 177–180. The SAC further alleges that the moving entities joined the combination to induce Plaintiffs' investments and continue concealing the fraud, that their agreement was express, tacit, or implied and was manifested through express communications and coordinated conduct, and that the participants committed

41

the pleaded misrepresentations and omissions in furtherance of that shared objective. SAC ¶¶ 1060–1064.

Thus, the SAC does not seek to impose fraud liability merely because the moving entities were affiliated with a speaker. It alleges that they made, authorized, ratified, or participated in the misrepresentations and participated in the pleaded conspiracy in furtherance of which the fraud was committed. SAC ¶¶ 33–34, 58–71, 173, 177–180, 807–815, 903(c)–(e), 1060–1064.

The fraudulent-concealment claim is also adequately pleaded. The SAC alleges that the Colliers/Long Parties held themselves out as having superior knowledge, expertise, and access to information concerning the TIC investments, while Plaintiffs lacked comparable experience, knowledge, and access to information, particularly because of the timing and technical requirements of Section 1031 exchanges. SAC ¶¶ 229–239, 1021–1030, 1034. The moving entities participated in the same coordinated enterprise and knew of, authorized, or ratified the conduct through which the material information was withheld. SAC ¶¶ 33–34, 58–71, 1060–1064. The SAC further alleges their participation in the coordinated combination formed to induce Plaintiffs' investments and continue concealing the fraud. SAC ¶¶ 58–71, 108, 1060–1064. The SAC identifies that withheld information, including the absence of the advertised bond, the financial and operational condition of the tenants and

guarantor, the status of renovations and equipment purchases, and the investments' likely noncompliance with Section 1031. SAC ¶ 1035.

### b. Negligent Misrepresentation

Utah permits recovery when a defendant with a pecuniary interest in a transaction, who is in a superior position to know the material facts, carelessly or negligently supplies false information upon which the defendant should reasonably foresee another will rely. *Price-Orem Investment Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986). The claim is not redundant merely because Plaintiffs plead fraud based on the same representations. Negligent misrepresentation does not require the intentional mental state required for fraud and may be pleaded as an alternative theory. *Id.* at 60 n.2.

Among the present movants, the Eighth Cause of Action is asserted only against Millrock, Millrock Management, GTR, and Long Holdings—not Adam Long individually. The SAC identifies the particular written and oral representations, the persons who communicated them, their recipients, and the means and approximate times of communication. It further expressly includes all four entities among the Colliers/Long Parties and alleges that those parties developed the Marketing Materials containing those representations. SAC ¶¶ 71, 245-279, 504, 510–555. It identifies the investor communications through which those representations were conveyed and alleges in detail why the

43

representations concerning the tenants, rent, leases, guarantees, bond protection, renovations, property values, and investment risks were false. SAC ¶¶ 603–685, 724–797. The SAC also supplies bases for attributing the information to each entity. Spencer Taylor, alleged to be Millrock's agent, reviewed the Marketing Materials and distributed them to Plaintiffs. SAC ¶¶ 46, 309–312, 504–509, 807–815. Kevin and Adam Long owned Millrock Management and together managed Millrock as it developed the TIC Program; Millrock Management directed, permitted, and knew of Millrock's conduct. SAC ¶¶ 33–34, 177. The MOU likewise states that the Fund paid Fund Management fees to manage its assets and to evaluate properties. Ex. A. GTR and Long Holdings were members of Millcreek and knew of, authorized, supervised, and ratified Millcreek's conduct. SAC ¶¶ 33–34, 57–59, 67–68, 807–815, 903(c)–(e), 1092. Those allegations are reinforced by the roles of their respective owners: Brent Smith helped develop the offerings and structure their leases, guarantees, bonds, and financial terms, while Adam Long managed Millrock during the Program's development and mentored its sales agents. SAC ¶¶ 65–66, 173, 177–180.

Those roles plausibly establish both a pecuniary interest in the sales and superior access to the facts being represented. Millrock was a seller that profited from selling the TIC interests at inflated prices; Millrock Management directed its conduct, and GTR and Long Holdings were principals of Millcreek, which

44

received transaction-generated commissions and marketing fees. SAC ¶¶ 689–719, 807–815, 1092. The SAC alleges that Millcreek received at least $127,920.10 in such fees from Plaintiffs' transactions. SAC ¶¶ 697–719. The entities' roles in owning, managing, evaluating, developing, and selling the offerings also placed them in a superior position to know the facts concerning the properties, leases, tenants, guarantees, renovations, and offering terms. SAC ¶¶ 134, 173, 177–180, 779–780, 807–815.  The SAC alleges that the representations were made to induce Plaintiffs' purchases, that Plaintiffs justifiably relied on them, and that the resulting investments caused pecuniary loss. SAC ¶¶ 1016–1020. These allegations identify the challenged information, how and to whom it was communicated, why it was false, and each moving entity's alleged connection to its development, dissemination, management, or authorization. They adequately plead negligent misrepresentation.

### c.  Simple Negligence

To state a negligence claim under Utah law, a plaintiff must plead that the defendant owed a duty of care, breached that duty, and proximately caused the plaintiff's damages. *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228. Adam Long and the Colliers executives argue that the SAC identifies no relationship or conduct giving rise to a duty of care. Utah distinguishes between affirmative conduct and a mere failure to act. A defendant who affirmatively

acts ordinarily must exercise reasonable care to avoid creating a foreseeable risk of harm, while liability for failing to protect another from a risk the defendant did not create generally requires a special relationship or another independent source of duty. *B.R. ex rel. Jeffs*, 2012 UT 11, ¶¶ 7–10. The SAC identifies affirmative functions these Defendants undertook within the operation that sold the TIC interests—approving the Colliers/Long partners, directing and supervising the participating entities, controlling Colliers' branding, training sales agents, and managing the development and sale of the offerings. Having undertaken those functions in connection with the development, approval, supervision, and operation of the TIC sales program, they were required to exercise reasonable care in performing them.

The SAC alleges that Borok and Hawkins managed Colliers Intermountain. Borok also led Colliers' United States division as its President and CEO and led the region that included Utah. Hawkins oversaw CIGI's legal, corporate, and regulatory status and oversight of significant legal matters involving its North American subsidiaries as Vice President and Legal Counsel. SAC ¶¶ 11–13. Josker was President of Colliers' Western Region Brokerage and responsible for the performance and entrepreneurial initiatives of the Utah office. He also approved draw payments for the agents selling the TIC offerings. SAC ¶¶ 14–16. Josker's alleged approval of draws for agents participating in the

TIC training and sales program supports a duty to exercise reasonable care in that compensation and authorization function, including reasonable care in confirming that the compensated agents operated within the approved brokerage and training structure

The SAC also alleges that Borok, Hawkins, and Josker simultaneously served as officers or managers of Colliers International North Texas, a Colliers subsidiary previously sued over a materially similar transaction involving a nonpaying medical tenant. SAC ¶¶ 17–21. That prior, similar controversy made the danger of inadequately supervised medical-tenant offerings foreseeable to executives charged with legal, regulatory, and brokerage oversight, particularly Hawkins, whose alleged responsibilities included CIGI's regulatory status and oversight of significant legal matters involving its North American subsidiaries. More directly, the SAC alleges that Borok, Hawkins, and Josker knew of and instructed, ratified, or approved Colliers' use of its name and logo in the TIC Program, but failed to adequately regulate, train, monitor, or supervise the agents who used that institutional credibility to sell the offerings. SAC ¶¶ 5–8, 11–21, 1078–1081. Cramer led Colliers' Utah division as its CEO and approved the specific MOU through which Colliers partnered with Kevin Long and his affiliates to provide brokerage, due-diligence, marketing, and sales-training services for the TIC Program. SAC ¶¶ 162, 174–175. Cramer also mentored the

47

sales agents who marketed the investments. SAC ¶ 178. Having undertaken responsibility for approving the partnership and training its sales force, Cramer was required to exercise reasonable care in performing those functions that placed the TIC offerings before Plaintiffs. The SAC alleges that he failed to ensure that the agents were properly trained and supervised or that the properties, tenants, guarantees, bonds, and offering materials were reasonably investigated, vetted, and approved before being marketed under Colliers' name. SAC ¶¶ 174–178, 1083–1086.

The SAC alleges affirmative acts, such as payment authorization, management, approval, ratification, and agent training, as well as omissions, such as failure to adequately supervise or regulate Colliers' activities and the Colliers/Long TIC Program, despite Colliers' awareness of materially similar prior fraudulent TIC schemes. The SAC identifies the authority Borok, Hawkins, and Josker exercised over the relevant subsidiary and sales operation, Josker's approval of payments to the sales agents, and Cramer's approval and implementation of the partnership and training program. SAC ¶¶ 11–21, 174–178. These Defendants were actionably careless in the performance of their duties, to Plaintiffs' detriment.

Adam Long likewise performed operational functions in an actionably careless fashion. Adam worked from Colliers' executive offices and mentored

the agents who marketed the investments. SAC ¶¶ 177–178. Adam was a founding partner and agent of Millcreek and represented that he was the Chief Operating Officer of Colliers' Utah division and Director of Special Projects for its United States division. SAC ¶¶ 65–66. He co-owned Millrock Management and jointly managed Millrock while it developed the TIC Program. Long Holdings, Adam's wholly owned entity and a principal of Millcreek, knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 67–68, 1092. Those allegations support a duty to exercise reasonable care in managing the entities and training and supervising the agents responsible for developing and selling the investments.

The Millrock Defendants likewise assumed operational responsibilities affecting Plaintiffs. Brent Smith developed and marketed the offerings, selected tenants and properties, and structured the leases, guarantees, bonds, and other offering terms. SAC ¶¶ 173, 179–180. Thomas Smith supplied funding, oversight, accountability, and mandatory training for the Program's sales agents. SAC ¶¶ 181–186. Millrock developed the Program, entered the material development and lease agreements, and directly sold TIC interests to Plaintiffs. SAC ¶¶ 779–780, 807–815. Millrock also disbursed at least $9,381,669.99 to ADP for Keller construction and renovation work and allegedly authorized those disbursements without verifying that the work had been completed or that meaningful progress

had occurred. SAC ¶¶ 769–772. Those allegations identify Millrock's own affirmative conduct, not merely its failure to prevent wrongdoing by ADP. GTR was a Millcreek principal controlled by Brent that knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 58–59, 1092.

The identified breaches correspond to those undertaken responsibilities. Defendants failed to reasonably vet the tenants and guarantor, verify the promised bond, supervise the use of renovation and equipment funds, monitor the accuracy of the offering information, and oversee the agents and entities through which the investments were marketed and managed. SAC ¶ 1086. Plaintiffs relied on the resulting sales operation and invested approximately $8 million. SAC ¶¶ 686–687. They suffered losses when the tenants defaulted, the promised bond and guarantees proved ineffective or nonexistent, the renovations remained incomplete, and the properties could not produce the promised income or value. SAC ¶¶ 724–797, 1082, 1087. These allegations plausibly plead duty, breach, causation, and damages.

## VII.    THE SAC ADEQUATELY PLEADS BREACH OF FIDUCIARY DUTY

Among the moving Defendants, the Ninth Cause of Action is asserted against Brent Smith, GTR Holdings, and Long Holdings. It is not asserted against Adam Long personally or the individual Colliers Defendants.

Utah courts recognize a fiduciary relationship where one party places particular confidence in another who possesses superior knowledge or influence and undertakes to act for the first party's benefit. *First Security Bank of Utah, N.A. v. Banberry Development Corp.*, 786 P.2d 1326, 1333 (Utah 1990). *Banberry* does not require a contract expressly creating fiduciary duties. The relationship may arise from "the factual situation surrounding the involved transactions and the relationship of the parties to each other." *Id.* at 1332. Whether the parties' relationship involved the necessary trust, superiority, and influence is a fact-intensive inquiry. *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 29, 446 P.3d 96; *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 53 n.7 (Utah Ct. App. 1995).

The SAC alleges substantially more than an ordinary arm's-length sale. Defendants held themselves out as having superior skill, knowledge, training, and experience concerning the TIC transactions and affirmatively invited Plaintiffs to rely on their judgment. SAC ¶¶ 1021–1022. Plaintiffs were comparatively inexperienced, faced the timing and technical requirements of Section 1031 exchanges, and were prohibited from actively managing their investments. SAC ¶¶ 229–235, 1023–1024. Plaintiffs depended on Defendants to investigate the tenants and guarantors and possessed substantially less information about the tenants' finances, the flow of funds, the promised

renovations, and the investments' likely 1031 compliance. SAC ¶¶ 1026–1030. The SAC further alleges that Defendants accepted Plaintiffs' trust and confidence. SAC ¶ 1027. These facts plausibly plead the confidence, dependence, superiority, and influence relevant under *Banberry*.

The SAC ties Brent, GTR, and Long Holdings directly to that relationship. Brent played an instrumental role in developing, marketing, and selling the investments, including selecting tenants and properties and structuring the leases, guarantees, bonds, and other offering terms on which Plaintiffs were expected to rely. SAC ¶¶ 173, 179–180. He later communicated with Plaintiffs about rent payments, capital calls, property operations, and replacement tenants, reinforcing his continuing advisory and managerial role after the purchases. SAC ¶¶ 883, 903(c), (d), (f).

GTR and Long Holdings were principals of Millcreek controlled by Brent and Adam Long, respectively. They were aware of, permitted, supervised, ratified, and authorized Millcreek's conduct. SAC ¶¶ 58–59, 67–68, 1092. Through that conduct, Millcreek undertook to investigate and market the investments, manage their continuing operations, and provide the information and expertise Plaintiffs lacked. SAC ¶¶ 208–220, 1021–1031. Taken as true, these allegations describe relationships involving accepted trust, dependence, superior influence, and an undertaking to advise and act for Plaintiffs' benefit,

rather than ordinary arm's-length sales. Whether the relationships existed and operated as alleged cannot be resolved against Plaintiffs on the pleadings; accepting those allegations, the SAC plausibly supports recognition of fiduciary duties under *Banberry*.

## VIII.   THE SAC ADEQUATELY PLEADS CIVIL CONSPIRACY AND AIDING AND ABETTING

The Millrock Defendants and Adam Long argue that the conspiracy and aiding-and-abetting claims fail because the SAC does not plead an underlying tort committed by each of them. Cramer separately argues that the conspiracy allegations do not establish his agreement or knowledge and that Utah does not recognize aiding and abetting tortious conduct. None of these arguments warrants dismissal. The SAC adequately pleads underlying torts committed in furtherance of the Colliers/Long TIC Program, and neither derivative claim requires every participating Defendant to have personally committed the underlying tort. The SAC also pleads Cramer's agreement and substantial assistance through his approval, supervision, and implementation of Colliers' partnership with the Program.

### a.  Civil Conspiracy

Civil conspiracy requires a combination of two or more persons, an object to be accomplished, a meeting of the minds, one or more unlawful overt acts, and resulting damages. *Pohl, Inc. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944.

53

But "it is not necessary that each member of the conspiracy commit an unlawful act in furtherance of the conspiracy to be liable." *Pyper v. Reil,* 2018 UT App 200, ¶ 16, 437 P.3d 493. Thus, "'conspiracy to defraud requires proof of the underlying fraud,'" but not proof that every conspirator personally committed that fraud. *Lawrence v. Intermountain, Inc.,* 2010 UT App 313, ¶ 13 n.4, 243 P.3d 508. *Weber* recently applied that rule to the same alleged TIC program and held that an adequately pleaded fraud by one participant supplies the underlying tort for the conspiracy claim against the other participants. *Weber v. Colliers International Group, Inc.,* No. 2:25-cv-00162-DBB-DBP, Dkt. 216 at 58–59 (D. Utah June 8, 2026). *Goldsmith* also recently applied that principle to the same alleged enterprise. Even after dismissing direct fraud claims against certain alleged conspirators, the Court declined to dismiss the conspiracy claim because each conspirator need not personally commit the underlying tort. *Goldsmith v. Long,* No. 2:24-cv-00499-AMA-CMR, ECF No. 114, at 27–28 (D. Utah July 28, 2026).

The SAC alleges underlying fraud and other torts committed in furtherance of the Program. It further alleges that Adam Long, Cramer, and the Millrock Defendants joined the combination to induce Plaintiffs' investments and continue concealing the scheme, that their agreement was manifested through communications and coordinated conduct, and that participants committed unlawful overt acts to accomplish that objective. SAC ¶¶ 1060–1064.

Cramer approved Colliers' partnership with Kevin Long and his affiliates and helped mentor the Program's sales agents. SAC ¶¶ 174–178. Adam Long managed Millrock as it developed the Program and also mentored its sales agents. SAC ¶¶ 177–178. The Millrock Defendants developed, financed, marketed, and directly sold the TIC investments. SAC ¶¶ 173, 181–186, 807–815. These allegations plausibly plead agreement and participation regardless of whether each Defendant personally committed every underlying tort.

### b. Aiding and Abetting

At minimum, the Thirteenth Cause of Action states a recognized claim for aiding and abetting breach of fiduciary duty. Utah recognizes that claim when a defendant knowingly participates in a fiduciary's breach. *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 46, 446 P.3d 96; see also *Zurich American Insurance Co. v. Ascent Construction, Inc.*, No. 1:20-cv-00089, 2022 WL 102256, at *7 (D. Utah Jan. 3, 2022). The SAC asserts an underlying fiduciary-duty claim against Brent Smith, GTR Holdings, and Long Holdings and alleges that Defendants knowingly assisted the conduct constituting those breaches. SAC ¶¶ 1021–1031, 1065–1074. An aider and abettor need not itself owe Plaintiffs a fiduciary duty or personally commit the underlying breach.

The Millrock Defendants' and Adam Long's argument therefore applies the wrong standard. The relevant question is whether the SAC pleads an

underlying fiduciary breach and their knowing participation in it, not whether each aider and abettor personally committed a separate tort. The SAC alleges that they assisted the operation through which Plaintiffs were induced to entrust their investments to the alleged fiduciaries by developing, financing, marketing, and selling the TIC Program; distributing its sales materials; facilitating the transactions; and directing investment proceeds to commissions and other compensation. SAC ¶¶ 1065–1074. Whether those allegations ultimately establish knowledge and substantial assistance presents a factual question; the absence of an underlying tort personally committed by each aider and abettor does not require dismissal.

Cramer's reliance on *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1253 (D. Utah 2017), does not establish otherwise. *Rabo* observed that Utah courts had "not yet recognized" aiding and abetting fraud; it did not address Utah's recognized cause of action for aiding and abetting breach of fiduciary duty. The Thirteenth Cause of Action incorporates Plaintiffs' fiduciary-duty theory and is not limited to aiding and abetting fraud. SAC ¶¶ 1065–1074. The SAC also alleges that Cramer approved Colliers' participation in the Program and personally mentored the agents through whom it was implemented. SAC ¶¶ 174–178; Ex. A, MOU. Cramer therefore cannot obtain dismissal of the entire

56

claim by characterizing it exclusively as an unrecognized claim for aiding and abetting fraud.

## IX.   THE SAC ADEQUATELY PLEADS UNJUST ENRICHMENT

Unjust enrichment requires a benefit conferred on the defendant, the defendant's knowledge of the benefit, and retention of the benefit under circumstances making it inequitable to do so. *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754. The moving Defendants argue that the SAC fails to identify a direct benefit received by each of them. But the SAC identifies the benefits as commissions, marketing fees, compensation, and direct use of Plaintiffs' investment proceeds, and connects those benefits to the transactions through which Plaintiffs purchased the TIC interests. SAC ¶¶ 689–719, 935–938, 1053–1054, 1151–1154.

The SAC identifies Millrock, Hello Bello, and Samuel Duke as prior owners who sold TIC interests to Plaintiffs at inflated prices, thereby receiving the proceeds of Plaintiffs' purchases. SAC ¶ 943(c). *Goldsmith* likewise rejected Millrock's argument that no benefit had been adequately pleaded, holding that an investor's payment to a Millrock entity, together with allegations that the proceeds were intermingled and used by Millrock, supported a reasonable inference that Millrock received a benefit. *Goldsmith v. Long*, No. 2:24-cv-00499-AMA-CMR, ECF No. 114, at 25–26 (D. Utah July 28, 2026).

The SAC also specifically names Brent Smith, Thomas Smith, Adam Long, Lew Cramer, and Samuel Duke as participants in the TIC Program whose business relationships included transactional commission payments. SAC ¶ 69. It further alleges that each Defendant received commissions or other compensation from the sales, that the value of commissions received by each exceeded $5,000, and that Defendants knew of those benefits because they directly received or used the investment proceeds. SAC ¶¶ 937, 1053–1054, 1151–1153. Considered together, these allegations identify the asserted benefit, its source, and the named Defendants' connection to its receipt.

The SAC identifies GTR and Long Holdings as principals of Millcreek, alleges that they authorized Millcreek's conduct, and alleges that income derived from the Program was used to establish or operate those entities. SAC ¶¶ 58–59, 67–68, 1092, 1127–1128. Those allegations, together with the SAC's express allegations that each Defendant received commissions, compensation, or direct use of investment proceeds, plausibly allege that GTR and Long Holdings obtained and knowingly retained investment-derived benefits. SAC ¶¶ 1151–1154.

*Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, 355 P.3d 1000, does not require dismissal. There, the court ruled on an undisputed summary-judgment record that the individual defendants were third parties to the

58

plaintiff's employment relationship with his law firm and received only incidental benefits from his work. *Id.* ¶¶ 64–70. Here, the SAC alleges that the relevant Defendants were active participants in the transactions through which Plaintiffs' money was obtained and distributed, specifically connects several of them to transactional commission payments, and alleges that they directly received or used the resulting proceeds. Those allegations must be accepted as true. The precise allocation and ultimate retention of the proceeds present factual questions that cannot be resolved from the pleadings.

## X. THE SAC ADEQUATELY PLEADS ELDER ABUSE

The Millrock Defendants and Long Holdings argue that Jose Rementeria and Charles Brauer did not personally suffer financial loss because their TIC interests were purchased through an LLC or trust. The Millrock Defendants also argue that the SAC does not plead their participation in financial exploitation. Neither argument supports dismissal. The Eleventh Cause of Action is asserted against Millrock Investment Fund 1, GTR Holdings, Millrock Investment Fund 1 Management, and Long Holdings, among others. SAC at 225–26. It is not asserted against Brent Smith, Thomas Smith, Hello Bello, or Samuel Duke. To the extent the Millrock Motion seeks dismissal of the Eleventh Cause of Action as to those four Defendants, it seeks dismissal of a claim Plaintiffs did not bring against them.

Utah law provides a private right of action to "[a] vulnerable adult who suffers harm or financial loss as a result of exploitation." Utah Code § 26B-6-213(1). A "vulnerable adult" includes an "elder adult," meaning an individual at least 65 years old. *Id.* § 26B-6-201(14), (35). Financial exploitation includes knowingly obtaining or using, by deception, a vulnerable adult's "funds, credit, assets, or other property" with the intent to deprive the vulnerable adult of their use or benefit. *Id.* § 76-5-111.4(2).

The SAC identifies nine Plaintiffs who were at least 65 when their investments were induced. SAC ¶¶ 1044–47. It alleges that Defendants occupied positions of trust or had business relationships with those Plaintiffs; knowingly obtained or used their funds, credit, assets, or property through deception; and intended to deprive them of the use or benefit of that property. *Id.* ¶¶ 1048–51. Defendants induced the investments through material misrepresentations and omissions to generate commissions, fees, and other benefits for themselves, thereby exposing the vulnerable Plaintiffs to an unreasonable risk of financial harm. *Id.* ¶¶ 1052–57.

### a. Purchasing Through an LLC or Trust Does Not Preclude Personal Financial Loss.

Whether a vulnerable adult suffered financial loss does not turn mechanically on whose name appears on the purchase documents. Utah's statute protects a vulnerable adult's "funds, credit, assets, or other property" and

60

provides a remedy for any "harm or financial loss" resulting from exploitation. Utah Code §§ 26B-6-213(1), 76-5-111.4(2). Nothing in that language requires the property to remain titled directly in the vulnerable adult's name at the time the loss occurs.

The recent *Weber* order rejected the same titleholder argument. *Weber v. Colliers International Group, Inc.*, No. 2:25-cv-00162-DBB-DBP, ECF No. 216, at 56–57 (D. Utah June 8, 2026). The court explained that the statute "only requires that the vulnerable adult suffer a harm or financial loss as a result of exploitation, not that any financial loss be against assets that are directly in the vulnerable adult's name." *Id.* at 56. Because the elderly plaintiffs invested their assets through a corporation they owned, the resulting diminution in the corporation's value could plausibly constitute a financial loss to them. *Id.* at 56–57.

That reasoning applies directly to Jose Rementeria. Jose and Teena Rementeria own Secure Self Storage, LLC, and Jose was 69 when their entity purchased interests in the Keller and Naperville Properties. SAC ¶ 110. Secure Self Storage invested approximately $566,000 in the Keller Property and another $160,800 in the Naperville Property. *Id.* ¶¶ 720(d), 723. The SAC does not allege merely that an unrelated LLC suffered a loss. Jose owned the entity, used it to complete the investment transaction Defendants solicited, and suffered a diminution in the value of that asset when the investment failed. Under *Weber*,

61

those allegations plausibly establish financial loss to Jose even though Secure Self Storage held the TIC interests.

The allegations concerning Charles Brauer likewise go beyond his service as a trustee for an unrelated beneficiary. Charles and Laura Brauer were trustees of Quest Realty Trust, were 70 and 64 when they purchased their Keller TIC interest, and are identified as the purchasers and owners of that interest. *Id.* ¶¶ 112, 720(c). They invested approximately $660,899.13. *Id.* ¶ 720(c).

The SAC thus identifies Charles's relationship to the trust, the transaction through which he and Laura purchased their interest, the amount invested, and the resulting loss.[3] At the pleading stage, these facts plausibly establish that the loss in value of the investment constituted a financial loss to Charles. The titleholder defense does not warrant dismissal.

### b. The SAC Plausibly Alleges the Moving Defendants' Participation.

Millrock played an instrumental role in developing the Colliers/Long TIC Program, entered development and lease agreements material to Plaintiffs' investment decisions, and directly sold TIC interests to Plaintiffs. SAC ¶¶ 807–15. The Rementerias specifically purchased their Keller interest from Millrock without that fact being disclosed during the sales process. *Id.* ¶ 585(c).

---

[3] Plaintiffs' Rule 7.1 Disclosure Statement identifies Charles and Laura Brauer as the members of Quest Realty Trust, further corroborating their asserted ownership relationship to the Trust. Dkt. 97 at 2.

Millrock also acted through agents and representatives who made and reinforced the misrepresentations used to obtain the vulnerable Plaintiffs' funds. Brent Smith was Millrock's agent and representative and helped develop the offerings by identifying tenants and properties and arranging the leases, guarantees, bonds, and financial terms used to market them. *Id.* ¶¶ 57, 173, 179–80. After Plaintiffs invested, Smith represented that the payments they received came from the tenants, that the properties would soon become occupied and operational, and that Neuragenex was a viable replacement tenant. *Id.* ¶ 903(c), (d), (f). He also participated in communications with Plaintiffs following the defaults to conduct capital calls and persuade them to accept replacement tenants based on incomplete or misleading information. *Id.* ¶ 883.

Spencer Taylor likewise acted as Millrock's agent and representative. *Id.* ¶¶ 44–46. The McQuearys, who were 70 and 69, were referred to Taylor for assistance identifying a suitable Section 1031 exchange investment. *Id.* ¶¶ 123, 611. Taylor represented that the tenant had signed the lease and begun paying rent, construction and renovations would be completed, and the McQuearys would have no difficulty selling or exchanging their TIC interest. *Id.* ¶¶ 611–12. The SAC alleges that those representations were false or misleading and induced the McQuearys to invest. *Id.* ¶¶ 611–12, 843, 849–50.

Millrock possessed direct knowledge contradicting these representations. It began paying HSMG's rent obligations in approximately December 2021 and later loaned HSMG at least $350,000 for "cash flow relief." *Id.* ¶¶ 724–34. Plaintiffs nevertheless continued receiving payments represented as rent from the tenant without disclosure that Millcreek or Millrock supplied the money. *Id.* ¶¶ 735–48, 903(c). These allegations connect Millrock and its representatives directly to the misrepresentations and concealed financial arrangements through which vulnerable Plaintiffs were induced to invest and retain their interests.

GTR Holdings, a member of Millcreek, knew of, permitted, supervised, ratified, and authorized Millcreek's conduct. *Id.* ¶¶ 58–59. The SAC also identifies GTR as one of the Colliers/Long Parties responsible for the program through which Defendants developed, marketed, and sold the TIC interests. *Id.* ¶ 71. Read together with the detailed allegations concerning that program and the exploitation of vulnerable Plaintiffs, these facts plausibly allege GTR's participation. *Id.* ¶¶ 132, 245–301, 1044–58.

The SAC identifies the vulnerable Plaintiffs, the misrepresentations used to obtain their funds, the participation of Millrock and its agents, GTR's authorization of Millcreek's conduct, and the resulting financial losses. Those allegations satisfy Rule 8.

## XI.    THE SAC ADEQUATELY PLEADS ITS CIVIL RICO CLAIMS

The motions advance two arguments. The Millrock Defendants contend that the PSLRA bars Plaintiffs' RICO claims and that the predicate acts are not pleaded with particularity. Adam Long and Cramer similarly argue that Plaintiffs must identify multiple predicate acts personally committed by each of them. Neither argument warrants dismissal.

### a.  The PSLRA Does Not Bar Plaintiffs from Pleading RICO in the Alternative

Rule 8 permits a plaintiff to plead alternative and inconsistent claims. Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs plead their RICO claims in the alternative because the Court has not yet adjudicated whether the TIC interests constitute securities for purposes of the federal securities laws. SAC ¶¶ 1088, 1136, 1145.

The same PSLRA argument was recently rejected in *Weber v. Colliers International Group, Inc.*, No. 2:25-cv-00162-DBB-DBP, Dkt. 216 at 64–65 (D. Utah June 8, 2026). The court distinguished *Bixler v. Foster*, 596 F.3d 751 (10th Cir. 2010), because the instruments in *Bixler* were indisputably securities. *Weber*, Dkt. 216 at 64–65. Where, as here, defendants dispute whether the TIC interests qualify as securities, the court cannot yet determine that the underlying conduct "would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). If the TIC interests are not securities, the conduct is not

65

actionable as securities fraud and the PSLRA bar does not apply. *Weber,* Dkt. 216
at 65.

The securities status of the TIC interests has not yet been adjudicated.
Plaintiffs plead RICO in the alternative because, if the Court concludes that the
TIC interests are not securities for purposes of the federal securities laws, the
alleged conduct would not have been actionable as securities fraud. At the
pleading stage, the PSLRA bar therefore does not independently require
dismissal of the alternative RICO claims. *Weber,* Dkt. 216 at 64–65.

### b.  Sections 1962(a) and 1962(d) Do Not Require Each Defendant to Have Personally Committed Two Predicate Acts

Adam Long, Cramer, and the Millrock Defendants incorrectly apply §
1962(c)'s personal-pattern requirement to every RICO claim. Section 1962(a)
reaches a defendant who receives income derived from a pattern of
racketeering in which the defendant participated as a principal and then uses or
invests that income in an enterprise. 18 U.S.C. § 1962(a). A "principal" includes a
person who aids, abets, counsels, commands, induces, or procures the
commission of an offense. 18 U.S.C. § 2(a). Section 1962(a) therefore does not
require the defendant to have personally made two fraudulent statements. *Weber
v. Colliers International Group, Inc.,* No. 2:25-cv-00162-DBB-DBP, Dkt. 216 at 62–63
(D. Utah June 8, 2026).

Nor must a RICO conspirator personally commit any predicate act. A defendant violates § 1962(d) when the defendant "adopts the goal of furthering the enterprise, even if the conspirator does not commit a predicate act." *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014); *Weber*, Dkt. 216 at 61–63. Accordingly, the motions' demand for multiple predicate acts personally committed by each defendant does not defeat the Fifteenth and Seventeenth Causes of Action.

The SAC alleges that Adam Long co-owned Millrock Investment Fund 1 Management with Kevin Long and jointly managed Millrock while it developed the Colliers/Long TIC Program. SAC ¶ 177. Adam, together with Cramer, mentored the sales agents who marketed the Program to investors. SAC ¶ 178. He received income derived from the Program and invested the proceeds in Axia and Long Holdings, entities through which the Program's business model and purported track record continued to be promoted. SAC ¶¶ 1092–1099, 1125, 1127. These allegations support the § 1962(a) claim and show that Adam adopted and furthered the enterprise's objective for purposes of § 1962(d). SAC ¶¶ 1146, 1148.

Cramer is named only in the § 1962(d) claim. The SAC alleges that, on Colliers' behalf, he approved the agreement through which Colliers partnered with Kevin Long and his affiliates to conduct the TIC Program through

67

brokerage, due-diligence, marketing, and sales-training activities. SAC ¶¶ 174–175. Cramer then worked with Adam Long to mentor the sales agents who marketed the TIC investments. SAC ¶ 178. These allegations show that Cramer agreed to and furthered the enterprise's objective. SAC ¶¶ 1147(a)–(c), 1148. His motion's demand for a personal predicate act imposes a requirement § 1962(d) does not contain.

The same rule defeats the Millrock Defendants' blanket argument that the § 1962(d) claim fails because the SAC does not attribute sufficiently particularized fraudulent statements to each of them. The SAC alleges that Brent Smith developed, marketed, and sold the Keller, Kennesaw, and Naperville investments; structured the leases, guarantees, bonds, and other offering terms; and used interstate communications to conduct capital calls and promote replacement tenants through false and incomplete information. SAC ¶¶ 173, 179–180, 883, 903(c), (d), (f). GTR was a principal of Millcreek controlled by Brent, and Brent used proceeds derived from the Program to establish and operate GTR and related enterprises. SAC ¶¶ 1092, 1125, 1128.

Millrock and Hello Bello directly sold TIC interests to Plaintiffs while participating in and furthering the Program's objectives. SAC ¶¶ 807–815. Millrock entered the development and lease agreements material to Plaintiffs' investment decisions and its agent, Brent Smith, later made representations

concerning the source of rent payments, the properties' operational status, and litigation supposedly being pursued for Plaintiffs' benefit. SAC ¶¶ 57, 812–815, 903(c)–(e). Samuel Duke, Hello Bello's principal and Millcreek's Head of Marketing, controlled the marketing campaigns, maintained the website, supplied marketing materials to the Program's partners, generated investor leads, and raised capital for the developments. SAC ¶¶ 809–811. Thomas Smith supplied funding, leadership, accountability oversight, and mandatory training for the Program's sales agents. SAC ¶¶ 181–186, 1147(d).

These allegations describe how each Millrock Defendant joined or furthered the common enterprise. SAC ¶¶ 1146–1148. Because § 1962(d) does not require each conspirator to have personally made a fraudulent statement or committed a predicate act, the Millrock Defendants cannot obtain dismissal of the conspiracy claim merely by asserting that the SAC fails to plead individualized predicate acts against each of them.

### c. The SAC Adequately Pleads Predicate Conduct Against Adam Long and the Millrock Defendants.

The allegations discussed above also identify the predicate conduct supporting the § 1962(c) claim. The SAC describes the participants' respective roles, the interstate communications used to market and administer the investments, and the particular misrepresentations through which the Program obtained and retained Plaintiffs' funds. SAC ¶¶ 173, 177–186, 807–815, 874–904.

Adam Long co-owned and managed Millrock Management while Millrock developed the TIC Program and worked with Cramer to mentor the agents through whom the Program marketed the investments. SAC ¶¶ 177–178. The SAC further alleges that Adam participated in the interstate enterprise through which standardized representations were repeatedly communicated to investors and that he received income derived from, and reinvested proceeds of, that operation. SAC ¶¶ 1092–1099, 1125, 1127, 1137–1142. Considered together with the transaction-specific interstate communications incorporated into the Sixteenth Cause of Action, these allegations plausibly support the predicate conduct and pattern required by § 1962(c) at the pleading stage.

Brent Smith developed and marketed the offerings, structured the leases, guarantees, bonds, and other offering terms, and later used interstate emails and video calls to conduct fraudulent capital calls and promote replacement tenants through false and incomplete information. SAC ¶¶ 173, 179–180, 883, 903(c), (d), (f). Millrock and Hello Bello directly sold TIC interests to Plaintiffs while withholding known defects, and Millrock's agent, Brent Smith, later misrepresented the source of rent payments, the properties' operational status, and the nature of litigation supposedly pursued for Plaintiffs' benefit. SAC ¶¶ 57, 807–815, 903(c)–(e). Samuel Duke controlled the Program's marketing campaigns, website, investor leads, and marketing materials. SAC ¶¶ 809–811.

70

GTR was controlled by Brent, and the SAC alleges that Brent used Program-derived proceeds to establish and operate GTR. SAC ¶¶ 1092, 1125, 1128.

These allegations, incorporated into the Sixteenth Cause of Action, provide the Millrock Defendants and Adam Long fair notice of the conduct and communications constituting the asserted pattern. Their motions cannot obtain dismissal by disregarding the incorporated allegations and treating paragraph 1141 as if it stood alone.

## XII. THE COURT SHOULD RETAIN JURISDICTION OVER THE REMAINING CLAIMS

Adam Long argues that the Court must dismiss Plaintiffs' state-law claims for lack of subject-matter jurisdiction if it dismisses the federal securities claims. That argument fails because, for the reasons explained above, Plaintiffs adequately plead their federal securities and civil RICO claims. The Court therefore retains original jurisdiction over those claims and supplemental jurisdiction over the related state-law claims. 28 U.S.C. §§ 1331, 1367(a).

Long also incorrectly treats dismissal of the federal claims under Rule 12(b)(6) as automatically eliminating subject-matter jurisdiction over the remaining claims. Even after dismissing all federal claims on the merits, a district court retains supplemental jurisdiction and has discretion whether to exercise it. *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009); 28 U.S.C. § 1367(c)(3). Here, Plaintiffs' federal and state claims arise from the

same TIC Program, transactions, misrepresentations, omissions, and resulting losses. Judicial economy, convenience, and consistency support resolving those interrelated claims together. Long's request to dismiss the state-law claims for lack of subject-matter jurisdiction should therefore be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss. To the extent the Court concludes that any cause of action requires additional factual particularity, Plaintiffs alternatively request leave to amend rather than dismissal with prejudice.

DATED this 31st day of July 2026.

DEISS LAW PC

*/s/ Andrew G. Deiss*
Andrew G. Deiss
Corey D. Riley
*Counsel for Plaintiffs*

# EXHIBIT A

## MEMORANDUM OF UNDERSTANDING

**TO:**      LEW CRAMER

**FROM:**    KEVIN G. LONG

**SUBJECT:** MILLROCK INVESTMENT FUND 1, LLC & MILLCREEK COMMERCIAL PROPERTIES

**DATE:**    SEPTEMBER 18, 2020

**CC:**      BRENT SMITH, J. ADAM LONG

# Basic Concepts

- We (the Smith family and the Long family) have formed a company to invest in quality long term debt free STNL properties (Millrock Investment Fund 1, LLC – "The Fund").

- Based on current fund capital the projected annual transaction volume to be processed through Colliers would be approximately $100 million.

- The fund acquires or develops real estate assets with the intent to market them for resale by syndicating them as real estate investments that fit a market need for appropriate investors in their IRAs and 401Ks as well as for 1031 exchange requirements of varying sizes.

- These high-quality assets are sold as Tenant-in-Common real estate with no debt when more than one investor is acquiring the property.

- The Fund retains The Kevin Long Team (via Colliers) as their exclusive agent for all acquisitions. The Fund documents allow the Kevin Long Team a minimum 2% commission for buyer representation on each acquisition.

- All acquisition commissions are processed through Colliers.

- The Fund lists the TIC resale product with The Kevin Long Team (via Colliers).

- The Fund is contracted with a marketing company (Millcreek Commercial Properties – "MCP") to brand the TIC properties and pays the unique marketing costs associated with this disruptive approach of marketing directly to non-conventional commercial real estate investors.

- Kevin Long in cooperation with J. Adam Long are the sole owners of the LLC that is the managing partner of the Fund (MillRock Investment Fund Management – "Fund Management").

- Both Kevin and Adam hold an equity stake in the Fund.

UC_64
50179.
1

COLLIERS-000144

- The Fund pays Fund Management a fee to manage the assets in the Fund.

- The Fund also pays Fund Management fees for property evaluation outside of commissions run through Colliers. This is recognized as a clear delineation of Colliers exclusion from any liability in relation to the underwriting of properties for acquisition.

- The Fund documents specifically indemnify Colliers as the Broker from any issues arising out of property selection.

- Colliers recognizes that as the Fund Manager, Kevin Long may acquire properties in states where he is not licensed due to there being no licensing requirements related to self-representation. Kevin Long may at his sole discretion decide to partner with a local Colliers office at which time the MCA guidelines would apply.

- The Fund is not owned by or otherwise affiliated with Colliers outside of its relationship as a brokerage client.

- There is a perpetual standard listing agreement in place between the Fund and Colliers covering any properties being marketed for sale by the Fund.

- The standard listing agreement specifies that the Fund pay Colliers in favor of the Kevin Long Team a 4% commission on all sales. The listing agent can offer 3% to cooperating brokers and retain only 1% on certain transactions as they see fit. At the client's discretion they may pay a listing commission larger than 4% in order to provide greater incentive to any agent involved in the transaction.

- The Kevin Long Team is paid on the standard Colliers Pleasant Grove split structure.

- The Fund has a separate agreement with MCP where MCP is compensated for marketing and client services based on the sales volume of the fund. This arrangement is handled entirely outside of the relationship between Colliers and the Fund.

- In cooperation with Colliers, the Kevin Long Team and MCP agree to create, implement and manage a quality new agent training and mentoring program. It is our goal to create a sales team and ongoing training program that supports Collier's goal of developing promising Jr agents to supplement our current teams.

- These Jr agents will sign a one-year contract with the Kevin Long Team at the end of which time period each Jr agent may choose to remain with the Kevin Long Team or move to another brokerage team within Colliers.

- **As part of this training Program MCP and Kevin Long will provide**
  - Product for agents to sell
  - A quality academic training platform
  - Mentoring from Kevin Long
  - Direct agent supervision and daily training
  - Marketing and contacts for the trainees
  - Recruiting of quality candidates

2

UC_64
50179.
1

COLLIERS-000145

- o    A guarantee of agents' draws to Colliers

- o    Other material, incentives, and tools as MCP deems necessary

- **As part of the training program Colliers will provide:**

    - o    A $2,500 per month per new associate commission advance from Colliers but guaranteed by Kevin Long. Colliers will advance the money against future production of each of up to four high quality Jr agent recruits which Colliers management will be closely integrated in the selection and hiring thereof. If at the end of year one for each Jr agent there is not a clear path to making Colliers financially whole, Kevin Long's commissions may be held to cover this expenditure leaving no risk to Colliers. Once a trainee has their draw repaid that draw can be assigned to another recruit. With the total draw outstanding balance not allowed to exceed $100,000.

    - o    Commissions to these individuals will be paid according to the Kevin Long Team split in conjunction with the Colliers Utah Junior Agent program.

    - o    General desk costs.

    - o    Support in the training program, including mentoring from Lew Cramer and Adam Long.

- Kevin Long currently receives an agent assistant allowance in the amount of $2,000 monthly. Said allowance shall increase to $2,500 per month beginning once the Team GCI exceeds $1 million in a calendar year, and shall adjust to covering a fully covered dedicated support team member when the team surpasses and maintains $1.5 million in annual GCI.

- MCP shall be charged office rent for individuals not directly associated with Colliers. The rental schedule for this space is as follows:

    1.  Cubicle - $250 per month

    2.  Interior office - $500 per month

    3.  Exterior office - $1,000 per month

- Rent shall be deducted from the monthly agent assistant allowance.

- At the writing of this memo, one interior office is utilized by the deputy fund manager and the investor relations manager. Therefore, the team is charged for one interior office and receives a net administrative assistant credit of $1,500 monthly.

- Colliers provides ongoing marketing support for listings according to their current policy related to sign expenditures calculated as a percentage of the potential Colliers commission. For avoidance of doubt, this amount shall be calculated based on the minimum 1% commission that Colliers can receive. According to Colliers policy, said marketing expenditures can be allocated to different mediums if usual signage is not required.

- All hard costs associated with the unique direct marketing approach will be born by the client through their marketing agreement with MCP. These include but are not

3

UC_64
50179.
1

limited to bulk printing costs, web page development and hosting for fund product, travel, hosting client events, and direct advertising costs.

- Colliers is identified as the broker on all brokerage marketing material in accordance with applicable state law and real estate commission requirements.

- Colliers provides standard support for all acquisition activities including the development of due diligence packages.

- The Kevin Long Team will still have access to all general Colliers pooled services such as GIS, graphic design, and general support. However, their utilization will likely be limited due to the support provided by MCP.

4

UC_64
50179.
1

COLLIERS-000147